# Exhibit 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**JANE DOE 1, individually and on**
**behalf of others similarly situated,**

      **Plaintiff,**

      **v.**                           **Case No. 1:16-cv-10877**

**DEJA VU SERVICES, INC., f/k/a**       **Hon. Steven J. Murphy, III**
**DEJA VU CONSULTING, INC. a**
**Michigan Corporation; DV**
**SAGINAW, LLC, a Michigan**
**Limited Liability Company, d/b/a**
**DEJA VU SHOWGIRLS and ;**
**HARRY MOHNEY, an individual**

      **Defendants.**
_____/

**RELEASE AND SETTLEMENT AGREEMENT**

**I.**    **INTRODUCTION**

    1.1    This Release and Settlement Agreement (which, together with all attached exhibits, is referred to collectively herein as the "Agreement") is entered into between Plaintiff Jane Doe 1 (sometimes "Named Plaintiff") and Jane Doe 2 who intends to be added as a party plaintiff and Class Representative[1] to this Action pursuant to the terms of this Agreement, on behalf of themselves and all others similarly situated (the Named Plaintiff, Jane Doe 2 and all others similarly situated are collectively referred to hereafter as the "Plaintiffs"), and Defendants DV

---

[1] Capitalized terms and phrases contained in this Introduction and in the Recitals portion of this Agreement are specifically defined in Article III herein or elsewhere in this Agreement.

Saginaw, LLC (sometimes hereafter "Deja Vu Saginaw"), Deja Vu Services, Inc. (formerly known as Déjà vu Consulting, Inc. and hereafter "Services"), and Harry Mohney ("Mohney"), along with all of the additional Affiliated Entities identified on Exhibit A attached hereto and incorporated by reference (Deja Vu Saginaw, Services, Mohney, and the Affiliated Entities are collectively referred to in the balance of this Agreement as the "Defendants").  This Agreement settles collective claims – except those specifically reserved herein – brought pursuant to the provisions of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq*. -- the "FLSA") and class action claims under various state labor laws pursuant to Federal Rule of Civil Procedure Rule 23 ("Rule 23").  Upon execution of this Agreement, Final Approval by the Court, and the Judgment becoming Final, it is the express intent of the Parties to resolve all Claims – those specifically reserved herein –  which were brought (both initially and by way of the amendment permitted under this Agreement), or which could have been brought, by the Class Representatives, by all "opt in" Class Members who file a Consent to Join this Action, and by all Class Members who have declined to opt out of the Settlement as set forth in this Agreement and who therefore constitute the Rule 23 Settlement Class. The Settlement shall become operative upon the date that the Judgment becomes Final, and will then constitute a full, final, and binding settlement agreement.

## II.   **RECITALS**

2.1     On June 25, 2008, an individual identified as Jane Doe 1 (the "Cin-Lan Plaintiff") filed suit in the United States District Court for the Eastern District of Michigan, Southern Division, Case No. 2:08-cv-12719, alleging that she and all Entertainers who Performed at Cin-Lan, Inc. ("Cin-Lan") and/or at eight (8) other  identified adult entertainment establishments in Michigan were misclassified as non-employees or as "independent contractors" by their alleged employer, Cin-Lan, and also contending that Deja Vu Consulting, Inc. ("Consulting," now

"Services") was their joint employer (the "Cin-Lan Action"). The Cin-Lan Plaintiff claimed that this alleged misclassification resulted in her sustaining certain losses, including not being paid minimum wages, being subjected to impermissible tip sharing, and not being provided other employee benefits, all of which she contended was actionable under the FLSA and the Michigan Minimum Wage Act ("MWL"). That action was assigned to the Hon. Stephen J. Murphy, III of this Court.

2.2     Mohney was later added as a defendant to the Cin-Lan Action wherein the Cin-Lan Plaintiff alleged that he was her joint employer as well.

2.3     The defendants in the Cin-Lan Action, Cin-Lan, Consulting and Mohney (the "Cin-Lan Defendants"), vigorously contested the joint employer allegations as well as the misclassification claims asserted by the Cin-Lan Plaintiff, and filed Counterclaims against her and against the putative class for, among other things, offset, breach of contract, fraud and unjust enrichment.

2.4     Following comprehensive discovery and the undertaking of extensive motion practice, which resulted in, among other things, this Court refusing to dismiss the Cin-Lan Defendants' counterclaims against the Cin-Lan Plaintiff and the putative class, the parties to the Cin-Lan Action engaged in lengthy settlement negotiations that extended over more than a six (6) month period, in an effort to reach a resolution of the Cin-Lan Action. Such negotiations resulted in extending the scope and resolution of the Cin-Lan Action to include Entertainer Claims against all exotic dance establishments then-affiliated with Consulting (the "Consulting-Affiliated Clubs"), which included Deja Vu Saginaw. That resolution was ultimately approved by the Court (the "Cin-Lan Settlement") in 2011.

2.5     At the time of the settlement negotiations surrounding the Cin-Lan Action, seven (7) substantially similar lawsuits and three (3) state labor claims were pending that all alleged that Entertainers Performing at certain Consulting-Affiliated Clubs were misclassified as non-employees or as "independent contractors." These comprised:

(1)     *Arfat v Deja Vu North Hollywood* (Los Angeles Superior Court, Case No. BC367362), filed March 5, 2007;

(2)     *Hills v Deja Vu City of Industry* (Los Angeles Superior Court, Case No. BC 385610), filed February 14, 2008;

(3)     *Trauth v Deja Vu City of Industry* (Los Angeles Superior Court, Case No. BC 427315), filed December 4, 2009;

(4)     *Doe v Pacers/Hustler San Diego* (San Diego Superior Court, Case No. 37-2009-00097991-CU-OE-CTL), filed September 24, 2009 (dismissed without prejudice);

(5)     *Doe v CBDM* (Deja Vu Kearney Villa) (San Diego Superior Court, Case No. 37-2009-00097992-CU-OE-CTL), filed September 24, 2009;

(6)     *Doe v Deja Vu Showgirls* (Déjà Vu Midway) (San Diego Superior Court, Case No. 37-2009-00097990-CU-OE-CTL), filed September 24, 2009;

(7)     *Blunt v. Deja Vu Showgirls of Las Vegas, LLC*, Case No. A-09-603563-C Dept. 25 Clark County Nevada District Court), filed February 25, 2010;

(8)     *Corbin v BT California LLC*, State Case No. 11-39860-CT, California Division of Labor Standards Enforcement ("DLSE"), filed August 9, 2010;

(9)     *Corbin v. Gold Club SF, LLC*, State Case No. 11-39859-CT, California Dept. Industrial Relations, Division of Labor Standards Enforcement ("DLSE"), filed August 9, 2010; and

(10)    *Handelman v. Gold Club SF, LLC*, State Case No. 11-39926-CT, California Dept. Industrial Relations, Division of Labor Standards Enforcement ("DLSE"), filed August 17, 2010.

These matters and proceedings were all, pursuant to this Court's granting of an All Writs Motion, eventually subsumed into, became a part of, and were resolved by, the Cin-Lan Settlement.

4

2.6     In seeking to obtain a satisfactory resolution of the Cin-Lan Action, class counsel, the firm of Sommers Schwartz, P.C., and in particular attorney Jason Thompson (sometimes hereafter collectively just "Sommers Schwartz") sought and obtained the input of numerous class members in regard to the relief that they desired to obtain out of any possible settlement, and did not find at the time any significant desire of such individuals to require, as a condition of such settlement, conversion of Entertainers who Performed at the Consulting-Affiliated Clubs to employees.  As a result, the Cin-Lan Settlement, as approved by the Court, did not mandate the conversion of Entertainers who Performed at Consulting-Affiliated Clubs into Club employees.

2.7     As part of the Cin-Lan Settlement, certain injunctive relief was provided therein for the protection of the class members to the Cin-Lan Action.

2.8     In approving the Cin-Lan Settlement, Judge Murphy retained jurisdiction over the administration of that settlement in the Rule 23 Final Approval Order and Judgment of Dismissal.

2.9     On March 10, 2016, the Named Plaintiff (who is *not* the same Jane Doe 1 who initiated the Cin-Lan Action) filed suit in the United States District Court for the Eastern District of Michigan, Southern Division, Case No. 1:16-cv-10877, alleging that she and all other Entertainers who performed at DV Saginaw, LLC, were misclassified as non-employees, or as "independent contractors," by their alleged employer, Deja Vu Saginaw, and asserting that Services and Mohney were joint employers of Entertainers (including the Named Plaintiff) who Performed or Perform at Deja Vu Saginaw (the "Action").  The Action was initially assigned to the Hon. Thomas L. Ludington.

2.10     On March 16, 2016, Plaintiff filed a First Amended Class Action and Collective Action Complaint and Demand for Jury, to purportedly identify the proper defendants.

5

2.11    Sommers Schwartz, the class counsel approved by the Court in the Cin-Lan Action, also requests to be appointed as co-Class Counsel in this Action, and since the Consulting-Affiliated Clubs in the Cin-Lan Action are, in most respects, the same Clubs subject to this Agreement, they therefore have extensive knowledge in regard to the Claims asserted herein, the potential counterclaims that the Defendants can and could raise in this Action (or in any ordered arbitration proceeding), and the business operations of the Defendants in general and in specific as they relate to the Entertainers who perform in the Clubs.

2.12    On September 16, 2016, Deja Vu Saginaw, Services and Mohney filed a motion to compel the Named Plaintiff into individualized arbitration and to dismiss or stay the Action. That motion has been fully briefed and is awaiting consideration and resolution by the Court.

2.13    Since approximately August of 2016, Class Counsel and Defense Counsel have been discussing a potential resolution of the Action, and have ultimately negotiated, through extensive and prolonged efforts, the potential expansion of the Action and the ultimate Settlement thereof as contemplated by this Agreement.

2.14    On or about December 28, 2016, the Parties reached a preliminary resolution of the Action through the execution of a "term sheet" that broadly laid out the terms of settlement and that provided for a ninety (90) day period for the Parties to attempt to negotiate a full and complete settlement agreement (which is now memorialized by this Agreement).

2.15    Also on December 28, 2016, the Named Plaintiff filed a Motion to Transfer the Action, Intra-District, to the Hon. Steven J. Murphy, III, as a result of the continuing jurisdiction retained by him over the Cin-Lan Settlement.  That motion was granted by order of the Court dated January 4, 2017.

2.16    To date, at least twelve (12) substantially similar lawsuits and administrative labor law proceedings, all alleging that Entertainers Performing at one or more of the Clubs were misclassified as non-employees or as "independent contractors," have been filed and/or commenced naming as defendants thereto various entities – including one or more of the Clubs – and individuals (the "Pending Proceedings").  These include:

(a)     *Campbell, et al v. Dean Martin Dr. – Las Vegas, LLC, et al*, Case No. A-14-709417-C (District Court Clark County, Nevada);

(b)     *Rodriguez, et al v. CMSG Restaurant Group, LLC, et al*, Case No. 1:15-cv-01181 (S.D.N.Y);

(c)     *Campbell v. Las Vegas Bistro, LLC*, Case No. 2:16-cv-01842 (D. Nev.);

(d)     *Garcia v. Déjà vu Showgirls of Tampa, LC*, et al, Case No. 8:16-cv-01193 (M.D. Fla.);

(e)     *Hermes v. S.A.W. Entertainment, Ltd, et al*, Case No. CGC-16-552576 (Sup. Ct. San Francisco County);

(f)     *Wells v. Showgirls of San Diego* (California PAGA letter submitted);

(g)     *Predmore v. Déjà vu Showgirls, et al* (California PAGA letter submitted);

(h)     *Wilson v. 59th St LD Oklahoma City LLC*, Case No 5:16-cv-01124 (W.D. Okla.);

(i)     *Campbell, et al v. Déjà vu Entertainment Enterprises of Minnesota, Inc.* (District Court Hennepin County, Minnesota);

(j)     *Doe v. Déjà vu Consulting, Inc., et al*, Case No. 3:17-cv-00040 (M.D. Tenn.); and

(k)     *Doe v. Las Vegas Bistro, LLC, et al*, Case No. 2:17-cv-00205 (D. Nev.);

As used herein, the phrase "Pending Proceedings" shall also refer to any similar labor/employment claims filed, initiated, served upon, or commenced against any of the Defendants prior to the Effective Date.

2.17     Plaintiffs intend to file, in accordance with this Settlement, a Second Amended Class and Collective Action Complaint ("Amended Complaint for Settlement") that more fully sets forth the alleged facts, specific legal bases, and nationwide character and scope of the Claims included in the Action and resolved by this Agreement if so approved by the Court.

2.18     Following the Cin-Lan Settlement, the Spearmint Rhino group of gentlemen's clubs (the "Spearmint Rhino Group") settled a national employment misclassification class action lawsuit brought by Entertainers wherein, following the settlement and pursuant to a provision demanded by the federal district court there as a condition of approval, those establishments were required to convert the Entertainers who performed in the facilities to employees or to "co-owners" (the "Spearmint Rhino Settlement").

2.19     In accordance with the Spearmint Rhino Settlement, the Spearmint Rhino Group converted the Entertainers who performed in those establishments to employees consistent with applicable laws. Nevertheless, a large number of those Entertainers, across the country, ceased performing in those facilities because they did not desire to work as employees subject to the controls and constraints that such a relationship entails.  This led to the Spearmint Rhino Clubs then converting the remaining Entertainers into "co-owners" of those establishments.

2.20     Class Counsel have reviewed the business structure created by the "co-owner" arrangement currently used by the Spearmint Rhino Group, and have determined that the Class Members here are better served by the terms negotiated in this Agreement.

2.21     Class Counsel have obtained, through their own investigation and extensive informal discovery provided through Defense Counsel, information regarding Defendants' policies and practices regarding the putative class' activities at the Clubs, the Dancer Contracts or other agreements executed between those establishments and Entertainers, and the number of Class Members who Performed  during the Class Period, and currently Perform, at the Clubs.

2.22     In their investigation into the matters pertaining to the Action, Class Counsel has spoken to and otherwise communicated with numerous Entertainers who would be Class Members of this Settlement.  Those Entertainers do not currently work at the Clubs under a relationship denominated by the Clubs as one of employment, but rather Perform under a number of different business structures (discussed below) where the Clubs describe them to be Independent Professional Entertainers ("IPE").  As a result of those discussions, Class Counsel have additionally become aware that many Entertainers who perform at the Clubs oppose, for a variety of legitimate and justifiable reasons, working in the Clubs as employees (including but limited to the fact that they do not desire to be subject to the type of control that the Clubs could exercise over employee-Entertainers; they do not want to be required to meet the financial, time, and performance expectations that would come with working as employees; they prefer the tax benefits of performing as independent business persons; and they want the flexibility of performing as IPE's).  Nevertheless, a number of such potential Class Members contend that the Clubs, or at least some of them, have – from time-to-time – infringed upon their contractual and/or legal rights and privileges of performing as IPE's.  As a result, they seek from the resolution of this Action not conversion to employee status but, rather, to obtain legal redress, enforceable as injunctive relief through the Court, to preserve, protect and enhance their business arrangements with the Clubs under an appropriate, lawful, and legally binding IPE business structure.

2.23     In light of all of the above, Class Counsel have engaged in extensive arms-length negotiations with Defense Counsel with a view toward achieving substantial benefits for the Class Members and to comprehensively address their divergent interests, expectations and goals, while avoiding the cost, delay and uncertainty of further litigations, trials, and appellate review.

2.24     Since the resolution of the Cin-Lan Action, many Clubs have altered their business operations in regard to the Entertainers who Perform in those facilities beyond what was required by them as a result of the terms of the Cin-Lan Settlement. Whereas at the time of the resolution of the Cin-Lan Action almost all of the Clubs used a business model whereby the Entertainers entered into a Dancer Performance Lease with the Clubs and paid rent to the Clubs for the right to be able to utilize the Club premises for their business activities (the "Lease Model"), a significant number of Clubs now pay the Entertainers directly for their services by way of Form 1099-MISC payments (the "Independent Contractor Model"), and some Clubs share and allocate certain entertainment revenues with the Entertainers (the "Joint Venture Model").

2.25     Class Counsel have investigated the operation of the Independent Contractor Model and have determined that even if the Entertainers operating thereunder were found to be employees in this Action, the payments made to Entertainers by the Clubs using the Independent Contractor Model may well be found by the Court to constitute wage payments, which could significantly reduce, if not totally abrogate, the minimum wage claims being asserted by Entertainers operating under the Independent Contractor Model.  In their investigation of the Independent Contractor Model, Class Counsel have also determined that such method of operation does not appear to suffer from the operational problems noted in the decision of *Hart v. Rick's Cabaret International, Inc.*, 967 F.Supp.2d 901 (S.D. N.Y. 2013), whereby that court rejected the use of IRS Form 1099-MISC payments to offset minimum wage obligations under the FLSA because of the failure there of

10

Rick's Cabaret to track, and issue IRS Form 1099-MISC's on, all mandatory entertainment charges collected by the Entertainers Performing at that establishment.

2.26    In the Cin-Lan Action, the Cin-Lan Defendants had asserted both legal and contractual counterclaims against the Cin-Lan Plaintiff and the putative class there contending, among other things, that the mandatory entertainment charges to customers but collected and retained by the Entertainers, were – in the event that the Entertainers were reclassified to have been employees – the lawful property and income of Cin-Lan, which would then have to be legally returned by the Entertainers to Cin-Lan upon a misclassification finding; with Cin-Lan then being able to use those sums to pay any minimum wages found to be due.  These are, in part, the counterclaims that the Court refused to dismiss.

2.27    As part of the proceedings to approve the settlement in the Cin-Lan Action, the Cin-Lan Defendants brought to the attention of the Court a variety of formal rulings from the Internal Revenue Service ("IRS") and the United State Department of Labor ("DOL") that – the Cin-Lan Defendants asserted – supported their position that the mandatory entertainment charges collected from customers by Entertainers were, in fact, "service charges" and not tip income, which could be used, under applicable law, to satisfy any minimum wage obligations found to be due if the Entertainers there were ultimately found to have been the employees of the applicable establishments. Those rulings included FLSA 2005-31, 2005 WL 3308602 (DOL Wage-Hour); WH-305, 1975 WL 40930 (DOL Wage-Hour);  WH-386, 1976 WL 41739 (DOL Wage-Hour); Rev. Ruling 77-290; Rev. Ruling 65-282; Rev. Ruling 59-252; Rev. Ruling 58-220; and Rev. Ruling 58-515.

2.28    None of the formal rulings identified in the Section immediately above have been abrogated by the IRS or the DOL since the Cin-Lan Settlement.

11

2.29    In fact, the Parties, Class Counsel, and Defense Counsel are also aware of the issuance by the IRS, subsequent to the Cin-Lan Settlement, of Rev. Ruling 2012-18 which, the Defendants contend, further supports such a conclusion.

2.30    Class Counsel is aware of a number of court rulings issued subsequent to the Cin-Lan Settlement finding exotic dancers to have been employees and/or finding that a wage "offset" was not available in those circumstances.  Class Counsel has reviewed the decisions and, when available, the pleadings in those actions and have not found that any of the respective defendants therein raised, or that the courts decided, the applicability of the formal administrative rulings set forth in the two Sections immediately above or the Supremacy of federal law in this regard over certain state laws that could be construed to the contrary, to the types of Claims asserted by these Plaintiffs or to the types of counterclaims and affirmative defenses that the Defendants could raise here.  Accordingly, the Parties, Class Counsel, and Defense Counsel all acknowledge that there exists in this Action an unresolved legal issue as to whether Class Members operating under the Lease Model or the Joint Venture Model would be entitled to any wages, remuneration, damages or other compensation or penalties, even if they were found to have been employees of the Clubs; the outcome of which remains in significant doubt.

2.31    During the course of the negotiations, and since this Action was filed, Defendants have asserted, and continue to assert, both formally and in discussions with Class Counsel, that they have substantial defenses – predicated in part on the matters set forth above – to the Claims brought by the Plaintiffs.  Plaintiffs, for their part, dispute the validity of these defenses.  These defenses include, but are not limited, to the following:

2.31.1 The Plaintiffs and each and every one of them, have executed Dancer Contracts that contain legally valid and binding arbitration clauses, which include

12

comprehensive waivers of class and collective action proceedings and that therefore preclude Plaintiffs from proceeding: a) in any forum other than in individualized arbitration;  or b) as a Rule 23 class or as a collective under § 216(b) of the FLSA;

2.31.2  Entertainers are properly classified as non-employees because, among other things, they perform if, when, where and for whom they choose; they are not paid by the hour; they are not terminable at will; they control their profits and losses; they must exercise independent initiative in order to successfully engage in their professional occupation; they perform at other businesses; they intended to be independent contractors and/or non-employees; and they specifically rejected to become Club employees when that option was offered to them;

2.31.3 Entertainers specifically fall within the statutory exemptions for professionals;

2.31.4 Defendants' policies and practices with respect to permitting the Entertainers at the Clubs to classify themselves as independent contractors and/or as non-employees are fully lawful and legally enforceable, and comply with industry standards. Moreover, the applicable agreements signed by the Entertainers are clear and unambiguous, and are not unlawful, unfair, deceptive, fraudulent, misleading, wrongful or unenforceable in any way;

2.31.5  Entertainers earn more income as IPE's than they would as employees, and after offset of non-tip service charge monies paid, either directly or indirectly, to the Entertainers, the Entertainers would not be entitled to any compensation, damages or restitution of any kind;

2.31.6  Joint employer liability cannot be imposed upon the Defendants in the circumstances here;

2.31.7  There is substantial case law, federal regulations and formal administrative opinions supporting the legal argument that mandatory dance fees are not "tips," and it is likely that this defense would establish that all Class Members earned far more than minimum wage, exclusive of tips, while Performing at the Clubs; thereby negating any claims for monetary remuneration, damages or other penalties;

2.31.8  A significant number of the Clubs pay the Entertainers through IRS Form 1099-MISC payments, and such payments would fully satisfy any minimum wage obligations found to be due; and

2.31.9  A finding of "willfulness," and therefore entitlement to liquidated damages or other penalties and an extended statute of limitations, cannot be sustained because, among other things, the Clubs have obtained rulings which hold:  a) that classifying Entertainers as independent contractors or as non-employees was both appropriate and "reasonable" under the law; and/or b) that Entertainers were not in fact "employees" under the methods of operation at issue herein.

2.32    As such, Defendants deny each and every one of the Claims that are asserted, that will be asserted by way of the amendment permitted by this Agreement, or that could have been asserted, by the Plaintiffs in the Action, including but not limited to Claims alleging worker misclassification; entitlement to employment wages, benefits, penalties or other remuneration; and the imposition of joint employer liability. Defendants' decision to enter into this Agreement and to conditionally consent to class treatment of Plaintiffs' Claims shall not be construed as any form

of admission of liability.    Rather, all liability is expressly and specifically denied by each and every one of the Defendants.

2.33    Notwithstanding their differing view on the merits of the various Claims and potential counterclaims in this Action, and in measured consideration of the forgoing and as a consequence of the negotiations between the Parties and of Class Counsels' extensive investigations, analysis, and discovery, the Parties agree to settle the Actions under the terms and conditions memorialized in this Agreement; believing such Settlement to be fair, reasonable, adequate, and in the best interests of the Class and the general public.

**NOW THEREFORE,** in consideration of the foregoing and of the promises and mutual covenants contained herein, and other good and valuable consideration, the adequacy of which is acknowledged, it is hereby agreed by and among the undersigned Parties as follows:

III.    **DEFINITIONS**

As used in this Settlement Agreement and the attached exhibits, the following words and phrases shall have the meanings specified in this Article.  Capitalized words and phrases in such definitions, not previously explained, are further defined herein.

3.1    "Action(s)" means, collectively, this Action and the Pending Proceedings.

3.2    "Administrative Costs" means the administrative costs of settlement, including but not limited to, preparation and copying of the Class Notice Documents, mailing of the Class Notice Documents, website maintenance, tracking Class Members who have requested exclusion from the Settlement and the consequent preparation of the Opt-Out List, tracking of Settlement Class Members who have requested Cash Pool Claims, Cash Pool Claims' administration, and any other reasonable fees and costs incurred or charged by a jointly approved Settlement Administrator in

15

connection with the execution of its duties under this Agreement.  The Notice and Administrative Fund as defined herein is part of the Administrative Costs.

