UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOES 1-2, individually and on behalf
of all others similarly situated,

      Plaintiffs,                    Case No. 1:16-cv-10877

v.                                 Hon. Stephen J. Murphy, III

DÉJÀ VU SERVICES, INC., *et al*,

      Defendants.

_____

**PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT,
INCENTIVE AWARDS, AND *CY PRES* DESIGNATION**

      Pursuant to Fed. R. Civ. P. 23(e) and 29 U.S.C. §216(b) Plaintiffs,

individually and on behalf of all others similarly situated, move for an order

granting final approval to the settlement described in the Settlement Agreement,

attached hereto as ***Exhibit 1*** (hereinafter referred to as "Settlement Agreement"),

Incentive Awards to the Class Representatives, and the requested *Cy Pres*

designation.  The motion is supported by the attached Memorandum of Law and

attached exhibits.

                                  Respectfully submitted,

Date: April 28, 2017          SOMMERS SCHWARTZ, P.C.

                              */s/ Jason J. Thompson*
                              Jason J. Thompson (P47184)
                              Jesse L. Young (P72614)
                              One Towne Square, 17th Floor

Southfield, Michigan 48076
Telephone: (248)355-3000
Fax: (248) 436-8453
E-mail: jthompson@sommerspc.com
        jyoung@sommerspc.com


*/s/ Megan A. Bonanni*
Megan A. Bonanni (P52079)
Rachael Kohl (P78930)
Pitt McGehee Palmer & Rivers, P.C.
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
mbonanni@pittlawpc.com
rkohl@pittlawpc.com


*Class Counsel*

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................ 1

II.   LAW AND ARGUMENT ........................................................... 2

      A.    FINAL APPROVAL OF THE PARTIES' SETTLEMENT IS
            WARRANTED BECAUSE, THE SETTLEMENT IS FAIR,
            ADEQUATE, AND REASONABLE .................................................. 2

            1.   The Standards for Final Approval Under Fed. R. Civ. P. 23(e)
                 And Section 216(B) of the FLSA ................................................. 2

            2.   The Settlement Meets the Test for a Fair, Reasonable, and
                 Adequate Resolution of the Parties' Dispute ................................ 3

                 a.   Success of the Merits ................................................ 4

                      i.   Monetary Components ....................................... 6

                      ii.  Injunctive Relief ............................................. 13

                      iii. Additional Value of the Settlement Benefits................... 18

                 b.   The Complexity, Expense and Likely Duration
                      of the Litigation ....................................................... 20

                 c.   The Stage of the Proceedings and the Amount of
                      Discovery Completed................................................ 21

                 d.   The Judgment of Experienced Trial Counsel.......................... 22

                 e.   The Nature of the Negotiations ............................... 23

                 f.   The Objections, if any, Raised by the Class Members........... 24

                 g.   The Public Interest  ...................................................... 25

      B.   THE ELEMENTS OF RULE 23(a) AND 23 (b)(3) ARE MET ............. 25

            1.   Numerosity ................................................................. 26

            2.   Commonality .............................................................. 26

            3.   Typicality .................................................................. 27

            4.   Adequacy................................................................... 28

            5.   Predominance and Superiority ..................................... 29

i

C. THE REQUESTED INCENTIVE AWARDS ARE APPROPRIATE .................................................................. 30

D. THE CONTINGENT *CY PRES* PROVISIONS IS THE APPROPRIATE "NEXT BEST USE" OF SETTLEMENT FUNDS ................................................................. 35

E. THE SETTLEMENT ALSO WARRANTS APPROVAL UNDER THE FLSA ........................................................................ 38

III. CONCLUSION ......................................................................... 40

IV. CERTIFICATE OF SERVICE ................................................ 41

## INDEX OF AUTHORITIES

Akkala v. Lakes Shore, Inc., 82 F.3d 417 ............................................................... 24

Alexander v. Fedex Ground Package Sys., 2016 WL 14258,

    (N.D. Cal. Apr. 12, 2016) ................................................................. 12

Amaral v. Cintas Corp. No. 2, 163 Cal. App. 4th 1157 (2008) .............................. 9

Aros v. United Rentals, Inc., 2011 U.S. Dist. LEXIS 125870

    (D. Conn. Oct. 31, 2011) ................................................................. 32

Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 101 S. Ct. 1437,

    67 L. Ed. 2d 641 (1981) ........................................................... 5, 38

Bert v. AK Steel Corp., 2008 U.S. Dist. LEXIS 11171

    (S.D. Ohio Oct. 23, 2008) ....................................................... 33, 34

Bronson v. Board of Educ., 604 F. Supp. 73 (S.D. Ohio 1984) ........................... 24

Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 65 S. Ct. 895 (1945) .................... 38

Buel v. Chowder House, Inc., 2006 WL 1545860 (Cal. App. 1st Dist.) .............. 22

Byers v. Care Transp., Inc., 2017 U.S. Dist. LEXIS 25233

    (E.D. Mich. Feb. 23, 2017) ....................................................... 2, 4

Cardoza v. Bloomin' Brands, Inc., Case No. 13-cv-01820

    (D. Nev. Nov. 15, 2016)..................................................................31

Chu v. Wells Fargo Investments, LLC, 2011 WL 672645

    (N.D. Cal. Feb. 16, 2011) ............................................................... 12

Collins v. Sanderson Farms, Inc., 568 F. Supp. 2d 714, 719 (E.D. La. 2008)........39

Cotter v Lyft, Inc., 167 F. Supp. 3d 930, (N.D. Cal. 2016) ................ 10, 12, 13, 19

Crawford v. Lexington-Fayette Urban County Gov't,

    2008 U.S. Dist. LEXIS 070, (E.D. Ky. Oct. 23, 2008) ......................... 2-3, 39

Dallas v. Alcatel-Lucent USA, Inc., 2013 U.S. Dist. LEXIS 71204

    (E.D. Mich. May 20, 2013) ............................................... 31, 33, 34

Date v. Sony Elecs., Inc., 2013 U.S. Dist. LEXIS 108095

    (E.D. Mich. July 31, 2013) ............................................................. 32

Dennis v. Kellogg Co., 697 F.3d 858 (9th Cir. 2012) ........................................... 36

Donovan v. Brandel, 736 F. 2d 1114 (6th Cir. 1984) ........................................... 27

Franco v. Ruiz Food Products, Inc., No 10-CV-02354, 2012 WL 5941801
    (E.D. Cal. Nov 27, 2012) ................................................................. 12

Frank v. Eastman Kodak Co., 228 F.R.D. 174 (W.D.N.Y. 2005) ................... 33, 34

Garcia v Gordon Trucking, Inc., No. 10-CV-0324, 2012 WL 5364575
    (E.D. Cal. Oct. 31, 2012) ................................................................. 12

Griffin v. Flagstar Bancorp.  Inc., 2013 WL 6511860
    (E.D. Mich. Dec. 12, 2013) ............................................................. 32

Guippone v. BH S&B Holdings, 2011 WL 5148650 (S.D.N.Y. Oct. 28, 2011) ... 34

Hadix v. Johnson, 322 F.3d 895 (6th Cir. 2003) ................................................. 33

Hopson v. Hanesbrands Inc., 2009 WL 928133 (N.D. Cal. Apr. 3, 2009) ........... 12

In re American Med. Sys., 75 F.3d 1069 (6th Cir. 1996) ...................................... 28

In re Packaged Ice Antitrust Litig., 2012 U.S. Dist. LEXIS 16245
    (E.D. Mich. Nov. 13, 2012) ............................................................ 32

Int'l Union, 497 F.3d ..................................................................................... 4, 21

IUE-CWA v. General Motors Corp., 238 F.R.D. 583, 598-99 ............................ 21

Knuckles v. Mary Jane Elliott, PC, 2016 U.S. Dist. LEXIS 94858
    (E.D. Mich. July 20, 2016) ............................................................. 36

Kritzer v. Safelite Sols., LLC, 2012 U.S. Dist. LEXIS 74994
    (S.D. Ohio May 30, 2012) ................................................................. 3

Lane v. Facebook, Inc., 696 F.3d 811 (9th Cir. 2012) ......................................... 36