3.3     "Affiliated Entities" means those business entities that are identified on the attached *Exhibit A*, which are businesses that currently are, or that at any time during the Class Period were, either: A) parties to an agreement or contract with Services whereby they receive(d) either consulting or management services, or licensing rights, from Services; B) parties to an agreement or contract with Global Licensing, Inc. ("Global"), whereby they receive(d) licensing rights from Global; C) owned, either wholly or in part, and directly or indirectly, by either Mohney or Jason Cash Mohney; or D) tenants of Mohney or Jason Mohney, either directly or indirectly.

3.4     **"Aggr**egate Points Allocation" means the combined sum of the Individual Points Allocations.

3.5     "Assessment" means an evaluation by Club management, utilizing the Assessment Criteria as contained within the Entertainer Assessment Form, as defined immediately below, to determine whether an Entertainer Applicant or an Entertainer qualifies to be able to Perform as a bona fide IPE.

3.6     "Assessment Criteria" means analyzing whether an Entertainer or an Entertainer Applicant qualifies to be able to Perform as a bona fide IPE.  To determine whether an Entertainer or an Entertainer Applicant so qualifies, the Parties agree that the Club will conduct a critical analysis as to whether she:  A) Has stated a belief in writing that she Performs, or desires to Perform, as an IPE instead of as an employee; B) has rejected an Enhanced Offer of Employment set forth in Section 8.16 herein; C) is self-incorporated or possesses a business license or permit, or other professional or occupational licensure; D) maintains a business address separate and distinct from the Club's address; E) possesses and utilizes business cards; F) advertises her

16

business services through social media, handouts, or other means; G) Performs at exotic dance establishments other than the Club; H) selects the Persons for whom she chooses to Perform, and may freely decline to Perform for any Person; I) presents entertainment Performances requiring invention, imagination, originality or talent as opposed to consisting of routine mental, manual, mechanical or physical work; J) notwithstanding the exercise of control necessary to comply with statutory, regulatory, or contractual obligations, has control and discretion over the means and manner by which her Performances are produced and presented; K) has expended  substantial (based upon the amount of income she generates from her Performances) investment of capital in her business; L) possesses the skill of an bona fide professional entertainer; M) possesses significant experience Performing as an IPE; N) does not have set hours of work; O) Performs if, when, and where she chooses -- subject to being required to provide to the Club a schedule at least one week in advance as to when she intends to Perform, to participating in stage promotional rotations, and to Performing a certain number of hours on any Dates of Performance she schedules herself to Perform; P) does not require instruction for Performing as a professional entertainer; Q) files or intends to file a Schedule "C" in her tax returns and takes tax deductions for business expenses that she would not be lawfully entitled to take as an employee; R) if she has previously Performed at the Club as an IPE and has been obligated to file tax returns after commencing such Performances, neither paid, in accordance with  26 C.F.R. 31.6652(c)-1, a 50% tax penalty for not reporting her tip income to the Club nor provided to the IRS a written statement in the form of a declaration filed under penalty of perjury providing facts establishing reasonable cause for her not having reported such tip income to the Club; and S) derives earnings from her Performances as an Entertainer that support non-employee status.  No one of these elements is controlling.  A determination must be made based upon the totality of the circumstances, and if a majority of these

17

elements are found to apply, a presumption shall exist that the Entertainer qualifies as a bona fide IPE and may Perform at the Club as such.

3.7 "Entertainer Assessment Form" means a questionnaire to be used in the Assessment, incorporating the Assessment Criteria, which shall be approved by Defense Counsel, Class Counsel, and the Court and which shall conform in all material respects to **Exhibit B**.

3.8 "Assessment Review" means an additional Assessment conducted no later than the sixth month anniversary of when an Entertainer Applicant began to Perform in a Club as an employee in order to determine whether she then qualifies to be able to Perform as a bona fide IPE.

3.9 "Attorney Fee and Expense Award" means such funds that Class Counsel or any other attorney may receive either directly from Defendants, as a portion of the Secondary Pool Remuneration as described in this Agreement, or through an Order of the Court, to compensate them for their time and costs incurred in the Actions and in this Settlement.

3.10 "Bar Date" means the final time and date by which Cash Election Form must be postmarked to the Settlement Administrator in order for a Class Member to be eligible to receive a Monetary Settlement Benefit. The Bar Date shall be specifically identified and set forth in the Preliminary Approval Order and the Class Notice.

3.11 "CAFA Notice" means notice sent by Defendants that complies with the requirements of the Class Action Fairness Act of 2005, 28 U.S.C. § 1711, *et seq*.

3.12 "California Released Claims" means, for Participating Class Members who Performed at a Club located in the State of California during the Class Period:

(a) Any and all Claims pursuant to the California Labor Code, including but not limited to Claims under or pursuant to California Labor Code sections 200-204, 206.5,

18

207, 208, 210-214, 216, 218, 218.5, 218.6, 221, 222.5, 223, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353, 432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2698 et seq. (PAGA), 2753, 2802, and 2804;

      (b)    Claims pursuant to California Code of Civil Procedure section 1021.5;

      (c)    Claims pursuant to California Code of Regulations, Title 8, sections 11010 and 11040;

      (d)    Claims pursuant to Industrial Welfare Commission Wage Orders;

      (e)    Claims under California Business and Professions Code sections 17200, *et seq.* and 17500;

      (f)    All Claims, including common law Claims, arising out of or related to the statutory causes of actions described in this Section 3.12; and

      (g)    Claims under California common law to recover any alleged tip, expense, or other payment.

3.13    "Cash Election Form" means a form in all material respects identical to ***Exhibit C***, which is to be provided to Class Members and returned to the Settlement Administrator in order for them to become eligible to receive a Cash Pool Claim under this Agreement.

3.14    "Cash Payment" means the amount of money to be paid pursuant to the terms of this Agreement to Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of a one-time cash payment. Although the term "cash" is used, Cash Payments will be paid via check.

3.15    "Cash Pool" means the amount of two million dollars ($2,000,000.00) made available by the Defendants pursuant to the terms of this Agreement to pay Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of a Cash Payment,

to pay the Enhancement Payments, 50% of cost of the Settlement Administrator, and Direct Attorneys' Fees and Expenses.

3.16    "Cash Pool Claim" means the submission made by a Class Member using Cash Election Form wherein she requests to receive her Monetary Settlement Benefit under this Agreement in the form of a one-time cash payment.

3.17    "Cash Pool Claimant" means a Class Member who has submitted a Valid Cash Pool Claim.

3.18    "Claim(s)" means, when used alone herein and not as a part of another specifically defined phrase,  any and all past, present and future claims, actions, demands, causes of action, suits, debts, obligations, damages, and rights or other assertions of liability or wrongdoing, of any conceivable kind, nature and description whatsoever, whether known or unknown, whether existing or potential, whether fixed or contingent, whether asserted or not, recognized now or hereafter and whether expected or unexpected, pursuant to any theory of recovery and whether at law, in equity or otherwise, including but not limited to those based in contract, tort, common law, federal, state or local law, statute, ordinance, or regulation, and whether for compensatory, consequential, punitive or exemplary damages, statutory damages, penalties, interest, attorneys' fees, costs, or disbursements (including but not limited to those incurred by Class Counsel or any other counsel representing the Class Representatives or any Settlement Class Members, other than those expressly awarded by the Court in the Attorney Fee and Expense Award authorized by this Agreement), that a Person may have.

3.19    "Election Period" means the time period from the Notice Date through the Bar Date, which is the time period that Class Members will have to submit a Cash Election Form in order to obtain a Cash Pool Claim pursuant to this Agreement. The Election Period shall run for a

20

period of time ordered by the Court, and last until at least ninety (90) days from the Notice Date. Any Cash Election Form that is not Properly Completed or is not Timely Submitted shall be deemed invalid.

3.20     "Class" means the group of Entertainers who, during the Class Period, performed at one or more of the Clubs, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Nightclub during the Class Period.  The Class is defined as all current and former entertainers who worked for Defendants at any time during the Class Period and todays date at any of the "Déjà Vu affiliated clubs" listed on Exhibit A to this Agreement.

3.21     "Class Counsel" means the law firms of Pitt McGehee Palmer & Rivers P.C. and Sommers Schwartz, P.C.

3.22     "Class Member" means any individual who, during the Class Period, has performed as an Entertainer at one or more of the Clubs, but does not include those individuals who provide or who have provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club during the Class Period.

3.23     "Class Notice" means the proposed notice to putative Class Members which shall conform in all material respects to the document attached as ***Exhibit D***.

3.24     "Class Notice Documents" means the Class Notice and the Cash Election Form.

3.25     "Class Period" means the period commencing: (a) for Entertainers who Performed at Deja Vu Saginaw or at any of the Clubs located in the State of Michigan,  March 10, 2013; (b) for Entertainers who performed at Clubs located outside of the State of Michigan and who are not a putative class member in any of the Pending Proceedings, the date upon which the statutes of limitations period under their applicable state labor laws began to run prior to March 10, 2016; or

21

(c) for any Entertainers who are a putative class member on any of the Pending Proceedings, the earliest date of the applicable statute of limitations period as tolled by those Pending Proceedings, through the Effective Date of this Agreement.

3.26    "Class Representatives" means the Named Plaintiff, the other Entertainer identified through a pseudonym in the Second Amended Complaint for Settlement that is to be filed in accordance with this Agreement (Jane Doe 2) each of whom has been separately identified to Defense Counsel and whose identities will be filed under seal with the Court, or any other person(s) duly appointed as additional or successor representatives of the Settlement Class.

3.27    "Clubs" means Deja Vu Saginaw and those Affiliated Entities identified on the attached *Exhibit A* that present performance dance entertainment to the consenting adult public on their premises.

3.28    "Consent to Join" means a Class Member's consent to join as a party plaintiff to the FLSA Claims asserted in this Action pursuant to 29 U.S.C. § 216(b). A Class Member's signed Election Form that is Properly Completed and Timely Submitted to the Settlement Administrator and a Secondary Pool Claim Form submitted to a Participating Class Members' Qualifying Club shall serve as that Class Member's Consent to Join.

3.29    "Conversation Beverages" means those beverages for sale in a Club that an Entertainer may, if legally permitted, solicit a customer to purchase and consume either herself or together with such customer ("ladies drinks," "bottle service," and the like).

3.30    "Cost of Employment" means those costs and expenses that a Club is legally required to incur when hiring a Person as an employee, which are for such individual, as applicable: the wages paid (whether a full minimum wage or a "tip credited" minimum wage, and including overtime pay if due, but not including the tip credit portion of a tip credited wage or any tips

reported or commissions earned by the employee), worker's compensation taxes/premiums, social security and Medicare taxes, unemployment compensation taxes (both federal and/or state), the premiums for any legally required health care coverage or insurance, and the costs of any legally mandated sick or vacation pay.

3.31    "Court" means the United States District Court for the Eastern District of Michigan, Southern Division.

3.32    "Dance Fee" means the mandatory, established, and published price and cost of personal entertainment performances engaged in by Entertainers at the Clubs for, and paid by, customers.  "Dance Fee" shall not refer to any "room rental," "VIP Room" fee or other similar location use fee, that is assessed against a patron or customer by a Club and collected directly by club employees.

3.33    "Dance Fee Payment(s)" means the amount of money to be paid pursuant to the terms of this Agreement to Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of the payment of Dance Fees.

3.34    "Dancer Contract" means a contract entered into between an Entertainer and a Club, which permits the Entertainer to Perform, and to engage in personal entertainment performances for remuneration, upon the Club's premises.

3.35    "Dance Fees" means the remuneration paid by customers as the purchase price for personal entertainment Performances engaged in by employee Entertainers (the payment of which is non-discretionary on the part of the customer, and the amounts of which are set by the Club in consultation with the Entertainers and are posted at various places in the Club).  Consistent with applicable law, all Dance Fees for employee Entertainers are the lawful property and gross income

of the Club.  "Dance Fees" do not include any "door" or entrance fees or charges, private room fees/charges, or any tip income generated by the employee Entertainer.

3.36    "Dancer Performance Lease" means a Dancer Contract in the form of a lease agreement where the Entertainer pays a Club that utilizes the Lease Model for the right to be able to use those premises for her Performances.

3.37    "Date of Performance" means the date(s) an Entertainer Performed or Performs pursuant to a Dancer Contract at a Club.  For purposes of this definition, one Date of Performance shall include any connected block of time that an Entertainer is on the premises of a Club in order to Perform, regardless of the fact that the Date of Performance extends over more than one calendar day.  By way of illustration only, if an Entertainer commences Performing on a Tuesday night at 9:00 p.m., and completes her Performances at 2:00 a.m. on Wednesday morning and then leaves the Club, that period will be considered for purposes of this Agreement to constitute one Date of Performance.  If the same Entertainer then returns to a Club on Wednesday evening and again commences Performing (which may carry over to Thursday morning), that will constitute a second Date of Performance.

3.38    "Defense Counsel" means Shafer & Associates, P.C., and Edith A. Thomas and Associates.

3.39    "Direct Attorneys' Fees" means Attorneys' Fees paid directly by the Defendants to Class Counsel from the Cash Pool to compensate them for their work in obtaining a settlement for the Class pursuant to their Claims under Section 216(b) of the FLSA and Rule 23 state law claims.

3.40   "Effective Date" means seven (7) days after which both of the following events have occurred: (a) the Final Approval Order and Judgement have been entered, and (b) the Judgment has become Final.

3.41   "Election Period" means the time period from the Notice Date through the Bar Date, which is the time period that Class Members will have to submit a Cash Election Form in order to obtain a Cash Pool Claim pursuant to this Agreement. The Election Period shall run for a period of time ordered by the Court, and last until at least ninety (90) days from the Notice Date. Any Cash Election Form that is not Properly Completed or is not Timely Submitted shall be deemed invalid.

3.42   "Enhancement Payment" means the amount approved by the Court to be paid to the Class Representatives identified in Section 9.5, in addition to their respective payments under the Plan of Allocation. The Enhancement Payment will have two monetary components. The first will be in recognition of the Class Representative's efforts in coming forward as a Class Representative and her efforts to secure the Settlement in this Action.  The second will be as consideration for a full, general, and comprehensive release of that individual's General Released Claims.

3.43   "Entertainer(s)" means Persons who dance, Perform, and/or entertain, or who have danced, Performed or entertained, on the premises of an exotic dance nightclub or "gentlemen's club" (including but not limited to one of the Clubs), but excludes, for those individuals who Perform or who have Performed at a Club, Persons who provide or provided services as "headliner" or "feature" performers unless such individual was otherwise a party to a Dancer Contract with a Club.

3.44    "ERISA" means the Employee Retirement Income Securities Act of 1974, 29 U.S.C. § 1001, *et seq.*

3.45    "Exclusion/Objection Deadline" means the final date, established by and set forth in the Preliminary Approval Order, by which a Class Member may either:  (a) object to any aspect of the Settlement pursuant to Section 11.1; or (b) request to be excluded from the Settlement pursuant to Section 11.3.

3.46    "Fairness Hearing" means the hearing that is to take place after the entry of the Preliminary Approval Order and after the Notice Date for purposes of: (a) determining whether the Settlement should be approved as fair, reasonable, and adequate; (b) entering the Final Approval Order and Judgment and dismissing the Action with prejudice; (c) ruling upon an application for Enhancement Payments by the Class Representatives and other individuals; (d) ruling upon an application by Class Counsel for an Attorneys' Fee and Expense Award; and (e) awarding Enhancement Payments. The Parties shall request that the Court schedule the Fairness Hearing for a date that is in compliance with the provisions of 28 U.S.C. § 1715(d).

3.47    "Final," when referring to the Judgment or to the Settlement, means that: (a) the Judgment is a final, appealable judgment; and (b) either (i) no appeal has been taken from the Judgment as of the date on which all times to appeal therefrom have expired, or (ii) an appeal or other review proceeding of the Judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by way of appeal, petitions for rehearing or re-argument, petitions for rehearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the Judgment in its entirety.

26

3.48    "Final Approval" means formal and written approval of the Settlement by entry of the Final Approval Order and the Judgment by the Court.

3.49    "Final Approval Order" means the order that the Class Representatives and Defendants will seek from the Court, to be agreed upon by the Parties, memorializing the Court's final approval of the Settlement.

3.50    "FLSA Claims" means any Claims under, or pursuant to, the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

3.51    "General Released Claims" means any and all Claims by the Class Representative or other Settlement Class Members receiving Enhancement Payments, against the Released Parties, or against any one or group of them (including, for any Class Member who has performed in the State of California during the Class Period, the California Released Claims defined herein and unknown Claims covered by California Civil Code Section 1542 as quoted herein, arising during the period from the beginning of the Class Representatives' (or other Settlement Class Members receiving Enhancement Payments) first interaction with Defendants to the Effective Date, for any type of relief that can be released as a matter of law, including, without limitation, Claims for wages, damages, unpaid costs, penalties (including civil and waiting time penalties), retaliatory conduct, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief, with the exception of any Claims which cannot be released as a matter of law.

3.52    "General Release Form" means the form the parties will negotiate and execute, which outlines the claims being released by the Named Plaintiff and Jane Doe 2. Within seven (7) days of the date on which the Court enters the Final Approval Order, the Class Representatives and other Participating Class Members receiving Enhancement Payments shall each sign and

execute a copy of the General Release Form without any deletion or amendment to any language in said form.

3.53    "Gross Settlement Amount," also sometimes referred to as the "Settlement Consideration," shall mean the aggregate financial benefit conferred on the Settlement Class Members through the Cash Payments, Secondary Pool Remuneration, Enhancement Payments, a portion of the PAGA Payment, and changes to the Defendants' business practices, all which confer a direct financial benefit on Settlement Class Members, a portion of the PAGA Payment conferred on the California Labor and Workforce Development Agency, together with the Attorney Fee and Expense Award and the Administrative Costs.  The Gross Settlement Amount shall not exceed six million five hundred fifty thousand dollars ($6,550,000.00).

3.54    "Indirect Attorneys' Fees" means the Attorneys' Fees Class Counsel shall receive in compensation for the benefit they have obtained on behalf of the Class in the form of the Secondary Pool Remuneration.

3.55    "Individual Points Allocation" means the number of points assigned to each Cash Pool Claimant pursuant to the formula described in Section 6.1.4(a) and used to determine the Cash Payment.

3.56    "Judgment" means the final judgment to be entered in the Action upon Final Approval of this Settlement and entry of the Final Approval Order, in a form that is approved by and acceptable to all Parties.

3.57    "Legally Authorized Representatives" means an administrator/administratrix, personal representative, or executor/executrix of a deceased Person's estate; and a guardian, conservator, or next friend of an incapacitated Person; or any other legally appointed Person responsible for handling the business affairs of another Person. All rights and obligations of Class

28

Members, Participating Class Members Settlement Class Members and Class Representatives as set forth in this Agreement extend to their Legally Authorized Representatives as well.

3.58    "Litigation Expenses" includes any expenses incurred by Class Counsel in connection with the prosecution and resolution of this Action and/or in the Pending Proceedings, including all Court-approved litigation costs.

3.59    "Monetary Settlement Benefit" means the amount of direct monetary consideration that a Participating Class Member will receive under this Agreement by way of one of the following: a) Cash Payments; b) Dance Fee Payments; or c) Rent Credits.

3.60    "Net Cash Payment Settlement Fund" means the Cash Pool, less the Attorney Fee and Expense Award, the PAGA Payment, Enhancement Payments, and Administrative Costs approved by the Court and as further provided for in this Agreement.

3.61    "Notice Date" means the date of the initial distribution of the Class Notice to Class Members.

3.62    "Opt Out" means the  mechanism for a Class Member to opt out of the Settlement.

3.63    "Opt Out List" means the Court-approved list of all Class Members who timely and properly requested exclusion from the Settlement.  The contents of the Opt Out List shall be designated as Confidential Information subject to the terms of a Stipulated Protective Order in the Action, and shall be held in confidence by the Parties pursuant to the terms of that order. The Opt Out List shall not be disclosed through any manner of public filing or other public disclosure.

3.64    "Opt Out Period" means a period of 95 days from the entry of the Preliminary Approval Order or the re-mailing of a particular Class Notice as permitted herein, within which time the Class Member's request to be excluded from the settlement (the Opt Out Form) must be signed by the Class Member, mailed to the Settlement Administration, and be postmarked.

3.65    "PAGA" means the California Labor Code Private Attorney General Act of 2004;
Cal. Lab. Code § 2698, *et seq.*

3.66    "PAGA Claims" mean all civil penalties sought against the Defendants pursuant to
PAGA.

3.67    "PAGA Payment" means the payments made pursuant to Section 5.2.4 of this
Agreement to resolve all PAGA Claims.

3.68    "Participating Class Member(s)" means the Class Representatives and all Class
Members who elect to receive their Monetary Settlement Benefit through the Cash Pool by
submitting a valid Cash Pool Claim or who do not otherwise submit an Opt Out Form.

3.69    "Participating Class Member PAGA Payments" means that portion of the PAGA
Payment that is to be distributed, pursuant to the Plan of Allocation, among Participating Class
Members who Performed at a Club located in the State of California during the Class Period.

3.70    "Participating Class Members' Released Claims" means the Settlement Class
Member Released Claims together with any and all Claims whatsoever kind or nature pursuant to
the FLSA.

3.71    "Parties" means, collectively, the Class Representatives, Settlement Class
Members and Defendants, and "Party" means any one of them.

3.72    "Perform(s)," "Performed," "Performing," and "Performances" means all acts of
entertaining, dancing, and/or engaging in entertainment services, and all activities related thereto,
at an exotic dance nightclub or "gentlemen's club" (including but not limited to at the Clubs or at
any one or group of them).

3.73    "Performance Month" means any month during the Class Period in which a
Settlement Class Member had at least one Date of Performance at a Club.

30

3.74    "Person" means any individual, corporation, partnership, association, affiliate, joint stock company, estate, trust, unincorporated association, entity, government and any political subdivision thereof, or any other type of business or legal entity.

3.75    "Plan of Allocation" means the plan for allocating the Net Cash Payment Settlement Fund, the Secondary Pool, and the Participating Class Member PAGA Payments, between and among Participating Class Members as approved by the Court.

3.76    "Posted Notice" means a notification which is to be posted in the Entertainer dressing room of each Club announcing the existence of the Cash Pool and the Secondary Pool and the ability of Entertainers to seek remuneration therefrom, attached as ***Exhibit E***.

3.77    "Preliminary Approval Date" means the date on which the Court enters the Preliminary Approval Order and thus: (a) preliminarily approves the Settlement, including the Exhibits thereto, and (b) enters an order providing for distribution of the Class Notice to the Class Members, an opportunity to be excluded, or to "opt out," from the Settlement, and an opportunity to submit timely objections to the Settlement; establishing procedures for submitting Cash Pool Claims and Secondary Pool Claims; and setting the Fairness Hearing.

3.78    "Preliminary Approval Order" means the order that the Class Representatives and Defendants will seek from the Court.  Entry of the Preliminary Approval Order shall constitute preliminary approval by the Court of the Settlement as embodied by this Agreement.

3.79    "Properly Complete(d)" in terms of a Cash Election Form means a document dated and personally signed by the Settlement Class Member, which provides accurate – to the best of the Participating Class Member's knowledge – answers/responses to all of the information requested in the document.

31

3.80    "Qualifying Club" means the Club at which the Participating Class Member last Performed prior to entry of the Preliminary Approval Order.

3.81    "Released Claims" shall be construed as broadly as possible to effect complete finality over the Actions and the Claims asserted therein.  "Released Claims" include the General Released Claims, the Settlement Class Members' Released Claims, the California Released Claims, and the Participating Class Members' Released Claims.  As provided for in this Agreement, the release of any Claims under the FLSA contemplated by this Settlement shall be effectuated only if and after a Class Member has submitted a Valid Cash Pool Claim or Secondary Pool Claim and thereby has consented to join this Action as party plaintiff to the FLSA Claims asserted therein pursuant to 29 U.S.C. § 216(b).

3.82    "Released Defendants" means Deja Vu Saginaw, Services, Mohney, and each and every one of the Affiliated Entities identified in Exhibit A, together with each and every one of their respective current, former, and future:  Owners (either direct or indirect, including but not limited to partners, shareholders, members, parent companies, holding companies, trusts and/or trustees), officers, directors, managers, employees, agents, representatives, non-Entertainer contractors, insurers, reinsurers, attorneys, auditors, accountants, bookkeepers, experts, subsidiaries, affiliates, divisions, licensees, licensors, consultants, heirs, executors, personal representatives, predecessors and successors in interest, and assigns, as well as any benefit plans sponsored or administered by any of the proceeding individuals and entities.

3.83    "Releasing Parties" means Settlement Class Member, and each and every one of their heirs, guardians, executors, administrators, representatives, agents, attorneys, and assigns.