Lessard v. City of Allen Park, 470 F. Supp. 2d 781 (E.D. Mich. 2007)  ... 36, 37, 38

Lonardo v. Travelers Indem. Co., 706 F. Supp. 2d 766 (N.D. Ohio 2010) ........... 33

Lusby v. GameStop Inc., 297 F.R.D. 400 (N.D. Cal. 2013) ................................. 12

Lusby v. GameStop Inc., 2015 WL 1501095 (N.D. Cal. Mar. 31, 2015) ............. 12

Lynn's Food Stores, Inc. v. United States, 679 F.2d 1350 (11th Cir. 1982) ......... 39

Merenda, 296 F.R.D. 528, 536 (E.D. Mich. 2014, opinion reinstated on
    reconsideration sub nom. Cason-Merenda v. VHS of Michigan, Inc.,
    No. 06-15601, 2014 WL 905828 (E.D. Mich. Mar. 7, 2014) ........................ 26

Moore v. PetSmart, Inc., 2015 WL 5439000 (N.D. Cal. Aug. 4, 2015) ............... 12

Olden v. LaFarge Corp., 203 F.R.D. 254 (E.D. Mich. 2001), aff'd by Olden v. LaFarge Corp., 383 F.3d 495 (6th Cir. 2004) ................................................. 28

Parker v. Jekyll & Hyde Entm't Holdings, LLC, 2010 U.S. Dist. LEXIS 12762 (S.D.N.Y. Feb. 9, 2010) ........................................................................ 32-33

Redington v. Goodyear Tire & Rubber Co., 2008 U.S. Dist. LEXIS 6463 (N.D. Ohio Aug. 22, 2008) ............................................................................ 4

Rikos v. Procter & Gamble Co., 799 F.3d 497 (6th Cir. 2015), cert. denied, 136 S. Ct. 1493 (2016) ....................................................... 27-28

Ross v. Jack Rabbit Servs., LLC, 2016 U.S. Dist. LEXIS 1732, (W.D. Ky. Dec. 15, 2016) ....................................................................... 3, 4

Schiller v. David's Bridal, Inc., 2012 WL 211700 (E.D. Cal. June 11, 2012) ...... 12

Yadira v. Fernandez, 2011 U.S. Dist. LEXIS 101617, *8 (N.D. Cal. Sept. 7, 2011) ............................................................................ 9

Sewell, 2012 WL 1320124 at *14 ....................................................................... 34

Swigart v. Fifth Third Bank, No. 11 Civ 88, 2014 WL 3447947 (S.D. Ohio July 11, 2014) ............................................................................ 34

Vasalle v. Midland Funding LLC, 708 F.3d 747 (6th Cir. 2013) .................... 28-29

Vasquez v. Escort Sunnyvale Corp. dba The Brass Rail (No. 1:14-cv-272861) (California Superior Court, Santa Clara County).............................................38

Velez v. Majik Cleaning Serv., 2005 U.S. Dist. LEXIS 709 (S.D.N.Y. Jan. 18, 2005) .......................................................................... 32

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011) ........................................ 27

Yadira v. Fernandez, 2011 U.S. Dist. LEXIS 101617, *8 (N.D. Cal. Sept. 7, 2011)..............................................................................9

York v. Starbucks Corp., 2012 WL 1089035 (C.D. Cal. Nov. 1, 2012) ............. 8-9

Young v. Nationwide Mut. Ins. Co., 693 F.3d 532 (6th Cir. 2012) ................ 29, 30

## STATUTES

Fed. R. Civ. P. 23 ......................................................................................... 2, 39

Fed. R. Civ. P. 23(a) ............................................................................. 25, 27, 29

Fed. R. Civ. P. 23(b) ................................................................................... 25

Fed. R. Civ. P. 23(b)(3) ................................................................. 25, 29

Fed. R. Civ. P. 23(e) ......................................................................... 1, 2

Fed. R. Civ. P. 23(e)(1)(C) ................................................................... 3

29 U.S.C. § Section 216(b) ................................................. 1, 2, 3, 39, 40

28 U.S.C. § 1715(b) ............................................................................. 8

## **OTHER**

Cal. Lab. Code § 2698 et seq. .............................................................. 7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JANE DOES 1-2, individually and on behalf
of all others similarly situated,

      Plaintiffs,                 Case No. 1:16-cv-10877

v.                                   Hon. Stephen J. Murphy, III

DÉJÀ VU SERVICES, INC., *et al*,

      Defendants.
_____

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENT, INCENTIVE AWARDS, AND *CY PRES* DESIGNATION

## I.    INTRODUCTION

The Plaintiffs request the Court grant their motion for final approval of the class action settlement in this case. Pursuant to the Court's Preliminary Approval Order (Doc. 31), Class Notice was mailed on March 24, 2017; a Second Amended Class Action Complaint was filed to expand the scope of the litigation to match the scope of the parties' proposed settlement (Doc. 33); an opportunity for filing objections has been provided; and a fairness hearing is set for June 6, 2017. The record will be complete at that time and the Court may rule on final approval of the settlement pursuant to Fed. R. Civ. P. 23 (e) and Section 216(b) of the FLSA.

1

## II.  <u>LAW AND ARGUMENT</u>

The parties' settlement agreement encompasses class action claims based on state wage and hour laws and collective action claims under the Fair Labor Standards Act ("FLSA").  Insofar as the Parties propose to settle claims of the opt-in FLSA plaintiffs, the proposed settlement agreement is subject to approval by the Court under 29 U.S.C. § 216(b).  *Byers v. Care Transp., Inc.*, 2017 U.S. Dist. LEXIS 25233, *2 (E.D. Mich. Feb. 23, 2017) (J. Murphy, III) (citing *Lynn's Food Stores, Inc. v. U.S.¸* 679 F.2d 1350, 1353 (11th Cir. 1982)). The proposed class settlement is also subject to approval by the Court under Fed. R. Civ. P. 23. *Clevenger v. JMC Mech., Inc.*, No. 15-CV-2639, 2015 WL 12681645, at *1 (S.D. Ohio Sept. 25, 2015 (citing *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)).

### A.  FINAL APPROVAL OF THE PARTIES' SETTLEMENT IS WARRANTED BECAUSE THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE

#### 1.  The Standards for Final Approval Under Fed. R. Civ. P. 23(e) and Section 216(B) of the FLSA

Pursuant to Fed. R. Civ. P. 23(e), a class action "shall not be dismissed or compromised without the approval of the court."  The district court must "ensure that any settlement . . . is fair, reasonable, and adequate," as well as, *inter alia*, consistent with the public interest.  *Crawford v. Lexington-Fayette Urban County*

*Gov't*, 2008 U.S. Dist. LEXIS 90070, \*13-14 (E.D. Ky. Oct. 23, 2008).  In addition, the Court must also determine whether class certification is appropriate in the first instance. *Kritzer v. Safelite Sols., LLC*, 2012 U.S. Dist. LEXIS 74994, at \*10 (S.D. Ohio May 30, 2012).

Similarly, FLSA claims may be dismissed when a court reviews and approves a settlement agreement in a private action for back wages under 29 U.S.C. § 216(b). *Ross v. Jack Rabbit Servs., LLC*, 2016 U.S. Dist. LEXIS 173292, \*4-5 (W.D. Ky. Dec. 15, 2016) (citing cases).  "Like a settlement pursuant to Fed. R. Civ. P. 23(e)(1)(C), courts in the Sixth Circuit require a settlement agreement under the FLSA to be approved by the court." *Id.* (citing cases).  Approving a settlement under Section 216(b) of the FLSA requires a court to "consider whether there is a bona fide dispute concerning the application of the FLSA and whether the settlement agreement represents a fair and reasonable compromise of the issues in dispute." *Ross*, 2016 U.S. Dist. LEXIS 173292 at \*13 (citing *Lynn's Food Stores*, 679 F.2d at 1353).

### 2.   The Settlement Meets the Test for a Fair, Reasonable, and Adequate Resolution of the Parties' Dispute

In determining whether a proposed class action settlement is fair, reasonable, and adequate, the Sixth Circuit has identified seven factors that may aid the Court in its determination:

(1) the risk of fraud or collusion;

3

(2) the complexity, expense, and likely duration of the litigation;

(3) the amount of discovery engaged in by the parties;

(4) the likelihood of success on the merits;

(5) the opinions of class counsel and class representatives;

(6) the reaction of absent class members; and

(7) the public interest.