3.84    "Rent" means any amount of money paid by a Class Member to a Club under the terms of a Dancer Performance Lease, whether "flat" or payable on a per-dance basis, or a

32

combination of both.  The term "Rent," however, shall not refer to any "room rental" or other charge that is assessed against a patron or customer where the total amount, or a portion, of that charge is paid to, and/or retained by, the Clubs.

3.85    "Rent Credit(s)" means the amount of credit a Participating Class Member may obtain, in accordance with the Plan of Allocation, against the Rent to which her Qualifying Club would otherwise be entitled under the terms of her Dancer Performance Lease, as her Monetary Settlement Benefit under this Agreement.

3.86    "Secondary Pool" means the maximum of four million five hundred thousand dollars ($4,500,000.00) made available pursuant to the Plan of Allocation, in the form of Dance Fee Payments and/or Rent Credits to Participating Class Members who decide to receive their Monetary Settlement Benefit in the form of Dance Fee Payments or Rent Credits, as opposed to a Cash Payment.

3.87    "Secondary Pool Claimant" means a Class Member who has elected to receive her Monetary Settlement Benefit in the form of the Secondary Pool, either Dance Fee Payments or Rent Credits, during the Secondary Pool Redemption Period..

3.88    "Secondary Pool Claim" means the election made by a Class Member wherein she requests to receive her Monetary Settlement Benefit under this Agreement in the form of Secondary Pool Remuneration; that being either Dance Fee Payments or Rent Credits.

3.89    "Secondary Pool Claim Form" means a form which is to be provided to Settlement Class Members at the Clubs, after she makes a request to receive her Monetary Settlement Benefit in the form of Secondary Pool Remuneration, and which must be returned Properly Completed and within the Secondary Pool Redemption Period to the Entertainer's Qualifying Club in order for that Settlement Class Member to be entitled to obtain Secondary Pool Remuneration.

3.90    "Secondary Pool Remuneration" means, as applicable depending upon whether the Qualifying Club uses the Independent Contractor Model, the Joint Venture Model, or the Lease Model, remuneration in the form of Dance Fee Payments and Rent Credits.

3.91    "Secondary Pool Redemption Period" means the period of one year after the last of: a) the determination by the Settlement Administrator of the identity of Settlement Class Members who have filed Valid Claims; b) the determination by the Settlement Administrator of the identity of Settlement Class Members who have selected to obtain their Monetary Settlement Benefit in the form of a Cash Payment; c) the expiration of the Opt Out Period; and d) thirty-one (31) days after the Judgment becoming Final.

3.92    "Settlement" means the compromise and settlement of the Action and of the Pending Proceedings embodied in this Agreement.

3.93    "Settlement Administrator" means an independent settlement administrator mutually agreed upon by the Parties and to be appointed by the Court.

3.94    "Settlement Class" means all Persons who, during the Class Period, have Performed as an Entertainer at one or more of the Clubs pursuant to a Dancer Contract, and who have not timely and properly excluded themselves from the Settlement as provided for in Section 11.3 of this Agreement

3.95    "Settlement Class Member" means any Class Member who has not timely and properly excluded herself from the Settlement as provided for in this Agreement.

3.96    "Settlement Class Members' Released Claims" means any and all Claims asserted in the Action, or to be asserted in the Action by way of the amendment contemplated in this Agreement, and any and all Claims of any conceivable kind or nature whatsoever that are based on such pleadings or that are reasonably related thereto (except only for those under the FLSA),

34

whether known or unknown, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law or in equity or otherwise, and specifically including:

(a)     Claims for unpaid wages (including without limitation claims for minimum wage, regular wages, overtime, final wages, calculation of the correct overtime or regular rate, and meal period and rest period premiums), uniform/costume costs and associated cleaning expenses, expense reimbursements, interest, and penalties;

(b)     Claims to recover any alleged tip, expense, or other payment;

(c)     The California Released Claims;

(d)     Claims asserting unfair business practices or violations of similar laws;

(e)     Any Claims under the Nation Labor Relations Act, 29 U.S.C. 151 et seq.;

(f)     Claims asserting any form of retaliation predicated upon a Class Member's assertion that any of the Release Defendants wrongfully terminated her Dancer Contract or right to Perform, or otherwise retaliated against her, after she or any other Person asserted a Claim that she was or that other Entertainers were misclassified as an independent contractor and/or as a non-employee;

(g)     Claims for liquidated, punitive, and/or exemplary damages based upon defendants' wage policies and/or their employment classification of Entertainers;

(h)     Any other employment, wage, or labor related Claims that could be brought under any statute, regulation, or otherwise against the Released Defendants, or against any one or group of them, that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, any act or omission that occurred during the Class Period and up to the Effective Date, including but not limited to any Claims under any legal or equitable theory as a result of the alleged violation of any

35

state or federal law or regulation, Claims brought pursuant to breach of contract, Claims

brought pursuant to common law, Claims of unjust enrichment and/or *quantum meruit*, and

any and all Claims pursuant to, or derived from, ERISA that arise, or may arise, from any

alleged failure to pay wages, including any Claims for benefits under any benefit plans

subject to ERISA;

       (i)     Claims for attorneys' fees and costs;

       (j)     All Claims, including common law claims, arising out of or related to the

statutory causes of action described herein.

3.90    "Stage Name" means the business name, DBA or pseudonym utilized by a Class

Member while Performing at one or more of the Clubs.

3.91    "Timely Submitted" means, when used in the context of a Cash Election Form, the

mailing by a Class Member with a postmark prior to the expiration of the Election Period.

3.92    "Valid Cash Pool Claim(s)" means a Cash Election Form Properly Completed and

Timely Submitted by a Class Member to the Settlement Administrator within the Election Period,

demonstrating the Class Member's election to receive her Monetary Settlement Benefit in the form

of a Cash Payment.

3.93    "Valid Secondary Pool Claim(s)" means a Timely Submitted request by a

Settlement Class Member to the Entertainer's Qualifying Club during the Secondary Pool

Redemption Period for that Settlement Class Member to be entitled to obtain Secondary Pool

Remuneration to her Qualifying Club.

3.94    "Valid Claim(s)" means, collectively, Valid Cash Pool Claims and Valid Secondary

Pool Claims.

## IV.    SUBMISSION OF THE SETTLEMENT AND THIS AGREEMENT TO THE COURT FOR REVIEW AND APPROVAL, CONDITIONAL CERTIFICATION

**OF PROPOSED CLASS FOR SETTLEMENT PURPOSES, STAY OF PENDING PROCEEDINGS, AND STIPULATION REGARDING AMENDMENT OF COMPLAINT.**

4.1     The Class subject to this Agreement is defined as all current and former Entertainers who worked for Defendants at any of the "Déjà Vu Affiliated Clubs" listed on Exhibit A to this Agreement from the beginning of the Class Period through the present. Promptly upon completing drafting this Settlement Agreement, the Parties shall submit to the Court a motion for preliminary approval of the Settlement, and shall concurrently submit the following documents:  This Agreement and all Exhibits hereto; the Proposed Cash Election Form; a proposed Preliminary Approval Order; and a proposed Class Notice and proposed Posted Notice.  The motion for preliminary approval shall include a proposed plan for the sending of the Class Notice to Class Members within fifty (50) days after the Preliminary Approval Date, and establishing the Exclusion/Objection Deadline.  The Exclusion/Objection Deadline requested shall be ninety-five (95) days after the entry of the Preliminary Approval Order, and shall be specifically identified and set forth in the Preliminary Approval Order and the Class Notice.  The Motion for Preliminary Approval shall also request a date for the Fairness Hearing for Final Approval of the Settlement and any determination on the request for the Attorney Fee and Expense Award and the Enhancement Payments; that Class Counsel shall file a petition for the Attorney Fee and Expense Award and Enhancement Payments at least eighty (80) days after entry of the Preliminary Approval Order; that the motion for Final Approval be filed at least eighty (80) days after entry of the Preliminary Approval Order; and that any reply briefs and petitions be filed no later than one hundred fifteen (115) days after entry of the Preliminary Approval Order.

4.2     For purposes of settlement only, the Parties agree to seek provisional certification of the Class as a collective action pursuant to 29 U.S.C. § 216(b) and as a Rule 23 Class.  Each

Party agrees that this stipulation shall not be used by any Person for any purpose whatsoever in any legal, administrative, or arbitral proceeding.  Such matters may only be submitted in a proceeding to enforce the terms of this Agreement.

4.3     Defendants do not consent to certification of the Class for any purpose other than to effectuate the Settlement of this Action.  The Parties acknowledge and agree that Defendants' consent to provisional certification for purposes of this Settlement only does not constitute an admission of wrongdoing, fault, liability, or damage of any kind to the Named Plaintiff or to any of the Class Members.

4.4     The Parties shall act in good faith to effectuate each and every term of this Agreement, and shall cooperate to promptly seek entry of the Preliminary Approval Order, to obtain Final Approval of this Agreement (including providing Class Notice under the FLSA and Rule 23(c) and (e)), to take all acts so that the Judgment becomes Final, and to secure a prompt, complete, and final resolution of the Settlement of this Action.

4.5     The parties have filed a Joint Motion For Preliminary Injunction requesting that this Court  enjoin all of the Pending Proceedings as listed in Section 2.16 and any other similar types of actions that involve matters and claims subject to this Agreement, pending Final Approval of this Settlement and pending the Judgment becoming Final; to enjoin in the future any Claim or action by any Participating Class Member related to matters settled by this Agreement; and to enter a permanent injunction prohibiting such actions in the future.  The Court shall retain jurisdiction to enforce the terms of this Agreement, and specifically the provisions of this Section 4.4.

4.6     Class Counsel shall cooperate in moving to stay all Pending Proceedings in which Class Counsel have filed an appearance.

4.7     To the Parties' knowledge, the Pending Proceedings identified in Section 2.16 represent all currently pending Entertainer class/collective action cases or Claims against any Defendant, any Club, and/or any Released Defendants, related to the matters and Claims at issue in the Action (and as may be amended by this Agreement), except for those individual Claims that have been commenced in arbitration, or have already (by the time of full execution of this Agreement), been converted to an arbitration proceeding.

4.8     Solely for purposes of implementing this Agreement and effectuating the proposed Settlement, the Parties agree and stipulate that:

a)     Named Plaintiff shall seek the Court's permission to enter the Second Amended Complaint for Settlement and Defendants shall consent to such amendment pursuant to Federal Rule of Civil Procedure Rule 15(a)(2). The Parties agree that the filing of the Second Amended Complaint for Settlement will streamline the settlement process and ensure that more money can be paid to Settlement Class Members by saving the costs of multiple notice and approval processes. The Parties further agree and stipulate that Defendants may seek an order from the Court establishing that the allegations in the Second Amended Complaint for Settlement are deemed fully controverted by Defendants, and by each and every one of them, such that no further responsive pleading from Defendants is required. If, for any reason, the Settlement and Judgment do not become Final or the Effective Date does not occur, the Second Amended Complaint for Settlement shall be stricken from the record and the operative complaint in the Action shall revert to the filed First Amended Complaint that preceded the Second Amended Complaint for Settlement, and no prejudice shall occur to the motion to arbitrate previously filed by Deja Vu Saginaw, Services, and Mohney.

        b)      The Parties will jointly request the Court to enter a Preliminary Approval Order preliminarily approving the Settlement and this Agreement.  Among other things, the Preliminary Approval Order shall grant leave to file the Second Amended Complaint for Settlement and to preliminarily certify the Class for settlement purposes only; approve the Named Plaintiff and Jane Doe 2 as class representatives; appoint Class Counsel to represent the Settlement Class and appoint the Settlement Administrator; approve the Class Notice, the Posted Notice, and the and the Class Notice plan embodied in this Agreement, and approve them as consistent with 29 U.S.C. § 201, *et seq.*, Rule 23, and due process; set out the requirements for Class Members to be able to exclude themselves from the Settlement and for Settlement Class Members to object to the terms of the Settlement,  all as provided for in this Agreement; provide that certification and all actions associated with certification are undertaken on the condition that the certification and other related actions shall be automatically vacated if this Agreement is terminated or if the Settlement does not become Final, all as provided in this Agreement; preliminarily enjoin all Class Members and their Legally Authorized Representatives, unless and until they submit a timely request for exclusion from the Settlement pursuant to this Agreement, from filing or otherwise participating in any other suit or non-administrative proceeding based on the Released Claims, or from attempting to effect an opt-out from the Settlement as a group, class, or subclass of individuals; and schedule the Fairness Hearing.

4.9      Any of the Parties, Class Counsel, and any person objecting to this Agreement, may file with the Court, as directed by the Court in its Preliminary Approval Order, a written brief setting forth their respective positions regarding the fairness of the Settlement.  All submissions to the Court shall comply with the provisions set forth in Federal Rules of Civil Procedure and Local

Rules for the Eastern District of Michigan, as well as the dates established by the Court in its Preliminary Approval Order.

4.10    At the Fairness Hearing, the Class Representatives shall request entry of the Final Approval Order and the Judgment, the terms of which shall be agreed upon by the Parties.  The entry of the Final Approval Order and the Judgment by the Court is a material condition of the Settlement and of this Agreement, and shall order, among other things, that the Court:

a)    finally approves the Settlement as fair, reasonable, and adequate, within the meaning of Rule 23 and due process, and directs its consummation pursuant to the terms of this Agreement;

b)    finds that Class Counsel and the Class Representatives adequately represent the Settlement Class for the purpose of entering into and implementing this Agreement;

c)    re-confirms the appointment of the Settlement Administrator and finds that the Settlement Administrator has fulfilled its duties under the Settlement;

d)    finds that the Class Notice: (i) constituted the best practicable notice; (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Class Members of the pendency of the Action and their right to exclude themselves from, or object to, the proposed Settlement and to appear at the Fairness Hearing; (iii) was reasonable and constituted due, adequate, and sufficient notice to all Persons entitled to receive notice; and (iv) met all applicable requirements of Rule 23, due process, and any other applicable rules or law;

e)    finds that the CAFA Notice sent by Defendants complied with 28 U.S.C. § 1715 and all other provisions of the Class Action Fairness Act of 2005;

41

f)      approves the Opt Out List and determines that the Opt Out List is a complete list of all Class Members who have timely requested exclusion from the Settlement and who, accordingly, shall neither share in nor be bound by the Final Approval Order and Judgment;

g)      dismisses the Action on the merits and with prejudice, and without fees or costs except as provided in this Agreement;

h)      directs that the Final Approval Order and Judgment shall be final and entered forthwith;

i)      without affecting the finality of the Final Approval Order and the Judgment, reserves jurisdiction over the Class Representatives, the Settlement Class, and Defendants as to all matters concerning the administration, consummation, and enforcement of this Agreement, including but not limited to those provisions relating to the extension of injunctive relief into the future as provided for herein;

j)      adjudges that, as of the Effective Date, the Class Representatives and all Class Members who have not been excluded from the Settlement as provided in the Opt Out List approved by the Court, as well as their Legally Authorized Representatives, together with anyone claiming through them or acting or purporting to act for them, in their interest, on their behalf, or for their benefit, regardless of whether they received actual notice of the proposed Settlement, have conclusively compromised, settled, discharged, and released the General Released Claims (in the case of the Class Representatives and other designated Settlement Class Members who are to receive an Enhancement Payment), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the

42

Participating Class Members) against Defendants and the Released Parties, and are bound by the provisions of this Agreement;

k)    declares this Agreement and the Final Approval Order and Judgment to be binding on, and have *res judicata* and preclusive effect in regard to, all pending and future lawsuits or other proceedings: (i) that encompass the General Released Claims and that are maintained by or on behalf of the a Class Representative or other designated Settlement Class Member who is to receive an Enhancement Payment pursuant to this Agreement, or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit; (ii) that encompass the Settlement Class Members' Released Claims and that are maintained by or on behalf of any Settlement Class Member, or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit, regardless of whether the Settlement Class Member or other such Person previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Settlement Class Members' Released Claims and even if such Settlement Class Member never received actual notice of the Action or this proposed Settlement; and iii) that encompass the Participating Class Members' Released Claims and that are maintained by or on behalf of any Participating Class Member, or her Legally Authorized Representatives, or anyone claiming through her or acting or purporting to act for her, in her interest, on her behalf, or for her benefit, regardless of whether the Participating Class Member previously initiated or subsequently initiates individual litigation or other proceedings encompassed by the Participating Class Members' Released Claims;

43

l)        permanently bars and enjoins the Class Representatives and all other Settlement Class Members from:  (i) filing, commencing, prosecuting, intervening in, or participating (as class members or otherwise) in any other lawsuit or administrative, regulatory, arbitration, or other proceeding in any jurisdiction based on the General Released Claims (in the case of the Class Representatives or other Settlement Class Members who are to receive an Enhancement Payment pursuant to this Agreement), the Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members); and (ii) organizing Settlement Class Members or Participating Class Members into a separate group, class, or subclass for purposes of pursuing, as a purported class action, any lawsuit or administrative, regulatory, arbitration, or other proceeding (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a Pending Proceeding), based on the Settlement Class Members' Released Claims or the Participating Class Members' Released Claims;

m)        determines that the Agreement and the Settlement provided for herein, and any proceedings taken pursuant thereto, are not, and should not in any event be offered, received, or construed as evidence of, a presumption, concession, or an admission by any Party of liability or non-liability or of the certifiability or non-certifiability of a litigation class, or of any misrepresentation or omission in any statement or written document approved or made by any Party; provided, however, that reference may be made to this Agreement and the Settlement provided for herein in such proceedings as may be necessary to effectuate the provisions of this Agreement;

n)        orders that the certification of the Class and Final Approval of the proposed

Settlement, and all actions associated with them, are undertaken on the condition that they

shall be vacated if this Agreement is terminated or disapproved in whole or in part by the

Court, or by any appellate court and/or other court of review, or if Defendants invoke the

right to withdraw from the Settlement as provided herein, in which event this Agreement

and the fact that it was entered into shall not be offered, received, or construed as an

admission or as evidence for any purpose, including, but not limited to, an admission by

any Party of liability or non-liability or of any misrepresentation or omission in any

statement or written document approved or made by any Party, or of the certifiability of a

litigation class;

o)        authorizes the Parties, without further approval from the Court, to agree to

and adopt such amendments, modifications, and expansions of this Agreement, including

all Exhibits hereto, as: (i) shall be consistent in all material respects with the Final Approval

Order, and (ii) do not limit the rights of Settlement Class Members; and

p)        contains such other and further provisions consistent with the terms of this

Agreement to which the Parties expressly consent in writing.

4.11    At the Fairness Hearing and as a part of the Final Approval of this Settlement, Class

Counsel will also request approval of the Plan of Allocation set forth in Article VI.   Any

modification to the Plan of Allocation by the Court shall not: (a) affect the enforceability of the

Settlement Agreement, (b) provide any of the Parties with the right to terminate the Settlement or

this Agreement, or (c) impose any obligation on the Defendants to increase the consideration

extended in connection with the Settlement.

4.12   At the Fairness Hearing, Class Counsel may also request entry of an order approving Class Counsels' application for the Attorney Fee and Expense Award and for Enhancement Payments to the Class Representatives. In no event shall Defendants otherwise be obligated to pay for any attorneys' fees or expenses or Enhancement Payments.  The disposition of Class Counsels' application for an Attorney Fee and Expense Award, and for Enhancement Payments, is within the sound discretion of the Court and is not a material term of the Settlement or of this Agreement, and it is not a condition of this Agreement that such applications be granted or be granted under any particular terms.  Any disapproval or modification of such applications by the Court shall not: (a) affect the enforceability of the Settlement Agreement, (b) provide any of the Parties with the right to terminate the Settlement or this Agreement, or (c) impose any obligation on the Defendants to increase the consideration extended in connection with the Settlement.

## V.   SETLEMENT CONSIDERATION.

5.1   <u>Gross Settlement Value</u>.  The Gross Settlement Value is an amount up to six million five hundred fifty thousand dollars ($6,550,000.00) consisting of Cash Payments, Secondary Pool Remuneration, changes to Defendants' business practices that will confer a direct financial benefit on Settlement Class Members, the PAGA Payment, the Attorney Fee and Expense Award, and Administration Costs.  Under no circumstances shall Defendants be responsible for making payments or other remunerations of any kind, for extending credits, or for changing their business practices, in a manner that confers an aggregate financial benefit on the Settlement Class Members, on Class Counsel, on the California Labor and Workforce Development Agency (the "LWDA"), and on the Settlement Administrator, in excess of the Gross Settlement Value.

5.2   <u>Monetary Settlement Consideration</u>.   The Cash Payment, Secondary Pool

Remuneration, Enhancement Payments, PAGA Payments, Attorney Fee and Expense Award, and Administrative Costs components of the Settlement Consideration shall consist of the following:

5.2.1 Cash Pool: The sum of one million dollars ($1,000,000.00) will be made available by Defendants to provide cash compensation to those Participating Class Members who elect to receive their Monetary Settlement Benefit in the form of a single monetary payment. The sums in the Cash Pool shall be distributed as set forth in Article VI, below, to Settlement Class Members who have submitted Valid Cash Pool Claims. The Cash Pool shall also be used to pay the Enhancement Payments set forth in subsection 5.2.3 below.

5.2.2 Secondary Pool Remuneration: Defendants agree to make available Secondary Pool Remuneration to those Participating Class Members who do not participate in the Cash Pool but who appear to perform at, and claim -- in accordance with the provisions of Section 7 below – Secondary Pool Remuneration from, their Qualifying Club. The total Secondary Pool Remuneration to be made available is four million five hundred thousand dollars ($4,500,000.00). Participating Class Members may redeem Secondary Pool Remuneration in accordance with Section 7.1 below.

5.2.3 Enhancement Payments: Defendants shall pay, out of the Cash Pool, the Enhancement Payments as ordered by the Court in the Final Approval Order. One portion of the Enhancement Payment to each Class Representatives is contingent upon her execution of the General Release Form. Enhancement Payments are payable by the Settlement Administrator twenty-one (21) days after the Effective Date. Enhancement Payments shall be considered non-wage income for which an IRS Form 1099 will be issued

47

by the Defendants as required by law to each of the Class Representatives receiving such a payment.

      5.2.4  <u>The PAGA Payment</u>:  Defendants shall pay the sum of one hundred thousand dollars ($100,000.00) to resolve all California PAGA Claims.  From the PAGA Payment, seventy-five percent (75%), or seventy five thousand dollars ($ 75,000.00), shall be paid to the State of California LWDA as civil penalties pursuant to PAGA and twenty-five percent (25%), or twenty-five thousand dollars ($ 25,000.00), shall be distributed on a pro rata basis to Cash Pool Claimants and Secondary Pool Claimants who Performed in the State of California during the Class Period.

      5.2.5  <u>Attorney Fee and Expense Award</u>:  Defendants shall pay to Class Counsel, in order to compensate them for their work in obtaining the Settlement Consideration as set forth herein, an amount as ordered by the Court in the Final Approval Order, which shall include attorneys' fees, costs, and expenses incurred in connection with the Action and this Settlement.  Defendants agree not to object to a request of an Attorney Fee and Expense Award (Direct Attorney Fees) that does not exceed the sum of nine hundred thousand dollars ($900,000.00). Defendants also agree not to object to a request of an Attorney Fee Award (Indirect Attorney fees) that does not exceed three hundred thousand dollars ($300,000.00). Indirect Attorney Fees will be paid out of the Secondary Pool. Indirect Attorney Fees shall be calculated based on 33.3% of redeemed Secondary Pool Remuneration.

      5.2.6  <u>Administrative Costs</u>: Defendants shall pay to the Settlement Administrator 50% of the costs for administering the Settlement, including, but not limited to, the preparation and copying of Class Notice, mailing of the Class Notice, tracking Class

Members who have requested exclusion from the Settlement and the consequent preparation of the Opt Out List, , website maintenance, Cash Pool Claims calculation and administration, and any other reasonable fees and costs incurred or charged by a jointly approved Settlement Administrator in connection with the execution of its duties under this Agreement.   In the event that those costs exceed one hundred thousand dollars ($100,000.00), such additional sums shall come out of the Cash Pool.