*Byers*, 2017 U.S. Dist. LEXIS 25233 at *2; *Ross*, 2016 U.S. Dist. LEXIS 173292 at *8-13 (citing *Int'l Union*, 497 F.3d at 631). "The Court may choose to consider only those factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case." *Redington v. Goodyear Tire & Rubber Co.*, 2008 U.S. Dist. LEXIS 64639, *31 (N.D. Ohio Aug. 22, 2008) (citing *Granada Invs., Inc. v. DWG Corp.,* 962 F.2d 1203, 1205-06 (6th Cir.1992)). On balance, the above factors strongly weigh in favor of the Court granting final approval of the parties' settlement.

### a.    Success on the Merits

The most important factor to consider in approving a class settlement is the plaintiffs' probability of success on the merits, particularly when weighed against the recovery provided in the proposed settlement agreement. *Int'l Union*, 497 F.3d at 631 (citing *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981)). In this case, the Plaintiffs' likelihood of success on the merits is far from certain. Were this case to move forward, Plaintiffs would face discovery and evidentiary challenges on issues involving the economic realities test and joint employer. Questions as to acceptable representative testimony and sample size would have been contested, and

4

ultimately required dancer participation at sufficient levels to prevail. Moreover, Defendants have, in informal meetings, in settlement discussions, in discussions with experts retained by the parties, and in other similar matters pending across the Country, sharply contested the notion that the entertainers suffered *any* damages under the existing pay policies, including tip sharing. Further, defenses on class certification issues and entertainer arbitration agreements pose significant impediments for each class member. In short, there are factual and legal complexities present in this case that cut against a clear determination of the Plaintiffs' likelihood of prevailing on the merits, such that a settlement at this juncture of the case is desirable.

Against this uncertainty of continued litigation, the Court has a bounty of evidence from which to weigh the benefit of settlement – including the amount and forms of relief. The goal of the FLSA is to ensure that a covered employee receives a "fair day's pay for a fair day's work" and is "protected from the evil of overwork as well as underpay." *Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981). As the parties explained during the preliminary approval process, this settlement attempts to meet the goals of the FLSA by tackling the classification challenge facing the clubs and entertainers through a joint assessment process. That joint assessment represents a significant benefit to this settlement and an innovative change relative to any other FLSA settlement of

exotic dancer cases.  It goes to the heart of exotic dancer class actions; whether exotic dancers should be classified as employees or independent contractors.

The parties' settlement contains both monetary and injunctive relief, both of which contribute to the value of the settlement, and both should be considered by the Court in determining the fairness of the settlement.

### i.    Monetary Components

The $6.55 total monetary component of the settlement includes the $1 million cash payment pool, the $4.5 million rent credit/dance fee payment pool, the $1 million for direct attorneys' fees and PAGA penalties, and Defendants portion ($50,000) for administration costs.  (***Exhibit 1***, Settlement Agreement at Section V). Critically, the pools are not subject to a typical claims-made process; rather, the cash payment pool will be paid out in its entirety and any unclaimed rent credits/dance fee-payments will expire approximately one year after final approval.  To date, approximately 2,700 entertainers have elected to receive a cash payment. (***Exhibit 2***, Declaration of Richard Simmons at ¶ 36). In addition, Defendant has agreed to pay attorneys' fees of $900,000, plus up to $300,000 from any rent credit/dance fees claimed by the class members; actual litigation costs; and class notice and administration costs of up to $50,000.  Having the choice to receive either cash payment or a rent credit/dance fee payment is a positive aspect of this settlement.  The design was intended to assist each class member pick the best

option, given her current work situation and taxation classification.  It was designed also to result in a higher rate of participation, which historically is low in dancer cases.

Lastly, $100,000 is being paid for claims based upon potential civil penalties under the California Labor Code Private Attorneys General Act ("PAGA"), Cal. Lab. Code § 2698 *et seq.*  Pursuant to that statute, 75% of this amount is to be allocated to the California Labor Workforce Development Agency ("LWDA") and 25% to the affected (California performing) entertainers.

The PAGA statute provides for the possibility of substantial penalties to be imposed on "employers" proven to have violated California's wage and hour laws. For a myriad of reasons -- including that: (a) any valuation of a PAGA recovery would be speculative and reductions probable; (b) only 14 of the 55 Participating Nightclubs are premised in California and subject to PAGA; (c) the percentage allocated for PAGA exceeds that approved in other cases; and (d) reductions are not only permissible but probable and warranted here due to the risks in Plaintiffs' case and the Defendants' good faith reliance on prior victories – the $100,000 allocated for "PAGA" is more than reasonable.  Moreover, the only entity that would have standing to object to the amount of a PAGA settlement is the State of California, and though it received PAGA notices from two California entertainers in 2015 and 2016, and though it was served in March of 2017 with a copy of the Settlement Agreement

in this case pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b), the State of California has not chosen to become involved or to object, and if it has not done so prior to the final fairness hearing on June 6, 2017, the time period to object will have already expired.

> (a)  *Valuation of a likely PAGA Recovery is Appropriate Because the Claims are Speculative and Reductions Would be Probable.*

PAGA allows for substantial penalties for violations of its Labor Code.  A complicated assessment of the potential penalties would necessarily begin with attempting to calculate how many "payroll periods" each class member worked, and from there, assessing $100-$200 in penalties per pay period.  The statute of limitations under PAGA is only one (1) year.

Here, the class members performed sporadically, performing one time or hundreds of times over the 5-year class period.  It would require an entertainer-by-entertainer individualized assessment of how many "weeks" that person performed, which under the circumstances, the parties found not only nearly impossible but virtually unnecessary.  For one thing, any valuation of a likely PAGA recovery would have not only taken hundreds of man hours or otherwise been a wild estimate, it would have been inherently speculative because of the Court's statutory discretion to reduce a PAGA penalty on due process grounds – where it is "unjust, arbitrary and oppressive, or confiscatory." *See York v. Starbucks Corp.*, 2012 WL 10890355, *10 (C.D. Cal. Nov. 1, 2012) ("PAGA's section 2699(e) (2) provides the Court with

the ability to fashion an appropriate penalty in this case that will not offend notions of due process.").

Under the circumstances of this case, in which the participating nightclubs' classification of entertainers as independent contractors has been upheld by the IRS, various California state agencies, a California Jury, and the California Court of Appeals, it is extremely likely that the Court would impose a dramatically reduced PAGA award even if it found liability on the part of the California Defendants. While there is little case law regarding the extent of an appropriate reduction, in this case Plaintiffs believed it possible that the Court would adopt the benchmark of a one-third reduction as set forth in *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1214 (2008). Moreover, the uncertainty in the law with respect to PAGA penalties and whether they, as the Defendants here would argue, constitute an unlawful double recovery, and whether PAGA penalty "stacking" is permissible, likewise impacted the parties' assessment of a fair allocation to PAGA.   *See e.g., Yadira v. Fernandez*, 2011 U.S. Dist. LEXIS 101617, *8 (N.D. Cal. Sept. 7, 2011) (citing *Doe v. D.M. Camp & Sons*, 624 F. Supp. 2d 1153, 1174 (E.D. Cal. 2008) (recognizing that "[w]here state law provides for statutory damages, the trial court's discretion may be called upon to prevent double recovery").

Against this backdrop, the parties considered these additional items: There are approximately 10,000 California class members; it was anticipated that there would

be approximately a 20% response rate; and each of the 14 California nightclubs had methodically issued IRS forms 1099-MISC for every one of the class period years, which would prove direct payments to the class members and immediately reduce (or in fact completely abrogate) any wage claim by the amount they were already paid.  Based on these additional facts, allocating $100,000 for PAGA was deemed more than adequate – in fact, probably too high. *See e.g., Cotter et al v. Lyft, Inc.*, Case No. 3:13-cv-04065-VC (N.D. Cal.), Doc. 200 at p. 21 ("This does not appear to be a case in which a company deliberately sought to evade California's wage and hour laws by classifying workers as 'independent contractors' when it knew they were really 'employees.' How to classify Lyft drivers under California's archaic law is a difficult question, and it does not seem that Lyft made its initial classification decision in bad faith. It would therefore be 'unjust' or 'oppressive' to impose full PAGA penalties, and it may well be unjust to merely reduce them to one-third of damages.").