5.3    <u>Class Member Election</u>:  Class Members will be mailed the Class Notice to their last known address as reflected on the most recent Dancer Contract they have executed at the last Club at which they Performed prior to the entry of the Preliminary Approval Order.  Class Members who wish to participate in the Cash Pool are required to *opt-in* to the Cash Pool pursuant to the provisions of § 216(b) of the FLSA during the Election Period. Class Members making such an election must complete and timely submit (pursuant to Sections 3 and 5) the Cash Election Form.  Those Class Members who do not elect to participate in the Cash Pool and who are Participating Class Members by not having "opted-out" of this Action pursuant to the provisions of Sections 11, are eligible to participate in Secondary Pool and to receive Secondary Pool Remuneration as set forth in Section 7.2 below.  In no event may a Participating Class Member elect both a Cash Payment and Secondary Pool Remuneration.  The Cash Election Form, if signed by a Settlement Class Member and Timely Submitted to the Settlement Administrator as set forth in Section 6, shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Action pursuant to 29 U.S.C. § 216(b) and shall effect a full and complete release of any and all FLSA Claims asserted in the Actions or that are reasonably related thereto and that could have been brought in the Actions.  In the event that the Court does not grant Final

Approval of the Settlement, or the Settlement does not become Final, any Consent to Join and release of the FLSA Claims filed on behalf of any Class Member shall be null and void *ab initio*.

## VI.     DISBURSEMENT AND PLAN OF ALLOCATION OF CASH PAYMENT

6.1     <u>Cash Pool Claims</u>:  A Class Member who wishes to participate in the Cash Pool shall comply with the following procedures:

6.1.1     <u>Cash Election Form</u>:  In order to receive a Cash Payment from the Cash Pool, a Class Member must Properly Complete the Cash Election Form to obtain their Monetary Settlement Benefit in the form of a Cash Payment, and must Timely Submit the Cash Election Form to the Settlement Administrator before the expiration of the Election Period.  Class Members who do not Timely Submit a Properly Completed Cash Election Form to the Settlement Administrator (by having the same mailed and postmarked prior to the expiration of the Election Period) will not be entitled to receive a Cash Payment from the Cash Pool.

6.1.2     <u>Cash Election Forms Not Properly Completed</u>.  In the event that the Settlement Administrator receives, prior to the expiration of the Election Period, a Cash Election Form from a Class Member that is not Properly Completed, the Settlement Administrator shall immediately e-mail a copy of that Cash Election Form to both Class Counsel and to Defense Counsel, who shall be required to cooperate in order to determine whether enough information has been provided, or can be provided, to render the Cash Election Form a Valid Cash Pool Claim.  If additional information is needed, the Settlement Administrator shall immediately request the same from the Class Member.  Unless Class Counsel and Defense Counsel otherwise  jointly conclude, before the expiration of the Election Period, that the Class Member provided sufficient information to have the document constitute a Properly Completed Cash Election Form, or the Settlement Administrator  receives additional information so as to consider the document to constitute a Valid

Cash Pool Claim, the Cash Election Form shall be deemed invalid for all purposes hereunder and such Class Member shall not be entitled to a Cash Payment.

6.1.3  <u>Election Reporting (Cash Pool Claims)</u>. Within seven (7) calendar days of the end of the Election Period, the Settlement Administrator shall furnish to Class Counsel and Defense Counsel a copy of the Valid Cash Pool Claims.  Within seven (7) calendar days of receiving the Valid Cash Pool Claims, Defendants shall request from the applicable Clubs a copy of each Class Members' Original Contract contained in the Club's records to enable a determination to be made of the date each Class Member started work for Defendants. The applicable Club shall furnish its records to the Settlement Administrator within thirty (30) days of receiving the Valid Cash Pool Claims from the Settlement Administrator.

6.1.4  <u>Determination of the Value of Cash Pool Claims</u>:  Cash Pool Claimants shall be paid a pro-rata share of the available Cash Pool based on the length of time they worked during the Class Period relative to all other Cash Pool Claimants. The pro rata share of the Cash Pool will be determined by the Settlement Administrator based on a formulaic points system, designed by the parties for ease of administration and recognition of the limits of Defendants' records, in the following manner:

(a)  <u>Individual Points Allocation</u>. For each Participating Class Member with valid class pool claims, the month in which their Original Contract was signed will be used to determine the how many points are allocated to each Class Member, as follows:  (1) if the Class Member's Dancer Contract was signed within six months of the Preliminary Approval Order, she will receive 2 points for each month worked, up to a maximum of 12 points; (2) if the Class Member worked more than six months but less than one year before the Preliminary Approval Order, the Class Member will receive an additional 1 point for each added month worked, up to 6 additional points;

51

and (3) if the Class member began work more than one year before the Preliminary Approval Order, the Class Member will receive 8 points for each year regardless of the number of additional months worked in those years.   .   Partial months score the same as if full months. The Individual Points Allocation is intended to award higher values to more recently worked months in consideration for the strength of those claims, more recent evidence, witness memory, and a longer statute of limitations.  The maximum Individual Points Allocation a Class Member can receive is 42 points.

(b)     <u>Cash Payments Formula</u>.  The formula for determining the Cash Payments is based on the Individual Points Allocation, the Aggregate Points Allocation, and the available Cash Pool. Once each Participating Class Members' Individual Points Allocation is determined, an Aggregate Points Allocation will be determined by adding together the Individual Points Allocation for all Participating Class Members.  The total available Cash Pool is then divided by the Aggregate Points Allocation to determine a per-point dollar value, which is then multiplied by each Participating Class Member's Individual Points Allocation to determine her pro rata share of the available Cash Pool. For example, someone whose scored points equate to 1% of the total points scored will receive 1% of the Cash Pool.  However, each Participating Class Member with Valid Cash Pool Claims will receive $25 as a minimum amount, regardless of their actual calculated amount.

6.1.5   <u>Distribution of the Cash Pool</u>:  The Settlement Administrator shall be directed to allocate, and make payments from, the Cash Pool as follows:  Upon the determination by the Settlement Administrator of the total amount of Cash Payments to be made pursuant to Section 5.2.1 above, and upon the Judgment becoming Final, the Defendants shall, within fifteen (15) days of the latter thereof, fully fund the Cash Pool by depositing the amount of nine hundred twenty

thousand dollars ($920,000.00) into a bank account established for this purpose.  Within thirty (30) days after the deposit of that amount, the Settlement Administrator shall make all Cash Payments out of this account to the Cash Pool Claimants.

6.1.6    <u>Tax Considerations of Cash Payment Distributions</u>.  The Class Representatives and each Participating Class Member who submits a Valid Cash Pool Claim acknowledge and agree that the Cash Payments made to them pursuant to Sections 5.2.1  do not constitute "wages" within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code.  A Form 1099-MISC shall be issued by the Defendants as required by law, at their sole cost, to each Participating Class Member who selects to receive a Cash Payment reflecting the payments made in accordance with this Agreement, and copies of said forms shall be duly filed with the United States Internal Revenue Service and with the department of revenue and/or taxation of the state in which the Participating Class Member's Qualifying Club is located.

6.1.7    <u>Uncollected Cash Payment Pool Funds</u>:  If the uncashed or unpaid funds remain in the Cash Pool, then the remaining amount contained in the Cash Pool bank account shall be paid to a charitable organization to be determined by Class Counsel and approved by the Court at Final Approval.

6.1.8    <u>Excess Claims</u>: There can be no excess Cash Pool Claims or Cash Payments under the scoring system because Participating Class Member shall share 100% of the Available Cash Pool on a pro-rata basis.

## VII.    <u>DISBURSEMENT AND PLAN OF ALLOCATION OF SECONDARY POOL REMUNERATION</u>

7.1    <u>Plan of Allocation of the Secondary Pool</u>:  Secondary Pool Remuneration shall be administered as follows:

7.1.1   <u>Secondary Pool</u>:  Defendants will make four million five hundred thousand dollars ($ 4,500,000.00) available for use as Secondary Pool Remuneration that can be obtained by any Participating Class Member, subject to the terms herein, who does not opt into the Cash Pool.  Secondary Pool Remuneration may only be redeemed by Participating Class Members at their Qualifying Club.  Defendants shall supply Class Counsel and each Club with a list of each Participating Class Member who is eligible to Secondary Pool Remuneration at that Club, along with the Participating Class Member's applicable Secondary Pool Tier defined and established in subsection 7.1.3 below.

7.1.2   <u>Application of Secondary Pool Remuneration</u>:   Secondary Pool Remuneration shall consist of Rent Credits for Qualifying Clubs using the Lease Model, and Dance Fee Payments for Qualifying Clubs using either the Independent Contractor Model or the Joint Venture Model.  Each Class Member who does not opt out pursuant to Sections 11.3 - 11.5 below and who does not timely select on the Claim Form to receive her Monetary Settlement Benefit in the form of a Cash Payment will be eligible to receive Secondary Pool Remuneration.

7.1.3   <u>Determination of a Participating Class Member's Maximum Secondary Pool Remuneration</u>:  Participating Class Members who do not validly select to receive a Cash Payment shall be entitled to Secondary Pool Remuneration based on the number of months that the Class Member Performed at her Qualifying Club prior to the Effective Date.  The amount of Secondary Pool Remuneration to which a Participating Class Member shall be entitled shall be determined pursuant to the following 3-Tier schedule (the "Secondary Pool Tier"):

      (a)     TIER I.  A maximum amount of two hundred dollars ($200.00) for any Class Member who performed for a period of at least one month at her Qualifying Club;

      (b)     TIER II. A maximum amount of one thousand dollars ($1,000.00) for any Class Member who performed for a continuous period of between six and eighteen months at her Qualifying Club; and

      (c)     TIER III.  A maximum amount of two thousand dollars ($2,000.00) for any Class Member who Performed more than eighteen months at her Qualifying Club.

7.2    <u>Redemption of Secondary Pool Remuneration</u>:  Secondary Pool Remuneration may be obtained by a Participating Class Member only at her Qualifying Club.  Participating Class Members electing to obtain Secondary Pool Remuneration are required to schedule a Date of Performance at her Qualifying Club and notify that Club of her intent to claim Secondary Pool Remuneration, both at least seven (7) business days before she desires to Perform and to obtain Secondary Pool Remuneration, in order to allow Defendants time to confirm the Participating Class Member's entitlement to such Secondary Pool Remuneration (including the fact that she has not made a Cash Pool Claim), her applicable Secondary Pool Tier, and the existence of a valid Dancer Contract between the Participating Class Member and her Qualifying Club.  Prior to obtaining Secondary Pool Remuneration, the Participating Class Member must submit to the Qualifying Club a Properly Completed Secondary Pool Claim Form, which shall, among other things, require the Participating Class Member to attest, to the best of her knowledge, the number of Performance Dates she Performed at that Club during the Class Period (if she had not previously submitted the Cash Election Form, and to acknowledge: (1) that she understands that obtaining Secondary Pool Remuneration may constitute a taxable event and that if Defendants deem it required under the Internal Revenue Code, they will issue Form 1099-MISC's to Participating Class Members receiving Secondary Pool Remuneration; (2) that she is not receiving any tax

advice from Class Counsel, Defense Counsel or Defendants, and that she should obtain her own tax advice; (3) that she is releasing all FLSA Claims; and (4) that Class Counsel is receiving 33.3% of redeemed Secondary Pool Remuneration, not to exceed a total of three hundred thousand dollars ($300,000.00), as Indirect Attorneys' Fees.  Participating Class Members must personally sign, date and submit the Secondary Pool Claim Form to her Qualifying Club before receiving any Secondary Pool Remuneration, and a copy shall be provided to Modern Bookkeeping, Inc. ("Modern"), to assist it in the administration of the Secondary Pool Remuneration.  After the Secondary Pool Redemption Period expires, copies of the Secondary Pool Claim Forms turned in shall be provided to Class Counsel. Secondary Pool Remuneration will be assigned as follows:

    a. <u>Rent Credits</u>: entitle the Participating Class Member to a sixty percent (60%) reduction of the established Rent for any Performance Date the Participating Class Member chooses to Perform at the Qualifying Club during the Secondary Pool Redemption Period, provided she has not exhausted the total amount of her Secondary Pool Remuneration as set forth in Section 7.1.3 and provided that the Secondary Pool has not been exhausted by Secondary Pool Claims.  The remaining forty percent (40%) of the established Rent shall be remitted to the Qualifying Club.

    b. <u>Dance Fee Payments</u>: entitle the Participating Class Member to payment of 100% of the Dance Fees that she generates out of her entertainment services for two Dates of Performance, with no allocation of those Dance Fees whatsoever going to the Qualifying Club.

Participating Class Members may only redeem a maximum of one hundred dollars ($100.00) in Secondary Pool Remuneration during any one Date of Performance, and no Qualifying Club shall be required to permit more than five (5) Participating Class Members to obtain Secondary Pool Remuneration on any given Date of Performance (first come/first served).

7.3     Payment of Indirect Attorneys' Fees: In order to obtain Secondary Pool Remuneration, the Participating Class Member shall, subject to the limitations as set forth in Section 7.5, pay to the   Qualifying Club thirty-three and one-third percent (33.3%) of the Secondary Pool Remuneration to which she is entitled, which shall be held in trust by the Qualifying Club in order to compensate Class Counsel for their efforts in securing the common fund in the form of the Secondary Pool.

7.4     Exemplar of Application of Secondary Pool Remuneration:  By way of example only, if the total Rent for a given Date of Performance is one hundred dollars ($100.00), the Participating Class Member would be entitled to a sixty dollar ($60.00) Rent Credit to be offset against her total Rent Credit (Secondary Pool Remuneration) set forth in Section 7.1.3.  While the Participating Class Member is entitled to sixty dollars ($60.00) in Rent Credit, she will pay to the Qualifying Club thirty-three and one-third percent (33.3%; i.e., twenty dollars ($20)) of the sixty dollar ($60.00) Rent Credit as Indirect Attorneys' Fees for Class Counsel.  The Qualifying Club shall, subject only the limitations as set forth in Section 7.5, collect the Indirect Attorneys' Fees and forward the same to Modern, which shall accumulate such funds in an escrow account held for Class Counsel's benefit and remit the same to Class Counsel as directed in Section 7.3..  The remaining forty dollars ($40.00) will be paid to the Qualifying Club as Rent.  In other words, the Participating Class Member would pay the Qualifying Club a total of sixty dollar ($60.00, of which it would retain forty dollars ($40.00) as Rent and, subject to the limitations set forth in Section 7.5,

57

deposit twenty dollars ($20.00) in the escrow account as Indirect Attorneys' Fees.  Similarly for Dance Fee Payments, for the Dance Fees of which the Participating Class Member is entitled to 100% allocation, she will pay to the Qualifying Club thirty-three and one-third percent (33.3%) as Indirect Attorneys' Fees for Class Counsel.  For example, if her entertainment services generate five hundred dollars ($500.00) in Dance Fees on that Date of Performance, she shall pay one hundred sixty-six dollars and sixty-six cents as Indirect Attorneys' Fees for Class Counsel.  The Club shall remit the same in the same fashion as do the Clubs using the Lease Model.

7.5     <u>Termination of Collection of Indirect Attorneys' Fees</u>.   In the event that the Qualifying Clubs collect, in the aggregate, a total of three hundred thousand dollars ($ 300,000.00) in Indirect Attorneys' Fees, the obligation of the Participating Class Members redeeming Secondary Pool Remuneration to pay Indirect Attorneys' Fees, and the obligation of the Qualifying Clubs to collect Indirect Attorneys' Fees, shall immediately cease.  Thereafter, until the Secondary Pool is extinguished or terminated as provided for herein, Participating Class Members redeeming Secondary Pool Remuneration will receive the full amount of the Rent Credits or Dance Fee Payments to which they are entitled pursuant to this Article, and they will no longer be required to pay 1/3 of their Secondary Pool Remuneration to their Qualifying Club as Indirect Attorneys' Fee.

7.6     <u>Redemption Period for </u>Secondary Pool Remuneration:  In addition to being able to select <u>Secondary Pool Remuneration as their Monetary Settlement Benefit within the Election Period, for those Participating Class Members who did not select to receive their Monetary Settlement Benefit in the form of a Cash Payment, each Settlement Class Member may also seek to obtain Secondary Pool Remuneration within the Secondary Pool Redemption Period.</u>  A Secondary Pool Claim Form shall serve as that Class Member's Consent to Join as a party plaintiff to the FLSA Claims asserted in the Action pursuant to 29 U.S.C. § 216(b); shall authorize Class

Counsel to file the Consent to Join with the Court; and shall effect a full and complete release of any and all FLSA Claims asserted in the Actions or that are reasonably related thereto and that could have been brought in the Actions. Regardless of whether the Participating Class Members have fully exhausted the Secondary Pool, the Participating Class Members' entitlement to Secondary Pool Remuneration shall terminate at the expiration of the Secondary Pool Redemption Period. Expired Secondary Pool Remuneration shall have no value.

7.7    Exhaustion of Rent Credit Pool:    Secondary Pool Remuneration is considered redeemed by a Participating Class Member only after she has Performed a Date of Performance to which she is entitled to Secondary Pool Remuneration. Defendants' obligation to provide Secondary Pool Remuneration shall be satisfied if the aggregate amount of the Secondary Pool is exhausted, regardless of whether all Participating Class Members have redeemed their total Secondary Pool Remuneration.

7.8    Performing at Deja Vu-Affiliated Nightclubs:  Nothing in this Agreement requires that any Club permit any particular Class Member the right to Perform on its premises. A Participating Class Member who desires to Perform at a Club in order to obtain Secondary Pool Remuneration (which must be at her Qualifying Club) must either be a party to a current Dancer Contract or execute a Dancer Contract prior to Performing and receiving Secondary Pool Remuneration. Should a Participating Class Member desire to Perform at her Qualifying Club in order to obtain Secondary Pool Remuneration pursuant to this Agreement but that Club refuses to allow her to Perform for a legitimate business reason, that Participating Class Member shall be given written notice that she has thirty (30) days thereafter to select to obtain a Cash Payment pursuant to the terms of this Agreement or to opt out of the Settlement pursuant to the provisions of Sections 11.3 if the Cash Pool is depleted.

7.9    Tax Considerations of Secondary Pool Remuneration: A Participating Class Member electing to obtain Secondary Pool Remuneration through this Agreement must complete and submit to her Qualifying Club, prior to obtaining Secondary Pool Remuneration, a Secondary Pool Claim Form in which, among other things, she acknowledges and agrees that such Secondary Pool Remuneration does not constitute "wages" within the meaning of § 3111(a) of the Internal Revenue Code, any other applicable provisions therein, or any applicable state tax or revenue code. Defendants may seek advice from their accountants as to whether Forms 1099-MISC should be issued by them to each Participating Class Member who receives Secondary Pool Remuneration pursuant to this Agreement. Should it be determined that Forms 1099-MISC should issue in regard to the Secondary Pool Remuneration provided hereunder, Defendants, at their sole cost, shall issue such forms to each Participating Class Member who has elected to and has obtained Secondary Pool Remuneration. The Form 1099-MISC shall reflect the value of the Secondary Pool Remuneration received, and copies of said forms shall be duly filed with the United States Internal Revenue Service and the applicable department of revenue/taxation of the state in which the Qualifying Club is located.

7.10    Taxation and No Tax Advice: Each Participating Class Member shall be obligated to obtain her own independent tax advice concerning the proper income reporting and tax obligations regarding any and all payments and/or other remuneration she receives or obtains pursuant to this Agreement, and shall further assume the responsibility of remitting to the Internal Revenue Service and any other relevant taxing authorities any and all amounts required by law to be paid out of any monies received, or other remuneration obtained, under this Agreement, without any contribution whatsoever from any of the Released Defendants or Class Counsel. Nothing in this Agreement shall be construed as Class Counsel providing any advice regarding the payment

60

of taxes or the tax consequences of a Participating Class Members' participation in any portion of this Agreement.

7.11    <u>Audit and Data Rights</u>:  Throughout the existence of the Secondary Pool, Class Counsel shall be provided reasonable access to data and records used to determine any Class Member's eligibility, position in the 3-Tier graduated schedule, amount of individual Secondary Pool Remuneration redeemed and remaining, and the total amount of the Secondary Pool redeemed and remaining.

<u>Administration of Secondary Pool</u>:  The accounting for the Secondary Pool and collection of the one-third (1/3) Indirect Attorneys' Fees from redeemed Secondary Pool Remuneration shall be administered by Modern.  Defendants shall pay all costs associated with Modern administering the Secondary Pool.  The Settlement Administrator selected pursuant to Section10.3 shall have no obligations or duties related to the administration or allocation of Secondary Pool Remuneration through the Secondary Pool

## VIII.   **DEFENDANTS' CHANGES OF BUSINESS PRACTICES, WHICH WILL CONFER A DIRECT AND SUBSTANTIAL FINANCIAL BENEFIT TO THE SETTLEMENT CLASS**

8.1    The Parties, Class Counsel, and Defense Counsel all acknowledge that employees are not permitted to waive or contract away their rights under applicable labor laws (except as may be specifically permitted therein), including but not limited to those set forth in the FLSA, and that workers who meet the legal standards of being employees may not contract to work under a business arrangement or structure that does not provide for the legal protections and benefits to which employees are otherwise entitled.  The purpose of this Section is not to in any way circumvent, invade upon, or negate those legal principles, but to rather: a) delineate the parameters, as recognized by Class Counsel, Defense Counsel, and the Court, under which Entertainers may

lawfully Perform in the Clubs as bona fide Independent Professional Entertainers, as opposed to as employees, if they meet the criteria for being able to do so as set forth in this Agreement; b) establish legally enforceable rights, as granted through this Agreement and specifically by way of the injunctive relief afforded hereunder, for the protection of such Entertainers who desire to lawfully Perform as IPE's and meet the criteria for being able to do so as set forth in this Agreement, so that the Clubs do not in the future compromise or impinge in any way upon the privileges such Entertainers possess under such a business structure; and c) provide for certain employment benefits -- beyond those as are afforded under statutory law -- for Entertainers who choose or are required to work at the Clubs as employees at the Clubs as employees in accordance with the terms of this Agreement.

8.2    Following the Effective Date, upon Application and satisfying an audition, the Clubs shall provide an Enhanced Offer of Employment to Persons interested in Performing as an Entertainer at the Club ("Entertainer Applicant"), providing her an informed choice to Perform at the Club as an IPE or to work for the Club as an employee, under the respective terms for each set forth in this Article.

8.3    Each Club shall provide the option set forth in Section 8.2 immediately above to Entertainer Applicants in a "hard copy" writing or in an electronic format (the "Enhanced Offer of Employment", attached as ***Exhibit F***).  The contents of the Enhanced Offer of Employment are currently agreed upon by Class Counsel and Defense Counsel, but may be subsequently modified by the Defendants without approval from Class Counsel in order to comply with any changes in applicable laws.

8.4    No Entertainer Applicant shall be required to make her selection before she has had an opportunity to fully review the Enhanced Offer of Employment and before she has been

62

afforded an opportunity to have the Enhanced Offer of Employment reviewed by professionals (accountants, attorneys, etc.) of her choice.

8.5    Neither the Clubs nor anyone in Club management shall take any position as to, and shall not in any manner attempt to influence, the choice that an Entertainer Applicant should make on the Enhanced Offer of Employment.

8.6    The applicable Club may require the Entertainer Applicant to attest in writing to the Club's compliance with the provisions of subsections above.

8.7    Each Entertainer Applicant who expresses her desire to Perform at the Club as an IPE instead of working for the Club as an employee shall then be offered a Dancer Performer Lease or Club-Performer Contract and permitted to perform as an IPE.

8.8    After the expiration of a six-month trial period, the IPS shall be provided with an Entertainer Assessment Form (***Exhibit B***) in order to permit the Club to undertake the Assessment discussed in Section 8.9 immediately below.  The Club shall be entitled to rely upon the answers provided by the Entertainer Applicant on the Entertainer Assessment Form as being truthful responses, and shall have no obligation hereunder to conduct its own investigation of such Entertainer Applicant prior to conducting the Assessment.

8.9    Following receipt of the Entertainer Assessment Form, Club management shall undertake the Assessment in order to determine whether the Entertainer Applicant meets the Assessment Criteria establishing her as being a bona fide Independent Professional Entertainer.  If the Assessment determines that the Entertainer Applicant does not satisfy the Assessment Criteria, then the Club shall so inform the Entertainer Applicant that the Club will agree to hire her as an employee.  If, however, the Entertainer Applicant nevertheless believes that she satisfies the Assessment Criteria and desires to Perform at the Club as an IPE, thereby opposing being

63

converted to employee status, she may provide to the Club a letter from her attorney or Certified Public Accountant ("CPA"), establishing that she has undertaken their own independent Assessment and finds that the Entertainer meets the Assessment Criteria of a bona fide Independent Professional Entertainer (each constituting a "Justification Letter"). The Justification Letter shall then be forwarded to the Club's CPAs. If they concur in the Justification Letter, the Entertainer Applicant may then begin to Perform as a Bona Fide IPE. If they do not concur with the Justification Letter, the Entertainer Applicant may only Perform as a Club employee. The decision of the Club's CPA's shall be final. Under no circumstances shall an Entertainer Applicant be permitted to Perform at the Club as an IPE unless the Assessment Criteria is satisfied either by way of a Club management Assessment or a Justification Letter in which the Club's CPA's concur.