(b)   *Only 14 of 55 Participating Nightclubs are Subject to PAGA.*

The general practice for analyzing whether a settlement's PAGA allocation is adequate is to compare the PAGA allocation (here, $100,000) to the total settlement amount (here, $6,550,000).  But here, the vast majority of the settling nightclubs are not situated in California, and therefore not subject to PAGA's reach.  As such, it is critical for a PAGA analysis to take into consideration that only 14 of the 55

participating clubs are situated in California (25.46% of the settling nightclubs) and therefore only 25.46% of the total settlement value -- $1,667,630 -- is relevant for this PAGA comparison.  When properly viewed in this way, the appropriate question then is whether the PAGA allocation of $100,000 is reasonable when compared to the settlement value allocated for California-only nightclubs - $1,667,630, which is 5.99%.  Once this calculation is understood, it is easily shown to be a more than fair allocation for PAGA.  In fact, a 5.99% percent is substantially higher than most PAGA allocations approved by the California courts.

(c)    <em>The 5.99% Allocated to PAGA is More Generous than other<br>PAGA Allocations Approved by California Courts.</em>

At the outset, it must be understood that the PAGA statute itself provides no criteria to evaluate whether a proposed PAGA settlement should be approved, the result of which is that courts generally look at the allocations approved by other courts. For example, and most recently, a California case involving exotic dancers with nearly identical allegations received preliminary approval where the total value of the settlement was $5 million with $100,000 allocated to PAGA (2%).  Because the Court found that the Plaintiffs had a significant risk that a jury could find the entertainers to be properly classified as contractors, it found that a 2% allocation was fair and reasonable.  *Roe v SFBSC Management, LLC*, Case No. 14-cv-03616-LB, Doc. 151.

11

Many other cases also indicate the 5.99% allocation here is generous.[1] In addition, a significant number of courts have approved PAGA allocations of $10,000 or less, regardless of the settlement value of the case and regardless of the valuation (if any) of the PAGA claim.[2]

While some recent decisions show that some courts have taken a closer look at PAGA settlements, none undermine the validity of the allocation here.  For example, in *Cotter v Lyft, Inc.*, 167 F. Supp. 3d 930, 945 (N.D. Cal. 2016), the parties proposed less than 1% of a $12.25 million dollar settlement for PAGA, which the Court found insufficient because the allocation was viewed as an "arbitrary" number in view of Plaintiff's own (wild) estimation that PAGA penalties could have totaled a billion dollars.  Settlement approval was re-visited, *Cotter v Lyft, Inc.* --- F.Supp.3d

---

[1] *See e.g., Franco v. Ruiz Food Products, Inc.*, No 10-CV-02354, 2012 WL 5941801 *14 (E.D. Cal. Nov 27, 2012) (approving PAGA settlement payment of $10,000 out of $2.5 million settlement fund - 0.4%); *Garcia v Gordon Trucking, Inc.*, No. 10-CV-0324, 2012 WL 5364575, at *7 (E.D. Cal. Oct. 31, 2012) (approving PAGA settlement payment of $10,000 out of the $3.7 million settlement - 0.27%); *Hopson v. Hanesbrands Inc.*, 2009 WL 928133, *9 (N.D. Cal. Apr. 3, 2009) (approving total PAGA allocation that was 0.49% of $408,420.32 gross settlement); *Moore v. PetSmart, Inc.*, 2015 WL 5439000, *8 (N.D. Cal. Aug. 4, 2015) (approving total PAGA allocation that was 0.5% of $10,000,000 gross settlement); *Lusby v. GameStop Inc.*, 297 F.R.D. 400, 407 (N.D. Cal. 2013) (approving total PAGA allocation that was 0.67% of $750,000 gross settlement), *final approval granted*, *Lusby v. GameStop Inc.*, 2015 WL 1501095, *2 (N.D. Cal. Mar. 31, 2015); *Alexander v. Fedex Ground Package Sys.*, 2016 WL 1427358, *2 n.5 (N.D. Cal. Apr. 12, 2016) (conditionally approving PAGA allocation that was 0.7% of $173 million net settlement amount).

[2] *See e.g., Chu v. Wells Fargo Investments, LLC*, 2011 WL 672645, *1 (N.D. Cal. Feb. 16, 2011) (approving PAGA settlement payment of $7,500 to the LWDA out of $6.9 million settlement - 0.1%); *Schiller v. David's Bridal, Inc.*, 2012 WL 2117001, *14 (E.D. Cal. June 11, 2012) (approving PAGA settlement payment of $7,500 to the LWDA out of $518,245 settlement - 1.44%).

---, No. 13-CV-04065, 2016 WL 3561742, at *5 (N.D. Cal. June 23, 2016) after the parties revised their settlement agreement and increased the PAGA allocation from $122,250 to $1 million dollars. The judge then found that the PAGA allocation (8.16%) was "*quite high* compared to the typical amount apportioned to claims for PAGA penalties in wage and hour settlements," noting that it would have applied a "significant reduction" to any PAGA penalties given the unsettled nature of the law (on classification of workers). The judge approved the revised PAGA allocation and settlement.

The point of all these cases is this: The Settlement Agreement here allocates 5.99% to PAGA, and it is far in excess of nearly all of the cases which examined the fairness of PAGA allocations. Under the circumstances of this case and Defendant's legitimate defenses to Labor Code violations, it is extremely unlikely that the Court would impose a dramatically high PAGA award. Therefore, while imperfect, the PAGA analysis is not arbitrary, and instead meets the standard for PAGA allocation and valuation in this District. *Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930 (N.D. Cal. 2016).

### ii.   Injunctive Relief

As the parties explained during the preliminary approval process, class settlements in exotic dancer misclassification cases have largely involved the defendant making a payment of a negotiated sum of money that is then distributed

*pro rata* to the entertainers as back wages.  There may be some injunctive relief, but for the most part, the fundamental challenge of classifying the entertainers goes untouched.  Neither the clubs nor the class members experience any real relief from the misclassification problem, and repeat litigation becomes the norm.

This case is different.

The non-monetary components of this settlement fall into three (3) groups. First, and for the first time in exotic dancer litigation, the class benefits will contain a process to properly classify dancers using the economic realities test.  (***Exhibit 1***, Settlement Agreement at Section VIII).   Within thirty (30) days of the effective date of the settlement, each club shall provide to each entertainer an opportunity to terminate her dancer contract and to be hired as an employee under terms negotiated by Class Counsel that provide for remuneration *above that mandated by the very laws that underlie this action* (the "Enhanced Offer of Employment"). Each entertainer who was performing at a club prior to the effective date and who declines the Enhanced Offer of Employment shall be required, no later than six (6) months after the effective date, to submit a fully completed and signed Entertainer Assessment Form. (*See* Docs. 34-3 and 34-7, Exhibits B and F to the Settlement Agreement). The parties created the Entertainer Assessment Form using the

14

important criteria of the IRS and economic realities tests.[3]  It is designed to be useable, clear, and simple to complete by the club managers, who often have the most knowledge as to the entertainers' working conditions, activities, schedules, and other relevant factors. (Doc. 34-3).  Most importantly, it brings, for the first time, *objective* standards and criteria to apply to this confusing and difficult areas of the law.