8.10    If an Assessment determines that the Entertainer Applicant does not satisfy the Assessment Criteria but the Entertainer Applicant nevertheless believes that she satisfies the Assessment Criteria and desires to Perform at the Club as an IPE, and the Entertainer Applicant then proceeds to Perform at the Club as an employee in accordance with the provisions of Section 8.9 immediately above, Club management shall undertake at the request of the Entertainer, but in no event earlier than the second month anniversary from the time the Entertainer Applicant first began to work at the Club as an employee, an additional Assessment utilizing the same Assessment Criteria that were applied in the initial Assessment, in order to determine whether the Entertainer Applicant then meets the Assessment Criteria to be able to Perform at the Club as a bona fide Independent Professional Entertainer (the "Assessment Review").

8.11    If the Assessment Review determines that the Entertainer does not satisfy the Assessment Criteria, then the Club shall so inform the Entertainer and she shall not be permitted to thereafter Perform at the Club as an IPE. She may, however, provide a Justification Letter in

64

the form as set forth in Section 8.9 above, which will be subject to the same Club CPA review as established therein.

8.12    Within thirty (30) days of the Effective Date, each Club shall provide to each Entertainer then Performing at that Club, either in a "hard copy" writing or in an electronic format, an offer to permit such individual to terminate her IPE Dancer Contract with the Club and to be hired as an employee consistent with the provisions of Section 8.23 (the "Enhanced Offer of Employment"). The contents of the Enhanced Offer of Employment shall be agreed upon by Class Counsel and Defense Counsel, and may be subsequently modified by the Defendants without approval from Class Counsel in order to comply with any changes in applicable laws.

8.13    No Entertainer shall be required to make her decision before she has had an opportunity to fully review the Enhanced Offer of Employment, and before she has been afforded an opportunity to have the Enhanced Offer of Employment reviewed by professionals (accountants, attorneys, etc.) of her choice.

8.14    Neither the Clubs nor anyone in Club management shall take any position as to, and shall not in any manner attempt to influence, the choice that an Entertainer should make on the Enhanced Offer of Employment.

8.15    The applicable Club may require the Entertainer Applicant to attest in writing to the Club's compliance with the provisions herein.

8.16    Each Entertainer who declines the Enhanced Offer of Employment shall be required, no later than six months after she commences performing as an IPE, to submit a fully completed and signed  Entertainer Assessment Form in order to permit the Club to undertake an Assessment in the form generally discussed in Section 8.9 above. The Club shall be entitled to rely upon the answers provided by the Entertainer on the Entertainer Assessment Form as being

65

truthful responses, and shall have no obligation hereunder to conduct its own investigation of such Entertainer prior to conducting the Assessment.

8.17    Following receipt of the Entertainer Assessment Form, Club management shall undertake, no later than three (3) months from the Effective Date, the Assessment generally described in Section 8.10 above in order to determine whether the Entertainer meets the Assessment Criteria to be able to continue to Perform at the Club as a bona fide Independent Professional Entertainer.  If the Assessment determines that the Entertainer does not satisfy the Assessment Criteria, then the Club shall so inform the Entertainer Applicant and further inform her that the Club will, at the end of seven (7) days thereafter, terminate her Dancer Contract and hire her as an employee in accordance with the terms of Section 8.21 herein.  If the Entertainer desires to continue to Perform at the Club as an IPE, she may, within that seven (7) day period, provide to the Club a Justification Letter, subject to review by the Club's CPA as specified in Section 8.10 above.  If she does (subject to Club CPA review), she will be permitted to continue to Perform at the Club as a bona fide Independent Professional Entertainer.  If she does not and she declines to be hired by the Club as an employee, or if the Club's CPA does not concur with the Justification Letter, the Club will be permitted to immediately thereafter terminate her Dancer Contract regardless of any termination notice period that might otherwise be contained in such Dancer Contract.

8.18    Any Entertainer Performing as an IPE at any Club and who is not in breach of her Dancer Contract shall be entitled, at any time and regardless of whether she satisfies the Assessment Criteria, to notify Club management, in writing, of her desire to terminate her Dancer Contract and to be hired as an employee.  Such Club shall, within three business days thereafter, terminate such Entertainer's Dancer Contract and if she is deemed by the club to be qualified to

66

perform as an employee entertainer, hire the Entertainer as an employee in accordance with the terms as set forth in Section 8.21 below.

8.19    Once an Entertainer who is Performing as a bona fide IPE at a Club requests, in accordance with the terms of Sections 8.12 or 8.20, to terminate her IPE contract and to be hired as an employee, and if she is so hired as an employee, then such Entertainer shall at all times thereafter  Perform only as an employee at the Club and shall not be entitled to re-convert back to an IPE unless she undergoes a new Assessment and is found to meet the Assessment Criteria to be able to Perform at the Club as an IPE.

8.20    For Entertainers or Entertainer Applicants who select to work as a Club employee, or who are otherwise required to work as a Club employee pursuant to the terms of this Agreement:

        i)    They shall be entitled to all of the rights, benefits and privileges of, and subject to all of the obligations and policies (including but not limited to all of those aspects of control exercised, or that could be exercised, by the Club over its non-managerial employees) that apply to, all other non-managerial Club employees, without discrimination, except as may be specifically provided to the contrary in this Section 8.21;

        ii)    They shall be paid by the Club at the then-existing applicable minimum wage rate.  For Clubs located in states where a tip credited wage is permitted, such Clubs may, at their option, retain Entertainers as employees pursuant to a tip credited wage in accordance with all laws that apply to the payment of such a tip credited wage;

        iii)    They shall be entitled to commissions of no less than 20% of the amount that their Dance Fees exceed the Cost of Employment for such Entertainer

67

on that Date of Performance (each particular Club being free to, in its absolute discretion, pay Dance Fee commissions of a higher amount either to Entertainers as a whole or to particular Entertainers);

iv)     They shall be entitled, if permitted by applicable law, to commissions of no less than 20%  of their sale of Conversation Beverages (each particular Club being free to, in its absolute discretion, pay Conversation Beverage commissions of a higher amount either to Entertainers as a whole or to particular Entertainers);

v)     They shall be reimbursed by the Club for all application and license/permit fees that are incurred by the Entertainer after she has been hired as an employee for any and all licenses or permits that she is legally required to obtain and maintain in order to be able to continue to Perform at the Club (Entertainer Applicants who will Perform at a Club as an Employee, and Entertainers who either choose to Perform at a Club as an employee or who are required to Perform as an Employee pursuant to the terms of this Agreement, will be required to possess, as a condition of being hired, all legally required licenses and permits, for which the Club shall have no obligation to reimburse such Entertainers);

vi)     They shall not be required to pay any form of fee for the redemption, or receive anything below the actual "face" value, of the scrip certificates they may receive while working (for employee Entertainers, scrip redemption shall be made through payroll checks);

vii)     They shall be provided by the Club two logo costumes per month (which they will be required to wear while working) and, if required by law,

68

laundering services for such costumes, as well as a $25.00 monthly allowance for footwear;

viii)   They may be provided by the Club training in the methods to increase their sales, both in regard to their performance skills and their physical presentation (hair, make-up, etc.), and may also be provided dance lessons by the Club;

ix)   They may be required to tip out to, or tip pool with, the Club's other regularly tipped employees (as designated by the Club) in the amount of  15% of all of their daily tip income (whether by way of "cash," credit card, scrip, or otherwise);

x)   They shall be provided by the Club with any unemployment insurance coverage as mandated by law;

xi)   They shall be provided by the Club with any workers' compensation coverage as mandated by law;

xii)   They shall be provided by the Club with all social security contributions as mandated by law;

xiii)   They shall be afforded all paid and unpaid breaks as required by law;

xiv)   They shall be afforded all applicable statutory protections, rights and benefits of employees, including but not limited to those under the National Labor Relations Act, the Fair Labor Standards Act, the Equal Employment Opportunity Act, Title VII of Civil Rights Act of 1964, Americans With Disabilities Act (ADA), Family Medical Leave Act ("FMLA") and the Age Discrimination in Employment Act of 1967.

69

8.21    The provisions contained in the Enhanced Offer of Employment as set forth immediately above shall create no contractual rights, or causes of action predicated thereon, in the event that an Entertainer rejects the Enhanced Offer of Employment or in the event that an Entertainer Applicant chooses to Perform at the Club as an IPE instead of working at the Club as an employee and is permitted, pursuant to the terms of this Agreement, to Perform at the Club as a bona fide Independent Professional Entertainer.

8.22    Nothing contained in this Article or in this Agreement shall in any way preclude any Club from terminating the employment of any Entertainer for any reason not prohibited by law (by way of example only, Clubs may, under this Agreement, freely terminate the employment of Entertainers who fail to appear as scheduled or whose entertainment services do not generate sufficient revenues to justify maintaining such individuals as employees).  However, no Club may terminate the employment of an Entertainer for the reason that she chose to work at the Club, either initially or by changing from an IPE, as an employee.

8.23    For Entertainers or Entertainer Applicants who select, and are permitted under the terms of this Agreement,  to Perform bona fide IPE's at a Club:

i)      The Club shall not control the manner, means, or details of the bona fide IPE Entertainers' entertainment services except to ensure: a) compliance with all applicable laws and regulations; b) that no damage to the Club's property occurs; and c) the premises are used in a safe fashion for all those thereon.  Nevertheless, IPE Entertainers shall be obligated to comply with all the terms of her Contract including to participate in stage performance rotations in order to ensure a continuous entertainment performance in the Clubs;

ii)     The Club shall not be permitted to impose any work schedule upon the bona fide IPE's in regard to the Dates of Performance during which they appear to Perform (although the Club

70

may require a bona fide IPE to provide the Club with the schedule she selects to Perform at least one week in advance for any week during which she intends to Perform);

iii)     They shall not be required to tip out to, or tip pool with, any Club employees;

iv)     They shall not be subject to any controls by the Club over the costumes they wear while Performing, other than requiring that such costumes comply with all laws.  The Club may also require that each bona fide IPE appear in a manner consistent with a professional entertainer Performing in an upscale entertainment facility;

v)      They shall abide by all rules that the Club imposes upon all business invitees (for example, no weapons allowed on the premises, the right to bag search, no use of cell phones in the show-bar area in order to prohibit unconsented photography and video recording and thereby ensure privacy, etc.);

vi)     They shall abide by all rules for bona fide IPE's voted upon by a majority of IPE's then under contract with the Club who attended the at-least-annual IPE meeting discussed in the subsection immediately below;

vii)    At least once per year, each Club shall conduct a meeting open to all bona fide IPE's then under contract with that Club (the "IPE Meeting").  The purpose of the IPE Meeting shall be to provide a forum for the IPE's to collectively negotiate revisions to the Dancer Contracts (which the Clubs generally revised once per year); to decide whether the IPE's desire to form a committee in order to communicate to Club management on the price of private dances, the general operations of the Club in order to potentially enhance IPE income including advertising, rules, policies or directives that they desire all IPE's to follow (the adoption of such rules requiring the consent of a majority of IPE's attending the IPE Meeting); and to allow the IPE's to vote to revise, modify, or revoke, any rules

they previously adopted or to revise or modify any Club policies or business operations that concern, affect, or impact upon the IPE's and/or the gross income they can generate from their independent business activities (the adoption of such revisions to previously adopted IPE rules or to previously adopted Club policies or business operations requiring the consent of a majority of bona fide IPE's then under contract with the Club), which shall include but not be limited to:

a)      The prices to be charged for all personal entertainment performances (including changes to such prices when special events occur in the area);

b)      The handling and administration of large scrip purchases to ensure a fair allocation of risk of customer chargebacks;

c)      How often and under what circumstances the Club or the Disc Jockey should run promotional dances (such as 2 for 1's);

d)      They type of promotional dances to be Performed at the Club;

e)      How stage performances are to be structured and allocated (including but not limited to the length of time for each stage performance, the number of songs per each stage performance, factors to determine the rotation of stage performances, under what circumstances an IPE may decline to engage in a specific stage performance or stage performances in general during a Date of Performance, and how stage performances are to be allocated between and among employee Entertainers and IPE's);

f)      Whether there should be a minimum number of hours each IPE is expected to be available to perform on the Club's premises during each Date of

72

Performance she selects to Perform, and if so what that minimum number would be; and

   g)  Whether there should be a minimum number of days per week each IPE is expected to be available to perform on the Club's premises during weeks that she decides to Perform, and if so what that minimum number would be.

  8.24 <u>Posting of Contract Damages List</u>: Upon the Effective Date, each Club will post a list of all contract damages, if any, which a bona fide IPE may be charged while under contract with the Club.  The notice of contract damages shall be posted in the IPE dressing room.

  8.25 <u>Limitation of Contract Damages:</u> No Club may impose any contract damage or monetary penalty on an IPE that is not identified on the notice of contract damages.

  8.26 <u>Records of Contract Damages:</u> Any Club that charges an IPE contract damages, or imposes a monetary penalty thereon, shall provide a written explanation of the contract damage to the IPE and for the Club's records. The Club shall maintain said record for at least one (1) year. IPE's shall be provided, within the notice of contract damages, an avenue of complaint above that of the club manager. The person or entity responsible for resolving such complaints shall be provided with the written explanation by the IPE should she assert that the contract damage was wrongly imposed.

  8.27 Prior to the Judgment becoming Final, legal counsel for the Clubs may create a training video that explains the options for Entertainer and Entertainer Applicants set forth in this Article (the "Training Video"), the Assessment, and the Assessment Criteria.  Prior to use in the Clubs, the Training Video may be reviewed and approved by Class Counsel. .  The Training Video may be modified from time to time for legal compliance purposes.

  8.28 In recognition of the fact that the business and regulatory landscape may

significantly change over time, the Parties agree that the mandatory obligations upon the Clubs as set forth in this Article VIII, including all Sections and subsections thereof, shall expire upon the earliest of the following two dates: (i) five (5) years after the Effective Date; or (ii) the date upon which there are changes to any applicable statute, regulation, or other law that Defendants reasonably believe would require a modification to any of the provisions set forth in this Article, including all Sections and subsections thereof, in order to comply with such changes to the applicable statutes, regulations, or laws.

8.29    Defendants maintain the right to make further changes to their business practices so long as such changes do not materially and adversely undermine the non-monetary terms set forth in this Article. In addition, Defendants maintain the right to make changes to any of the non-monetary terms set forth in Article VIII if changes to those terms are warranted by a change in statutory or common law that is material to the classification of independent contractors/non-employees and/or employees.

## IX.    ATTORNEYS' FEES AND COSTS, AND CLASS REPRESENTATIVE INCENTIVE PAYMENTS.

9.1    Payment of the Attorney Fee and Expense Award:   Defendants shall pay to Class Counsel the Cash Pool amount of the Attorney Fee and Expenses Award as determined and ordered by the Court by depositing into an escrow account to be established by Modern on the following schedule:

9.1.1    Four hundred fifty thousand dollars ($450,000.00) within thirty (30) days of the Effective Date of this Agreement;

9.1.2    Four hundred thousand dollars ($ 450,000.00) within ninety (90) days of the Effective Date of this Agreement.

9.1.3   33.3%  of redeemed Secondary Pool Remuneration,(Indirect Attorney Fees) not to exceed a total of three hundred thousand dollars ($300,000.00) of the Secondary Pool Remuneration to which she is entitled, which Modern shall remit said sums to Class Counsel expeditiously upon receipt of the same.

9.2   <u>Allocation of Attorneys' Fees and Court Approval</u>:  Subject to Court approval, Class Counsel shall, within their sole discretion, allocate Attorney Fees and Expense Award amongst the various firms that constitute Class Counsel.  As directed by the Court's Preliminary Approval Order, Class Counsel shall apply to the Court for an award of attorneys' fees and costs as set forth in this Agreement. The petition for the Attorney Fee and Cost Award shall set forth the proposed allocation of attorneys' fees endorsed by Class Counsel.  Defendants shall not oppose Class Counsels' application so long as the application requests an aggregate Attorney Fee and Cost Award that complies with the terms of this Agreement, and in no event shall the Defendants be requested or required to pay any attorneys' fees, costs, or expenses in excess of those set forth in this Agreement.  No attorney shall be entitled to any award or allocation of attorneys' fees or costs prior to satisfying the following two conditions:

(a)   Filing a petition for attorneys' fees and/or costs with the Court as set forth in Section 9.2.

(b)   Obtaining their clients' consent to be bound by the terms and conditions of this Agreement without objection.

9.3   <u>No Appeal</u>:   Any attorney making a request for attorneys' fees in conformity with Section 9.1 shall be bound by the decision of the Court, and expressly waives any right to appeal the Court's fee award.

9.4    <u>Litigation Expenses and Administrative Costs</u>:  With the exception of the payments for the Attorney Fee and Expense Award made pursuant to Sections 5.2.5 and 9.1, all other Litigation Expenses incurred in connection with prosecuting this Action and in the Pending Proceedings shall be borne exclusively by Class Counsel.   Under no circumstances shall Defendants be responsible for Litigation Costs that exceed the amount of the maximum Attorney Fee and Expense Award provided for herein; that being one million two hundred thousand dollars ($1,200,000.00).  Within fifteen (15) days of entry of the Preliminary Approval Order, Defendants shall remit to the Settlement Administrator, fifty thousand dollars ($50,000.00) towards the cost of mailing the Class Notice.

9.5    <u>Enhancement Payments</u>:  Class Counsel may apply to the Court for each of the Class Representatives incentive awards for the time, effort and expense that they incurred in securing the Settlement in this Action (in addition to compensating them for their portion of the overall Settlement proceeds available to the Settlement Class).   Subject to Court approval, the Enhancement Payments for each of the Class Representatives will have two monetary components. The first, in the amount of five thousand dollars ($5,000.00) will be in recognition of each of the Class Representative's efforts in coming forward as a Class Representative and her efforts to secure the Settlement in this Action.   The second, in the amount of ten thousand dollars ($10,000.00), will act as consideration for a full, general, and comprehensive release of that individual's General Released Claims. The Enhancement Payments as ordered by the Court shall be paid by Defendants within thirty (30) days of the Effective Date, and shall not exceed, in the aggregate, thirty thousand dollars ($ 30,000.00).

## X.    <u>CLASS NOTICE AND CLAIM FORMS</u>

10.1    Information to be Supplied by each Deja Vu-Affiliated Nightclub as identified in Exhibit A: Within fourteen (14) days of the entry of the Preliminary Approval Order by the Court, Defendants will provide the Settlement Administrator, to the extent available in Defendants' records, the following information:

10.1.1  Each Class Member's legal name;

10.1.2  Each Class Member's last known address from the Class Member's Qualifying Club's last Dancer Contract; and

10.1.3  The Deja Vu-Affiliated Nightclub at which each Class Member last Performed prior to the Preliminary Approval Order, as reflected in the Deja Vu-Affiliated Nightclubs' records.

10.2    Confidentiality of Information:  The Parties agree that the information to be disclosed pursuant to Section 10.1 shall be deemed confidential, attorneys' eyes only. Notwithstanding these restrictions, the Deja Vu-Affiliated Nightclubs and their representatives may use this information in order to determine entitlement to, and the amount of, Cash Payments and Rent Credits.

10.3    The Settlement Administrator's Obligations and Duties: As set forth below, the Settlement Administrator shall be responsible for the mailing of the Class Notice and adjudication of all disputed claims related to the eligibility or payment of claims from the Cash Pool.

10.4    Mailing of Notice:  Within fourteen (14) days of receipt of the Class Member information identified in Section 10.1, the Settlement Administrator shall mail the Class Notice to each Class Member. The envelope containing the Class Notice will identify the Settlement Administrator's return address only, and shall not contain *any* Deja Vu-Affiliated Nightclub-

related information from which a reader of the envelope could glean that it relates to the adult nightclub industry.  The envelope shall include the Class Notice Documents.

10.5    <u>Claims Adjudication</u>: As set forth in Article VI above, the Settlement Administrator shall be responsible for issuing Cash Payments to Class Members seeking payment from the Cash Pool.  The Settlement Administrator shall be responsible for adjudicating all contested claims.

10.6    <u>Return of Class Notice</u>:  If the Class Notice Documents mailed to a Class Member are returned within twenty-one (21) days of the initial mailing, with a forwarding address provided by the Postal Service, the Class Notice Documents will be re-sent by the Settlement Administrator to the forwarding address within seven (7) days of return, but a Properly Completed Cash Election Form must nevertheless be remitted to the Settlement Administrator and postmarked by the close of the Election Period in order for the Class Member to have a Valid Cash Pool Claim.

10.7    <u>Posted Notice</u>:    In addition to the mailed notice identified in Section 10.4, Defendants shall post the details of the Cash Pool and Dancer Rent Credit Pool ("Posted Notice"). Each Deja Vu-Affiliated Nightclub shall prominently display the Posted Notice in the Deja Vu-Affiliated Nightclub's Entertainer dressing room. The Posted Notice shall remain posted until the redemption period for the Dancer Rent Credit Pool expires.

10.8    <u>Class Notice Verification</u>:  No later than thirty (30) days after the Settlement Administrator has completed the mailing of the Class Notice as set forth in Sections 10.4 and 10.6, and before the Fairness Hearing, the Parties shall file with the Court a notice of compliance stating that the Class Notice has been mailed to the Class Members.

## XI.    **<u>OBJECTIONS AND OPT OUTS</u>**.

11.1    Objections to Settlement:  All objections to the Settlement must be in writing and must be filed with the Court in accordance with the Court's Preliminary Approval Order. All objections must be mailed to both Class Counsel and Defendants' Counsel.

11.2    Procedures for Objections: The procedures of objection shall be as set forth in the Preliminary Approval Order.

11.3    Opting Out of the Settlement:  Any Class Member who wishes to be excluded from the Settlement must mail to the Settlement Administrator, at the address that is set forth in the Class Notice, a request for exclusion from the Settlement personally signed by the Class Member and postmarked no later than ninety-five (95) days from the entry of the Preliminary Approval Order or the re-mailing of a particular Class Notice as permitted in Section 10.6.  The Settlement Administrator shall date stamp the original of any Opt Out Form and serve copies on both Class Counsel and Defendants' Counsel via electronic mail and United States Mail within five (5) business days of receipt of any such statement.  Class Counsel shall file copies of all timely requests for such exclusion, not timely rescinded, with the Court prior to the Fairness Hearing.

11.4    Failure to Properly Opt Out, and Opt Out Limitations:  Any Member of the Settlement Class who does not fully complete, personally sign, and timely mail notice of her intention to opt out of the Settlement will be deemed included as a Participating Class Member in accordance with this Settlement.  All Class Representatives waive any right to opt out of the Settlement.

11.5    Conflicting Responses:  If a Member of the Settlement Class submits a Cash Election Form and a request for exclusion, the request for exclusion will be invalid and the Member of the Settlement Class will be deemed to be a Participating Class Member and be bound by the terms of the Settlement and this Agreement.

79

11.6    <u>Notification to Counsel of Opt Outs</u>:  Within ten (10) days following the last of the deadlines to opt out, the Settlement Administrator shall provide Class Counsel and Defendants' Counsel with information setting forth the total number of opt outs and the identities (which shall include the information required by the terms of this Agreement) of such individuals who have decided to opt out.

## XII.    <u>RELEASES AND COVENANTS</u>

12.1    <u>Scope of Releases</u>:  The Released Claims against each and all of the Released Defendants shall be released and dismissed with prejudice and on the merits (without an award of fees or costs to any Party other than as provided in this Agreement) upon entry of the Final Approval Order and Judgment becoming Final, provided that the General Released Claims shall be released upon the execution of the General Release Form, and provided that a Class Member's FLSA  Claims shall be released and dismissed with prejudice on the merits (without an award of fees or costs to any party other than as provided in this Agreement) only if that Class Member Consents to Join this Action.