In essence, the club manager(s) and the entertainer will discuss whether the entertainer is properly classified as an independent contractor or employee based on these objective test factors.  For this assessment:

i) Entertainers will be required to answer a questionnaire that cover topics negotiated by the parties.

ii) Club management will then determine whether, based upon the answers and their training on those standards discussed below, the entertainer meets the qualifications for performing as a bona fide independent professional entertainer ("IPE").  If she does not, she will be offered employee status.

iii) If the Entertainer declines employee status, she will be precluded from further performing at the club unless she provides to management a letter signed by her attorney or accountant attesting to the fact that she satisfies the standards articulated in the definitive settlement agreement of being able to perform as a bona fide IPE.  If she does, the entertainer will be permitted to perform at the club as a bona fide IPE unless the Certified Public Accountants for the club conclude that she

---

[3] The Department of Labor Fact Sheet 13 was used as a guideline for the Assessment review and decision. See https://www.dol.gov/whd/regs/compliance/whdfs13.htm

nevertheless does not satisfy the standards set out in the assessment form. The club's CPA's decision will be final and dispositive.

iv)    If an entertainer desires to perform as an IPE but is required to work as an employee under the terms of the settlement, she shall be permitted to request a re-assessment, utilizing the same standards, no earlier than three months from the time her request to perform as an IPE is rejected.

Moreover, this benefit will apply to **all** entertainers performing after final approval of this settlement and those who apply to so perform after the settlement for the next 5 years (unless the law changes). As stated, entertainers who do not meet the test for independent contractors (IPE's) will be offered employment status, and will not be permitted to perform as potentially misclassified independent contractors. Obviously, employee status brings with it several important legal benefits, including, workers' compensation and unemployment compensation benefits and potentially other insurance coverage; social security eligibility and vesting opportunities; an hourly wage at no less than the applicable state or local minimum wage; and the many protections afforded under federal and state employment laws.

In addition to the payment of the applicable minimum wage or reduced cash (*i.e.*, tip credited) wage, the Enhanced Offer of Employment will include:

i)    Commissions on dance sales of no less than 20% of such sales after the club has recouped the legal costs of employment of the individual (wages, taxes, insurance premiums, etc.);

16

ii)     Commissions of no less than 20% of their sale of what are referred to as "conversation beverages," to the extent permitted by law (some states do not permit employees to share in the sales of alcoholic beverages) ;

iii)    Reimbursement by the club for any renewal fees for licenses or permits they are required to possess for their occupation;

iv)     That employee entertainers not be required to pay any form of "redemption" fee for any "scrip" certificates they redeem at the club;

v)      That employee entertainers will be provided with 2 "logo" costumes per month and a $25.00 monthly allowance for footwear; and

vi)     That employee entertainers, of course, be provided with all employment benefits as required by law.

(Doc. 34-7, Exhibit F to Settlement Agreement).

Lastly, entertainers who remain independent contractors will receive added worker protections from this settlement as well, all of which were negotiated based on the parties' joint investigation into the most common complaints of the entertainers (***Exhibit 1***, Settlement Agreement at Section VIII), including:

i)      There will be limits on the controls that the clubs may exert over such entertainers;

ii)     The clubs will not be able to impose work schedules of the dates or times that entertainers are required to perform (but may require entertainers to provide a schedule they intend to perform at least one week in advance);

iii)    The Entertainers will be notified they are not required to tip out any club employees;

iv)   The clubs will not control the costumes the Entertainers wear other than requiring that they comply with the law and expecting that the entertainers appear in a manner consistent with professional entertainers performing in an upscale entertainment facility;

v)    The clubs will conduct a meeting with IPE's at least once a year where the entertainers will be permitted to vote upon and change certain club rules and policies specified in their contracts or the Settlement Agreement; and

vi)   There will be limitations to the contract damages that can be imposed by the clubs.

(Settlement Agreement at 8.20).

In summary, this settlement takes a completely novel approach to settling exotic dancer classification cases.  The backbone of this settlement includes a path forward for classifying entertainers who perform at the affected clubs in the future, with the ultimate goal of negating the need for further litigation.

### iii.   Additional Value of the Settlement Benefits

Clearly, the $6.55 million dollars being directly provided to the class members represents the minimum valuation of the parties' settlement.  But in addition, a full valuation of the settlement would include values for: (1) the injunctive relief provided by way of the settlement; (2) the protections afforded to IPE's moving forward; and (3) the employment benefits proved to the class through the Enhanced Offer of Employment for entertainers who voluntarily decide to work as employees or who are required to do so under the terms of the settlement. In this regard, the

18

parties obtained expert opinions as to the added value of employment conversion under the settlement to assist the Court in making its decision.

Class Counsel obtained an expert review of the settlement from experienced FLSA and labor lawyer, Robert E. DeRose. Mr. DeRose reviewed the Court's record, including the settlement agreement, and his opinion is attached as ***Exhibit 3***. In light of the record, Mr. DeRose identified and considered the federal and state "benefits and protections" entertainers would receive if they were classified as employees rather than independent contractors. (*Id*. at p. 7). In short, Mr. DeRose concluded that entertainers who were classified as employees would enjoy significant employment benefits and protections over those classified as independent contractors; most importantly, the right to organize and gain bargaining power through unionization. (*Id*. at pp. 46-47).

Further, Defendants have engaged David Shindel, from the outside CPA firm Shindel, Rock & Associates, P.C., to review the estimated cost of converting entertainers to employees and the value to those entertainers who so convert. While those values are not expressly identified in the settlement, they are real; the costs will be absorbed by Defendants as to any entertainers who convert from independent contractors to employees; and the benefits to the entertainers are substantial. Mr. Shindel's report was not yet complete at the time this brief was filed, but it will be filed as a supplemental exhibit to the instant motion as soon as possible.

### b.     The Complexity, Expense and Likely Duration of the Litigation

Discovery in most FLSA exotic dancer lawsuits involves extensive, and expensive, discovery efforts as to whether the class representatives and opt-in entertainers more closely meet the test for an employee or an independent contractor. The parties explained in their preliminary approval motion that discovery topics include dancer working conditions, club operations and management, payroll systems and recording, schedules, and how much money was paid to the entertainers in remuneration and tips. All these issues come with their own complexities and expenses, including CPA and business operation experts.  Likewise, depositions of opt-in plaintiffs, managers, and club owners often become lengthy.  The Defendants' bookkeepers are required to produce seemingly endless amounts of financial data, including the "payroll" data for thousands of entertainers over four or more years.

In addition to the cumbersome discovery efforts, the legal effect of contract issues such as arbitration clauses or election of employment status by the entertainers require attention.  Circuit splits on many of those legal issues make for a challenging review and decision process by the lawyers and courts.  The United States Supreme Court recently agreed to hear three decisions on the use of class and collective action waivers in arbitration clauses in FLSA cases in order to resolve a circuit split.[4]  This

---

4 According to the January 13, 2017 Order List, granting certiorari to cases in the Fifth, Seventh, and Ninth Circuits, all involving class/collective action waivers and the NLRB rejection of such

Court is familiar with the effort and time that goes into an exotic dancer class action lawsuit.

### c.     The Stage of the Proceedings and the Amount of Discovery Completed

This case was settled relatively early in the process.  However, that fact should not suggest that a settlement is premature or ill-advised.  First, this is the second class action settlement Defendants reached while in this Court, and the Court is aware of all the work Class Counsel did in the first case, which involved hotly contested litigation for three years. *Doe v. Cin-Lan, Inc.*, Case No. 08-cv-12719 (E.D. Mich.).  Second, the other actions throughout the country being resolved and stayed by this settlement have advanced through various stages of motion practice and discovery.  There was nothing new or of benefit uncovered in those actions compared to the first case settled before this Court.  All of this suggests that the parties' settlement was not the product of a quick sell-off by Class Counsel or otherwise the product of collusive activity, as the case law warns against. *Int'l Union,* 497 F.3d at 631; *IUE-CWA v. General Motors Corp.,* 238 F.R.D. 583, 598-99 (E.D. Mich. 2006).