12.2    <u>Release of Released Defendants</u>:    As of the Effective Date, the Class Representatives and each and every one of the Settlement Class Members, individually and on behalf of their heirs, estates, trustees, executors, administrators, representatives, agents, successors, and assigns, and anyone claiming through them, or acting or purporting to act on their behalf or for their benefit, shall be deemed to have, and have actually, knowingly and voluntarily, forever released, relinquished, acquitted, discharged, and held harmless,  each and every one of the Released Defendants from, and covenanted not to sue each and everyone one of the Released Defendants regarding, each and every one of the General Released Claims (in the case of the Class Representatives), the Settlement Class Members' Released Claims (in the case of the Settlement

80

Class Members), and the Participating Class Members' Released Claims (in the case of the Participating Class Members), and by operation of the Judgment becoming Final shall have fully and finally released, relinquished, acquitted and forever discharged all such Claims against each and every one of the Released Defendants; and they further agree that they shall not now or hereafter initiate, maintain, or assert any General Released Claims (in the case of the Class Representatives), any Settlement Class Members' Released Claims (in the case of the Settlement Class Members), or any Participating Class Members' Released Claims (in the case of the Participating Class Members) against the Released Defendants or against any one or group of them in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicating body.  Without in any way limiting the scope of the releases described in this Section and in this Article XII, these releases cover, without limitation, any and all Claims for attorneys' fees, costs, or disbursements incurred by Class Counsel or by any other counsel representing the Class Members or Settlement Class Members, or by the Class Representatives or Settlement Class Members themselves, or by any one or group of them, in connection with or related in any manner to the Actions, the Settlement of the Action, any other action or proceeding, the administration of the Settlement, and/or the Released Claims, except to the extent otherwise specified in this Agreement.

12.3   Each and every Settlement Class Member, in return for the complete and full considerations, terms, covenants and conditions as set forth in this Agreement, further specifically releases and waives each and all of their rights to bring any Claim, charge, action, proceeding, cause and/or causes or action predicated on the matters that comprise the Settlement  Class Members' Released Claims at any time in the future against the Released Defendants, or against any one or group of them, for any matters arising prior to the Effective Date.  As part of the

Settlement of this matter, each Settlement Class Member acknowledges and agrees that the Court will enjoin, and maintain authority to enforce an injunction precluding, any Claims released by this Agreement from being further litigated, brought or pursued by any Settlement Class Member or otherwise.

      12.4    <u>Release of FLSA Claims</u>:  With respect to those Claims that could be asserted under the FLSA, a Class Member's submission of a Valid Cash Pool Claim or a Valid Secondary Pool Claim shall be deemed as that Class Member's Consent to Join.  The filing of the Claim Form before the Court shall fully, finally and forever settle and release all such FLSA Claims and matters as of the Effective Date for Cash Pool Claimants, and the filing of the Claim Form before the Court where the Participating Class Member selects to receive her Monetary Settlement Benefit in the form of Secondary Pool Remuneration, or the submission of a Secondary Pool Claim Form to a Qualifying Club, shall fully, finally and forever settle and release all such FLSA Claims for Secondary Pool Claimants as of the date upon which she receives the first of her Secondary Pool Remuneration.

      12.5    <u>Claims Enjoined</u>:  As of the Effective Date, the Class Representatives, all Settlement Class Members and all Participating Class Members, shall be permanently barred and enjoined from initiating, asserting, or prosecuting against the Released Defendants or against any one or group of them, in any federal or state court or before any administrative body, tribunal, arbitration panel, or other adjudicating body,  any and all of the General Released Claims (in the case of the Class Members), any Settlement Class Members' Released Claims (in the case of the Settlement Class Members), and any Participating Class Members' Released Claims (in the case of the Authorized Claimants).

      12.6    <u>Knowing Execution</u>:  Each Class Representative acknowledges, agrees, and

understands that: (a) she has read and understands the terms of this Agreement; (b) she has been advised in writing to consult with an attorney before executing this Agreement; (c) she has obtained and considered such legal counsel as she deems necessary; and (d) she has been given twenty-one (21) days to consider whether or not to enter into this Agreement (although she may elect not to use the full 21 day period at his/her option).

12.7    Indemnity Regarding Participating Class Members' Released Claims:    For and in return of the complete and full considerations, terms, covenants and conditions as set forth in this Agreement, the Participating Class Members, and each and every one of them, agree to waive their right to bring any Claims against the Released Defendants, or any one or group of them, at any time in the future arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Participating Class Members' Released Claims at any time in the future.

12.8    Waiver of Additional Compensation and Indemnity:  Except as otherwise specifically provided for in this Agreement, the Participating Class Members, and each and every one of them, acknowledge and agree that they will not seek to enforce, recover or collect upon any damages, awards, remunerations, sanctions, costs and/or attorney fees assessed against the Released Defendants, or against any one or group of them, arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Participating Class Members' Released Claims, including but not limited to any investigations, proceedings, lawsuits, Claims, charges, cause and/or causes of actions that she may have or that may be asserted by others, or by any governmental entity, organization or agency, on her behalf, in her interest, or for her benefit, either in whole or in part.

12.9   <u>Claims by Third Parties</u>:  Irrespective of the releases, waivers, indemnifications, and satisfactions set forth herein, if any court, tribunal, firm, third person or persons, business entity, or governmental entity, organization or agency brings, asserts, or assumes jurisdiction over any form of investigation, proceeding, lawsuit, claim, charge or cause of action for or on behalf of any such Participating Class Member, and/or in her interest or for her benefit, either in whole or in part, against the Released Defendants, or against any one or group of them, arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Participating Class Members' Released Claims, such Participating Class Member shall reasonably cooperate with any request from the Released Defendants, at the Released Defendants' cost, to demand the dismissal, with prejudice, of any such investigation, proceeding, lawsuit, claim, charge or cause of action, and/or, as may be appropriate, her withdrawal therefrom (by way of example and without limitation, "withdrawal" includes, where applicable, a formal written request for withdrawal of, or non-participation in, an administrative proceeding, formally "opting"-out of an opt out class action lawsuit, and refraining from formally "opting"-in to an opt-in class or collective action matter).  In the event, however, that any court, tribunal, or governmental entity, organization or agency should assess any damages, awards, remunerations, sanctions, costs, and/or attorney fees of any kind whatsoever against any Released Defendant (in this Section, sometimes generally hereinafter simply referred to as "Award") arising out of, relating to, associated with, based upon, or concerning, in any way, manner, regard or fashion whatsoever, the Participating Class Members' Released Claims,  the Participating Class Members, and each and every one of them, agree to specifically waive entitlement to, and refrain from collecting upon, any such Award.

12.10   <u>Sufficiency of Consideration</u>: Each and every Participating Class Member specifically represents that sufficient and adequate consideration is being conveyed to her through

this Agreement and the Settlement to support the releases of any and all of the Participating Class Members' Released Claims, irrespective of the fact that the Participating Class Members are only entitled to one form of remunerative recovery by way of either the Cash Pool or Secondary Pool Remuneration.

12.11   <u>Satisfaction of Participating Class Member Claims</u>:   The Participating Class Members specifically acknowledge that the payments made, and other considerations conveyed, by the Defendants to the Participating Class Members as set forth herein represent valid compromises, settlements, resolutions, accords, satisfactions, waivers and releases of any and all claims for FLSA or state wage/labor law coverage; minimum wage; overtime; liquidated, punitive and/or exemplary damage payments; penalties; costs; attorney fees; and/or any other benefits allegedly due the Participating Class Members in regard to any matters or conduct arising from, relating to, associated with, based upon, or concerning, in any way, matter, regard or fashion whatsoever, the Participating Class Members' Released Claims.

12.12   <u>Acknowledgement of Other Claims</u>:   The Class Representatives, and each and every one of them, specifically represent that to their own personal knowledge: A) There are no other lawsuits, claims, charges, actions, proceedings, investigations, cause and/or causes of actions of any kind whatsoever, other than those that are set forth in Plaintiffs' First Amended Class Action and Collective Action Complaint and Demand for Jury in this Action and in the second amended complaint to be filed as part of this Settlement, pending or anticipated against the Released Defendants, or against any one or group of them, whether filed or unfiled, and whether civil or criminal, arising from, relating to, associated with, based upon, or concerning, in any way, manner, regard, or fashion whatsoever, the Participating Class Members' Released Claims, with the exception of those matters set forth in Section 2.16; B) that none of them have filed, been served with, or have

any personal knowledge of any such matters; and C) that they have not participated in, or have provided assistance or cooperation to, such matters.

12.13   <u>Release of Participating Class Members</u>:   Subject to any Claims that they may have for libel, slander, business disparagement, damage or destruction of property, assault and/or battery, or the like, each and every Released Defendant hereby, knowingly and voluntarily, releases, acquits, and forever discharges, each and every Participating Class Member from any and all claims of every conceivable kind or nature whatsoever that they have, had, or may have, against the Participating Class Members, or against any one or group of them, whether known or unknown, whether fixed or contingent, whether asserted or unasserted, and whether filed or unfiled, at law, in equity or otherwise, that arise out of, relate to, are associated with, are based upon, or concern in any way, manner, regard or fashion whatsoever, the business arrangement that the Clubs had or have with the Participating Class Members and which occurred during the Class Period and/or up until the Effective Date of this Settlement, including, but not limited to, any claim for breach of contract, any claim purportedly arising out a Dancer Contract, or any claim that could exist as a result of the Participating Class Member's election to declare herself an "employee" under the terms of a Dancer Contract.   Notwithstanding the foregoing, Defendants retain the right to bring claims based upon future violations of the terms of Dancer Contracts and for claimed breach of the terms of this Agreement.

12.14   <u>Performing in the Future at the Clubs</u>:   The Plaintiffs acknowledge that some of them are no longer Performing at any one of the Clubs and that the considerations conveyed to them hereby release the Released Defendants, and each and every one of them, from any and all claims that arise out of, relate to, are associated with, are based upon, or concern in any way, manner, regard or fashion whatsoever, assertions of wrongful termination, failure to "hire," or the

86

like.  Nothing in this Agreement shall require any Club to permit any Class Member not under contract at the time of execution of this Agreement to Perform on its premises at any time in the future, and the Plaintiffs release the Released Defendants from, and waive any right to assert at any time in the future, any claims of any conceivable kind or nature whatsoever that they may have that arise out of, relate to, are associated with, are based upon, or concern, in any way, manner, regard or fashion whatsoever, the refusal of any Club to permit the Plaintiffs, or any one or group of them, to Perform on its premises at any time in the future.

12.15   <u>Waiver of California Civil Code Section 1542</u>:  To effect the full and complete releases as described above, Plaintiffs expressly waive and relinquish all rights and benefits of Section 1542 of the Civil Code of the State of California, and do so understanding and acknowledging the significance and consequence of specifically waiving Section 1542.  Section 1542 of the Civil Code of the State of California states as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Thus, notwithstanding the provisions of Section 1542, and to implement the full and complete releases, satisfactions, indemnifications, waivers and discharges set forth above, Plaintiffs expressly acknowledge that, except as specifically reserved above, this Agreement is intended to include in its effect, without limitation, all claims Plaintiffs do not know or suspect to exist in their favor at the time of their signing this Agreement, and that this Agreement contemplates the extinguishment of any such claims.  Plaintiffs warrant that they have read this Agreement, including this waiver of California Civil Code Section 1542, and that they have consulted with or had the opportunity to consult with counsel of their choosing about this Agreement, and specifically about the waiver of Section 1542, and that they understand this

87

Agreement and the Section 1542 waiver and that they freely and knowingly enter into this Agreement.

12.15   With respect to the General Released Claim each Class Representative shall be deemed to have expressly, knowingly, and voluntarily waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits she may otherwise have or have had pursuant to Section 1542 of the California Civil Code and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein.  In connection with the General Released Claims, the Class Representatives acknowledge that they are aware that they may hereafter discover claims presently unknown and unsuspected or facts in addition to or different from those which they now know or believe to be true with respect to matters released herein. Nevertheless, the Class Representatives acknowledge that a portion of the consideration received herein is for a release with respect to unknown damages and complaints, whether resulting from known injuries and consequences or from unknown injuries or unknown consequences of known or unknown injuries, and state that it is the intention of the Class Representatives in agreeing to this release to fully, finally, and forever to settle and release all matters and all Claims that exist, may exist (currently or hereafter), or might have existed (whether or not previously or currently asserted in any action or proceeding), constituting the General Released Claims.

12.15   Additional Facts:  Plaintiffs further acknowledge that they later may discover facts different from or in addition to those that they now know or believe to be true regarding the matters released or described in this Agreement, and even so, they agree that the releases, satisfactions, indemnifications, waivers and discharges contained in this Agreement shall remain effective in all respects, notwithstanding any later discover of any different or additional facts.  Plaintiffs expressly assume any and all risks of any mistake in connection with the true facts involved in the

2:16-cv-10877-SJM-PTM   Doc # 29-2   Filed 02/02/17   Pg 90 of 126   Pg ID 640

matters, disputes or controversies released or described in this Agreement, or with regard to any facts now unknown to Plaintiffs relating thereto.

12.16   <u>Non-Assignment of Claims</u>:   Except as set forth in this Agreement regarding the payment of Indirect Attorney Fees, each Participating Class Member represents and agrees that she has not and will not assign any of her Participating Class Members' Released Claims to any other person or entity, and each Settlement Class Member shall be deemed to have, and have actually, knowingly and voluntarily, represented that she has not assigned any of her Settlement Class Members' Released Claims to any other person or entity.  These representations shall survive the execution of this Agreement and the approval by the Court of the Settlement contemplated herein.

12.17   <u>Dismissals</u>:   Subject to Court approval, the Class Representatives and all Settlement Class Members shall be bound by this Agreement, and all of their Released Claims shall be dismissed with prejudice and fully and forever released, even if such Persons never received actual notice of the Action or this Settlement.

## XIII.   TERMINATION OF SETTLEMENT

13.1   <u>Events Permitting Termination</u>:  This Agreement and the Settlement shall terminate and be canceled within ten (10) business days after any of the following events if one of the Parties provides written notification of an election to terminate this Agreement and the Settlement based upon the occurrence of any of the following circumstances:

(a)   The Court rescinds preliminary approval of this Agreement, or declines to enter, or materially modifies, the contents of the Preliminary Approval Order;

(b)   Each and every one of the Parties has not signed this Agreement at least fifteen (15) days prior to Final Approval;

89

(c)     The Court declines to provide Final Approval of this Agreement, or declines to enter the Judgment that fully adopts the terms of this Agreement, or enters a Judgment that material modifies, or that is at material variance from, the terms of this Agreement;

(d)     The Court declines to, or is unable to, enjoin each and every one of the Pending Proceedings identified in Section 2.16 with the Parties acknowledging that the ability of the Court to enjoin all such Pending Proceedings is a condition precedent to the Defendants entering into the Settlement and executing this Agreement;

(e)     The Court's Judgment is vacated, reversed or modified in any material respect in any appeal or other review, or in any collateral proceeding occurring prior to the Effective Date;

(f)     The Effective Date does not occur for some other reason; or

(g)     Any federal or state authorities object to, or request material modifications of, the Agreement and the Court adopts such objections and/or modifications.

13.2    <u>Consequences of Termination</u>:  In the event this Agreement does not receive Final Approval by the Court, or in the event the Court's Final Approval is overturned, reversed, vacated, or modified in any material way on appeal or review or by or through any collateral proceeding, or in the event the Settlement is terminated or fails to become effective in accordance with the terms of this Agreement, the Parties shall request the Court to restore them to their respective positions in the Action as of January 31, 2017.  In such event: a) the terms and provisions of this Agreement shall have no further force or effect with respect to the Parties; b) neither this Agreement nor any discussions or documents regarding it, or the Settlement prior to the termination/cancellation of this Agreement, shall be used in the Action or in any other proceeding for any purpose; c) any order or judgment entered by the Court in accordance with the terms of

this Agreement shall be treated as vacated, *nunc pro tunc*; d) no prejudice shall attach to the Defendants' pending (at the time of submission of this Agreement) motion to compel the Named Plaintiff into individualized arbitration and to dismiss and/or stay this action.

13.3   *Costs of Termination:*   If any Party terminates this Agreement, either together or separately, both Plaintiffs and Defendants shall be equally responsible for the Administrative Costs incurred (whether Defendants initially paid for them or not).

13.4   *Effects of Termination:*   In the event the Settlement is terminated:

(a)   The Defendants shall have no obligations to make any payments to any Party, Class Representative, Class Member, attorney, fund, or account, or to the Settlement Administrator;

(b)   Any Preliminary Approval Order and the Judgment, including any order of class certification pursuant to the Agreement, shall be vacated and the Second Amended Complaint for Settlement and any answer/counterclaim thereto shall be deemed withdrawn; and

(c)   Any monies paid by Defendants to Class Counsel pursuant to Section 5.2.6, except mailing costs to the extent actually spent on mailing Class Notice, shall be immediately returned.

**XIV.   <u>NO ADMISSION OF WRONGDOING</u>**

14.1   Neither this Agreement nor the Settlement, nor any act performed or document executed pursuant to or in furtherance thereof, is, or may be deemed to be, or may be used as: (a) an admission or evidence of the validity of any of the Class Member Released Claims, or any alleged wrongdoing or liability of any of the Released Defendants; (b) an admission or evidence of any fault or omission of any of the Released Defendants in any civil, criminal or administrative

91

proceeding in any court, administrative agency or other tribunal, other than such proceedings as may be necessary to consummate or enforce this Agreement, the Settlement memorialized herein, or the Judgment; (c) an admission that Consulting or Mohney is, or could be held to be, a "joint employer" of the Deja Vu-Affiliated Nightclubs; or (d) an admission that each of the Deja Vu-Affiliated Nightclubs' separate corporate identity is or can be disregarded. Notwithstanding the preceding, however, this Agreement and/or the Judgment may be filed and used in any action or proceeding in any court, administrative agency or other tribunal to support a defense of *res judicata*, collateral estoppel, payment, release, good faith settlement, accord and satisfaction, claim preclusion, issue preclusion, or any similar defense or counterclaim.

## XV.   <u>PROTECTIVE ORDER</u>

15.1    All documents and/or things produced or generated through discovery by any Party in this Action shall be destroyed within thirty (30) days of the Effective Date. Each Party shall promptly certify to the other that all documents and/or things produced or generated through discovery have been destroyed. No Party shall be required, however, to destroy their own documents and things or any other document that the Protective Order entitles the Party or its Counsel to retain following the termination of litigation.

## XVI.   <u>MISCELLANEOUS PROVISIONS</u>

16.1    This Agreement may be amended or modified only by a written instrument signed by or on behalf of all of the signatories hereto or their successors-in-interest. No oral amendment or modification shall be permitted or effective.

16.2    This Agreement and the Settlement were entered into after substantial good faith, arms-length negotiations between the Parties, Class Counsel and Defendants' Counsel. As such,

no Party shall be deemed to have relied upon the representations of any other Party or opposing counsel in relation to the negotiation or execution of this Agreement.

16.3    Each counsel or other person executing this Agreement on behalf of any of the Parties hereto represents that such person has the authority to so execute this Agreement.

16.4    This Agreement may be executed in one or more counterparts.  All executed counterparts and each of them shall be deemed to be one and the same Agreement. This Agreement may be executed by signature delivered by facsimile or PDF, and need not be the original "ink" signature.  A complete set of executed counterparts shall be filed with the Court.  This Agreement shall become binding upon its execution by the Class Representatives, the Defendants, all counsels of record, and upon approval by the Court.

16.5    This Agreement and the exhibits hereto constitute the entire fully integrated agreement among the Parties.  No representations, warranties or inducements have been made to any Party concerning the Settlement, this Agreement or its exhibits, other than the representations, warranties and covenants contained in such documents.

16.6    The failure of any of the Parties to perform any of their obligations hereunder shall not subject such Party to any liability or remedy for damages, or otherwise, where such failure is occasioned, in whole or in part, by acts of God, fires, accidents, earthquakes, other natural disasters, explosions, floods, wars, interruptions or delays in transportation, power outages, labor disputes or shortages, shortages of material or supplies, governmental laws, restrictions, rules or regulations, sabotage, terrorist acts, acts or failures to act of any third parties, or any other similar or different circumstances or causes beyond the reasonable control of such Party.

16.7     This Agreement shall be governed by the laws of the State of Michigan.  All actions or proceedings relating to this Agreement may only be brought in the United States District Court for the Eastern District of Michigan.

16.8     Upon the occurrence of the Effective Date, the Settlement shall be fully enforceable by the Court, and the Court shall retain exclusive and continuous jurisdiction over the Parties and the Members of the Settlement Class to interpret and enforce the terms and conditions of, and rights under, the Settlement until the terms of this Agreement are fully performed.

16.9     Unless otherwise indicated herein, where any Party's exercise of any right under this Agreement requires written notice, the Party shall serve such written notice on the counsel of record for the other Parties by First Class U.S. Mail or any method that is at least as reliable and timely as First Class U.S. Mail.

16.10    Each of the Parties acknowledges and represents that he/she/it has fully and carefully read this Agreement prior to execution; that he/she/it has been fully apprised by his/her/its counsel of the legal effect and meaning of this Agreement and all terms and conditions hereof; that he/she/it has had the opportunity to make whatever investigation or inquiry he/she/it deemed necessary or appropriate in connection with the subject matter of the Action; that he/she/it has been afforded the opportunity to negotiate any and all terms of this Agreement; and that he/she/it is executing this Agreement voluntarily and free from any undue influence, coercion, duress, or menace of any kind.  This Agreement reflects the conclusion of each of the Parties that this Agreement, the Settlement, the Judgment to be entered hereunder, and the releases, waivers and covenants provided for herein, are in the best interest of said Parties, the general public, and the Settlement Class.  Except as expressly provided herein, this Agreement is not intended to confer upon any other person or entity any rights or remedies.

16.11   In the event that any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall in no way affect any other provisions if Defendants' Counsel and Class Counsel, on behalf of the Parties and the Settlement Class, mutually elect in writing to proceed as if such invalid, illegal, or unenforceable provision had never been included in this Agreement, except as otherwise provided herein. However, if any funds have been paid, or other consideration conveyed, to a Class Representative or a Participating Class Member, then the releases and discharges granted, waivers conferred, and satisfactions conveyed by this Agreement may not be terminated.

16.12   The headings and captions inserted in this Agreement are for convenience only and in no way define, limit, or otherwise describe the scope or intent of this Agreement, or any provision hereof, or in any way affect the interpretation of this Agreement.

16.13   Except as otherwise provided in this Agreement, the Parties shall bear their own respective costs and fees.

16.14   None of the Parties, or their respective counsel, shall be deemed to be the drafter of this Agreement or its exhibits for purposes of construing their provisions.  The language in all parts of this Agreement and its exhibits shall be interpreted according to its fair meaning, and shall not be interpreted for or against any of the Parties as the drafter of the language.

16.15   All time computations under this Agreement shall be done in accordance with the provisions of the Federal Rules of Civil Procedure, as amended by the Local Rule for the Eastern District of Michigan which governs the calculation of time.

16.16   The waiver by any of the Parties to this Agreement of any provision thereof shall not be deemed a waiver by that Party of any other provision of this Agreement.

16.17   Each and every one of the Parties hereto acknowledges and agrees that he/she/it will, and shall, at all times subsequent to the execution of this Agreement and upon reasonable request, make, do and execute, or cause to be made, done or executed, all such further documents and instruments to effectuate the full intent, purpose, covenants and conditions as set forth herein as any Party may require.

16.18   This Agreement shall be binding upon and inure to the benefit of the Parties, the Participating Class Members, Class Counsel, Defendants' Counsel, as well as their assigns, successors-in-interest of any kind whatsoever, purchasers of any of their assets and/or liabilities, heirs, executors, and administrators.