---

waivers: 16-285 *Epic Systems Corp v. Lewis Stephen, et al*; 16-300 *Jacob Ernst & Young, et al v Morris*; and 16-307 *NLRB v Murphy Oil USA, Inc, et al.*

### d.   The Judgment of Experienced Trial Counsel

The Court has the benefit of truly expert Class Counsel – on both sides of the case.  Lawyers from Sommers Schwartz, P.C. specialize in wage and hour class and collective actions, as does Megan Bonanni of Pitt McGehee Palmer & Rivers. (*See Exhibit 4*, Class Counsel bios).  Furthermore, Class Counsel has litigated several FLSA exotic dancer cases in their lengthy and productive careers.  They have experience with the class and merit challenges facing each dancer case, as well as the challenges each dancer would have if they litigated separately from the class. The Defendants' counsel – Bradley Shafer and Edith Thomas – are equally reputable and have literally decades of experience defending their clients in entertainer-related litigation, including many class actions and Department of Labor investigations for the exact same claims being settled here.  They have even successfully defeated a dancer misclassification cases in trial; something few if any class action lawyers can claim. *See Davis v. Deja Vu Entertainment Enterprises of Minnesota, et al.*, Hennepin County District Court, State of Minnesota, File No. CT 92-10727, December 6, 1992 (reversing jury verdict in favor of certified class of dancers on post-trial motions); and *Buel v. Chowder House, Inc.*, 2006 WL 1545860 (Cal. App. 1st Dist.). Together, all counsel strongly support the granting of final approval of this settlement, and believe it represents an innovative, fair, adequate, and reasonable resolution of the claims and defenses. *See In re Cardizem CD Antitrust Litigation,*

218 F.R.D. 508, 525 (E.D. Mich. 2003) ("in approving a proposed settlement, the court also considers the opinion of experienced counsel as to the merits of the settlement").

### e.    The Nature of the Negotiations

The instant settlement was the product of a lengthy and substantive negotiation process.  Obviously, all counsel were well-versed in the facts and issue from the prior *Doe v. Cin-Lan*, *Inc.* case.  In this case, counsels' attention quickly turned to exploring settlement.  Multiple telephone conferences were held, followed by a face-to-face meeting in Las Vegas at Defendants' offices, where a follow-up meeting between Defendants' counsel and club owners took place.  More meetings with the individual club owners took place over 2016.  Draft term sheets were signed. Finally, by late 2016, a tentative structure was agreed upon – which essentially meant there would be a cash pool and rent credit/dance fee payment pool, but, more importantly, a material change in the way entertainers are classified.  This was the hardest piece of the settlement to reach agreement on, and the most challenging to create and obtain full agreement from both sides.   It only happened through innovative thinking and tireless effort of all counsel.  Counsel are unaware of any such comprehensive approach being considered and approved in any other suit.

### f.    The Objections, if any, Raised by the Class Members

The Court should carefully consider any objections raised by class members, but approval need not be withheld "merely because some class members object to its terms." *Akkala v. Lakes Shore, Inc.*, 82 F.3d 417 (table) (6th Cir. 1996); *Bronson v. Board of Educ.*, 604 F. Supp. 73 (S.D. Ohio 1984).  Approval should also not be withheld merely because the amount of the settlement is less than what a successful plaintiff would have received at the conclusion of a fully litigated case. *Id.* at 74.

To date, there has been only one (1) objection filed. (Doc. 39, Stephanie Sage) (***Exhibit 2***, Declaration of Richard Simmons at ¶ 38). Out of the 28,177 putative class members, this represents a miniscule 0.000036% of the class. (Simmons Decl. at ¶ 11). Furthermore, the objection amounts to a demand for more money.  While believing one is entitled to more money is understandable, there is nothing on the face of this $6.55 million settlement to suggest that it is so inadequate an amount to justify rejecting the entire settlement. Any class member who truly believes her claims are not being fairly compensated under the term of the settlement could have exercised their right to opt out pursuant to Rule 23.  To date, 14 entertainers have selected that option. (Simmons Decl. at ¶ 37).  To reject the settlement impliedly approved by 99.999964% because .000036% object – but did not themselves opt out – is unwarranted.

### g.      The Public Interest

The public interest is usually well-served when parties settle their disputes. *See In re Cardizem,* 218 F.R.D. at 530 ("[T]here is a strong public interest in encouraging the settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources"). Such is the case here.  Furthermore, the fact that this settlement attempts to remedy the longstanding challenges of dancer classification by imposing an obligation to apply the economic realities test to each entertainer is a testament to the public interest being attended to in this settlement.

## B.      THE ELEMENTS OF RULE 23(a) AND 23 (b)(3) ARE MET

Fed. R. Civ. P. 23(a) allows one or more members of a class to sue as representatives on behalf of all if: (1) the class is so numerous that joinder is impracticable (the "numerosity" requirement); (2) there are questions of law and fact common to the class (the "commonality" and "typicality" requirements); and (3) the representatives' claims will fairly and adequately protect the interests of the class (the "adequacy of representation" requirement). *See* Fed. R. Civ. P. 23(a). If each of these requirements is satisfied, the district court may certify a class action if the plaintiffs also satisfy one of the three provisions of Fed. R. Civ. P. 23(b).  In this case, the parties' settlement meets the requirements of the third provision of Rule 23(b)(3) - the questions of law or fact common to class members predominate over

any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

### 1.    Numerosity

The numerosity of the class was reflected in the notice to class members issued pursuant to this Court's Preliminary Approval Order. The class consists of 28,177 members. This number is sufficiently large such that joinder of all class members is impracticable. See *Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528, 536 (E.D. Mich. 2014, opinion reinstated on reconsideration sub nom. *Cason-Merenda v. VHS of Michigan, Inc.*, No. 06-15601, 2014 WL 905828 (E.D. Mich. Mar. 7, 2014) ("[the] sheer number of potential litigants in a class, especially if it is more than several hundred, can be the only factor needed to satisfy Rule 23(a)(1)") (quoting *Bacon v. Honda of America Manuf'g, Inc.*, 370 F.3d 565, 570 (6th Cir. 2004)).

### 2.    Commonality

The same legal question is at play with all members of the class:  Whether Defendants misclassified entertainers as independent contractors. *See Merenda*, 296 F.R.D. at 536 ("the Sixth Circuit has held that 'there need only be one question common to the class.'") (quoting *Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir. 1998)). What's more, the "common contention . . . most be of such a nature that it is capable of class-wide resolution—which means that determination

of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, the question of worker classification – as employee or independent contractor – is the fundamental issue, as it is in many FLSA cases.  *See e.g.*, *Donovan v. Brandel*, 736 F. 2d 1114, 1117-19 (6th Cir. 1984). This is because all of the FLSA's worker protections – such as minimum wage and overtime rules – apply only to workers who qualify as employees.  In contrast, an employer owes no such duties to an independent contract worker.  In addition, all FLSA exotic dancer lawsuits involve other common questions of whether the clubs in which they work followed a company policy of misclassification and whether the pay practices of the dancers denied them minimum wage and improperly confiscated tips.

In addition to those common questions, this case also posed similar questions under the various state law standards for each state law class, as well as imposition of fines under California's PAGA.  The test for commonality is met here.

### 3.    Typicality

Typicality is also satisfied for purposes of the Rule 23(a) inquiry. The typicality requirement tends to merge with commonality, and "many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Rikos v. Procter & Gamble Co.*, 799 F.3d

497, 509 (6th Cir. 2015), cert. denied, 136 S. Ct. 1493 (2016) (quoting Wright, Miller

& Kane, 7A Federal Practice and Procedure § 1764 (3d ed. 2005)). A class plaintiff's

claim is typical of those of other class members if the "the representative's interests

will be aligned with those of the represented group, and in pursuing his own claims,

the named plaintiff will also advance the interests of the class members." *In re*

*American Med. Sys.*, 75 F.3d 1069, 1082 (6th Cir. 1996) (internal citation omitted).

Resolution of the class representatives' claims would resolve the common

issues identified above.  Other than damage amounts, there are no unique issues that

would render each class member atypical, and certainly none of the proposed class

representatives are atypical entertainers.  And the fact that individualized review of

the monetary recovery may have been necessary in a trial of this action does not

foreclose typicality.  *See e.g.*, *Widdis v. Marathon Petroleum Corp.*, Case No. 13-

cv-12925, Doc. 57 at PgID # 1638-39 (E.D. Mich. Nov. 18, 2014) (discussing *Olden*

*v. LaFarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001), *aff'd by Olden v. LaFarge*

*Corp.*, 383 F.3d 495 (6th Cir. 2004)).