Respectfully submitted,

Dated: _____, 2017          _____
                                 Jason J. Thompson (P47184)
                                 Sommers Schwartz, P.C.
                                 Co-Counsel for Plaintiffs
                                 One Towne Square, Suite 1700
                                 Southfield, MI 48076
                                 (248) 355-0300
                                 jthompson@sommerspc.com

Dated: _____, 2017          _____
                                 Edith A. Thomas
                                 Edi Thomas Associates
                                 Co-Counsel for Defendants
                                 214 N. Ridge Drive, Suite B
                                 Fallbrook, CA 92028
                                 888-349-3940
                                 edithomas.fb.calif@gmail.com

Dated: _____, 2017 _____          _____
                                          Bradley J. Shafer (P36604)
                                          Shafer & Associates, P.C.
                                          Co-Counsel for Defendants

                                          3800 Capital City Blvd., Suite 2
                                          Lansing, MI 48906
                                          (517) 886-6560
                                          brad@bradshaferlaw.com

# Exhibit A

**GLOBAL SETTLEMENT POTENTIAL PARTICIPANTS**

IF NOT THE WHOLE TIME

| CORPORATE NAME | D.B.A. | PERIOD START | PERIOD END | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| 59TH ST LD OKLAHOMA CITY, LLC | LITTLE DARLINGS | | | 1500 SE 59TH ST | OKLAHOMA CITY | OKLAHOMA | 73129 |
| 411 BURLESQUE CLUB, INC. | LITTLE DARLINGS | 3/10/2012 | 6/6/2013 | 411 BOURBON ST. | NEW ORLEANS | LOUISIANA | 70130 |
| 3610 BARNETT AVE., LLC | ADULT SUPERSTORE | | | 3610 BARNETT AVE. | SAN DIEGO | CALIFORNIA | 92110 |
| BALTIMORE LITTLE D'S, LLC | LITTLE DARLINGS | 4/5/2012 | | 403 E. BALTIMORE ST | BALTIMORE | MARYLAND | 21202 |
| CMSG RESTAURANT GROUP, LLC (formerly HDV Manhattan) | LARRY FLYNT'S HUSTLER | | | 639-641 W. 51ST STREET | NEW YORK | NEW YORK | 10019 |
| CATHAY ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | | | 16025 GALE AVE, STE A11-A12 | CITY OF INDUSTRY | CALIFORNIA | 91745 |
| CINEMA ART THEATRE OF SPRINGFIELD INC | DEJA VU | | | 3270 LAKE PLAZA DRIVE | SPRINGFIELD | ILLINOIS | 62703 |
| CINEMA THEATRE OF KALAMAZOO INC | DÉJÀ VU SHOWGIRLS | | | 1336 RAVINE RD, SUITE C | KALAMAZOO | MICHIGAN | 49004 |
| CIN - LAN INC | DÉJÀ VU SHOWGIRLS | | | 1000 W JOLLY ROAD | LANSING | MICHIGAN | 48910 |
| COLDWATER, LLC | DÉJÀ VU SHOWGIRLS | | | 7350 COLDWATER CANYON | N. HOLLYWOOD | CALIFORNIA | 91605 |
| D.V. II - SHREVEPORT, LLC | DÉJÀ VU | | | 202 COMMERCE STREET | SHREVEPORT | LOUISIANA | 71101 |
| DALLAS FOOD & BEVERAGE, LLC | PRESENTS LARRY FLYNT'S | 1/27/2015 | | 2150 CALIFORNIA CROSSING | DALLAS | TEXAS | 75220 |
| DEJA VU - COLORADO SPRINGS, INC. | DEJA VU | | | 2145 B STREET | COLORADO SPRING | COLORADO | 80906 |
| DÉJÀ VU - HIGHLAND PARK, LLC | DÉJÀ VU SHOWGIRLS | 3/10/2012 | 10/4/2015 | 16549 WOODWARD AVE | HIGHLAND PARK | MICHIGAN | 48203 |
| DEJA VU - LAKE CITY, INC. | DEJA VU | | | 14556 BOTHELL WAY NE | LAKE FOREST PARK | WASHINGTON | 98155 |
| DEJA VU - SEATTLE, LLC | LITTLE DARLINGS | | | 2027 WESTLAKE | SEATTLE | WASHINGTON | 98121 |
| DEJA VU - SPOKANE, INC. | DEJA VU | | | EAST 8722 SPRAGUE AVE | SPOKANE VALLEY | WASHINGTON | 99212 |
| DEJA VU - TACOMA, INC. | DEJA VU | | | 8920 SOUTH TACOMA WAY | LAKEWOOD | WASHINGTON | 98499 |
| DEJA VU - TUKWILA, INC. | DEJA VU | | | 15011 TUKWILA INT'L BLVD | TUKWILA | WASHINGTON | 98188 |
| DEJA VU - TOLEDO, INC. | DÉJÀ VU | | | 135 S. BYRNE RD. | TOLEDO | OHIO | 43615 |
| DEJA VU ENTERTAINMENT ENTERPRISES OF MINNESOTA INC | DÉJÀ VU | | | 315 WASHINGTON AVE NORTH | MINNEAPOLIS | MINNESOTA | 55401 |
| DEJA VU OF HAMMOND INC | DEJA VU & DREAMGIRLS | | | 2491 RIPLEY STREET | LAKE STATION | INDIANA | 46405 |
| DEJA VU OF KENTUCKY, INC. | DEJA VU | | | 485 NEW CIRCLE RD. W | LEXINGTON | KENTUCKY | 40511 |
| DEJA VU OF NASHVILLE INC | DEJA VU | | | 1214 DEMONBREUN | NASHVILLE | TENNESSEE | 37203 |
| DEJA VU SHOWGIRLS - SACRAMENTO, LLC | DEJA VU SHOWGIRLS | | | 11252 TRADE CENTER DR | RANCHO CORDOVA | CALIFORNIA | 95742 |
| DÉJÀ VU SHOWGIRLS - WASHINGTON PARK, LLC | LARRY FLYNT'S HUSTLER | | | 5420 BUNKUM | WASH. PARK | ILLINOIS | 62204 |
| DEJA VU SHOWGIRLS OF LAS VEGAS, L.L.C. | DÉJÀ VU & RUMP TOWER | | | 3247 SAMMY DAVIS JR DRIVE | LAS VEGAS | NEVADA | 89109 |
| DÉJÀ VU SHOWGIRLS OF NEW ORLEANS, LLC (formerly 226-228 B | DÉJÀ VU SHOWGIRLS | | | 226-228 BOURBON ST. | NEW ORLEANS | LOUISIANA | 70130 |
| DEJA VU SHOWGIRLS OF TAMPA, L.C. | DEJA VU | | | 6805 E. ADAMO DR. | TAMPA | FLORIDA | 33609 |
| DREAMGIRLS OF LAKE CITY, LLC | DREAMGIRLS @ RICKS | | | 11332 LAKE CITY WAY NE | SEATTLE | WASHINGTON | 98125 |
| DREAMGIRLS OF SEATTLE, LLC | DREAMGIRLS SODO | | | 1530 FIRST AVENUE SOUTH | SEATTLE | WASHINGTON | 98134 |
| DREAMGIRLS OF TACOMA, LLC | DREAMGIRLS @ FOX'S | | | 10708 PACIFIC AVE S | TACOMA | WASHINGTON | 98445 |
| DV BISTRO OKC, LLC | DÉJÀ VU SHOWGIRLS | 12/30/2015 | | 1540 SE 59TH ST | OKLAHOMA CITY | OKLAHOMA | 73129 |
| DV DIAMOND CLUB OF FLINT, LLC | LITTLE DARLINGS | 8/1/2012 | | 2431 S DORT HWY | FLINT | MICHIGAN | 48507 |
| DV KALAMAZOO, LLC | LITTLE DARLINGS | | | 1336 RAVINE RD, SUITE A | KALAMAZOO | MICHIGAN | 49004 |
| DV OF LA, LLC | DÉJÀ VU LA - MAIN ST. | | | 1800 S. MAIN ST. | LOS ANGELES | CALIFORNIA | 90015 |
| DV SAGINAW, LLC | DÉJÀ VU SHOWGIRLS | | | 6530 BAY ROAD | SAGINAW | MICHIGAN | 48604 |
| EF5 ACQUISITIONS GROUP, LLC | DEJA VU SHOWGIRLS | | | 20320 HAMILTON AVE | TORRANCE | CALIFORNIA | 90502 |
| EYEFULL, INC. | DEJA VU SHOWGIRLS | 3/10/2012 | 10/31/2012 | C/O P.O. BOX 408 | DURAND | MICHIGAN | 48429 |
| FLINT THEATRICAL ENTERPRISES, INC. | DÉJÀ VU SHOWGIRLS | | | 2402 S DORT HWY | FLINT | MICHIGAN | 48507 |
| GRAPEVINE ENTERTAINMENT, INC. | DÉJÀ VU SHOWGIRLS | | | 1524 GOLDEN STATE HWY | BAKERSFIELD | CALIFORNIA | 93301 |
| H.D.V. - BALTIMORE II, LLC | LARRY FLYNT'S HUSTLER | | | 403-409 E. BALTIMORE ST. | BALTIMORE | MARYLAND | 21202 |
| H.D.V. - CLEVELAND, LLC | LARRY FLYNT'S HUSTLER | | | 1101 CENTER STREET | CLEVELAND | OHIO | 44113 |
| H.D.V. GREEKTOWN, LLC | LEGENDS | 1/28/2015 | 5/5/2015 | C/O P.O. BOX 408 | DURAND | MICHIGAN | 48429 |
| H.D.V. NO. 1, LLC | LARRY FLYNT'S HUSTLER | | | 225 BOURBON ST | NEW ORLEANS | LOUISIANA | 70130 |
| HDV - LINCOLN PARK, LLC | LARRY FLYNT'S HUSTLER | | | 980 JOHN A PAPALAS DR | LINCOLN PARK | MICHIGAN | 48146 |

| CORPORATE NAME | D.B.A. | PERIOD START | PERIOD END IF NOT THE WHOLE TIME | ADDRESS | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|---|
| HOLLYWOOD & VINE CLUB, LLC | DEJA VU SHOWGIRLS | | | 6315 HOLLYWOOD BLVD | LOS ANGELES | CALIFORNIA | |
| JGMA, ANAHEIM HOSPITALITY, INC. | SAM'S AFTER DARK | | | 1501 E WASHINGTON BLVD | LOS ANGELES | CALIFORNIA | 90021 |
| JOLAR CINEMA OF SAN DIEGO, LTD | JOLAR CINEMA | | | 6321 UNIVERSITY AVE | SAN DIEGO | CALIFORNIA | 92115 |
| LAS VEGAS BISTRO, LLC (formerly Las Vegas Entertainment, LLC) | LARRY FLYNT'S HUSTLER | | | 6007 DEAN MARTIN DR. | LAS VEGAS | NEVADA | 89118 |
| LITTLE DARLINGS OF LAS VEGAS, L.L.C. | LITTLE DARLINGS | | | 1514 WESTERN AVE. | LAS VEGAS | NEVADA | 89102 |
| LOVE BOUTIQUE - MICHIGAN CITY, LLC | DEJA VU LOVE BOUTIQUE | 3/10/2012 | 12/1/2012 | 412 HIGHWAY 20 WEST | MICHIGAN CITY | INDIANA | 46360 |
| MINNEAPPLE ENTERPRISES OF MINNESOTA INC | DREAMGIRLS | | | 12-14 N 5TH ST | MINNEAPOLIS | MINNESOTA | 55403 |
| NITE LIFE EAST, LLC | LITTLE DARLINGS | | | 8290 BROADWAY | LEMON GROVE | CALIFORNIA | 91945 |
| ROUGE PORTLAND, LLC | CLUB ROUGE | | | 403 SW STARK ST | PORTLAND | OREGON | 97204 |
| SB ENTERTAINMENT, INC. | HUSTLER BARELY LEGAL CLUB | | | 423-427 BOURBON ST | NEW ORLEANS | LOUISIANA | 70130 |
| SEATTLE AMUSEMENT CO., INC. | FANTASY UNLIMITED | | | 2027 WESTLAKE | SEATTLE | WASHINGTON | 98121 |
| SEATTLE AMUSEMENT CO., INC. | SHOWGIRLS & SUPERSTORE | | | 1510 FIRST AVENUE | SEATTLE | WASHINGTON | 98101 |
| SHOWGIRLS OF SAN DIEGO INC | DÉJÀ VU SHOWGIRLS | | | 2720 MIDWAY DR | SAN DIEGO | CALIFORNIA | 92110 |
| SP STAR ENTERPRISE, INC. | DÉJÀ VU LA - UNION STATION | | | 710 E. COMMERCIAL ST | LOS ANGELES | CALIFORNIA | 90012 |
| STOCKTON ENTERPRISES, LLC | DÉJÀ VU SHOWGIRLS | | | 4206 WEST LANE | STOCKTON | CALIFORNIA | 95204 |
| TAYLOR BLVD. THEATRE, INC. | DEJA VU | | | 3419, 3421 TAYLOR BLVD. | LOUISVILLE | KENTUCKY | 40215 |
| VEGAS VALLEY FOOD & BEVERAGE, LLC | DEJA VU EROTIC ULTRA LOUNGE | | 10/27/2013 | 4740 ARVILLE ST | LAS VEGAS | NEVADA | 89103 |
| YPSILANTI ART THEATRE CORP | DÉJÀ VU SHOWGIRLS | | | 31 N WASHINGTON | YPSILANTI | MICHIGAN | 48197 |

# Exhibit B

## ENTERTAINER ASSESSMENT FORM

ENTERTAINER'S LEGAL NAME _____

ENTERTAINER'S STAGE NAME(S) _____

DATE OF FIRST PERFORMANCE _____

TODAY'S DATE _____

NUMBER OF PERFORMANCES TO DATE _____

INTERVIEWER/ASSESSOR'S NAME, TITLE _____

INSTRUCTIONS:  CHECK ONLY THOSE ITEMS THAT ARE TRUE

1.  Entertainer holds an entertainer's license (where required by law)  ____
2.  Entertainer has a business card ____
3.  Entertainer advertises (i.e., on social media, handouts, etc.) ____
4.  Entertainer performs at other clubs ____
5.  Entertainer has skill ____
6.  Entertainer has experience ____
7.  Entertainer maintains a business address separate from the club _____
8.  Entertainer has her own costumes and other equipment related to her entertainment work
9.  Entertainer does not have set hours of work _____
10. Entertainer performs part time ____
11. Entertainer performs if, when she chooses _____
12. Entertainer does not require instruction  _____
13. Entertainer has stated a belief that she is an independent contractor ____
14. Entertainer has rejected an offer to become an employee_____
15. Entertainer's earnings support non-employee status _____

I UNDERSTAND THAT THIS ASSESSMENT WILL BE RELIED UPON BY THE CLUB TO
PROPERLY CLASSIFY ME AS EITHER A CONTRATOR OR AN EMPLOYEE.  I HEREBY
CERTIFY THAT I _____ [ENTERTAINER'S NAME] FREELY AND OF Y OWN
VOLITION PROVIDED THE ANSWERS AS INDICATED ABOVE. _____
_____ [ENTERTAINER'S SIGNATURE and DATE]

//////////////////

FOR OFFICE USE ONLY -------------REVIEWER ASSESSMENT

SUMMARY: NUMBER OF TRUE STATEMENTS OUT OF 15 ABOVE _____

CONTRACT STATUS SUPPORTED _____

CONTRACT STATUS NOT SUPPORTED _____

IF CONTRACT STATUS NOT SUPPORTED, ENTERTAINER ACCEPTS EMPLOYMENT
_____

RESOLUTION
_____

# Exhibit C

## CASH ELECTION FORM

To receive the settlement benefit in *Doe v. Déjà Vu Services, Inc.* as cash, you must file this Cash Election Form. You have two option for filing the Form:

1. <u>File Online</u>:  File online at www._____.com; or
2. <u>File by Mail</u>:  Fill out this form and mail it to:

Settlement Administrator
XXXXXXXXXXXXX

Eligible class members who do not file a Cash Election Form will instead receive a Rent or Dance Fee Credit good towards the rent to which a club would otherwise be entitled under the terms of the dancer lease agreement.  You must file this Cash Election Form by **[insert date]** to receive a Cash Payment instead of a Rent Credit.

If you file your Cash Election Form, you will receive the payment by way of a check.

Personal ID # ___  ___  ___  ___  ___  ___  ___  ___  ___  ___  ___  ___  ___

You can find this number on the top of the settlement notice you received.  If you no longer have the notice, and need your Personal ID Number, e-mail the Administrator at: _____.

Your Name                _____

Street Address           _____

City              _____        State _____        ZIP _____

E-mail Address_____

Check the space below in order to receive a cash payment.  The Administrator will confirm your eligibility.

_____  I want to receive the Cash Payment instead of receiving the Rent Credit. (**check space**)

_____        _____
**Your Signature**                                                                **Date**

# Exhibit D

---

*UNITED STATES DISTRICT COURT – EASTERN DISTRICT OF MICHIGAN*

## Notice of Settlement of Nationwide Class Action

*If You Performed at any "Deja Vu-Affiliated Nightclub" as an Exotic Dancer, a Proposed Class Action Settlement May Affect Your Rights. You May Be Entitled to a Cash Payment.*

---

**A U.S. Federal Court has authorized this Notice.**
**It is not from a lawyer. You are not being sued.**

You are receiving this notice because there is a proposed settlement of a nationwide class action lawsuit brought by a Professional Entertainer (hereinafter "Plaintiff") against Deja Vu Consulting Inc., Harry V. Mohney, Cin-Lan, Inc., and other "Deja Vu-Affiliated Nightclubs" (referred to below as "Deja Vu," or "Defendants"). The lawsuit is captioned *Doe, et al. v. Déjà Vu Services, Inc., et al.*, No. 2:16-cv-10877, and is pending before Judge Stephen J. Murphy, III, in the United States District Court for the Eastern District of Michigan.

In the lawsuit, the Plaintiffs have filed suit under the pseudonyms of Jane Does 1-2, and brought their claims on behalf of all other entertainers (the "Class"). The lawsuit alleges that the Defendants failed to pay minimum wages, and unlawfully confiscated tips belonging, to the Plaintiffs and to other entertainers performing at nightclubs across the country operating as "Deja Vu," "Little Darlings," "Showgirls," "Larry Flynt's Hustler Club," "Barely Legal," and "Dream Girls" (collectively referred to as "Deja Vu-Affiliated Nightclubs").

The Defendants have denied and continue to deny all of the allegations in Plaintiffs' Complaint and have threatened counterclaims against the Plaintiffs and the Class; including claims that the entertainers should be required to return the mandatory dance fees they retained if the clubs were found to owe them minimum wages.

The Court has not made a determination of the merits of Plaintiffs' claims, or Deja Vu's defenses or threatened counterclaims.

Rather than continue to litigate these matters, the parties have reached a settlement. The monetary value of the settlement is $6.5 million dollars. Pursuant to the terms of the settlement, entertainers may elect to receive, subject to the provisions below, either: (1) a one-time cash payment, an amount to be determined based on when the entertainer began performing during the class period as defined below; or (2) a "Rent Credit" of up to $2,000 based upon the number of dates performed during the Class Period. Rent Credits issued pursuant to the settlement can be used only at the last club at which an entertainer performed prior to the effective date of this settlement, and will be good for one year (or until they are exhausted) after the Election Period. These credits may be used to offset

- 1 -

future "rent," "stage fees" or the club's share of dance sales.

The Court has preliminarily approved the settlement. However, settlement benefits cannot be distributed until after the Court grants final approval of the settlement and after any possible appeals are resolved.

The Court has certified the Class for settlement purposes as being:

> **All entertainers who performed at any Deja Vu-Affiliated Nightclub identified on *Exhibit A* attached to the settlement agreement during the period March 10, 2013, through the present, or during the applicable limitations period for any entertainer who performed at any of the clubs involved in one of the other pending lawsuits, whichever is longer.**

The time periods set forth in this definition are referred to as the "Class Period."

Your legal rights are affected by the Court's decision to certify a class, and you have a **choice** to make now.  Please read the following pages carefully, including the *Summary of Your Rights and Choices* and the *Settlement Benefits and My Options* sections, which are below.

## Summary of Your Rights and Choices:

*Your Legal Rights Are Affected Even If You Do Not Act.*
*Read This Notice Carefully.*

| You May: | Effect of Choosing the Option: | Due Date: |
|---|---|---|
| ***Exclude Yourself*** | You can elect to get out of the Class and keep your right to sue Deja Vu on your own in regard to the claims in the lawsuits.  To exclude yourself from participating in the settlement, you **must** follow the exclusion procedure explained below. | ***Postmarked or E-Mailed by TBD*** |
| ***File Objection*** | If you do not exclude yourself, you can remain a Class member and still write to the Court about why you disagree with the settlement. | ***Postmarked or E-Mailed by TBD*** |
| ***Appear at a Hearing*** | If you do not exclude yourself, you can also ask to speak to the Court about the fairness of the settlement. | ***The Notice of Appearance Must be postmarked on or before TBD, 2017 to appear at the final hearing*** |

- 2 -

| | | |
|---|---|---|
| | | *on* **TBD**, *2017 at the Federal Courthouse in Detroit, MI* |
| ***Do Nothing*** | You **will** be bound by the terms of the settlement and give up your right to sue Deja Vu yourself on these claims later. | |
| ***Elect Your Form of Settlement Benefit*** | If you wish to be included in the Class settlement, you still have **a choice to make on how to receive your benefit**: (1) You may elect to receive a cash payment by indicating so on the Cash Election Form; or (2) you may elect to receive a Rent Credit at the Deja Vu-Affiliated Nightclub where you last performed as explained below in sections 6 and 7. ***If you make no election, you will be considered to have selected to receive the Rent Credit by default. To utilize the Rent Credit, you must follow the instructions in this Notice.*** | *Election Form Postmarked, Faxed, or E-Mailed by* **TBD**, *2017*<br><br>*Dancer Rent Credit Used Within One Year, or Until Available Rent Credit Funds are Used, Whichever is Shorter* |

## WHAT THIS NOTICE CONTAINS

**BASIC INFORMATION**

1. Why did I get this Notice? ................................................................X
2. What is a Class Action? ...................................................................X
3. What is this Class Action About? ......................................................X
4. Who are the Class Members? ...........................................................X
5. Why is the Class Action Being Settled? ............................................X

**SETTLEMENT BENEFITS AND MY OPTIONS**

6. What are the Settlement Benefits? ...................................................X
7. What are my two options to receive Settlement Benefits? ..................X

**REMAINING IN THE CLASS**

8.  What happens if I do nothing and stay in the Class? ..................................................X
9.  If I remain in the Class, what am I giving up? ..........................................................X

**EXCLUDING YOURSELF FROM THE CLASS**

10. Why would I want to be excluded from the Class? .....................................................X
11. How do I exclude myself from the Class? .................................................................X
12. How do I object to the Settlement? ...........................................................................X

**THE LAWYERS REPRESENTING YOU**

13. Do I have a lawyer representing my interests in this case? .......................................X
14. How will the lawyers be paid? ..................................................................................X
15. How will the Class Representatives be Paid? ...........................................................X

**THE COURT'S FINAL APPROVAL HEARING**

16. When and Where will the Court Decide Whether to Approve the Settlement? .....................X
17. Do I have to attend the Hearing? ..............................................................................X
18. Can I have my lawyer appear at the Final Approval Hearing to tell the Court about
    my opinions regarding the Settlement? .....................................................................X

**GETTING MORE INFORMATION**

19. Where do I obtain more information? .........................................................................X

# BASIC INFORMATION

| 1.   Why did I get this Notice? |
| --- |

The Court directed this Notice be sent to you because you may have performed as an entertainer at a Deja Vu-Affiliated Club during the Class Period, and therefore may be entitled to benefits pursuant to the terms of the settlement.

If you are a member of the Class, the proposed settlement will affect your legal rights. Therefore, it is important that you read this notice carefully. You have choices to make before the Court decides whether or not to approve the settlement.

| 2.   What is a Class Action? |
| --- |

In a class action lawsuit, one or more people called "Representative Plaintiffs" sue one or more defendants on behalf of other people who may have similar claims. All these people

- 4 -

together are a "class" or are "class members." The court can determine whether it will allow a lawsuit to proceed as a class action.  If it does, a trial then decides the lawsuit for everyone in the class or the parties may settle without a trial.

In a class action, one court resolves the common issues for everyone in the class - except for those people who choose to exclude themselves from the class.

| 3.   What is this Class Action about? |
| --- |

The lawsuit alleges that Deja Vu-Affiliated Nightclubs misclassified entertainers as non-employees and as a result of this misclassification, entertainers were not paid minimum wages and other compensation required under federal and/or various state wage and hour laws. In addition, the lawsuit alleges that Defendants unlawfully confiscated entertainer tips. The Defendants have denied these allegations and have threatened counterclaims to recover the value of mandatory dance fees retained by entertainers if the clubs are determined to owe minimum wages.

The Court has approved the certification of the class of entertainers who performed at any Deja Vu-Affiliated Nightclub during the Class Period, concluding that the question of whether Deja Vu is liable under Fair Labor Standard Act ("FLSA") or state wage laws for the purported misclassification of entertainers, and whether Deja Vu improperly confiscated tips, are common issues deserving class action treatment.

Plaintiffs and Defendants have reached a settlement in this case. The Court has not ruled on the merits of Plaintiffs' claims or on Deja Vu's defenses or counter-claims.  Rather, the Court has simply certified a settlement class and tentatively approved the proposed settlement.

| 4.   Who are the Class Members? |
| --- |

In order to determine if you are entitled to benefits from this settlement, you first must determine if you are a Class Member, defined as:

> **All entertainers who performed at any Deja Vu-Affiliated Nightclub identified on *Exhibit A* attached to the settlement agreement during the period March 10, 2013, through the present, or during the applicable limitations period for any entertainer who performed at any of the clubs involved in one of the other pending lawsuits, whichever is longer.**

If you fall within the definition of a Class Member, you may qualify for either a "Cash Payment" or a "Rent Credit" pursuant to the criteria set forth in the settlement agreement. **<u>You may not receive both</u>**.  If you are not a Class Member as described above, you do not qualify for settlement benefits.