### 4.    Adequacy

As to adequacy of representation, the Court looks at two factors: "(1) the

representative must have common interests with the unnamed members of the class,

and (2) it must appear that the representatives will vigorously prosecute the interests

of the class through qualified counsel." *Vasalle v. Midland Funding LLC*, 708 F.3d

747, 757 (6th Cir. 2013) (internal citation omitted). Class Counsel is experienced and vigorously prosecuted this case, and the class representatives all participated in pursuit of the common interest and support this settlement. Further, the class representatives from this case have petitioned for an incentive award (see below) for their effort and risk undertaken to secure the settlement benefits for the class. Incentive awards are properly provided to the class representatives when the criteria for such awarded are met. The adequacy requirement is satisfied.

### 5. Predominance and Superiority

Having found the prerequisites of Fed. R. Civ. P. 23(a) met, the Court must determine whether the proposed class action fits under the criteria specified in Rule 23(b)(3). That provision allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The predominance inquiry focuses on whether "issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (quoting *Randleman v. Fid. Nat. Title Ins. Co.*, 646 F.3d 347, 352-53 (6th Cir. 2011)). A finding of predomination is not precluded by the

29

prospect that "a defense may arise and may affect different class members differently." *Id.* (quoting *Beattie v. CenturyTel, Inc.,* 511 F.3d 554, 564 (6th Cir. 2007)). "While the commonality element of Rule 23(a)(2) requires showing one question of law or fact common to the class, a Rule 23(b)(3) class must show that common questions will *predominate* over individual ones." *Id.* (emphasis in original).

Here, the common question is whether the plaintiffs where classified correctly, and this is subject to generalized proof applicable to the class as a whole; therefore, a common issue predominates. The Court should also find that the class action is the "superior" method of adjudicating the controversy here. "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* at 545 (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 617 (1997). The wages at issue on the individual class member level are relatively small, undercutting the individual class members' interests in pursuing their own separate actions.

## C.   **THE REQUESTED INCENTIVE AWARDS ARE APPROPRIATE**

As provided for in the settlement agreement, and set forth in the notice to class members, the class representatives seek "incentive" payments totaling

$30,000.00.  (**Exhibit 1**, Settlement Agreement at Section 9.5).  Each original class representative seeks and award of $15,000, respectively.

Since Preliminary approval, a third class representative has joined the settlement, Ms. Angel Wilson.  Ms. Wilson was a named plaintiff in one of the FLSA cases stayed as part of this settlement.  Her declaration in support of the settlement is attached as **Exhibit 5**.  Class Counsel requests she to receive $15,000 for the same reasons as the original class representatives, but that her $15,000 be paid from any attorneys' fees awarded by the Court so as not to diminish the Net Cash Payment Settlement Fund below what was published in the Class Notice.  *See e.g., Cardoza v. Bloomin' Brands*, *Inc.*, Case No. 13-cv-01820 (D. Nev. Nov. 15, 2016) (Doc. 460, Order Granting Final Approval at ¶ 9(h)) (ordering the settlement administrator to allocate the gifted sum of $48,094 from Class Counsel's attorneys' fees to class members).

 "[C]lass representatives who have had extensive involvement in a . . . litigation deserve compensation above and beyond amounts to which they are entitled to by virtue of Class Membership alone." *Dallas v. Alcatel-Lucent USA, Inc.,* 2013 U.S. Dist. LEXIS 71204 (E.D. Mich. May 20, 2013) *accord Date v. Sony Elecs., Inc.,* 2013 U.S. Dist. LEXIS 108095 (E.D. Mich. July 31, 2013) (awarding service award in common fund case for, *inter alia*, Collective representative's "responding to discovery and sitting for his deposition") (citation

omitted); *see also Griffin v. Flagstar Bancorp. Inc.*, 2013 WL 6511860, at *9 (E.D. Mich. Dec. 12, 2013) (stating that service "awards have been approved by the Sixth Circuit"). Courts acknowledge that named plaintiffs in collective actions play a crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny. *See e.g.*, *In re Packaged Ice Antitrust Litig.*, 2012 U.S. Dist. LEXIS 162459, *48 (E.D. Mich. Nov. 13, 2012) (service awards are "well deserved" when Collective representative spent "time and effort . . . all to the general benefit of the Collective") (citing *In re Cardizem*, 218 F.R.D. at 536 (service awards "deserve[d]" when named plaintiffs "devoted a significant amount of time to the prosecution of this matter for the benefit of absent Class Members")); *Aros v. United Rentals, Inc.,* 2011 U.S. Dist. LEXIS 125870, *3 (D. Conn. Oct. 31, 2011); *Parker v. Jekyll & Hyde Entm't Holdings, LLC*, 2010 U.S. Dist. LEXIS 12762, *1 (S.D.N.Y. Feb. 9, 2010) ("Enhancement awards for Collective representatives serve the dual functions of recognizing the risks incurred by named plaintiffs and compensating them for their additional efforts."); *Velez v. Majik Cleaning Serv.,* 2005 U.S. Dist. LEXIS 709, *7 (S.D.N.Y. Jan. 18, 2005) ("in employment litigation, the plaintiff is often a former or current employee of the Defendants, and thus, by lending his name to the litigation, he has, for the benefit

of the Collective as a whole, undertaken the risk of adverse actions by the employer or co- workers") (internal quotes and citation omitted).[5]

Incentive awards are within the discretion of the court. *See Dallas*, 2013 U.S. Dist. LEXIS 71204 at *10-11; *see also Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 187 (W.D.N.Y. 2005) ("Incentive awards are not uncommon in Collective action cases and are within the discretion of the court"; Incentive "awards are particularly appropriate in the employment context.").    In examining the reasonableness of incentive awards to plaintiffs, courts consider: (1) the actions they took to protect the interests of class members, and whether those actions resulted in substantial benefit to class members; (2) the personal risk they incurred; and (3) the amount of time and effort they spent in pursuing the litigation. *See e.g., Bert v. AK Steel Corp.*, 2008 U.S. Dist. LEXIS 111711, *10 (S.D. Ohio Oct. 23, 2008); *see also Dallas*, 2013 U.S. Dist. LEXIS 71204 at *10 (in common fund cases, class representatives "deserve compensation above and beyond amounts to which they are entitled to by virtue of Class Membership alone"); *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 787 (N.D. Ohio 2010) (same).

---

[5] *See also* Nantiya Ruan, *Bringing Sense to Incentive Payments: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Collective Actions*, 10 Emp. Rts. & Emp. Pol'y J. 395 (2006) (discussing the importance of aggregation of claims in the prosecution of civil and wage and hour rights); *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) ("[I]ncentive awards are efficacious ways of encouraging members of a Collective to become Collective representatives and rewarding individual efforts taken on behalf of the Collective.").

Here, Plaintiffs satisfy all three factors.  First, the Class Representatives took substantial actions to protect the interests of putative class members, and those actions resulted in a substantial benefit to those potential collective/class members.  They engaged in substantial pre-suit investigation, including mediation and strategy meetings and provided documents crucial to establishing Plaintiffs' claims.  *Frank*, 228 F.R.D. at 187 (recognizing the important role that Collective representatives play as the "primary source of information concerning the claims[,]" including by responding to counsel's questions and reviewing documents).[6]

Additionally, the amount of the requested service award is reasonable and consistent with awards that have been granted in employment class/collective actions within the Sixth Circuit. *See Swigart v. Fifth Third Bank*, No. 11 Civ. 88, 2014 WL 3447947, at *7 (S.D. Ohio July 11, 2014) ("The modest Collective representative award requests of $10,000 to each of the two Collective Representatives have been tailored to compensate each Collective Representative in proportion to his or her time and effort in prosecuting the claims asserted in this [FLSA] action."); *Bert*, 2008 U.S. Dist. LEXIS 111711, at *10 (finding service

---

[6] See also *Sewell*, 2012 WL 1320124, at *14 ("[F]ormer employees [] fac[ed] [sic] potential risks of being blacklisted as 'problem' employees."); *Guippone v. BH S&B Holdings*, 2011 WL 5148650, at *7 (S.D.N.Y. Oct. 28, 2011) ("Today, the fact that a plaintiff has filed a federal lawsuit is searchable on the internet and may become known to prospective employers when evaluating the person.").

award of $10,000 to five Collective representatives was "rather modest" and "fair and reasonable" in employment discrimination case). In FLSA cases in this Circuit and elsewhere, courts consistently approve service awards that are larger than what Plaintiffs request here.