## 5.   Why is the Class Action Being Settled?

This matter is being settled because both sides have agreed to a settlement of this case in order to avoid the costs and risks of trial.

# SETTLEMENT BENEFITS AND MY OPTIONS

## 6.   What are the Settlement Benefits?

The settlement agreement, if approved, provides both monetary and nonmonetary benefits to the Class.  First, each Class Member will have the choice as between one of two monetary benefits. Second, all entertainers will benefit from certain injunctive relief as explained below.

As described in greater detail in Section 7 below, the two alternative financial benefits are: (1) a one-time cash payment; *or* (2) a Rent Credit.. You may elect only one of the financial benefits; not both.

As part of the settlement, Defendants have agreed to pay up to $1,000,000 to the Class in the form of a "Cash Pool." If the Cash Election Form submitted by Class Members in order to receive cash payments exceed the amount in the Cash Pool, then each Class Member requesting a cash payment will receive a pro rata share of the Cash Pool.  The Rent Credit Pool will be $4,500,000.

As described below, if the settlement is approved, the attorneys representing the Class ("Class Counsel") will have their attorneys' fees paid separately by Deja Vu.

## 7.   What are my two options to receive Settlement benefits?

**Cash Payment:** If you elect to receive a one-time cash payment and not a Rent Credit, **you must** indicate so on the Cash Election Form, and submit, by first class United States mail, **postmarked on or before [insert date],** or by e-mail**,** the Cash Election Form that is included with this notice, to:

> Settlement Administrator
> In re: Nightclub Litigation
> P.O. Box xxx
> City, State Zip code

Only one Cash Election Form is needed, and only one form will be accepted. The Cash Election Form can be downloaded at the website listed below if you lose your form.

Each entertainer electing to receive the cash payment will be paid based upon the length

- 6 -

of time she worked for Déjà Vu-Affiliated Nightclubs during the Class Period. Specifically, the cash payments will be paid on a pro-rata basis, based on a points-system, as follows: (1) if the entertainer's dancer contract was signed within the past six months, she will receive 2 points for each month worked, up to a maximum of 12 points; (2) if the entertainer worked more than six months before the Preliminary Approval Order, but less than one year before, the entertainer will receive an additional 1 point per month, up to 6 additional points; and (3) if the entertainer began work more than one year ago, the entertainer will receive 8 points total regardless of the when the original dancer contract was signed. Each entertainer will receive a pro-rata cash payment based on the number of points received in comparison with all other entertainers who elect a cash payment.

**YOU MUST SUBMIT A TIMELY CASH ELECTION FORM TO RECEIVE A CASH PAYMENT.**  If you select to receive a cash payment, you may receive an IRS Form1099-MISC for the amount of the cash payment made to you. You will be responsible for the payment of any federal and state taxes due as a result of the cash payment.

Please read the Cash Election Form for more detailed instructions on how to elect a cash payment. If you are a Class Member and you do not fill out either a Cash Election Form or an Opt Out Form (as described below), you will automatically be deemed to have elected to receive a Rent Credit.

**Rent Credits:**  If you are a member of the Class and do not elect to receive a cash payment from the Cash Pool, you will be entitled to a Rent Credit. In order to redeem the Rent Credits, do not submit the Cash Election Form. Instead, simply contact your Qualifying Club and advise them that you intend to receive your class benefit in the form of a Rent Credit. This must be done at least seven (7) days prior the first date you wish to redeem the Rent Credits. You will be given a Secondary Pool Claim Form that must be filled out and returned to the Qualifying Club before you will be permitted to redeem your Rent Credits. If you are not currently performing at your Qualifying Club but wish to return to perform, you must apply for an entertainer position, enter into a contract, and submit the Secondary Pool Claim Form to redeem the Rent Credits.  However, Deja Vu is under no obligation to permit you to perform. In such circumstance, you will be given additional time to submit a Cash Election Form.

Rent Credits vary between $200, $1,000, or $2,000.  The amount of the Rent Credit is based upon the number of dates you performed at your Qualifying Club before the date the settlement becomes effective.  If an entertainer performed less than 10 performance dates, then the credit she will be entitled to is $200; if she performed between 11 and 25 performance dates, the Rent Credit she will be entitled to is $1,000; and if she performed more than 25 performance dates, then the Rent Credit will be the maximum of $2,000. You may receive an IRS Form 1099-MISC for any Rent Credits you redeem. In addition, you will be required to pay federal and/or state income taxes on the value of the Rent Credits redeemed.

The Rent Credits expire when either the $4.5 million Rent Credit Pool runs out or one year from the deadline to submit the Cash Election Form, whichever comes first.

**NO RENT CREDITS CAN BE REDEEMED UNTIL FINAL APPROVAL OF THE SETTLEMENT HAS BEEN RECEIVED FROM THE COURT, ALL APPEALS HAVE BEEN EXHAUSTED, AND ALL VALID CASH ELECTION FORMS HAVE BEEN SUBMITTED.**

**Summary:** To summarize, if you wish to remain in the Class and receive a cash payment, then you **MUST** fill out and timely submit to the Settlement Administrator the Cash Election Form.  If you choose a cash payment, you cannot also receive a Rent Credit.

If you are currently performing or want to return to perform at your Qualifying Club and have not chosen a cash payment, you must notify your Qualifying Club of your intent to redeem Rent Credits at least seven (7) days in advance and provide to that club a fully completed Secondary Pool Claim Form before being eligible to receive a Rent Credit. The Rent Credits will be applied (as applicable) to the "rent," "stage fees" or the club's share of dance sales.

***You should seek the advice of a tax professional if you have any questions about the tax implications of this settlement.***

# REMAINING IN THE CLASS

| 8.  What happens if I do nothing and stay in the Class? |
| --- |

If you do nothing, you will be included in the Class, and you will be bound by the terms and conditions of the settlement. Under the terms of the settlement, you may elect to receive either a "cash payment" or a "Rent Credit" as described herein.  However, you may not receive both. Please read the *Settlement Benefits and My Options* section.

| 9.  If I remain in the Class, what am I giving up? |
| --- |

If the Court approves the settlement, you will have released all Defendants, including all of the Deja Vu–Affiliated Nightclubs, from any further claims related to the matters raised in this lawsuit, and you cannot ever sue any of the Defendants about these issues based upon conduct that occurred prior to the effective date of the settlement. Should you have any questions about the scope of the release, you may contact Class Counsel.

# EXCLUDING YOURSELF FROM THE CLASS

| 10.  Why would I want to be excluded from the Class? |
| --- |

You do not have to take part in the settlement or be a member of the Class. You can exclude yourself from the settlement by "opting out." If you exclude yourself, you will not get the benefits of the settlement, nor can you object to the settlement. Any Court orders will not apply to you. By excluding yourself, you keep any right to file or proceed with a lawsuit against the Defendants regarding the subject of the settlement.

If you have sued any of the Defendants and want to continue with your suit, you need to personally ask to be excluded from the Class.  If you exclude yourself, you will not be legally bound by the Court's judgments in this case. Similarly, if you wish to start your own lawsuit against any of the Defendants, you must exclude yourself from the Class. Should you do so, you will have to hire and pay your own lawyer for that lawsuit and prove your own claims. If you do exclude yourself so you can start or continue your own lawsuit against Deja Vu, you should talk to your own lawyer soon, because your claims may be subject to a statute of limitations.

| **11.  How do I exclude myself from the Class?** |
|---|

If you are a member of the Class and wish to be excluded from the settlement, you must complete and personally sign the Opt Out Form included with this notice, _or_ send a written request, signed by you personally, which includes all of the following:

- Your legal name, current address and telephone number;
- The name and number of the lawsuit: _Doe v. Déjà Vu Services, Inc, et al_, No. 2:16-cv-10877.
- A statement, signed personally by you, clearly stating that that you want to be excluded from the Class.

All exclusion requests must be mailed first class United States mail, **postmarked on or before [TBD 2017],** to:

> Settlement Administrator
> In re: Nightclub Litigation
> P.O. Box xxx
> City, State Zip code

_**Any request for exclusion must contain your personal signature, which shall be an indication to the Court that you wish to be excluded from the Class**_. You cannot exclude yourself by phone or by e-mail.  Further, if you do not follow these instructions properly, you will lose your right to exclude yourself. There are no exceptions.

**UNLESS YOU PROPERLY SIGN AND TIMELY MAIL AN OPT OUT FORM OR REQUEST FOR EXCLUSION, YOU WILL BE BOUND BY ANY JUDGMENT IN THIS CASE AND YOU WILL NOT BE PERMITTED TO PURSUE ANY PENDING OR FUTURE LITIGATION AGAINST DEJA VU REGARDING THE**

**MATTERS RESOLVED IN THIS SETTLEMENT. SHOULD YOU WISH TO EXCLUDE YOURSELF FROM THIS SETTLEMENT, IT IS IMPORTANT THAT YOU FOLLOW THESE INSTRUCTIONS CAREFULLY.**

| 12.  How Do I Object to the Settlement? |
|---|

If you don't like the settlement, you may file an objection to it. This means you can tell the Court that you disagree with the settlement or some of its terms. For example, you can say you don't think the settlement is fair or adequate, or that you object to the amount of the attorneys' fees, costs, or expenses. The Court will consider your views but may approve the settlement anyway.

You can object only if you do not exclude yourself from the Class (i.e., you do not "opt out"). If you opt out, or exclude yourself, you cannot object.

To object, either you or a lawyer of your own choosing must prepare an objection that contains all of the following:

1. The name and title of the lawsuit: *Does v. Déjà Vu Services, Inc, et al*, No. 2:16-cv-10877 (E.D. Mich.);

2. A written statement of objections clearly specifying the grounds or reasons for each objection;

3. A statement of whether or not you or your lawyer will ask to appear at the Final Approval Hearing to talk about your objections, and, if so, how long you will need to present your objections; and

4. Copies of documents (if any) you or your lawyer will present at the Final Approval Hearing.

Your objection must be filed with the Court and served on Class Counsel and Counsel for the Defendants **no later than [insert date], 2017**. Any objection postmarked after that date will be rejected.

*To File an Objection with the Court, Mail Objection to:*

Clerk of the Court
United States District Court
Eastern District of Michigan
231 W Lafayette Blvd # 827
Detroit, MI 48226-2774

*To Serve Class Counsel, Mail Objection to:*

Jason J. Thompson, (P47184)
Sommers Schwartz, P.C.
One Towne Square, Suite 1700
Southfield, Michigan  48076

*and*

Megan A. Bonanni (P52079)
Pitt McGehee Palmer & Rivers, P.C.
117 West Fourth Street, Suite 200
Royal Oak, MI 48067

**To Serve Defendants' Counsel, Mail Objection to:**

Bradley J. Shafer (P36604)
Shafer & Associates, P.C.
3800 Capitol City Blvd # 2,
Lansing, MI 48906

Objections postmarked after *[insert date], 2017* will be untimely and not be considered by the Court.

# THE LAWYERS REPRESENTING YOU

## 13.   Do I have a lawyer representing my interests in this case?

Yes.  The Court has appointed law firms to represent you and other Class Members. These lawyers are referred to as Class Counsel, and include:

| | |
|---|---|
| Jason J. Thompson, (P47184) | Megan A. Bonanni (P52079) |
| Sommers Schwartz, P.C. | Pitt McGehee Palmer & Rivers, P.C. |
| One Towne Square, Suite 1700 | 117 West Fourth Street, Suite 200 |
| Southfield, Michigan  48076 | Royal Oak, MI 48067 |

You will not be charged directly by Class Counsel for their lawyers' services, but they will ask the Court to award them a fee from the settlement.  More information about Class Counsel and their experience is available at the websites listed above.  (Add Website for Class Counsel Information)

If you so desire, you may hire your own attorney.  However, you will be responsible for that attorney's fees and expenses.

## 14.   How Will the Lawyers be Paid?

The lawyers who represent the Class will ask the Court for reimbursement of their out of pocket expenses and an award of attorneys' fees based on their work in this litigation. The amount of attorneys' fees to be awarded will be determined solely by the Court. Under the terms of the settlement agreement and subject to Court approval, Class Counsel will petition the Court for One Million Two Hundred Thousand ($1,200,000.00) dollars in attorneys' fees and reimbursement of their out-of-pocket costs associated with prosecuting this case and effectuating the settlement. Attorneys' fees payable to Class Counsel have been factored into the value of the settlement.

A portion of these fees will be paid from the Cash Pool and another portion will be paid by the entertainers at the time of redemption of their Rent Credits. In particular, Class Counsel have asked to be paid an attorney fee equal to 1/3 of the value of the Cash Pool, up to a maximum of three hundred thousand dollars ($300,000).

The settlement agreement provides further details on attorney fees payable to Class Counsel, and a copy of the settlement agreement may be obtained either from Class Counsel or the Court.

## 15.   How Will the Class Representatives be Paid?

To compensate the Class Representatives (Jane Does 1-2) for their work in this litigation on behalf of the Class and for the particular claims they may have, the named Plaintiffs will share a total award and incentive payment of $30,000. The Defendants shall pay this award to the named Plaintiffs from the Cash Pool proceeds that are available to the Class, but the incentive payment has been factored into the value of the settlement.

# THE COURT'S FINAL APPROVAL HEARING

## 16.   When and Where will the Court Decide Whether to Approve the Settlement?

The Court will hold a Final Approval Hearing on *June __, 2017*. At this hearing, the Court will consider whether or not the settlement is fair, reasonable, and adequate. If there are written objections, the Court will consider them, and the Court will listen to people who have asked to speak at the hearing. After the hearing, the Court will decide whether or not to approve the settlement.

The Hearing will be held at: United States District Court for the Eastern District of Michigan, the Honorable Stephen J. Murphy, III, Theodore Levin U.S. Courthouse, 231 W. Lafayette Blvd., Room 564, Detroit, MI 48226.

## 17.   Do I have to attend the Hearing?

No. Class Counsel will answer questions the Court may have, but you may appear at your own expense. If you send a written objection, the Court will consider it. You may also pay your own lawyer to attend the hearing if you desire.

| **18.   Can my lawyer appear at the Final Approval Hearing to tell the Court about my opinions regarding the Settlement?** |
| --- |

Yes.  As long as you don't exclude yourself, you have the right to appear through counsel at the Final Approval Hearing, so long as your Attorney's Notice of Appearance and any written objections you may have are postmarked or received by the Court, Defendants' Counsel, and Class Counsel by TBD, 2017. If you do this, however, the cost of having your lawyer appear will be at your own expense.

## GETTING MORE INFORMATION

| **19.   Where do I obtain more information?** |
| --- |

If you want additional information, you may write Class Counsel at the addresses listed above.

In addition, Class Counsel has created a specific website containing relevant documents, including the operative class action complaint and complete settlement agreement. WWW.(INSERT WEB ADDRESS HERE).com

The specific terms of the settlement are outlined in the legal documents that have been filed with the Court. You can look at and copy these documents at any time during regular office hours at the Office of the Clerk of Court for the United States District Court for the Eastern District of Michigan, Southern Division, 231 W Lafayette Blvd # 827, Detroit, MI 48226-2774. If you have a PACER account, you may view the documents on the Court's CM/ECF website.

**PLEASE DO NOT CONTACT THE COURT**
**REGARDING THE CONTENTS OF THIS NOTICE**

# Exhibit E

# Class Action Settlement
## You May Qualify for a Cash Payment or a "Rent" Credit

Entertainers who performed at any "Deja Vu-Affiliated Nightclubs" after March 10, 2013 (or may qualify for a Cash Payment or a "Rent" Credit as provided for in a recent Class Action Settlement. Please review this notice for details.

If you qualify as a settlement class member, the financial benefit that you can claim will be based upon the number of days you performed at the Deja Vu-Affiliated Nightclub where you last performed prior to [insert date] (referred to as your "Qualifying Club"). If you are eligible to be in the settlement class, you may select to receive either a Cash Payment or a "Rent" Credit, but not both.

If you desire to receive a Cash Payment, it will be calculated based on the length of time you first worked at any Déjà Vu-Affiliated Nightclub after March 10, 2013. To obtain the Cash Payment, you must return the Cash Election Form that was mailed to you to the Settlement Administrator postmarked no later than [insert date]. If you did not received a Cash Election Form in the mail on if you misplaced it, you can download the form from the website www._____. **Acceptance of a Cash Payment may be taxable event, and you may be issued an IRS Form 1099-MISC regarding such payment.**

If you are eligible to be in the settlement class and do not elect to receive a Cash Payment, you may claim certain Rent Credits for Qualifying Clubs using the Lease Model, and Dance Fee Payments for Qualifying Clubs using either the Independent Contractor Model or the Joint Venture Model.  . These "Rent credits or Dance Fee Payments" operate to reduce any "rent" or the club's contract portion of dance fees which may be due at the end of a performance date.

Rent Credits can be redeemed ONLY at your Qualifying Club

The amount of rent credits to which a Participating Class Member shall be entitled shall be determined pursuant to the following 3-Tier schedule (the "Secondary Pool Tier"):

> (a)    TIER I.  A maximum amount of two hundred dollars ($200.00) for any Class Member who performed for a period of at least one month at her Qualifying Club;

> (b)    TIER II. A maximum amount of one thousand dollars ($1,000.00) for any Class Member who performed for a continuous period of between six and eighteen months at her Qualifying Club; and

> (c)    TIER III.  A maximum amount of two thousand dollars ($2,000.00) for any Class Member who Performed more than eighteen months at her Qualifying Club.

If you decide to select a Rent Credit:

- The Rent Credits entitle you to a 60% reduction off the total amount of "rent" or off the club's contract portion of the dance fees), subject to the payment of attorney fees discussed below.

- You will be required to pay (or permit the club to retain from dance fees)

  (a) 40% of the "rent" or the club's contract portion of the dance fees owed for that performance date, plus

  (b) an additional 20% of the "rent" or the club's contract portion of the dance fees, which money the club will pay over to the Plaintiffs' lawyers for their work in obtaining this settlement for you.

- The Dance Fee Payments: entitle the Participating Class Member to payment of 100% of the Dance Fees that she generates out of her entertainment services for two Dates of Performance, with no allocation of those Dance Fees whatsoever going to the Qualifying Club.

- The maximum amount of Rent Credit you can redeem on any one performance date is $100.00.

- The Rent Credits expire one year from [insert date], or when all the Rent Credits have been exhausted or "used up" by dancers who claimed their Rent Credits earlier.

Rent Credits are limited in amount, and are available on a first come, first serve basis.  As such, if you intend to claim Rent Credits, you should do so as early as possible.  **Acceptance of Rent Credits may be a taxable event, and you may be issued an IRS Form 1099-MISC for any Rent Credits you redeem.**

TO MAKE A CLAIM FOR RENT CREDITS OR DANCE FEES, YOU MUST FOLLOW THESE INSTRUCTIONS:

- Ask the Club Manager at your Qualifying Club for a Secondary Pool Claim Form.  This club will inform you of when Rent Credits or Dance Fees may begin to be redeemed.

**Class Action Settlement
You May Qualify for a Cash Payment or a "Rent" Credit**

- Fill out the Secondary Pool Claim Form and provide it to the Club Manager at least seven (7) days before you plan to begin to redeem your Rent Credits.

- The Club Manager will use the information on your form to obtain information from the Class Action Settlement Data Base concerning whether you are eligible and, if so, how much in Rent Credits or Dance Fees you may be eligible to receive. He or she will also confirm the Qualifying Club at which you are required to redeem your Rent Credits.

NOTE:   If you have any questions about your eligibility to be in the settlement class or any details about this notice, you may visit the website www._____ for more information.  In addition, if at any time you believe an error has been made regarding your Rent Credits, or if you experience any problems in claiming or redeeming your Rent Credits, you may telephone 1-800-XXX-XXXX during regular business hours.

# Exhibit F

EST.version.11.16.16

# ENHANCED OFFER OF  EMPLOYMENT

**THIS DOCUMENT CONSTITUTES AN ENHANCED OFFER OF EMPLOYMENT.  PLEASE READ IT CAREFULLY.**

**THE COMPANY WANTS YOU TO SERIOUSLY CONSIDER THIS EMPLOYMENT OFFER AS AN ATTRACTIVE ALTERNATIVE TO YOUR CURRENT CONTRACTOR STATUS. TAKE THIS DOCUMENT HOME AND READ IT CAREFULLY, OR HAVE YOUR ATTORNEYS OR ACCOUNTANTS REVIEW IT.  THE COMPANY REQUIRES A DECISION FROM YOU, ONE WAY OR THE OTHER, BY _____.**

Background.  There have been a number of lawsuits where entertainers alleged that nightclubs at which they performed had misclassified them as independent contractors. They have contended that the nightclubs should have had them work as *employees*, placed on a payroll, paid an hourly wage, overtime and provided other employee-like benefits.  When YOU first applied to perform at this Company, you were given a written option to perform as a payroll employee or as an Independent Contractor.  Our records indicate that you selected Independent Contractor status.

This document is intended to again provide you an option to choose employee status – and includes incentives designed to *encourage* you to do so. While it is not a "contract of employment" it does set out the details on how you would be treated and compensated if you choose to be an entertainer-employee.

Enhanced Offer.  Please consider the following information in making your decision concerning whether you want to terminate your current contract and begin performing as an employee of the Company:

1. You will no longer be an independent contractor. Instead, the Company will place you on its payroll, and pay you at the applicable minimum wage or tip-credit wage.
2. The Company will also pay you a commission of 20% on your sales of private dances and VIP rooms once your total sales exceed $150.00 per performance date.  This commission will be paid to you in your regular payroll check.
3. You will continue to own all your tips (except as an employee, the law requires that you tip report to the Club the total amount of your tips after each

EST.version.11.16.16

performance date). Note: as always, you will never be required to tip any club employee.

4. You will be issued a paycheck at the end of each payroll period, and the check will include your wages, commissions, and reported tips; as well, the payroll statement will include all information required by law including gross wages, total hours worked, overtime hours, commissions, bonuses, deductions for taxes, insurance, or anything else required by law. It will also specify the payroll period, your social security number, and total net wages being paid.

5. The Company will provide you a logo costume for you to wear while performing.

6. You will be given a performance schedule; however, the Company will consider your input into selecting the schedule, taking into consideration its business needs, including expected number of performers, customers, etc.

7. The Company will offer training on methods to increase your sales, improve your performance skills, physical presentation, routine, music selection, etc.

8. You will be afforded all the benefits of being an employee as required by California and Federal law; as well you will have all the employment obligations required by law as do all of the Company's employees.

9. Your employment would be (as with all Company employees) "at will", meaning that either you or the Company can terminate your employment at any time, with or without reason and without prior notice.

IMPORTANT NOTE: If you would like to know more about these matters, please ask to review the Company's employee new hire information packets that discuss these issues. You may also inform yourself by on-line research concerning the rights of employees in this state.There are many web sites with information concerning wages, overtime, meal and break periods, unemployment, safety requirements, leaves of absence, disability, wage statement requirements, rights to review your payroll and personnel files, etc. For example, consult the Department of Labor Standards Enforcement in your state.

PLEASE ADVISE THE COMPANY OF YOUR CHOICE BY CHECKING THE APPROPRIATE BOX BELOW.

_____ YES. I WANT TO BECOME AN EMPLOYEE entertainer in accordance with the structure set out above. I hereby give notice that I wish to terminate my Performer Contract with the Company. The Company will provide me with an employee hire package and place me on the next payroll.

EST.version.11.16.16

_____ NO. I DO NOT WANT TO BECOME AN EMPLOYEE, I choose to remain a contractor.  IN REFUSING THIS EMPLOYMENT OFFER, I HEREBY ACKNOWLEDGE THE FOLLOWING:

_____ I gave careful consideration to the offer of employee status.

_____ I confirm that I understand the choice.

_____ **I understand that I am rejecting all the benefits that employee status would have provided to me, including for example, unemployment or workers' compensation insurance, leave time, meal and break periods, etc.**

_____ I CONFIRM HERE THAT NO ONE HAS ATTEMPTED TO COERCE OR ENCOURAGE ME TO CHOOSE ONE WAY OR THE OTHER. I AFFIRM THAT MY CHOICE WAS OF MY OWN FREE WILL.

Signature (legal name)_____

Print legal name_____   Date_____

Business "Stage" Name_____

Witness Name (printed & signed) _____   _____

Camera #_____ date and time

3