In this case, the incentive awards sought are appropriate. The class representatives in this action helped Class Counsel gather the facts necessary for the prosecution of the case. They took on the risk of retaliation. They were kept abreast of the proceedings and assisted counsel in making important decisions. They assumed certain risks in filing litigation against well-armed corporate defendants, such as cost-shifting. And, most importantly, they are providing *general* releases to the Defendants; something which no other class members are being asked to do. Under such circumstances, the Court should approve payment of a reasonable class representative awards as permitted by the settlement agreement.

**D.    THE CONTINGENT *CY PRES* PROVISION IS THE APPROPRIATE "NEXT BEST USE" OF SETTLEMENT FUNDS**

Section 6.1.7 of the Agreement specifies that any uncashed or unpaid funds remaining in the Cash Pool shall be paid to Impact Fund, a charitable organization selected by Class Counsel.

*Cy pres*, a short-hand reference to the doctrine "*cy prés comme possible*," is used to direct class settlement funds to "the next best" recipient – typically a charity – when "the proof of individual claims would be burdensome or distribution of

damages costly." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (internal citations omitted). It is also employed when funds remain unclaimed following distribution. *Knuckles v. Mary Jane Elliott, PC*, 2016 U.S. Dist. LEXIS 94858, *5 (E.D. Mich. July 20, 2016). In light of the growing trend in designating *cy pres* distributions in class settlements, courts have come to impose a "higher standard of fairness" when *cy pres* distributions are involved. *See*, *e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 830-31 (9th Cir. 2012). That said, "[f]ederal courts have broad discretionary powers in shaping equitable decrees for distributing unclaimed class action funds." *Lessard v. City of Allen Park*, 470 F. Supp. 2d 781, 782 (E.D. Mich. 2007).

A determination of fairness in a *cy pres* distribution should be guided by "the objectives of the underlying statute and interests of the silent class members," as well as such factors as the "proportion of class members sharing in the recovery, the costs of administration, and any "spill over" benefits to non-class members." *Id.* at 782-83. When Plaintiffs will offer "documentation of far more damages than the fund could allay," a *cy pres* distribution related to the Plaintiffs' cause of action is the appropriate resolution. *Id.*at 783 (citing *Newberg of Class Actions*, § 10:16 n.1).

Class Counsel proposes that the Impact Fund of Berkeley, California, be designated as the *cy pres* recipient pursuant to the terms of the Agreement. Founded in 1993, the Impact Fund provides support for public interest litigation to achieve

36

economic and social justice through the United States. (*Exhibit 6*, Declaration of Jocelyn Larkin). The Impact Fund provides grants to non-profit organizations and small firms to support out-of-pocket expenses related to impact litigation, such as experts, transcripts, and travel expenses. (*Id.*). The Impact Fund also provides training and technical assistance on class action and impact litigation to non-profits and small firms. (*Id.*). The Impact Fund is a recipient very close to Plaintiffs' cause of action because it supports litigation seeking to vindicate the wage-and-hour rights of workers. Moreover, the Cash Pool claims are being distributed pro-rata, which implicitly means that class members are receiving a share that is less than their individually documented damages. (*Exhibit 1*, Settlement Agreement at Section VI). Therefore, return of funds to the Defendants is inappropriate. *Lessard*, 470 F. Supp. 2d at 783.

The Impact Fund has been approved as a *cy pres* recipient in dozens of cases over the past 25 years in state and federal courts around the country. (*Id.*) Because The Impact Fund supports impact litigation nationally and in many different substantive law areas, courts have found the organization to be an appropriate *cy pres* recipient in a wide range of cases, including consumer fraud, mortgage fraud, civil rights, wage and hour, WARN Act, environmental justice and sex discrimination. (*Id.*).  Most recently, the Impact Fund has been approved as a *cy pres* recipient in 14 wage and hour class actions, including a case alleging both wage and

hour violations and sexual harassment on behalf of exotic dancers, *Vasquez v. Escort Sunnyvale Corp. dba The Brass Rail* (No. 1:14-cv-272861) (California Superior Court, Santa Clara County). (*Id*.).

## E.   THE SETTLEMENT ALSO WARRANTS APPROVAL UNDER THE FLSA

The FLSA was enacted for the purpose of protecting all covered workers from the inequities in the workplace that result from the differences in bargaining power between employers and employees. *See Barrentine v. Arkansas–Best Freight System, Inc.,* 450 U.S. 728, 739; 101 S. Ct. 1437 (1981). The goal of the FLSA was to ensure that each employee covered by the Act received "[a] fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay." *Id.* at 739 (internal citation and quotations omitted). The FLSA, therefore, provides that "[a]ny employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee … affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be...." 29 U.S.C. § 216(b). The FLSA's provisions are mandatory and, except in two narrow circumstances, are generally not subject to bargaining, waiver, or modification by contract or settlement. *Brooklyn Sav. Bank v. O'Neil,* 324 U.S. 697, 65 S. Ct. 895 (1945). The two circumstances in which the FLSA may be compromised are claims that are supervised by the Secretary of Labor pursuant to 29 U.S.C. § 216(b), and when a court reviews and approves a settlement in a private

action for back wages under 29 U.S.C. § 216(b).  *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1353 (11th Cir. 1982).

The latter exception applies to this case. The Court's role in this situation is comparable to that of a court in a settlement of a class action brought pursuant to Fed. R. Civ. P. 23.  *Collins v. Sanderson Farms, Inc.,* 568 F. Supp. 2d 714, 719 (E.D. La. 2008).  "In essence, the Court must ensure that the parties are not, via settlement of the plaintiffs' claims, negotiating around the clear FLSA requirements of compensation for all hours worked, minimum wages, maximum hours, and overtime." *Id.* (citing 29 U.S.C. §§ 206, 207).  The existence of a question as to the plaintiffs' entitlement to compensation under the FLSA serves as a guarantee that the parties have not manipulated the settlement process to permit the employer to avoid its obligations under the FLSA.  Thus, to ensure that the plaintiffs have not abandoned their rights under the Act, "the court must determine whether such a question, or bona fide dispute, exists." *Crawford v. Lexington–Fayette Urban County Gov't,* 2008 U.S. Dist. LEXIS 90070, *12-13 (E.D. Ky. Oct. 23, 2008).

The Settlement Agreement in this case resolves a "bona fide dispute" under the FLSA and contains terms that seek to avoid further actions under the FLSA and other state wage and hour laws.  Both sides aggressively advocated their positions, which clearly demonstrated that the legal and factual issues presented in this action did not necessarily favor either side.  This bona fide dispute justifies settlement in

39

this matter.  Moreover, for all the foregoing reasons discussed in the context of Rule 23 standards, the settlement is a fair and reasonable compromise and should be approved under the appropriate FLSA standards.

### III.   CONCLUSION

In conclusion, the record demonstrates that the parties' settlement is a fair, adequate, and reasonable resolution of their disputes when considering the legal and factual impediments each side faced in continued litigation.  The parties have demonstrated that all the requirements of Section 216(b) and Rule 23 have all been fulfilled and, despite the single objection to date, final approval is warranted.  The Plaintiffs request the Court enter their proposed Order of Final Approval and Judgment.

Respectfully submitted,

Date: April 28, 2017                SOMMERS SCHWARTZ, P.C.

*/s/ Jason J. Thompson*
Jason J. Thompson (P47184)
Jesse L. Young (P72614)
One Towne Square, 17th Floor
Southfield, Michigan 48076
Telephone: (248)355-3000
Fax: (248) 436-8453
E-mail: jthompson@sommerspc.com
            jyoung@sommerspc.com

*/s/ Megan A. Bonanni*
Megan A. Bonanni (P52079)
Rachael Kohl (P78930)
Pitt McGehee Palmer & Rivers, P.C.

40

117 West Fourth Street, Suite 200
Royal Oak, MI 48067
248-398-9800
mbonanni@pittlawpc.com
rkohl@pittlawpc.com

*Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 28, 2017, I electronically filed the forgoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record.

<u>s/ Jason J. Thompson</u>
jthompson@sommerspc.com

41