# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**JANE DOES 1-2, individually and on behalf of all others similarly situated,**

     **Plaintiffs,**

           **Case No. 2:16-cv-10877**
           **Hon. STEPHEN J. MURPHY, III**

**v.**

**DÉJÀ VU SERVICES, INC., f/k/a DÉJÀ VU CONSULTING, INC., DV SAGINAW, LLC, d/b/a DÉJÀ VU SHOWGIRLS, HARRY MOHNEY, and THE "DÉJÀ VU AFFILIATED NIGHTCLUBS," jointly and severally,**

     **Defendants.**

---

## DEFENDANTS' RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF THE CLASS SETTLEMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ...........................................................v

INTRODUCTION, SUMMARY, AND OVERVIEW ..........................1

ARGUMENT ................................................................................11

I.  THE OBJECTORS. ..............................................................11

II.  THE RECENT RULING IN *SFBSC MANAGEMENT*. ...........13

III.  THE SETTLEMENT IS FAIR BECAUSE PLAINTIFFS' CLAIMS ARE OTHERWISE SUBJECT TO ARBITRATION, WHERE THEY CANNOT BE LITIGATED ON A CLASS BASIS OR COLLECTIVELY.
........................................................................15

   A.  *The Arbitration Clauses are Enforceable.* ...............................16

   B.  *The Waiver of Class and Collective Proceedings are Enforceable.*.........18

   C.  *The Cost Sharing Provisions of Arbitration are Enforceable.* .................20

IV.  THE SETTLEMENT IS FAIR BECAUSE PLAINTIFFS HAVE A VERY LOW CHANCE OF PREVAILING ON THEIR MISCLASSIFICATION CLAIMS. ........................................................................21

   A.  *Plaintiffs are Not in the Category of Those Meant to be Protected by the FLSA.* ........................................................................22

   B.  *The Actual Test That Would be Used Here to Differentiate Employees from Non-Employees May be Far Different From That as Articulated by the Objectors, and Demonstrates Why These Clubs Have Been Successful in Defending Misclassification Claims; Thereby Supporting the Fairness of the Settlement.* ........................................................................24

   C.  *The Numerous Decisions Finding Exotic Dance Entertainers to have Been Independent Contractors* ........................................................................29

       1.  The Deja Vu Group Decisions Rejecting Employee Status for Entertainers. ........................................................................30

**2.     The Non-Deja Vu Group Decisions Finding Entertainers to be Independent Contractors as opposed to Employees.** ...............................35

*D.  The California Class Members Do Not Have a Substantial Likelihood of Prevailing on Their PAGA Claims.* ................................................................41

**V.   THE SETTLEMENT IS FAIR BECAUSE EVEN IF THE DANCERS ARE FOUND TO HAVE BEEN EMPLOYEES, DEFENDANTS WOULD OWE MOST OF THEM NOTHING.** ........................................................43

*A.  The Clubs that Pay Entertainers Directly Would Clearly be Entitled to an Offset in the Unlikely Event of a Misclassification Ruling.* ...........................44

*B.  The Defendants Will More-Than-Likely also be Entitled to a Wage Offset for Clubs using the Lease Model or the Joint Venture Model, in the Unlikely Event that the Entertainers are Found to Have Been Misclassified.* ..............47

*C.  The Most Recent Pronouncements of the IRS Confirm that the Dance Fees are Service Charges and are not Tip Income.* .................................................51

*D.  Other Authorities Not Previously cited to this Court Establish that the Mandatory Entertainment Fees are Not Tips.* .................................................52

*E.  Service Charges Can be Applied as a Full Wage Setoff.* ..........................53

*F.  A Sampling of Data Demonstrates that Few Entertainers Would Not Have Made the Requisite Minimum Wage from the Service Charges they were Paid and/or Kept, in the Unlikely Event that They Would be Found to Have Been Misclassified.* ....................................................................................................55

*G.  If the Entertainers are Later Found to have been Employees, the Entertainment Fees are Legally the Property of the Club and Will Have to be Returned by the Plaintiffs to the Clubs.* ...........................................................57

**1.     The Ability to Contract For Possible Coverage Under the FLSA.** 57

**2.     The Applicable Internal Revenue Code Provisions.** ........................59

**3.     This Court's Previous Ruling on the Contractual Recharacterization issue.** ...........................................................................60

*H.  Equitable Counterclaims Also Demonstrate the Probability That the Entertainers Would be Entitled to No Remuneration Even if a Finding of Misclassification is Entered; Further Demonstrating the Fairness of the Settlement.* ...........................................................................................................61

iii

**VI.  THE OBJECTORS IGNORE THE SUBSTANTIAL VALUE TO THE CLASS OF THE CHANGE IN BUSINESS PRACTICES OF THE CLUBS IN REGARD TO THE ENTERTAINERS.**................................................63

**VII. THE OBJECTIONS FAIL TO ADDRESS IN THE LEAST THE VERY REAL FACT THAT MANY OF THE ENTERTAINERS SIMPLY DO NOT DESIRE TO BE EMPLOYEES, AND THAT THEY ARE NOT LEGALLY OBLIGATED TO BE TREATED AS SUCH.** .....................65

**VIII. AN "APPLES-TO-APPLES" COMPARISON BETWEEN THE PREVIOUS CIN-LAN SETTLEMENT APPROVED BY THIS COURT AND THIS PROPOSED SETTLEMENT DEMONSTRATES ITS FAIRNESS**................................................................................67

**IX.   THERE IS NO REASON CALIFORNIA CLAIMS SHOULD BE DISTRIBUTED A HIGHER CASH PAYMENT.** ..............................................71

# TABLE OF AUTHORITIES

## CASES

*Adams v. City of McMinnville*, 890 F.2d 836 (6th Cir. 1989) .......................... 16, 59

*Adkins v. Labor Ready, Inc.*, 303 F.3d 496 (4th Cir. 2002)....................................19

*American Express Corp. v. Italian Colors Rest.*, ___ U.S. ___, 133 S.Ct. 2304 (2013) ................................................................................................................ 16, 18

*Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983).............................................27

*AT&T Mobility, LLC v. Concepcion,* 563 U.S. 333 (2011)......................................18

*Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728 (1981) ....................4, 23

*Bartles v. Birmingham*, 332 U.S. 126 (1947) .........................................................27

*Berger v. National Collegiate Athletic Association*, 843 F.3d 285 (7th Cir. 2016) ..... ................................................................................................................................29

*Blackie v. State of Maine*, 75 F.3d 716 (1st Cir. 1996)............................... 57, 58, 59

*Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324 (5th Cir. 1972)...........................62

*Buel v. Chowder House, Inc.*, 2006 WL 1545860 (Cal. App. 1st Dist.) .................30

*Burry v. National Trailer Convoy, Inc.*, 239 F. Supp. 85 (E.D. Tenn. 1963)..........62

*Callahan v. City of Chicago*, 813 F.3d 658 (7th Cir. 2016) .....................................28

*Carla McKinney v. Chief Legal Counsel of the Department of Human Rights* (Ill. App. 5th Dist. 2002) .....................................................................................................39

*Cellular Sales of Mo., LLC v. NLRB*, 824 F.3d. 772 (8th Cir. 2016) .....................19

*Chin v. United States*, 57 F.3d 722 (9th Cir. 1995) .................................................31

*Circuit City Stores v. Adams*, 532 U.S. 105 (2001).................................................16

*Commodity Futures Trading Commission v. Baragosh*, 278 F.3d 319 (4th Cir. 2002) ................................................................................................................................51

*Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) ....................27

*Cotton v. Weyerhaeuser Timber Co.*, 147 P.2d 299 (Wash. 1944) .........................62

*D.R. Horten, Inc. v. NLRB*, 737 F.3d 344 (5th Cir. 2013).......................................19

*Deja Vu Entertainment Enterprises of Minnesota, Inc. v. United States*, 1 F.Supp.2d 964 (D. Minn. 1998).................................................................................................31

*Dennis v. Kellogg Co.*, Case No. 09-cv-1786, 2013 WL 6055326 (S.D. Cal. Nov. 14, 2013)......................................................................................................................13

*Discover Bank v. Superior Court*, 113 P. 3d 1100 (Cal. 2005) ..............................18

*Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984)................................. 25, 26, 27

*Dumas v. Gommerman*, 865 F.2d 1093 (9th Cir. 1989) .........................................27

*Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir. 1977)...............................23

*Ellington v. 7180 Sunset Blvd. Inc.*, Case No. BC 387114......................................22

*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938 (1995)...............................16

*Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000) ...................................................................................................................................51

*Forrester v. Roth's I.G.A. Foodliner, Inc.,* 475 F. Supp. 630 (D. Ore. 1979) *aff'd,* 646 F.2d 413 (9th Cir. 1981) ...............................................................................62

*Gale v. Fruehauf Trailer Co.,* 145 P.2d 125 (Kan. 1944) ......................................62

*Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20 (1991) ................. 16, 17, 18

*Green Tree Financial Corp. v. Randolph,* 531 U.S. 79 (2000) ...............................20

*Hai Ming Lu v. Jing Fong Restaurant, Inc.,* 503 F. Supp.2d 706 (S.D.N.Y. 2007).... ....................................................................................................................................50

*Hart v. Rick's Cabaret International, Inc.,* 967 F.Supp.2d 901 (S.D.N.Y. 2013) ...... ....................................................................................................... 46, 47, 48

*Hilborn v. Prime Time Club, Inc.,* 2012 WL 918751 (E.D. Ark.)...........................38

*In Re: A Touch of Class – (Ex. U)* .............................................................................40

*In Re: Condross Corp. – (Ex. 24 to Ex. G)*..............................................................40

*In Re: Fritz That's It – (Ex. T)* .................................................................................40

*In Re: Kit Kat Club – (Ex. V)* ..................................................................................40

*In Re: Lady Godivas,* 2000 WL 33300345 (W.Va.Off.Hrg.App.) .................. 39, 53

*In Re: Nite Life East, LLC – (Ex. 16 to Ex. G)* ........................................................34

*In Re: Showgirls of San Diego, Inc. – (Ex. 15 to Ex. G)* .........................................33

*Iskanian v. CLS Transp. L.A., LLC,* 327 P.3d 129 (Cal. 2014) ..............................19

*Kelly Perry v. Little Darlings Development Center – (Ex. 17 and 18 to Ex. G)* .....34

*Killion v. KeHE Distribs., LLC,* 761 F.3d 574, (6th Cir. 2014) ..............................19

*Kindred Nursing Centers Ltd. v. Clark,* __ U.S. __, 2017 WL 2039160 ...............16

*Krasinski v. Deja Vu of Saginaw, Inc. – (Ex. 13 to Ex. G)*.....................................33

*Labriola v. Clinton Entertainment Management, LLC,* 2017 WL 1150989 (N.D. Ill.) ........................................................................................................... 54, 55

*Lewis v. Epic Systems Corp.,* 823 F.3d 1147 (7th Cir. 2016)........................... 20, 35

*Lilly v. BTM Corp.,* 958 F.2d 746 (6th Cir. 1992)...................................................26

*Marlar, Inc. v. United States,* 151 F.3d 962 (9th Cir. 1998) ..................................38

*Marsh v. Minneapolis Herald, Inc.,* 134 N.W.2d 18 (Minn. 1965).......................62

*Matson v. 7455, Inc.,* 2000 WL 1132110 (D. Or.)........................................... 37, 53

*Mitsubishi Motors Corp. v. Soler Crysler-Plymouth, Inc.,* 473 U.S. 614 (1985)........ ....................................................................................................................................16

*Mohamed v. Uber Techs., Inc.,* 836 F.3d 1102 (9th Cir. 2016)...............................18

*Moody v. Razooly,* 2003 WL 464076 (Cal. App. Feb. 25, 2003) ...........................54

*Morris v. Ernst & Young, LLP,* 834 F.3d 975 (9th Cir. 2016) ................................20

*Mortenson v. Western Light & Tele. Co.,* 42 F. Supp. 319 (S.D. Iowa 1941).........62

*Moses H. Cone Memorial Hosp. v. Mercury Construction Co.,* 460 U.S. 1 (1983) ... ....................................................................................................................................16

*Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013 (5th Cir. 2015) ...................... 19, 20

*Murphy v. Penn. Higher Educ. Assistance Agency & Educ. Credit Manag. Corp.*, 282 F.3d 868 (5th Cir. 2002) ........................................................51

*National Mutual Ins. Co. v. Darden* 503 U.S. 318 (1992) ........................................26

*NLRB v. Alternative Entertainment, Inc.*, 2017 WL 2297620 (6th Cir. May 26, 2017) ...................................................................................................20

*Oakland County Bd. of Comm'rs v. United States Dep't of Labor*, 853 F.2d 439 (6th Cir. 1988).............................................................................48

*Oregon v. Acropolis McLoughlin, Inc.*, 945 P.2d 647 (Or. App. 1997) .................36

*Pierce v. Underwood*, 487 U.S. 552 (1988).............................................................51

*Reynolds v. Sisyphyan, LLC*, Case No. BC 346078.................................................22

*Roe v. SFBSC Management, LLC*, case No. 14-cv-03616LB .......................... 13, 71

*Ruffin v. Entertainment of the Eastern Panhandle*, 845 F.Supp.2d 762 (N.D. W.Va. 2011) ...............................................................................54

*Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)...............................27

*Secretary of Labor v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1997) ...............................5

*Shah v. Deaconess Hosp.*, 355 F.3d 496 (6th Cir. 2004)........................................26

*Simpson v. Ernst & Young*, 100 F.3d 436 (6th Cir. 1996)........................................26

*Sizemore v. Jezebel's, Inc.*, 152 P.3d 689; 2007 WL 656444 (Kan. App. March 2, 2007) ...............................................................................39

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).......................................................10

*Southerland v. Ernst & Young, LLP*, 726 F.3d 290 (2d Cir. 2013) ........................19

*State of Alaska v. Investors Unlimited, Inc.*, Case No. 3AN 92-37 (Alaska Supr. Ct. April 27, 1993) ...............................................................................52

*Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662 (2010) .............. 18, 20

*Stutler v. T.K. Contractors*, 484 F.3d 343 (6th Cir. 2006).......................................16

*Tallman v. 8th Jud. Dist. Ct.*, 359 P.3d 1113 (Nev. 2015) ......................................19

*Taylor Blvd. Theatre, Inc. v. United States*, 1998 WL 375291 ........................ 31, 32

*Thompson v. Lounge Management, Ltd. et al.*, No CX-03-12159 .........................37

*United States v. Cinemark USA, Inc.*, 348 F.3d 569 (6th Cir. 2003)......................49

*United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9th Cir. 1970) .......................62

*United States v. Silk*, 331 U.S. 704 (1947) ........................................................ 26, 27

*Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947).........................................10

*Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326 (11th Cir. 2014) .........................................................................................19

*Werner v. Bell Family Med. Ctr., Inc.*, 529 Fed.Appx. 541 (6th Cir. 2013) ......................................................................................... 25, 28, 29

*Wirtz v. Harrigill*, 214 F. Supp. 813, 815 (S.D. Miss. 1963), *aff'd*, 328 F.2d 903 (5th Cir. 1964)...............................................................................62

*York v. City of Wichita Falls*, 48 F.3d 919 (5th Cir. 1995) ........................ 12, 47, 59

## STATUTES

26 U.S.C. § 3121(d) ................................................................................31
28 U.S.C. § 1715(b) ...............................................................................71
29 C.F.R. § 531.52 ..................................................................................49
29 C.F.R. § 531.55 ..................................................................................53
29 C.F.R. §531.52 ............................................................................. 53, 49
29 U.S.C. §202(a) ...................................................................................23
8 AAC 15.907(e)(2) ................................................................................53
9 U.S.C. § 2 ............................................................................................16

## RULES

Rev. Ruling 2012-18 ...............................................................................53
Rev. Rulings 65-282 ...............................................................................62
Rev. Rulings 58-220 ...............................................................................62
Rev. Rulings 58-515 ...............................................................................62

## OTHER AUTHORITIES

U.S. Department of Labor, Field Operations Handbook §30d03 ............................52

Defendants, by and through legal counsel, Shafer & Associates, P.C., hereby respond to the various objections (collectively the "Objections," with the individuals submitting the same being the "Objectors") filed in response to the Release and Settlement Agreement ("Settlement Agreement," or the "Settlement," found at Dkt. 34 and abbreviated herein for citation purposes as "SA") preliminarily approved by this Court.[1]

## INTRODUCTION, SUMMARY, AND OVERVIEW

This Action involves one of the most hotly litigated issues of our time: Whether certain workers are really employees or are non-employee independent business operators who fend for themselves -- and in this case in fact financially compete with other similar individuals -- in the marketplace, and who take the risks, and potentially reap the rewards, of running their own commercial enterprises. The workers here are non-"headliner" exotic dance entertainers who, at present; nearly universally perform as non-employees (referred to in the industry and hereinafter as "Independent Professional Entertainers,"[2] or "IPE's" for short).

---

[1] Some of the Objectors take issue with, or have responded to, Class Counsels' motion for attorney fees (Dkt. 43; the "Attorney Fee Motion"). Because the Attorney Fee Motion is in conformity with the Settlement Agreement, Defendants do not respond to such arguments and leave Class Counsel to address those matters.

[2] For reasons that are discussed in detail, *infra*, the phrase "independent contractor" is not properly and legally descriptive of the work status of many of these Entertainers.

1

Of over 28,000 potential Class Members,[3] only 6 Entertainers have objected to the Settlement; 2 pro se and 4 through attorneys. Of the four Objectors represented by counsel, one worked a total of *6.53* hours, and one never performed at the Club she has identified.

A common claim running through all of the Objections is that the monetary terms of the Settlement are too low. The Objectors contend that more money should be put up by the Defendants. However, the fairness of the value of the Settlement, Defendants submit, must be analyzed by reviewing five separate and distinct matters, which, once accomplished, demonstrate that the value of the Settlement is more than fair.

First, if the broad arbitration agreements that the Class Members signed -- which contain comprehensive class and collective action waivers -- are enforceable, then there is no Class. Simply put, the claims underlying this Action would then be limited to one Entertainer against one club in arbitration. Notice would never go out, and the potential scope of monetary relief for these types of wage claims would then be limited to those few individuals who might initiate their own arbitration claims. In that circumstance, the value of Plaintiffs' claims and the claims of other similar Entertainers becomes *substantially* diminished; in fact in such a situation there would

---

[3] Unless otherwise noted or when it is clear that another definition is intended, capitalized terms and phrases here shall have the meanings ascribed to them in the Settlement Agreement.

2

then be *no reason at all* for the Defendants to pay out the multi-million dollar sums provided for in the Settlement Agreement.  By contrast, this Settlement provides substantial monetary and other value for Entertainers who might never assert their own wage claims if, as has been true in the past, the arbitration agreements are upheld and enforced pursuant to their terms.

In fact, pending at the time the Settlement Agreement was submitted to the Court for preliminary approval was a motion to compel arbitration and to dismiss this Action (Dkt. 12), which is preserved in the event the Settlement does not become Final. SA, §'s 4.9(a), 13.2.   Moreover, the only potential *real* obstacle to the enforceability of the class and collective action waivers -- the National Labor Relations Act ("NLRA") -- is set to be considered by the Supreme Court in the upcoming Term.  The majority of circuits uphold such comprehensive class and collective action waivers even in the face of the NLRA, and there is no reason to believe that the Court will not side with the clear majority of appellate courts.  That prospect *significantly* undermines the Objections.

Second, there is the real and significant prospect that if this case were to proceed, the Plaintiffs would *lose* on the claim that they were misclassified as non-employees; with every single damage claim hinging upon a finding of employment. While some of the Objectors refer to and/or attach rulings in other jurisdictions finding exotic dancers to have been employees at other establishments, none of those

involve clubs that are affiliated with Deja Vu Services, Inc. (referred to hereinafter as the "Deja Vu Group"). This isn't their "first rodeo," they do not have the operational problems noted in many of those other decisions, and they are represented by experienced counsel who understand and are knowledgeable of the sophisticated and complex legal and taxation issues involved and who know how to properly defend such claims.

For example, if the classification issue actually went to trial, Defendants will discuss that the courts, including the Sixth Circuit, mandate that worker classification is to be determined in light of the *purpose* of the FLSA, which is to protect workers from "substandard wages and oppressive working hours" (*Barrentine v. Arkansas-Best Freight System*, 450 U.S. 728, 739 (1981)), whereas in a Class over 28,000 Entertainers, a significant sampling of the Clubs' computer data demonstrates that the Class Members worked on average only *2.79 performance dates per week* (with many working only a single day in the weeks they chose to even perform at all) *and only 5.51 hours per each performance date*, and earned well over minimum wage.

Defendants would next argue a topic missed in most other exotic dancer misclassification cases (and certainly by the Objectors), and that is the question of just what is the legal test to determine whether these workers are employees? The subjective, ill-defined, elastic, and imprecise legal standards used to differentiate employees from non-employees has lead the esteemed Judge Frank Easterbrook of the

Seventh Circuit to opine in a misclassification case that "[p]eople are entitled to know the legal rules before they act, and only the most compelling reason should lead a court to announce an approach under which no one can know where he stands until litigation has been completed." *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1539 (7th Cir. 1997 (Easterbrook, J., concurring)).

What this all means is that the Objectors can trot out whatever decisions they want holding exotic dancers to have been employees in other cases defended by other counsel, but that does not mean that the legal standards applied in those matters are correct or that they will be the ones that are used by this Court (or more likely by an arbitrator) to make the work classification distinction here.  As a result, other cases concerning other clubs in other jurisdictions are simply not indicative of the chance of success for the Class here.

And to aptly drive that point home, Defendants bring to the attention of this Court, *infra*, a variety of rulings involving Clubs in the very Deja Vu Group at issue here where jurors, courts, and applicable administrative agencies specifically *rejected* the claim that Entertainers had been misclassified as non-employees.  These include *a United States Department of Labor* ("DOL") *investigation under the Fair Labor Standards Act* ("FLSA") *of the work classification of Entertainers performing at a Colorado Club in the Deja Group, which closed* <u>*without*</u> *requiring the dancers to be converted to employees or the Club having to pay back wages or other "employment"*

5

*benefits to any of the Entertainers*; a very recent decision of the Nevada Office of the Labor Commissioner declining to move forward with a claim by a Class Member that she was misclassified for state wage law purposes as a non-employee and had not been properly compensated; a *jury verdict* (affirmed on appeal) finding an Entertainer performing at one of the Clubs in the Deja Vu Group was not an employee; federal district court rulings involving Clubs in the Deja Vu Group finding a lack of control (usually, a critical factor in determining employee status) by the establishments over the Entertainers; and numerous other rulings in a variety of contexts (wage law, tax, unemployment compensation, worker's compensation, etc.) finding exotic dancers -- and mostly involving those who performed at Clubs in the Deja Vu Group -- to be properly classified as non-employees.  In all, Defendants present this Court with 29 such holdings.

Last on this point is the irrefutable fact that when class attorneys move to approve wage settlements, they often acknowledge the vagaries of litigation and the clear possibility that if settlement is not approved and they are then required to go to trial, *they may well lose*.  This was highlighted to Your Honor in the prior Cin-Lan Action when class counsel pointed out that the *very same attorneys* who had filed objections there had nonetheless acknowledged in motions to approve *their own* exotic dancer settlements that *they could well lose at trial if the case did not settle*; with one objecting attorney admitting that in these exotic dancer cases, it was a "*total*

*roll of the dice*" as to whether the entertainers or the clubs would win on the misclassification issue. This Court is faced with a similar circumstance here, where objecting Massachusetts attorney Shannon Liss-Riordan stated, in a recent declaration in support of her attempt to obtain approval of a settlement on behalf of certain Uber drivers that there was a "serious risk" that a jury would not see the case her clients' way. As Ms. Liss-Riordan acknowledged, when she was promoting a large worker classification-based settlement *she* crafted, these misclassification cases are anything but a "sure thing."

Third, even if Plaintiff and the Class were to overcome the misclassification hurdle, there is the additional question of whether they would nevertheless be entitled to any financial remuneration whatsoever from the Defendants. This involves the question of whether the Defendants would be entitled to an "off set" against the wage claims by monies the Entertainers already earned under their contract; an issue that was addressed by this Court in the earlier Cin-Lan Action when it refused to dismiss the Defendants' counterclaims based on such offsets. As recognized by numerous courts, legal "service charges" retained by exotic dancers can be used to partially or even fully satisfy any minimum wages found to be due and owning. In addition, a significant number of the involved Clubs directly *paid* the Entertainers for their services (a true "independent contractor" arrangement), and issued the required IRS Forms 1099-MISC to memorialize such payments.

7

If the Entertainers earned more than the applicable minimum wage by way of such service charges paid by their customers, or in 1099 payments from the Clubs (and irrespective of the comments of some of the Objectors, *the Clubs maintain elaborate and detailed computer records of hours worked and service charges retained by, and monies paid to, the Class Members*, *which demonstrate this very point*), and if such an offset is permitted as this Court previously suggested that it would, the Class Members would be entitled to *nothing* by way of a wage claim.

Defendants will establish why it is highly probable that such an offset would be permitted (in the unlikely event that the Entertainers would be found to have been misclassified); that their business procedures and recordkeeping do not suffer from the operational irregularities that lead other courts to refuse to permit such an offset; and more importantly the fact that other courts that have come to a contrary conclusion were simply not provided with the controlling DOL and IRS rulings that govern this analysis.  A finding here of entitlement to such a wage offset nullifies not only any claim of entitlement to wages, but would also abrogate any assertion of impermissible "tip confiscation" by the Class (and, consequently, any claims for liquidated damages, attorney fees, and/or costs as well).

Fourth, the Settlement provides, through 14 detailed pages in Article VIII thereof, novel structural relief that specifically addresses the worker misclassification issue that is vexing courts throughout the country.  Objector attorney Liss-Riordan

8

was recently quoted in a Daily Beast article concerning a settlement she negotiated on behalf of certain Lyft drivers (attached as Ex. A) who notably DID NOT OBTAIN ANY RELIEF AS TO RECLASSIFICATION THROUGH MS. LISS-RIORDAN'S EFFORTS, as saying that the "drivers' fight to be classified as employees '*will just have to wait for another day*.'"  As the Settlement terms show, neither the Deja Vu Group nor these Plaintiffs are interested in continuing to kick the employment-classification litigation can down the road any farther, as Ms. Liss-Riordan is apparently willing to do.

Article VIII of the Settlement Agreement addresses this issue through the issuance of detailed and specific affirmative structural relief governing the conduct of the Defendants moving forward and includes, among other things, legal protections to ensure that Entertainers who desire to work as employees of the Clubs are permitted to do so; *enhanced offers of employment* to *entice* Entertainers to select to work as employees where they are afforded monetary compensation *above* what the law requires; an elaborate "Assessment" process using *objective* criteria noted in the case law in order to determine whether  Entertainers can perform as IPE's instead of employees; the right of Entertainers to change from IPE's to employees at their choice in the future; and legal protections for Entertainers who decide to perform, or to continue to perform as IPE's.

9

Fifth, this Court must consider the simple but real fact here, as recognized by the Recitals in the Settlement, that many Entertainers just do not desire to perform as employees of the Defendants.  As the Supreme Court has long held:

> The law does not impose an arrangement upon the parties. It imposes upon the Court the task of finding what the relationship was.

*Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944).

Also observed by the Court, when considering the term "employee" as set forth in the FLSA, is the fact that such a definition was:

> Obviously not intended to stamp all person as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another.

*Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947).

Objectors are correct that true employees cannot waive the protections of the FLSA, but that is not what Article VIII does.  Rather, it affords protections *both* for employees and those Entertainers who desire to, and truly do, run their own independent business.  The Objections place no value whatsoever upon these very important provisions of the Settlement.

In addition, when evaluating the Objections here this Court should be assisted by a recent decision of another federal court that, in granting preliminary approval for a separate proposed settlement involving another group of businesses connected to these Defendants, considered but *rejected* very similar objections filed by Ms. Liss-Riordan in that matter.   And, finally, this Court should, of course, take into

consideration the Class Action Fairness Act notices sent out to the various states and the fact that *none* have objected to this Settlement.

Defendants discuss each of these issues, and other matters raised by the Objectors, in detail below.

**ARGUMENT**

Before responding directly to the Objections, Defendants first discuss the Objectors and a recent ruling that should be of particular interest to this Court.

## I. <u>THE OBJECTORS.</u>

In order to place the voluminous Objections in proper context, Defendants wish to share some information concerning the Objectors with the Court. Objector Eva Cabrera performed at the Club she identifies as "Deja Vu City of Industry" for a *total of 6.53 hours* over a two-day period, was *paid* by the Club a total of $456.00, and therefore earned compensation from the Club in the amount of *$69.86 per hour*. There are no computer records showing her as ever have performed at the other club she identifies; Deja Vu Main. Declaration of Donald Krontz ("Krontz Decl.") (Ex. B), ¶ 19.

Objector Merry ("Mandy") Clark earned hourly rates of mandatory entertainment charges (not including tip income), averaged over each year, of between $18.22 -- $43.54 per hour, with daily hourly rates as high as $141.09 per hour. Declaration of Donald Walker ("Walker.Decl."), at ¶ 14 and Exs. 1-4 thereto.

11

Objector "B.D." performed for a total of 48 days in the entire year of 2012, and only 2 days in 2013, for a total of 308.53 hours. For this limited time, she was paid a total of $4,788.00 by check from the Club at which she performed for just her "scrip" redemption (explained below); equating to $95.00 on average for each performance date, or $15.52 per hour. This does *not include* cash income she earned for personal entertainment performances (through *mandatory* charges to the customers) which, as a result of the protective order entered regarding "B.D.'s" identity, the Defendants were not able to access at this time. *See* Ex. G. Declaration of Bradley J. Shafer ("S.Decl."), at ¶'s 33-34; and. Ex. D, Declaration of Brian Scavetta ("Scavetta Decl."), ¶'s 8-12.

In addition, B.D. appears to be a custom acquired objector for her counsel, who have a later-filed putative collective action *Jane Doe #1 v. Deja Vu Consulting, Inc., et al.*, M.D. Tenn. Case No. 3:17-cv-00040. Counsel B.D. here and the Doe plaintiff in Tennessee are both represented by the Yezbak Law Offices. *See, e.g.*, Doc 58, 60, 61. Despite counsel being from Tennessee, B.D. claims to have performed at the Hustler Club in New York. *See also* Walker.Decl. at ¶ 12.

Meanwhile, Yezbak Law Offices' other client has opted out of the settlement and filed a motion in the Tennessee federal court asking that the court to an order under the All Writs Act prohibiting the "Michigan Litigants" from enforcing this Court's order and allowing the Tennessee action to proceed. Exhibit TT (at pp. 1-2,

alleging the present action is before "perhaps the only federal judge" who would approve the settlement). In other words, rather than having the Tennessee plaintiff chose between opting-out or challenging the settlement, counsel is seeking to have its cake and eat it too by collaterally attacking this Court's orders in Tennessee and acquiring B.D. as a client solely to file objections in this Court. This improper motive by her counsel renders her objections impotent. *See Dennis v. Kellogg Co.*, Case No. 09-cv-1786, 2013 WL 6055326, at *4 n. 2 (S.D. Cal. Nov. 14, 2013) ("when assessing the merits of an objection to a class action settlement, courts consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first.)"

Finally, the Objections of "C.T." were filed after the deadline established by this Court, any objections by her are therefore waived, and this Court should ignore her Objections. In any event, there is no record of her ever having performed at the Hustler Club in Cleveland, Ohio, as she claimed through her counsel. S.Decl, at ¶ 31; Walker.Decl. at ¶ 8-10.

## II. <u>THE RECENT RULING IN *SFBSC MANAGEMENT*</u>.

Attached as Ex. E is a recent ruling by the Northern District of California in the case of *Roe v. SFBSC Management, LLC*, case No. 14-cv-03616LB, (hereafter "San Francisco Déjà vu Case") which also involves an exotic dancer class action lawsuit but against other clubs in the Deja Vu Group, where Ms. Liss-Riorden raised very

similar challenges (on file in the Objections) to a proposed settlement (the "SFBSC Management Settlement"), but where the court granted preliminary approval over her objections and laid out in detail reasons why it rejected her arguments.

In that Preliminary Approval Order, the District Court concluded that the settlement was fair; that the dance fee payments (akin to the Secondary Pool Remuneration here) were a "fair alternative" to the cash payments; that the plaintiffs had provided examples of settlements in other courts showing that the settlement contemplated was in the "range of possible approval"; that allowing the settlement in the form of a class action "allows class members – who otherwise would not pursue their claims individually because costs would exceed recoveries – to obtain relief"; that there was a significant risk to the plaintiffs posed by litigation; that the numerous factors involved made estimating damages difficult; that the PAGA allocation seemed reasonable; that the settlement, irrespective of the objections, was not inadequate; that the objectors' assertion that approval should be denied because the plaintiffs had failed to provide a detailed analysis of the value of the claims, was misplaced; that the dance fee payments were not objectionable "coupon payments" and that "courts approved similar settlements, which convey a tangible monetary benefit" (and that "the benefit remains available to claimants for two years and costs the employers"); that given that the work force is transient, the dance fee payments "apparently maximizes recovery to the class as a whole"; that the changes of business practices as

specified there "will allow an alternative business model for the industry, providing employees with a guaranteed hourly rate, commissions, and benefits, among other changed practices"; and "preliminarily, there is an economic value that attaches to this portion of the settlement." *Id.*, pp. 12-18.

While Ms. Liss-Riorden filed objections here in regard to *final* approval, the comments of the Northern District of California aptly demonstrate why the arguments of the Objectors should be rejected.

## III. THE SETTLEMENT IS FAIR BECAUSE PLAINTIFFS' CLAIMS ARE OTHERWISE SUBJECT TO ARBITRATION, WHERE THEY CANNOT BE LITIGATED ON A CLASS BASIS OR COLLECTIVELY.[4]

The contracts at issue require the parties to submit any disputes to binding arbitration, and specifically preclude class arbitration or proceeding in arbitration as a collective. Ex. F is the Dancer Performance Lease of the original Plaintiff previously submitted to this Court in Defendants' motion to compel arbitration (Dkt. 12), with the arbitration provisions appearing at ¶ 21 thereto. All of the Clubs use either a variant of this contract or a revenue allocation agreement that also includes arbitration clauses containing comprehensive class and collective action waivers. S.Decl., Ex. G, ¶ 8. *See also* Ex. 1 to S.Decl. (a specimen of the revenue allocation agreement currently in use). These provisions are fully enforceable.

---

[4] The Jane Doe Plaintiff in the Cin-Lan Action had never signed a dancer contract, and was therefore never subject to an arbitration agreement. This fact distinguishes the settlement there from this proposed Settlement here.

15

### A. *The Arbitration Clauses are Enforceable*.

The Federal Arbitration Act ("FAA") states that a written agreement "to settle by arbitration a controversy" arising out of a contract or transactions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA "reflects a liberal federal policy favoring arbitration agreements." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 35 (1991) (citing *Mitsubishi Motors Corp. v. Soler Crysler-Plymouth, Inc.*, 473 U.S. 614, 626-627 (1985)). Under the FAA, "*any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.*" *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 945 (1995) (quoting *Moses H. Cone Memorial Hosp. v. Mercury Construction Co.*, 460 U.S. 1, 24-25 (1983)) (emphasis added).

Courts must "rigorously enforce" arbitration agreements according to their terms. *American Express Corp. v. Italian Colors Rest.*, ___ U.S. ___, 133 S.Ct. 2304, 2309 (2013). Moreover, the "FAA preempts any contradictory provision of state law." *Stutler v. T.K. Contractors*, 484 F.3d 343, 345 (6th Cir. 2006) (citing *Circuit City Stores v. Adams*, 532 U.S. 105, 111-112 (2001)). And, the Court issued what is probably its most forceful decision in support of arbitration just a few weeks ago in the 7-1 ruling in *Kindred Nursing Centers Ltd. v. Clark*, __ U.S. __, 2017 WL 2039160 (Kentucky Supreme Court ruling that a power of attorney could not entitle a representative to enter into an arbitration agreement "without specifically saying so,"

16

was invalid under the FAA).  Ex. H at *'s 4 -7.  There is now also no dispute that employment agreements (and then, consequently, agreements that are *alleged* to constitute employment agreements) are subject to arbitration under the FAA.  *See, e.g., Gilmer*, 500 U.S. at 26-35; and *Circuit City Stores*, 532 U.S. at 109-124.

Accordingly, the provisions referring the disputes here to arbitration are fully enforceable.  In fact, courts have routinely granted motions to compel arbitration when faced with the type of arbitration language found in Ex. F.  *See* S.Decl., at ¶'s 8, and Ex.'s 2-5 thereto.  In fact, when one Entertainer refused to consent to arbitration (necessitating the filing of a motion to compel arbitration), the *court granted, in accordance with existing precedents, attorney fees in favor of the exotic dance establishment and against the Entertainer*.  S.Decl., at ¶ 8, and Ex. 5 thereto.

Consequently, the fairness of the Settlement can be placed in context to statements made by objecting attorney Liss-Riordan in her recent declaration supporting her proposed settlement on behalf of Uber drivers.  The district court denied a motion to arbitrate, and Uber appealed.  In her declaration, Ms. Liss-Riordan stated:

> An adverse decision reversing this Court's rulings regarding the enforceability of Uber's 2013 and 2014 arbitration clauses could destroy the certified class in this case, *making recovery unfeasible for the vast majority of class members*.

Ex. I, ¶ 18 (emphasis added).  *See also id*. at ¶ 19 ("The uncertainty created by these appeals[5] was a major factor I took into account in deciding to accept this settlement on behalf of the class").

In fact, shortly thereafter the Ninth Circuit did indeed reverse the district court's denial of Uber's motion to arbitrate.  *Mohamed v. Uber Techs., Inc.*, 836 F.3d 1102 (9th Cir. 2016).  Similarly, the high likelihood of the enforceability of the arbitration agreements here support the fairness of the Settlement.

### B.    *The Waiver of Class and Collective Proceedings are Enforceable*.

Recent Supreme Court decisions make clear that class and collective action waivers contained in arbitration agreements are fully enforceable, even in the face of state law precluding the same.  *See AT&T Mobility, LLC v. Concepcion,* 563 U.S. 333, 335-351 (2011) (class action waivers enforceable, and overruling *Discover Bank v. Superior Court*, 113 P. 3d 1100 (Cal. 2005), which held to the contrary under California law); *Gilmer*, 500 U.S. at 32-33 (class and collective action waivers enforceable); and *Italian Colors*, 133 S.Ct. at 2307-09, 2311 (same).

Even if these arbitration provisions had been *silent* concerning class arbitration, they would nevertheless preclude class-wide arbitration.  *See Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 687 (2010) (arbitration agreement that was silent as to allowing class arbitration would not permit class arbitration because there

---

[5] An appeal also existed concerning class certification.  *See id*. at ¶'s 14-17.

18

was no specific agreement to permit the same, and because the costs involved in such a mass proceeding would not have been contemplated by the parties at the time they agreed to arbitrate their claims).

One issue on this subject remains, and that is whether such *articulated* waivers in an employment context survive the NLRA.  The Supreme Court is set next Term to resolve this question.  The Second, Fifth, and Eighth circuits, as well as the Supreme Courts of California and Nevada, have each determined that class and collective action waivers in employment-context arbitration agreements are enforceable under the FAA irrespective of the NLRA.[6]   In addition, three other circuits, including the Sixth, similarly have held that the FAA demands enforcement of class waivers in employment arbitration agreements, albeit without expressly discussing the NLRA aspects in their decisions.[7]   The Ninth Circuit, however, has held that class and collective action waivers, in order to be enforceable in an employment context, must contain a provision where the employee is permitted to "opt out" of arbitration.  And

---

[6] *See D.R. Horten, Inc. v. NLRB*, 737 F.3d 344, 362 (5th Cir. 2013); *Murphy Oil USA, Inc. v. NLRB*, 808 F.3d 1013, 1021 (5th Cir. 2015); *Cellular Sales of Mo., LLC v. NLRB*, 824 F.3d. 772, 776 (8th Cir. 2016); *Southerland v. Ernst & Young, LLP*, 726 F.3d 290-297 & n. 8 (2d Cir. 2013); *Iskanian v. CLS Transp. L.A., LLC*, 327 P.3d 129, 137-43 (Cal. 2014); and *Tallman v. 8th Jud. Dist. Ct.*, 359 P.3d 1113, 1122-23 (Nev. 2015).

[7] *See Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 592 (6th Cir. 2014), *Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1334-36 (11th Cir. 2014); and *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002).

the Seventh Circuit has held that such waiver provisions violate the NLRA.[8]  The Supreme Court has accepted review of *Murphy Oil*, *Morris*, and *Lewis*[9] to resolve this conflict.[10]  But the clear majority of circuits uphold such waivers, the likelihood that the Supreme Court will follow suit presents severe jeopardy for any class here, and supports the fairness of this Settlement.[11]

### C.    *The Cost Sharing Provisions of Arbitration are Enforceable.*

The arbitration clauses here have the parties splitting the arbitration fees unless the law requires a different allocation. Ex. F, ¶ 21(A).  The Supreme Court has clearly held that even "employment" litigants can be required to bear their fair share of the expenses of arbitration.  *See, e.g., Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 89-92 (2000).  Again, the Uber settlement declaration of objecting attorney Liss-Riordan places this circumstance in context to the fairness of *this* Settlement.

In short, it has been my experience that, even when a claimant is challenging what he or she alleges to be misclassification as an

---

[8] *See Morris v. Ernst & Young, LLP*, 834 F.3d 975 (9th Cir. 2016); and *Lewis v. Epic Systems Corp.,* 823 F.3d 1147 (7th Cir. 2016).

[9]   See n.'s 6 and 8 above.

[10] Consequently, the 2-1 decision at the Sixth Circuit this week in *NLRB v. Alternative Entertainment, Inc.*, 2017 WL 2297620 (6th Cir. May 26, 2017), is not dispositive of this issue.

[11]   In any event, even if articulated waivers are stricken as violating the NLRA, because the arbitration clauses here *do not specifically permit* class arbitration, arbitrations thereunder may not proceed on a class-wide basis.  *Stolt-Neilsen, supra.*

independent contractor, when an arbitration provision provides that the AAA Commercial Arbitration Rules apply, there is a real risk that the claimant may be required to split arbitration fees. *As a practical matter, this deterrent would essentially eliminate the possibility of recovery for all but the most motivated Drivers*.

Ex. I, ¶ 96 (emphasis added). *See also id*. at ¶'s 94-95 (Commercial Rules of the American Arbitration Association ("AAA") require arbitration fees to be split by the parties).

While Defendants do not, obviously, concede that the arbitration provisions at issue here have any type of "deterrent effect," Ms. Liss-Riordan's comments in her Uber declaration show the disingenuous nature of her Objections. According to her *own statements*, the existence of the fee-splitting provisions weighs in favor of the fairness of the Settlement.[12]

## IV.   THE SETTLEMENT IS FAIR BECAUSE PLAINTIFFS HAVE A VERY LOW CHANCE OF PREVAILING ON THEIR MISCLASSIFICATION CLAIMS.

Once again, Ms. Liss-Riordan's declaration in support of her proposed Uber settlement is relevant here. "A second major risk that I took into account [in

---

[12] Completely separate and distinct from the arbitration issue is the simple fact that each Entertainer presents her own unique facts and circumstances with regard to the ultimate question of whether *her* economic realities establish her as an employee. As the Oregon Court of Appeals noted in an exotic dancer misclassification case, "the economic realities with regard to each dancer necessarily depends on the *circumstances of the individual dancer. . . .*" *State of Oregon v. Acropolis McLoughlin, Inc.,* 945 P.2d 647, 654 (Or. 1997) (on reconsideration) (emphasis added).

deciding to settle] was the risk of trying the all-important employment status question to a jury."[13]  Ex. I, ¶ 20 (clarification added).  *Her concerns were not unfounded*.  Shortly after the submission of her declaration, an Uber driver case went to hearing in arbitration, that resulted in the issuance of a detailed 48 page ruling finding that the driver had *not* in fact proven that he was an employee.  Ex. L.  For the reasons set forth immediately below, the Class Members here are likely to suffer the same fate if the Settlement is not approved and Plaintiffs' claims go to arbitration or trial.

A.   **Plaintiffs are Not in the Category of Those Meant to be Protected by the FLSA.**

---

[13] After this Court preliminary approved the settlement in the Cin-Lan Action, objectors came forward as well.  Similarly, statements by those objecting attorneys in *other* exotic dancer cases where *they sought to have their own settlements approved by a court,* demonstrated the tenuous nature of these types of claims.  *See, e.g.*, *Reynolds v. Sisyphyan, LLC*, Case No. BC 346078 (Superior Court of the State of California, County of Los Angeles), at pp. 6-7 (Ex. J hereto) ("The Plaintiffs' claims in the Action rest upon a number of legal and factual contentions that are *unresolved, unsettled, novel, and uncertain*.  …Although Plaintiffs believed that they might ultimately prevail in the litigation, the result was *highly uncertain*.  … The Settlement, in contrast, offers a guaranteed, significant value to the Class that fairly and reasonably accounts for the very real risks of continued litigation"); and *Ellington v. 7180 Sunset Blvd. Inc.*, Case No. BC 387114 (Superior Court of the State of California, County of Los Angeles), p. 4 ¶ 10 (Ex. K hereto) ("… the Settlement is based on the fact that this is a case which is a **_total roll of the dice_**, and that the ultimate resolution of this case at trial could not be predicted by the parties at the time of the mediation, other than the fact that *each party had a substantial risk of losing the case*") (all emphasis added).

22

The purpose and intent of the FLSA is to preclude "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers."  29 U.S.C. §202(a).  *See also Barrentine v. Arkansas-Best Freight System,* 450 U.S. 728, 739 (1981) (the FLSA was intended to protect workers from "*substandard wages and oppressive working hours*"). (emphasis added).  And, the terms in the FLSA (such as "employer" and "employee") are to be determined in the context of furthering the purpose and intent of the minimum wage laws.  *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143-45 (6th Cir. 1977) (terms "must be read in the light of the mischief to be corrected and the end to be attained," so that "independent contractor," "employee" and "employer" should have meanings that are determined "in light of the purposes of the legislation in which they were used").

Here, the evidence shows that it would not further the purpose and intent of the FLSA to classify these Entertainers as employees, and the trier of fact (whoever that may be) would be obligated to consider the concepts of "employee" and "non-employee" (or "independent contractor") in the light of this reality.

Initially, there simply are no "oppressive working hours."  The report of CPA David Shindel, prepared at the request of Defense Counsel and using computer data from a statistically significant sampling of the Clubs in the Settlement, illustrates that Class Members averaged working *less than three shifts per week* (the actual average

23

number being *2.79*), and working on average *only 5.51 hours per day they do perform*. A sampling of *another* 11 Clubs shows that *only 3.68%* of the Entertainers who performed in *those* establishments *worked over 29 hours per week*. S.Decl., ¶ 10; Ex. 6 to S.Decl. (at Table 1, and Table 1, n.4). Under no stretch of the imagination can those facts constitute "oppressive working hours" requiring the protections of the FLSA.

Nor does the documentary evidence here establish the concern of "substandard wages" noted by the Supreme Court. First, there is the income recognized by some of the Objectors set forth in Section I. Second, Defendants' identify, in Section V below, other data demonstrating income of the Entertainers (including the initial Jane Doe) well above the applicable minimum wage. These are not the type of "substandard wages" that the FLSA was meant to address, and affording minimum wage protections to these Plaintiffs will not further the purpose and intent of the FLSA. For this reason alone, Plaintiffs have only a minimal chance of prevailing on their misclassification claims.

    **B.**    ***The Actual Test That Would be Used Here to Differentiate Employees from Non-Employees May be Far Different From That as Articulated by the Objectors, and Demonstrates Why These Clubs Have Been Successful in Defending Misclassification Claims; Thereby Supporting the Fairness of the Settlement.***

It is axiomatic that the distinction under the FLSA between employees and at least "independent contractors" is to be made based upon the "economic realities" of

the relationship. Under one economic realities test used by the Sixth Circuit, the trier of fact is *initially* to look to: 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services;  3) the worker's investment in equipment or materials for the task;  4) the worker's opportunity for profit or loss, depending on his skill;  5) the degree of the alleged employer's right to control the manner in which the work is performed; and   6) whether the service rendered is an integral part of the alleged employer's business.  *Werner v. Bell Family Med. Ctr., Inc.,* 529 Fed.Appx. 541, 543 (6th Cir. 2013).  But the actual test to make this employment distinction here may be far different than that.

First, court-articulated test elements may be irrelevant to the specific relationship at bar, and thus may be ignored.  *See, e.g., Donovan v. Brandel*, 736 F.2d 1114 (6th Cir. 1984) (the court noted that the test element of "investment," in the particular context of the migrant pickle farmer industry, "is not determinative of the issue of employment in this case").  Thus, for example, a Minnesota trial court in a class action misclassification proceeding under both the FLSA and state law, and involving one of the Clubs at issue here and litigated by the undersigned, held that the test element of "integration" was simply not relevant in the exotic dancer context.  S.Decl., ¶ 12; and Ex. 7 to S.Decl. ("the final factor [integration] does not lend itself to application in the entertainment context.  Every theater, or stadium depends upon the

performers who display their ability.  *As such this element is not applicable*")
(emphasis and clarification added).

Second, the economic realities test is admittedly incomplete, and is but a mere
broad guideline for the courts.  *See, e.g., United States v. Silk*, 331 U.S. 704, 716
(1947) (in discussing a five-element economic realities test, the Court noted that "no
one is controlling *nor is the list complete*") (emphasis added); *Donovan* (Sixth
Circuit), 736 F.2d at 1116 (the issue of an employment relationship "does not lend
itself to a precise test, but is to be determined on a case-by-case basis upon the
circumstances of the *whole business activity*") (emphasis added).

Moreover, the Sixth Circuit has recognized that the differences between the
economic realities test utilized under the FLSA and the "common law" tests applied in
other areas of jurisprudence "are minimal."  *Shah v. Deaconess Hosp.*, 355 F.3d 496,
499 (6th Cir. 2004).  *See also Simpson v. Ernst & Young*, 100 F.3d 436, 442 (6th Cir.
1996) (the court explained that "[a] panel of this circuit recently concluded that *Lilly*
[*v. BTM Corp.*, 958 F.2d 746 (6th Cir. 1992)]'s economic realities test juxtaposed with
[*National Mutual Ins. Co. v.*] *Darden* [503 U.S. 318 (1992)]'s common law agency
test disclosed *no material difference*") (emphasis added); and *Darden*, 503 U.S. at
323-324 (the Court noting for comparison the 11-factor common law test set forth in
the Restatement (Second) of Agency ' 220(2) and the 20-factor common law test then
used by the IRS to determine whether a person was an "employee" for tax purposes).

As such, courts use a variety of other factors to evaluate employment, such as the intent of the parties,[14] the requite initiative required of the worker,[15] and the way that the parties categorize themselves and the relationship between them for taxation purposes.[16]

---

[14] *See, e.g., Restatement (Second) of Agency*, ¶220(2)(i); *Armbruster v. Quinn*, 711 F.2d 1332, 1349 (6th Cir. 1983) (FLSA litigation); *Bartles v. Birmingham*, 332 U.S. 126, 129-132 (1947) (the Court noted that the terms in a contract for band members and band leaders was "one factor to be considered"); and *Donovan* (Sixth Circuit), 736 F.2d at 1116 (in holding migrant pickle farmers *not to be employees* under the FLSA, the court goes through an exhaustive analysis of the contract at issue there). Here, it is beyond question by reference to the underlying written agreements that the intent of the parties was to create a non-employment relationship. The underlying contract provides as such. *See* Ex. F, ¶ 12. In addition, as demonstrated by the original Plaintiff here, she was provided with an elaborate document that laid out, side-by-side, the distinctions of performing as an IPE or working as an employee; she was then asked to select the structure under which she desired to perform; she selected IPE status; and she specifically declined to work as an employee. *See, e.g.*, Ex. M. This fact helps establish that the Plaintiffs do not have a substantial likelihood of prevailing on their misclassification claims.

[15] *See, e.g., Silk*, 331 U.S. at 716 (the Court notes in referring to unloaders and truckers that "their *energy, care and judgment* may conserve their equipment or increase their earnings . . . and [they] depend upon their own *initiative, judgment and energy* for a large part of their success"). *Cf. Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947) ("while profits to the [meat] boners depended upon the efficiency of their work [the meat being provided by the alleged employer and was freely available to the workers without any "initiative" being required], it was more like piece work than an enterprise that actually depended for success upon the *initiative, judgment or foresight* of the typical independent contractor") (emphasis and clarification added).

[16] *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 752 (1989), *citing Dumas v. Gommerman*, 865 F.2d 1093, 1103-05 (9th Cir. 1989). First, this is demonstrated by the Dancer Performance Lease of the original Plaintiff. Ex. F, ¶ 13 ("**Entertainer** is exclusively responsible for, and shall pay, all applicable taxes and contributions imposed upon any income earned by **Entertainer** while performing on

Third, the *Werner* test may not even be applicable here.  In just the past few years, an emerging body of jurisprudence has developed where federal courts are no longer "throwing" the type of economic reality test set forth in *Werner* to every alleged "master/servant" relationship.  Rather, the courts are beginning to look at whether, in the first instance, the relationship can be considered to at least equate to a true independent contractor arrangement (*i.e.*, whether there is payment from the alleged master to the purported servant).  If that does not exist, another test must be utilized.

The Second Circuit created a "primary beneficiary" test for determining whether unpaid interns were employees entitled to protections under the FLSA.  *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 536-38 (2d Cir. 2016).  Then, the Seventh Circuit ruled that the City of Chicago was not the "employer" of licensed taxi drivers by concluding that FLSA's definition of "employ" (as including those who "suffer or permit to work") applied only when "*one person compensates another for work done on his property.*"  *Callahan v. City of Chicago*, 813 F.3d 658, 660-662 (7th Cir. 2016) (emphasis added).  Consequently, the court concluded, the suit by the taxi driver "*does not require a choice between employment and independent contractor*

---

the **Premises**").  Second, tax rulings discussed in Section IV(C), *infra*, hold that exotic dance Entertainers in general, and specifically at the Clubs, are properly classified as non-employees or independent contractors.  This factor as well weighs in favor of independent contractor status.

status." *Id.* at 662 (emphasis added). This lead the Seventh Circuit to most recently rule that non-revenue college athletes were not employees of the university, and that the normal "economic realities" test (such as the one in *Werner*) was simply not applicable to that relationship. *Berger v. National Collegiate Athletic Association*, 843 F.3d 285 (7th Cir. 2016) (*citing* both *Glatt* and *Callahan*).

The Clubs in California and Lansing, Michigan, remunerate Entertainers via 1099 payments. *See* SA, ¶ 2.24 (explaining the differences between the Clubs operating under the Lease Model, the Independent Contractor Model, and the Joint Venture Model); and Krontz Decl. (Ex. B), ¶'s 9-14. The other Clubs do not. Accordingly, the *Werner*-type test may simply be irrelevant to the majority of the Clubs at issue here. While the Defendants will not expend time and space here to argue to this Court at this juncture what the legal test should be to apply to the Clubs operating under the Lease Model and the Joint Venture Model, suffice it to say that because it is not at all clear whether the type of economic realities test set forth in *Werner* is the appropriate legal standard to use in these circumstances, most if not all of the decisions cited by the Objectors finding exotic dance entertainers to be employees under those factors may have little to no relevance here.

C.   ***The Numerous Decisions Finding Exotic Dance Entertainers to have Been Independent Contractors***.

Even assuming, arguendo, that the type of economic realities test set forth in *Werner* is the proper legal standard to at least initially use here (subject to the

29

modifications discussed above), it is clear that when applied to establishments that are sophisticated and knowledgeable on this subject, and when properly litigated by counsel that fully understand the complexities of these legal issues, exotic dancers are *routinely* found to be non-employees.

### 1. The Deja Vu Group Decisions Rejecting Employee Status for Entertainers.

In 1996, the United States Department of Labor initiated an investigation of the "Deja Vu" club in Colorado Springs, Colorado (one of the Clubs here), involving the work classification of the entertainers who performed at that establishment. Jack Burns, an attorney from Bellevue, Washington, represented that Club and was assisted by the undersigned. After being provided with detailed information as to the business relationship between the Club and the Entertainers, the DOL cancelled the wage-hour investigation and stated that it did not "anticipate that this investigation will be re-opened." It never was. S.Decl., ¶ 13; and Ex. 8 thereto.

In 2004, a jury in San Francisco returned a verdict in the case of dancer Tracy Buel, who performed at a club in the Deja Vu Group, rejecting her claim that she was an employee for minimum wage purposes. The California Court of Appeals affirmed in *Buel v. Chowder House, Inc*., 2006 WL 1545860 (Cal. App. 1ˢᵗ Dist.). S.Decl., ¶ 14; Ex.'s 9 and 10 thereto. The appellate court noted that Ms. Buel rejected an offer of employment (like the entertainers here); dancers needed to possess specialized

skills; the lack of payment by the club to the dancer favored independent contractor status; and club rules were based upon legal constraints. *id.* at *'s 6-9.

The IRS has also visited the issue of how to classify exotic dancers on numerous occasions. In the few cases where the IRS determined that such entertainers were employees and required Clubs to pay employment taxes, the federal courts reviewing those determinations *uniformly reversed*. *See, e.g., Deja Vu Entertainment Enterprises of Minnesota, Inc. v. United States*, 1 F.Supp.2d 964 (D. Minn. 1998); and *Taylor Blvd. Theatre, Inc. v. United States*, 1998 WL 375291 (W.D. Ky.) (Ex. N).

In specific regard to the labor classification at issue here, the district court in *Deja Vu Entertainment Enterprises of Minnesota* stated:

> In summary, Deja Vu had severable [sic] reasonable bases for treating its performers as independent contractors. There is uncontroverted evidence that it is commonplace in the industry for performers to be treated as non-employees. Further, Deja Vu's attorney's and accountant's advice with respect to the classification of the performers was reasonable. Moreover, the previous audit of Deja Vu's parent corporation provided a third reasonable basis upon which Deja Vu was entitled to rely.

1 F.Supp.2d at 969.

The other district court further observed:

> The federal tax laws define an 'employee' as 'any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee.' 26 U.S.C. § 3121(d). Often, the key factor is control. *See Chin v. United States*, 57 F.3d 722, 725 (9th Cir. 1995). Though Plaintiff exercises a degree of control over its dancers, *this control arguably does not rise to the level required for an employer-employee relationship*. It does not tell them

how to dance or dictate their choice of costume.  It has no control over any of the proceeds until the dancer pays the nightclub its share at the end of the evening.  Dancers set up their own schedules and can perform at other clubs if they wish.

*Taylor Blvd. Theatre, Inc.* (Ex. N), 1998 WL 375291 at *4 (emphasis added).

In 2007, the IRS initiated an employment tax audit of the Highland Park, Michigan, Deja Vu club (one of the Clubs at issue here), concerning the question as to whether an Entertainer who performed there was an employee for federal tax purposes.  Following the submission of briefing from the undersigned, the IRS concluded that since the Club had not paid the worker, "there is no employment relationship with employment tax liability between you and the worker at issue."  As a result, the IRS closed the investigation.  S.Decl., ¶ 15; Ex. 11 thereto.

In approximately 2012, the IRS began a comprehensive employment audit of Larry Flynt's Hustler Club in Las Vegas, Nevada, owned by Las Vegas Bistro, LLC (then known as Las Vegas Entertainment, LLC, and one of the Clubs here).  This employment tax audit included an examination as to whether the Entertainers should be reclassified as employees for federal tax purposes.  At the end of that comprehensive audit, the IRS issued a "no change" assessment (meaning that absolutely no taxes were due on the comprehensive employment tax audit).  The final determination (entitled "Summary of Employment Tax Examination") noted that the "examination of your employment tax returns as reflected on this report included an examination for employment tax purposes of whether any individual should be treated

32

as employees of the taxpayer…," and that the "examination concluded that the following classes of workers should *not* be treated as employees: *female professional entertainers*…." S.Decl., ¶ 16; Ex. 12 thereto (emphasis added).

*Krasinski v. Deja Vu of Saginaw, Inc*. (the initially targeted Defendant here), decided in the Referee Division of the Michigan Employment Security Commission, found in regard to a claim by an Entertainer that she had been an employee and was thus entitled to unemployment compensation benefits, that:

> The decision in this appeal is relatively simple. The performers [sic] did not fall under the control and direction of the employer, except they were expected to comply with the employer's rules. The performers could set their own hours, they paid their own taxes, and provided their own supplies. There is little in the record to permit the employee to conclude that the employer controlled and directed the performer. This performer in the performance of her work not only actually, but it was intended that she would be employed as an independent contractor, and such she was not an employee within the meaning of the Act.

S.Decl., Ex. 13 thereto, p.3. *See also* S.Decl., ¶ 17.

Three decisions from the Indiana Department of Revenue similarly held dancers at establishments that used to be part of the Deja Vu Group to be independent contractors as opposed to employees. S.Decl., ¶ 18; Ex. 14 thereto.

In the case of *In Re: Showgirls of San Diego, Inc*. (one of the Clubs here), the California Unemployment Insurance Appeals Board found the entertainers at issue there to be independent contractors, and not employees. S.Decl., ¶ 19; Ex. 15 to S.Decl.

The California Unemployment Insurance Appeals Board issued a similar decision with regard to another one of the Clubs, in the case of *In Re: Nite Life East, LLC*. The Board, in finding the dancers there to have been independent contractors, commented that they were not under the control of the club other than for the "end product" and the "work flow so as to have a product being supplied to its customers on a regular basis"; that the Club "had to compete" for the services of the dancers and "needed the dancers as bad as the dancers needed the work"; that the Club was making every effort to treat the entertainers as independent contractors; that the dancers set the hours of their work and could not be terminated except upon notice; and that the Club had *overcome the presumption* that the dancer were employees. Ex. 16 to S.Decl., at pp. 2-3. *See also* S.Decl., ¶ 20.

In *Kelly Perry v. Little Darlings Development Center* (one of the Clubs here), a state trial court in Baltimore, Maryland, denied a dancer's claim for worker's compensation benefits, and found her to have performed as an independent contractor as opposed to an employee. In the 2014 ruling, the court noted the terms of the written lease agreement; that the dancer was given the option of being an employee; and that she could have received a wage and be subject to control but that she chose instead to be a professional entertainer. Moreover, the club did not set a schedule for her; did not require a specific numbers of days of work from her; did not require her to wear specific outfits; did not choose her music or stage name; did not tell her how to

34

dance; did not require her to sell drinks; and "importantly" did not keep her from working for other establishments.  S.Decl., ¶ 21; Ex.'s 17 and 18 (Trans. p. H-50).

On June 9, 2015, an Entertainer Brandi Campbell, who had performed at Larry Flynt's Hustler Club in Las Vegas, Nevada, owned by Las Vegas Bistro, LLC (and which, again, is one of the Clubs at issue here), filed a complaint in the Nevada Office of the Labor Commissioner asserting that she had been forced to perform as an "independent contractor" when she was really an employee, and that the Club had failed to pay her wages and made certain "unauthorized deductions."  On July 10, 2015, Las Vegas Bistro, LLC, responded to the Office of Labor Commissioner through correspondence from the law firm of Jackson/Lewis, which included substantive briefing supplied by the office of the undersigned.  On November 3, 2015, only one and one half years ago, the Office of the Labor Commissioner issued its ruling declining to proceed on the complaint and closing the claim. S.Decl., ¶ 22; Ex. 19 thereto.

These *fourteen* consistent rulings involving the Clubs at issue or businesses affiliated to them establish that the Plaintiffs do not have a substantial likelihood of prevailing on their misclassification claims, but are only the tip of the iceberg.

      **2.**    **The Non-Deja Vu Group Decisions Finding Entertainers to be Independent Contractors as opposed to Employees.**

In order to save space, Defendants will merely summarize these other decisions and rulings, and leave the Court to review the actual opinions, where provided, for detailed analyses underlying the conclusions reached.

In *Oregon v. Acropolis McLoughlin, Inc*., 945 P.2d 647 (Or. App. 1997) (on reconsideration), the Oregon Court of Appeals found exotic dancers to be independent contractors for minimum wage purposes after changes to the clubs' business model were made where the dancers were no longer hired as employees and no longer paid by the club.

On April 13, 2006, the DOL initiated a wage and hour investigation of an entity known as IEC, Inc., which operated a chain of exotic dance establishments across the country generally under the name of "P.T.'s." The focus of the investigation was whether the Entertainers who performed there were employees or independent contractors, and if they were employees what, if any, wages were due and owing to them. The undersigned prepared a detailed response, and thereafter the DOL closed its investigation without requiring the Entertainers there to convert to employees and without requiring the payment of any wages or other employment benefits to the Entertainers. S.Decl., ¶ 23.

On May 17, 2006, an exotic dance establishment known as Diamond Cabaret located in Denver, Colorado (one of the IEC Clubs), was sent a complaint by the Colorado Department of Labor and Employment, Division of Labor, initiating an

investigation on behalf an anonymous entertainer asserting violations under Colorado Minimum Wage Order #22.  Again, the undersigned responded and similarly the Colorado Department of Labor and Employment issued a decision informing the undersigned that "no further action is contemplated by this office." S.Decl., ¶ 24; Ex. 20 thereto.

In May 2004, an order issued from the First Judicial District Court of the State of Minnesota, granting the defendant's motion for summary judgment in *Thompson v. Lounge Management, Ltd. et al.,* No CX-03-12159.  Plaintiff was an exotic dancer who sued the club at which she had performed in order to obtain minimum wages for the hours that she danced.  The court found that it was "apparent that under any factor and test that the Court adopts, the arrangement between Lounge Management and the Plaintiff was not an employee/employer relationship."  Ex. 21 to S.Decl., p. 11.  The undersigned prepared much of the briefing on the motion for summary judgment. S.Decl., ¶ 25.

In *Matson v. 7455, Inc*., 2000 WL 1132110 (D. Or.), the District Court was confronted with an exotic dancer misclassification claim, and noted that there was "[n]o genuine issue of material fact calling into question the plaintiff's status as an independent contractor."  Ex. O, at * 4.  The court found that the dancer acknowledged her responsibility to pay all taxes; she paid taxes as an independent contractor; she was paid exclusively through fees and tips paid by her customers,

which were dependent upon her own skill to attract customers; she was in control of her opportunity for profit; and rules to avoid criminal liability did not establish control.  *Id.*

Another such ruling is a recent decision from a federal district court in Arkansas reported as *Hilborn v. Prime Time Club, Inc*., 2012 WL 918751 (E.D. Ark.), where the court granted summary judgment to the defendants and found the dancers to have been independent contractors and not employees under the FLSA.  Ex. P.

In *Marlar, Inc. v. United States*, 151 F.3d 962 (9th Cir. 1998), the Ninth Circuit also found that a club was reasonable in its treatment of dancers as non-employees for federal tax purposes (". . .a reasonable person could find that the dancers are lessees instead of employees," and a prior IRS audit of a competitor "*approved of [its] classification of the dancers as lessees*, and made no assessment of employment taxes").  *Id*. at 968 (emphasis and clarification added, footnote omitted).

Making this point even clearer is the simple fact that after the IRS kept trying to classify exotic dancers as employees, in the face of clear precedent to the contrary, numerous federal courts ultimately awarded a number of clubs their litigation costs because -- the federal courts concluded -- the actions of the IRS were not "substantially justified."  The comments of one such court are particularly telling. *See, e.g., Marlar, Inc. v. United States*, 1999 WL 1103010 (W.D. Wash.) (Ex. Q) (awarding taxpayer $50,915.25, finding that "[i]t was the government's argument that

no reasonable person would act as Marlar had *that was unreasonable*") (emphasis added).

In *Sizemore v. Jezebel's, Inc*., 152 P.3d 689; 2007 WL 656444 (Kan. App. March 2, 2007) (Table), the court found dancers to be independent contractors for worker's compensation purposes.  The court noted that the language in the dancers' contract asserting independent contractor status was important; that the dancers were required to supply their own music, costumes and clothing; that the dancers choreographed their own dance routines; and that the club did not pay the dancers any wages, fringe benefits, or medical insurance.  Ex. R at *2.

Also finding exotic dance entertainers to be independent contractors instead of employees is an Order of the State of Illinois Department of Human Rights in *In Re Carla McKinney*, which discusses in detail the factors necessary to determine employment status.  Importantly, in discussing *each* factor, the Chief Legal Counsel found that exotic dancers at the establishment were independent contractors.  Ex. 22 to S.Decl. ¶'s 3-7.  This ruling was later affirmed in *Carla McKinney v. Chief Legal Counsel of the Department of Human Rights* (Ill. App. 5th Dist. 2002), based upon the lack of payment from the club to the dancer.  Again, the undersigned assisted in the briefing. S.Decl., ¶ 26, and Ex. 23 thereto.

Exhibit S is a decision of the West Virginia Office of Hearing Appeals in *In Re: Lady Godivas*, 2000 WL 33300345 (W.Va.Off.Hrg.App.).  At issue there was the

question of whether the portion of dance fees collected and retained by the club were taxable as "lease or rental fees of real property." The Administrative Law Judge noted that it was "*undisputed that exotic dancers are generally recognized as independent contractors by the courts*," and in the proceedings the *State of West Virginia STIPULATED that the dancers were in fact independent contractors*. *Id*. at *8. The additional relevance of this case is discussed in Section V below.

Exhibits T, U, and V are three decisions of the California Unemployment Insurance Appeals Board, identified as *In Re: Fritz That's It*, *In Re: A Touch of Class,* and *In Re: Kit Kat Club,* all holding that the dancers there were independent contractors as opposed to employees.

Exhibit 24 to the S.Decl. is a decision of the Indiana Department of Workforce Development, Unemployment Insurance Appeals, in the case of *In Re: Condross Corp.*, concluding that after operational changes were made to the business structure, the Entertainers were indeed independent contractors and not employees. The ALJ referenced the owner as having changed operations after attending a seminar in Las Vegas on the topic of the classification of exotic dancers. *The undersigned was the one who taught that seminar*. S.Decl., ¶ 27.

Given this extensive body of authority, comprising *twenty-nine* decisions which extend up to the present (and are therefore not the "stale" rulings as argued by one Objector), it is highly likely that the Plaintiffs will not prevail on their

misclassification claim. In any event, as the Defendants specifically relied upon these decisions in establishing and continuing the IPE structure of the dancers, no actions of the Defendants can be found to have been "willful" violations of the law, which substantially reduces the applicable statutes of limitations and which precludes the awarding of liquidated damages.  This was briefed extensively in the Cin-Lan Action in regard to the rulings that had been issued up to that point (Ex. W), and the Defendants simply incorporate that briefing here.

### D.   The California Class Members Do Not Have a Substantial Likelihood of Prevailing on Their PAGA Claims.

Entertainers who performed at clubs in California are entitled to raise certain penalty claims under the Private Attorney General Act ("PAGA"), Cal. Lab. Code ' 2698, *et seq*.  The Settlement provides for one hundred thousand dollars to be paid in PAGA penalties; 75% going to the California Labor and Workforce Development Agency ("LWDA") and 25% going to the California Entertainers (this allocation being mandated under PAGA).  SA, § 5.2.4. The amount of penalties, if any, that the California Entertainers and the LWDA would be entitled to receive if the California Plaintiffs prevailed on their misclassification claim are unclear because, *inter alia*;  A) the ability to "stack" PAGA penalties has not been addressed by the California Supreme Court;  B)  the payments to the California Plaintiffs, as discussed in Section V below, could abrogate certain penalties under PAGA;  C)  due process constrains the amount of a PAGA award;  and D)  PAGA penalties may not be "unjust, arbitrary

41

and oppressive, and/or confiscatory." These matters are all discussed in objecting attorney Liss-Riordan's declaration in support of her motion to approve her settlement on behalf of Uber Drivers, attached as Ex. I hereto, and the Court is referred thereto for a concise explanation. *See id.*, ¶'s 79-86.

Under PAGA, the LWDA has, in certain instances, discretion to assess a civil penalty for violations of the California Labor Code. When the LWDA has such discretion, "a court is authorized to exercise the same discretion subject to the same limitations and conditions, to assess a civil penalty." Cal. Lab. Code ' 2699 (e)(1). As discussed above, in any action by an aggrieved employee seeking recovery of a civil penalty available under PAGA, "a court may award a lesser amount than the maximum civil penalty amount specified by [the act] if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory." Cal. Lab. Code ' 2699 (e)(2) (clarification added).

In light of the circumstances discussed in Section IV(C)(1) above, and in particular where a properly instructed jury found an entertainer who performed at a California club in the Deja Vu Group to have been an independent contractor instead of an employee (*which was affirmed on appeal*), and where <u>numerous</u> decisions of the California Employment Development Department have found that Entertainers (some performing in the Clubs and some performing at other similar establishments) were

42

truly independent contractors and not employees, the chance of any sizable PAGA award, even in the event that the California Entertainers prevail on their misclassification claims, would be minimal.

In fact, in her Uber settlement declaration, Ms. Liss-Riordan points out the low nature of PAGA awards, including the fact that "a significant number of courts have approved PAGA allocations that are simply $10,000 or less, regardless of the settlement value of the case and regardless of the valuation (if any) of the PAGA claim." Ex. I, ¶ 85 & n.7 (collecting cases). In addition, it should also be pointed out that when this Court preliminarily approved the settlement of the Cin-Lan Action, notice thereof was appropriately sent out to the required departments and agencies of the State of California (Ex. X), and the State of California never objected to that settlement even though it made *absolutely no allocation whatsoever to any PAGA award*. Here, however, this settlement contemplates the substantial payment of one hundred thousand dollars. Under the facts, circumstances, and governing law, this aspect of this Settlement is more than fair.

## V.   THE SETTLEMENT IS FAIR BECAUSE EVEN IF THE DANCERS ARE FOUND TO HAVE BEEN EMPLOYEES, DEFENDANTS WOULD OWE MOST OF THEM NOTHING.

Even assuming, *arguendo*, that the Entertainers would prevail on their misclassification claims, whether they would be owed any wages is dependent upon: 1) the payments made to the Entertainers from Clubs using the Independent

Contractor Model; and 2) a determination as to whether the *mandatory charges* to the customers for the purchase of personal dance performances are "service charges" or are "tips" under the applicable labor and tax laws.  Both issues favor the Defendants, and the briefing on this issue by the Objectors demonstrates a profound misunderstanding by them of the operations of these Clubs, the data they collect in regard to the Entertainers, and the applicable law.

The dancer contracts at issue clearly establish the distinctions between mandatory charges to the customers for personal entertainment performances (referred to as "Entertainment Fees") and discretionary tip income paid by customers to Entertainers. *See, e.g.,* Ex. F, Dancer Performance Lease, ¶ 11.  The contract specifies that the *Club* is to establish the amounts of the Entertainment Fees in consultation with Entertainers. *Id*.  Plaintiffs here do not dispute, and in fact themselves allege, the fact that the Clubs set the price of the Entertainment Fees. *See, e.g.,* Dkt. 1, complaint, ¶'s 48, 56, 69-70.  This fact established entitlement to a wage setoff with respect to the Entertainment Fees in the unlikely event that the Entertainers are found to have been misclassified as other than employees.

    **A.**    **_The Clubs that Pay Entertainers Directly Would Clearly be Entitled to an Offset in the Unlikely Event of a Misclassification Ruling._**

All of the Clubs in California, and the Lansing, Michigan, Deja Vu Club, operate under what the Settlement Agreement refers to as the "Independent Contractor

Model." Under that structure, customers do not remit Entertainment Fees directly to the Entertainers. Rather, those mandatory charges are paid, by the customers, directly into designated collection boxes or into mechanical "bill acceptor" devices (not unlike a soft drink vending machine, where dollar bills can be inserted directly into a slot for collection). At the end of a performance date, the cash monies or scrip certificates – which are payment certificates that can be purchased by a customer by way of a credit card transaction – are collected by Club personnel (not by Entertainers); counted; and the Entertainer is then paid a percentage of those revenues specified in the dancer contracts (her "allocations" of those revenues). No tips (discretionary payments for stage performances and discretionary payments made by customers over and above the established Entertainment Fees) are paid into either the collection boxes or the bill acceptors. Those sums (the tips) are paid from customers directly to the Entertainers, and the Clubs that use the Independent Contractor Model take no portion of that tip income. The amount of revenues paid by these Clubs to the Entertainers are then reported from the Clubs to their bookkeeping service, which is Modern Bookkeeping, Inc., located in Durand, Michigan ("Modern"). Modern then remits to the Entertainers, as the bookkeeping service for these Clubs, IRS Forms 1099-MISC following the close of the tax year in amounts equivalent to the total of the Entertainment Fee allocations paid by the Clubs to the specific Entertainers. Ex. B, Krontz Decl., ¶'s 5-15.

The Objectors assert that these 1099 payments cannot be used to satisfy or offset any minimum wages found to be due and owing, and cite in support thereof *Hart v. Rick's Cabaret International, Inc.*, 967 F.Supp.2d 901 (S.D.N.Y. 2013). However, the operations of the club there had a fatal flaw that precluded the court there from permitting 1099 payments to be used to satisfy wage obligations. Rick's Cabaret kept records of, and issued 1099s *only* on, performance fees paid by *credit card* via the purchase of scrip (there, referred to as "Dance Dollars"), but did not, for some inexplicable reason, include the purchase of services by way of *cash*. *Id.* at 927-933.[17]

Here, *all* Entertainment Fees paid by customers in Clubs utilizing the Independent Contractor Model are collected by the Club; are recorded in the Club's computer records; and are included in the 1099's issued by the Clubs to the Entertainers. Ex. B, Krontz Decl., ¶ 5-15. *See also* SA, ¶ 2.25 (Class Counsel has investigated the operations of the Clubs using the Independent Contractor Model and find that they do not appear to suffer the problems noted by the court in *Rick's Cabaret*). In fact, in reaching its conclusion, the *Rick's Cabaret* court distinguished this Court's previous treatment of this issue in the Cin-Lan Action, which is discussed

---

[17] The additional concerns of the court in *Rick's Cabaret*, that the performance fees were not included in the business's gross receipts and were not paid to the Entertainers, are addressed in the subsection immediately below.

46

in greater detail in the subsection immediately below.  *See* 967 F.Supp.2d at 933 n.12. The 1099 payments here can certainly be used to satisfy any wages found to be owing.

In addition, the Hustler Club in New York (where Objector "B.D." performed) remits payments for scrip certificates *by check*.  Ex. D, Scavetta.Decl., ¶'s 1-13.  And unlike in *Rick's Cabaret*, this Club tracks *all* mandatory Entertainment Fees, regardless of whether they are paid in cash or by scrip. *Id.*, ¶ 8.

**B.**     **_The Defendants Will More-Than-Likely also be Entitled to a Wage Offset for Clubs using the Lease Model or the Joint Venture Model, in the Unlikely Event that the Entertainers are Found to Have Been Misclassified._**

The Objectors basically contend that a wage offset will not be permitted because the mandatory charges for entertainment are "tips" and not "service charges." They assert that this conclusion would be required because the Entertainment Fees do not come into the "gross receipts" of the business and because the fees were paid to the Entertainers not by the Clubs, but by the customers themselves.  Irrespective of the factual misunderstandings of the Objectors on these issues (discussed both above and below), this Court has already considered and addressed these issues.

In the Cin-Lan Action, the Plaintiff moved to dismiss the Defendants' amended counterclaims, which were based, in part, upon this setoff argument.  Defendant Cin-Lan, Inc., filed a response to that motion, which addressed the very issues raised by the Objectors. Cin-Lan Action, Dkt. 113 (Ex. Y).  As a result thereof, this Court issued an Opinion and Order Granting, In Part, Plaintiff's Motion to Dismiss

47

Amended Counterclaim, where it rejected the very argument raised by these Objectors (Cin-Lan Action, Dkt. 159, Ex. Z, pp 11-13) (court does not accept Doe's "legal argument about the necessity of the fees entering Cin-Lan's gross receipts[18]"). Moreover, as part of the final approval process in the Cin-Lan Action, Defendants filed a substantive memorandum, with voluminous supporting exhibits, addressing the "tip vs. service charge" issue. Cin-Lan Action, Dkt. 380, Ex. AA hereto. So as not to further burden this Court on this issue, Defendants rely upon the arguments and authorities contained in that memorandum, and provide only limited supplementation immediately below.

*This Court was not wrong in its previous ruling in the Cin-Lan Action.* That the Entertainment Fees are not tips under the FLSA, and do not have to come into a business's gross receipts in order to constitute service charges, is confirmed in a series of formal Opinion Letters issued by the DOL. And, Courts are to give substantial deference to an agency's interpretation of its own regulations.[19]

---

[18] In *Rick's Cabaret*, relied upon by the Objectors, the district court there, in denying a wage offset, distinguished the factual circumstances there from those as referenced by this Court in the Cin-Lan Action. "Cin-Lan is, further, factually distinguishable, in that the employer there kept records of the total number and price of dances performed, and the plaintiff dancer owed a percentage of her dance fees to the Club each night. *The same is not true here*." 967 F.Supp.2d at 933 n.12. For this additional reason, the Objectors' reliance upon *Rick's Cabaret* is misplaced.

[19] *See Oakland County Bd. of Comm'rs v. United States Dep't of Labor*, 853 F.2d 439, 442 (6th Cir. 1988) ("We will adopt the agency's interpretation of its own regulation unless it is plainly erroneous or inconsistent with the regulation"); *United States v.*

In FL'2005-31, 2005 WL 3308602 (DOL Wage-Hour) (Ex. BB), chauffeurs were to be paid a cash wage of $2.13 an hour (the federal tip-credited wage), in addition to a 15% "*imposed gratuity*" that would be added to every reservation and "*transferred through directly to the chauffeur*." "Customers would also be informed that they may provide an additional gratuity." *Id.* at p. 1 (emphasis added).

Most importantly for purposes here, the request for opinion specified: "This imposed gratuity would _not be included in the company's gross receipts_. The portion of this Opinion Letter that is most relevant to the arguments of the Objectors (that Entertainment Fees can't be service charges unless they first come into the Club's gross receipts) is as follows:

> *Although you state that you do not consider the imposed gratuity as part of the company's gross receipts*, because the imposed gratuity is *not optional for the customers*, amounts received from the imposed gratuity **do not meet the definition of a tip**.

*Id.* at p. 2 (emphasis added).

In that Opinion Letter, the DOL also observed the distinctions contained in 29 C.F.R. §531.52[20]; it referenced its own Field Operations Handbook §30d03 (Ex. CC),

_____

*Cinemark USA, Inc.,* 348 F.3d 569, 578 (6th Cir. 2003) ("When an agency is interpreting its own regulations, even greater deference is due to the agency's interpretation").

[20] 29 C.F.R. § 531.52 states: "General Characteristics of 'tips.' A tip is a sum presented by a customer as a gift of gratuity in recognition of some service performed for him. *It is to be distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters determined solely*

which explained that "a ***compulsory service charge is <u>not</u> considered a tip***"; and it ultimately then concluded that the "'***imposed gratuity' is not a tip under the FLSA***." (FLSA 2005-31, at page 2). *See also Hai Ming Lu v. Jing Fong Restaurant, Inc.*, 503 F. Supp .2d 706, 709-10 (S.D.N.Y. 2007) (where restaurant assessed a 15% "service charge" for banquet services at the time of payment for the banquet, of which 65% went directly to the wait staff and 35% was retained by the restaurant and accounted for in its gross receipts, the court determined that the 65% remitted to the wait staff was ***not a tip***).

This position is confirmed by another Opinion Letter [referenced in FLSA 2005-31], designated as WH-305, 1975 WL 40930 (DOL Wage-Hour) (Ex. DD). There, the Administrator stated that "if such services charges to customers are ***compulsory*** they are ***not tip income*** to the waiters, ***but <u>are</u> gross receipts to the employer.***" (Emphasis added). *See also* WH-386, 1976 WL 41739 (DOL Wage-Hour) (Ex. EE), at page 4 ("***It should also be noted that a <u>compulsory charge for service is not a tip</u>***") (emphasis added).

Consequently, whether mandatory fees come into the gross receipts of a business has been found by the DOL to be ***irrelevant*** to the question of whether those

---

***by the customer***, and generally he has the right to determine who shall be the recipient of his gratuity." (Emphasis added).  Under the Objectors' argument, there is never then an actual "charge…made for the service"; which is nothing short of an absurd position to take.

50

monies were service charges under the FLSA.  Rather, it is the ***mandatory nature*** of

those charges (which the Plaintiffs concede) that controls.  And, it should be noted

that such a conclusion under the FLSA directly correlates -- not coincidentally -- with

the requirements of the IRC discussed immediately below.

### C.   <u>The Most Recent Pronouncements of the IRS Confirm that the Dance Fees are Service Charges and are not Tip Income</u>.

In Rev. Ruling 2012-18 (Ex. FF), ***issued less than five years ago and not***

***addressed in any of the decisions cited by the Objectors***, the IRS as well clarified the

distinction between service charges and tip income, and more importantly the

distinction between what "is a tip or ***non-tip <u>wages</u>***." *Id*., p. 2.[21]  In noting that the

IRS would not merely defer to an *employer's* classification of a payment as a *tip* (*id*.),

the Service held:

---

[21] Where possible, terms used in interacting statutory schemes should be interpreted to mean the same thing so that the statutes work together harmoniously. *See, e.g., Commodity Futures Trading Commission v. Baragosh,* 278 F.3d 319, 328 (4th Cir. 2002) (quoting *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000), and stating that "courts 'strive to interpret [each] statute as a whole as a symmetrical and coherent regulatory scheme and [to] fit, if possible, all parts into a regulatory whole'") (other internal citation omitted)); *Murphy v. Penn. Higher Educ. Assistance Agency & Educ. Credit Manag. Corp.*, 282 F.3d 868, 872 (5th Cir. 2002) (courts "should attempt to give horizontal coherence to the United States Code and ensure that different statutes interact coherently and harmoniously") (citing *Pierce v. Underwood*, 487 U.S. 552, 561-563 (1988)).  Thus, tips and service charges are, and should be, interpreted to mean the *same thing under FLSA and the IRC* to avoid conflicting meanings and obligations of employers and employees.

The *absence of <u>any</u> of the following factors* **creates a doubt** as to whether a payment is *a tip* and indicates that the payment may be a **service charge**:

1) The payment must be **free from compulsion**;
2) The customer **must have the unrestricted right to determine the amount;**
3) **The payment should not be the subject of negotiation or dictated by the employer policy; and**
4) **Generally, the customer has the right to determine who receives the payment.**

*Id.*, p. 2 (emphasis added). Here, **each and every one** of these elements of a "*tip*" is missing. *See* Ex. B, Krontz Decl., ¶'s 5-16. *See also* Section V(G)(2), *infra* (under the Internal Revenue Code, mandatory charges to customers that are collected by employees **are** the property and gross receipts **of the employer**, and **not** of the employees).

### D.   <u>Other Authorities Not Previously cited to this Court Establish that the Mandatory Entertainment Fees are Not Tips</u>.

In addition to the authorities cited in Ex. AA, *see also State of Alaska v. Investors Unlimited, Inc.*, Case No. 3AN 92-37 (Alaska Supr. Ct. April 27, 1993) (Ex. GG) ("…genuine table dance revenues paid by patrons prior to performance of the dance, either in the amount mandated by the employer or in such higher amount as might be negotiated between the patron and the employee on the employer's behalf,

*are not tips within the meaning of Alaska's wage and hour laws*[22]....*" Id.* (emphasis added).

Similarly, the *Lady Godiva* case referenced above (Ex. S) *rejected* the club's argument that dance fee monies kept by dancers were *tips* because the amount to be paid for the dance was *determined by the club* (again, these Plaintiffs allege as such here), and not by the dancer. *Id.* at *10.

### E.   *Service Charges Can be Applied as a Full Wage Setoff*.

If the Entertainment Fees are service charges, and not tip income, they can be used as a wage setoff in the event that the dancers win their classification claim.

In *Matson v. 7455, Inc.,* 2000 WL 1132110 (D. Or. Jan. 14, 2000) (Ex. O), the court found that the definitions in 29 C.F.R. §§ 531.52 and 531.55 "make it abundantly clear that the fixed fees collected by the plaintiff in exchange for table dances are not 'tips,'" and observed that "[i]n addition to these fixed fees, it is true that the plaintiff received actual 'tips' from [the club's] patrons." *Id.* at *6 (clarification added). Obviously, the same circumstances apply here as well. The court then concluded that that even if the dancer was an employee (which the court

---

[22] Alaska law defines "tips" to mean "an amount of cash, or an amount designated as a 'tip' by a credit card customer on a credit card charge slip, that is determined, and freely given, by a customer in recognition of an employee's service to that customer; 'tips' does not include a compulsory charge for service that is part of the employer's gross receipts, such as a service charge of 15 percent of a customers' bill." 8 AAC 15.907(e)(2).

found was *not* the case), the dance fees could be used to satisfy any wages found to be due,[23] and because the dancer had kept more in dance fees than the applicable wage rate she would be entitled to nothing. *Id.* at *'s 5-6.

Similarly, in *Moody v. Razooly*, 2003 WL 464076 (Cal. App. Feb. 25, 2003) (Ex. HH), the California Court of Appeals noted that the jury hearing the case (of whether a dancer was an employee who had been denied wages) had reached the conclusion that the "special dance fees" were not tips. *Id.* at *7. Referencing this finding, the appellate court therefore held that the defendant employer was entitled to *credit those fees* against any minimum wages found to be due, and noted that a contrary result would amount to a "windfall" for the plaintiff. *Id.* It is, of course, such a windfall that these Plaintiffs seek here. *See also* Section V(H), *infra* (discussing the equitable counterclaims Defendants can raise).

Most recently, a district court in Illinois just this year granted summary judgement on behalf of an exotic dance establishment on wage claims made by two entertainers, by finding that the mandatory dance fees were in fact service charges, and that plaintiffs had made more in such fees than the applicable minimum wage. *Labriola v. Clinton Entertainment Management, LLC*, 2017 WL 1150989 (N.D. Ill.), at *'s 11-18 (Ex. II). The court noted that: "Plaintiffs do not dispute that the Club set fixed prices for dances. Plaintiffs also do not dispute that the dancers themselves

---

[23] *Accord, Ruffin v. Entertainment of the Eastern Panhandle*, 845 F.Supp.2d 762 (N.D. W.Va. 2011).

54

received a fixed portion of the fees for each dance, depending on the type of dance performed." *Id.* at * 11.  The court further observed that "the dance fees that customers paid were not tips. Plaintiffs' claim that dancers were paid only through tips *is demonstrably not true. ...It is now clear that Defendant's retaining portion of the dance fees was not confiscation of Plaintiffs' tips*." *Id.* at * 17.

### F.  *A Sampling of Data Demonstrates that Few Entertainers Would Not Have Made the Requisite Minimum Wage from the Service Charges they were Paid and/or Kept, in the Unlikely Event that They Would be Found to Have Been Misclassified.*

Similar to the circumstances in the *Labriola* case, even if the Entertainers (or some of them) were to be found to have been misclassified, summary judgment would be appropriate on their wage claims since few, if any of them, would be found to not have earned the applicable wage in mandatory Entertainment Fees.  Defendants present here three sources of data to demonstrate this.

First, is the income of some of the Objectors as set forth in Section I, *supra*.

Second, there is the income of the Jane Doe Plaintiff herself.  This is submitted under the Declaration of Karen Gay, attached hereto as Ex. QQ, and shows that on average she made in mandatory, non-discretionary, Entertainment Fees $26.57 per hour. *Id*. at ¶ 17; and Ex. 1 thereto.

Third, Defense Counsel requested a CPA who provides accounting services to the Clubs to conduct an investigation in regard to, among other things, current income generated by the Entertainers and the estimated financial benefit to the Class as a

result of the enhanced offers of employment set forth in the Settlement Agreement. That report is attached as Ex. 6 to S.Decl.  Based on a sampling of 18 of the 65 Clubs at issue in the Settlement, he determined that those Entertainers earn on average approximately $165 per day just in Entertainment Fees (referred to in the report as "Dance Revenues") (*id.* at p. 3), and that the Entertainers work on average 5.51 hours per day (*id.* at Table 1); equating to $29.95 per hour – *again, well in excess of any applicable minimum wage*.

Fourth, reports from three of the Independent Contractor Model clubs ("Cin-Lan" in Michigan and "SP Star" and "Cathay" in California") show even greater earnings.  *See* Exhibit SS, Declaration of Nicole Turnwald ("Turnwald.Decl").  These clubs issue 1099's to Entertainers as a matter of course.  *Id*. at ¶ 4.  In 2016, these clubs paid $1,164,215.97 to 144 entertainers; $1,429,486.00 to 352 entertainers, and $3,087,557.70 to 363 entertainers, respectively.  Entertainers at these clubs performed for a total of 45,352, 48,689, and 68,497 hours, respectively.  Ex. B, Krontz.Decl., Ex. 1 thereto.  This results in hourly Entertainment Fees of $25.67, $29.36, and $45.08 per hour – *far in excess of minimum wage*.

While these samplings of data do not establish that each and every Entertainer earned the applicable minimum wage each and every week or pay period, it does demonstrate the *significant probability* that in the unlikely event that the Entertainers were found to have been misclassified, *most of them* would be found to be owed

*absolutely nothing* by way of minimum wage. This demonstrates yet one more aspect as to why the Settlement is fair.

> **G.     *If the Entertainers are Later Found to have been Employees, the Entertainment Fees are Legally the Property of the Club and Will Have to be Returned by the Plaintiffs to the Clubs.***

Defendants are not just entitled to wage setoff if the Entertainers are found to have been employees. Both contractually and legally, if the dancers are found to have been the Club's employees, the Entertainers are obligated to return the retained Entertainment Fees to the Clubs.

The contracts at issue provide that if the relationship of the parties is determined to be one of employment, all Entertainment Fees would be the *property of the Club* and not of the dancer, and the Entertainer is to then remit back to the Club all such Entertainment Fees still held by her. *See, e.g.,* Ex. F, ¶ 12(B), (C)(i). These provisions are fully enforceable.

> **1.     The Ability to Contract For Possible Coverage Under the FLSA.**

In *Blackie v. State of Maine*, 75 F.3d 716 (1st Cir. 1996), the appellate court was confronted with the circumstance of a collective bargaining agreement concerning state probation officers which provided to them a special "premium" compensation payment of 16% above their basic salary. The agreement, however, contained the caveat that this premium payment would *not* be applicable if the plaintiffs' employment category was *found to be* "exempt from the Fair Labor Standards Act for

57

overtime compensation purposes. . . ." *Blackie*, 75 F.3d at 727.  A lawsuit was filed, and the probation officers were indeed found to be entitled to overtime compensation pursuant to the FLSA.  Consequently, the state denied the employees their 16% premium payment, and a number of the probation officers sued under the anti-retaliation provisions of the FLSA.  The district court entered summary judgment on behalf of the state, and this opinion was affirmed.

The *Blackie* court noted that the plaintiffs' contention there assumed "that the FLSA's ban on retaliating against an employee who engages in a protected activity is the functional equivalent of a straight-jacket which restrains an employer from responding on the basis of its business judgment to the *outcome* brought by the protected activity." *Blackie*, 75 F.3d at 723 (emphasis in original).  The First Circuit, correctly, rejected such an assumption.

> "The FLSA - like other anti-retaliation laws - does not immobilize employers in this manner.  An employer may reorganize its affairs and take other necessary employment actions *in order to manage the impact of compliance with the outcomes produced by a protected activity* so long as it does so for legitimate reasons and not in reprisal for the *fact* of an employee's participation. . . .A contrary rule would nullify the status quo and prevent an employer from complying with a court order in the manner that it deems most compatible of the lawful operation of its business.  Nothing in the FLSA even remotely suggests this grotesque result."

*Id.* (emphasis in original, citations omitted).

One such allowable "restructuring" is to modify compensation arrangements – even if it is to *reduce* compensation – in light of the requirement to comply with the

58

statutory requirements.[24]  As simply put by the First Circuit:  "The FLSA is neither a shield against legitimate employer actions *nor a statutory guaranty of undiluted compensation*, come what may."  *Blackie*, 75 F.3d, at 724 (emphasis added).

> Most telling, however, is the following comment:

> [A]pplying the anti-retaliation provisions as the appellants ask would bar the employer from enforcing a valid preagreed contractual provisions specifically negotiated to *guard against the very eventuality - a change in the parties' status* - that the appellants subsequently labored to achieve.  *That is not the law*.

*Blackie*, 75 F.3d at 724 (emphasis added).

Yet, as is discussed immediately below, these contractual provisions do nothing more *than what the law requires*.

## 2.    The Applicable Internal Revenue Code Provisions.

As a matter of simple Internal Revenue Code principles, charges for services rendered, even if paid by a customer directly to an employee, are the *property of the employing company* and *must*, as a matter of law, be included in the gross receipts of that business.  "Income a taxpayer receives for performing services for third parties as an employee or agent of an employer *is included in the income of the <u>employer</u>, not the income of the employee*."  *See* previous CCH Tax Reference Summary (Indiv:

---

[24] *See, e.g., York v. City of Wichita Falls*, 48 F.3d 919, 920-21 (5th Cir. 1995) (finding no retaliation under the FLSA when a city restructured compensation arrangements "within existing budgetary constraints" in order to comply with recent Supreme Court precedent extending FLSA protections to governmental employees); *Adams v. City of McMinnville*, 890 F.2d 836, 839 (6th Cir. 1989) (similar).

27,204) (Ex. JJ) (emphasis added), and authorities cited therein.  *See also* previous CCH Tax Reference Summary (Indiv: 27,052) (similar) (Ex. KK); and Rev. Rulings 65-282, 58-220, and 58-515 (collectively Ex. LL). ***This is NOT a disputable statement of the applicable law.***  Hence, if the Plaintiffs are recharacterized as they seem to desire in this suit, then the Entertainment Fees belong to the Clubs *as a matter of law*. [25]

### 3.    This Court's Previous Ruling on the Contractual Recharacterization issue.

In the previous Cin-Lan Action, this Court addressed the validity of the claims set forth above.  First, the defendants had asserted a breach of contract counterclaim based upon the language set forth in the Dancer Performance Lease requiring the plaintiff to return the Entertainment Fees retained by her.  This Court found that "Cin-Lan has stated a valid breach of contract claim and will not dismiss the count for failure to state a claim."  Ex. Z (Dkt. 159 of the Cin-Lan Action, pp. 5-6).  *See also id*., p. 8-9 ("Cin-Lan has alleged sufficient facts to support it [sic] claim of breach of contract and related argument for severance").  Second, most importantly, this Court concluded that the "recharchterization" provisions of the dancer contract at issue there (equivalent to the language cited above) "do not appear on their face to violate the FLSA or the MMWL [Michigan Minimum Wage Law].  Accordingly, Cin-Lan has

---

[25]   *See also* WH-305, 1975 WL 40930 (DOL Wage-Hour) (Ex. DD) cited above ("if such services charges to customers are *compulsory* they are *not tip income* to the waiters, *but are gross receipts to the employer*")  (emphasis added).

alleged sufficient facts to demonstrate a plausible claim for relief based on the Lease in the event Doe succeeds in the main action." *Id.*, p. 9 (clarification added). Third, this Court noted that Doe had missed the point on the claim of whether the Entertainment Fees went into the gross receipts of the business. The Court, correctly, concluded that such a factor was irrelevant to a claim not based on setoff, but, rather, to a claim that *mandatory* charges for entertainment should be returned to the business in the event of a finding of employment. *Id.*, pp. 11-13.

As simply stated by this Court: "To recover on the claims, Cin-Lan ultimately must establish the dance fees are *mandatory service charges*, not tips." *Id.*, p. 14. (Emphasis added). And as set forth, *supra*, the parties simply do not dispute that the Entertainment Fees are, in fact, *mandatory* charges for services. Consequently, for purposes here of determining whether the Settlement is fair, it must be kept in mind that for the *numerous* reasons set forth above, it is more-than-likely that even if the Entertainers are found to have been misclassified, they will *either* be entitled to no wages whatsoever (if an offset is permitted), or they may *even owe the Clubs far more money than they will ever be entitled to by way of minimum wage*. The Settlement is fair.

> **H.**    **_Equitable Counterclaims Also Demonstrate the Probability That the Entertainers Would be Entitled to No Remuneration Even if a Finding of Misclassification is Entered; Further Demonstrating the Fairness of the Settlement._**

In the event that the Court does not approve the Settlement and the Defendants are therefore required to defend this litigation, the Defendants would, as they did in the Cin-Lan Action, raise numerous and various equitable counterclaims which are indeed permissible in FLSA and other wage actions.[26] Again, this Court addressed the viability of such counterclaims in its order denying the motion to dismiss such

---

[26] *See e.g., Cotton v. Weyerhaeuser Timber Co.*, 147 P.2d 299, 312-13 (Wash. 1944) (plaintiff-employee had failed over a lengthy period of time to raise objection to his employer either of his salary checks or of statements provided by the employer regarding the plaintiff's compensable time worked and rate of pay and, in the eyes of the court, "thus, in effect, represented to the [employer] that the statements and checks were accurate and satisfactory, and that he had not worked overtime," and as a result equitably barred his claim); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 475 F. Supp. 630, 632-34 (D. Ore. 1979) (an FLSA suit), *aff'd*, 646 F.2d 413 (9th Cir. 1981), *citing United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir. 1970) (in denying an employee a claim for unpaid overtime compensation because of the individual's failure to report such alleged overtime accurately on his time sheets during the claimed period, the court noted that "the doctrine of equitable estoppel, as applied by the Ninth Circuit Court of Appeals, 'is a rule of justice which, in its proper field, prevails over all other rules'"); *Shoop v. Sycamore Preserve Works Corp.*, 88 F. Supp. 845, 847-48 (M.D. Ill. 1949) (FLSA claim barred on ground of estoppel when plaintiff made no demand for overtime compensation and "never at any time classified or represented himself as a person employed in any capacity which would make him come under the Act"); *Mortenson v. Western Light & Tele. Co.*, 42 F. Supp. 319, 322 (S.D. Iowa 1941); *Wirtz v. Harrigill*, 214 F. Supp. 813, 815 (S.D. Miss. 1963), *aff'd*, 328 F.2d 903 (5th Cir. 1964); *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1327 (5th Cir. 1972) (FLSA claim denied on the basis of estoppel for the reason that the employer intentionally under-reported her hours of work); *Gale v. Fruehauf Trailer Co.*, 145 P.2d 125 (Kan. 1944); *Burry v. National Trailer Convoy, Inc.*, 239 F. Supp. 85, 88-89 (E.D. Tenn. 1963) (fraud can preclude an FLSA claim). *See also, Marsh v. Minneapolis Herald, Inc.*, 134 N.W.2d 18, 21-23 (Minn. 1965) (in an FLSA action, the court noted that if an employee breaches his or her duty of honesty and faithfulness to his or her employer, which causes a loss to the employer and "goes to the very root of the subject-matter" of the employment contract, "a forfeiture of compensation may result").

counterclaims in the Cin-Lan Action, and concluded that the equitable counterclaim of unjust enrichment was valid as pled (Ex. Z, pp. 13-14). The viability of such a counterclaim here, which could bar any claim for minimum wages in light of the fact the Entertainers have retained Entertainment Fees, further demonstrates the fairness of this Settlement.

## VI.   THE OBJECTORS IGNORE THE SUBSTANTIAL VALUE TO THE CLASS OF THE CHANGE IN BUSINESS PRACTICES OF THE CLUBS IN REGARD TO THE ENTERTAINERS.

The Settlement provides, through 14 detailed pages in Article VIII thereof, novel structural relief that specifically addresses the worker misclassification issue that is vexing courts throughout the country. SA, pp. 60-73.

Broadly, this structural relief provides, *inter alia*: A) legal protections to ensure that Entertainers who desire to work as employees of the Clubs are permitted to do so without undue influence, coercion, retaliation or retribution (*id.*, §§ 8.5-8.6, 8.14-8.15); B) *enhanced offers of employment* to *entice* Entertainers to select to work as employees, where the Entertainers are afforded monetary compensation *above* what the law requires (*id.*, § 8.20); C) an elaborate "assessment" process using *objective* criteria noted in the case law in order to determine whether  Entertainers can, under legally appropriate but objective standards (thereby providing the type of clarity to this topic as suggested by Judge Easterbrook),  perform as IPE's instead of employees, and where if they do not satisfy those criteria they will only be permitted to work as

63

employees and cannot entertain as IPE's (*id.*, §§ 8.7-8.17); D)  the right of
Entertainers to change from IPE's to employees at their choice in the future (*id.*, §
8.18-8.19); and E) legal protections for Entertainers who decide to perform, or decide
to continue to perform, as IPE's.

Article VIII of the Settlement represents a negotiated and groundbreaking
approach to satisfy the varied desires and interests of Class Members, while at the
same time significantly reducing the prospect of further litigation on the
misclassification issue in the future.  The Objector attorneys can cite to no other case
in which *they* have been involved that has taken such an innovative approach to the
misclassification quagmire.  They have a pecuniary financial interest in perpetuating
this litigation machine; this Court, however, should have a primary interest in
reducing the need for future lawsuits.  This Settlement does just that.  And, these
critical and novel structural relief provisions certainly add value for the Class
Members.

First, is the value to Entertainers who switch, or are involuntarily switched
under the Assessment, to be employees.  Using data collected from a representative
sample of 18 of the Clubs that are participants in this Settlement, and predicated upon
conversations and information provided by Entertainers, past Entertainers, and  key
members of management, one of the CPA's for the Clubs, David Shindel, has
prepared a very detailed report discussing current income earned by the Entertainers

and what their estimated income would be as employees under the terms of the enhanced offers of employment provided for in Article VIII of the Settlement Agreement.  This estimate is that employee-Entertainers will earn, on average, an *additional $173.00 per shift*.  Ex. 6 to S.Decl., p. 3, and Tables 1, 2, 3, 4, and 5.

Second, there is the value to the Class, and the costs to the Defendants, of Entertainers converting, or being required to convert, to employees under the terms of the Settlement. CPA Shindel estimates this to be $3,415,808.00 *per year*.  Ex. 6 to S.Decl., at p. 2, and Tables 1,2,3,4 and 5.

Third, there is the value to those Entertainers who desire to remain as IPE's and who can do so under the Assessment.  This is discussed immediately below.

## VII.   THE OBJECTIONS FAIL TO ADDRESS IN THE LEAST THE VERY REAL FACT THAT MANY OF THE ENTERTAINERS SIMPLY DO NOT DESIRE TO BE EMPLOYEES, AND THAT THEY ARE NOT LEGALLY OBLIGATED TO BE TREATED AS SUCH.

The simple but real fact here is that many Entertainers just do not desire to be employees of the Defendants' establishments.  This is discussed in detail in the Settlement Agreement. *See* SA, §'s 2.18 - 2.20, 2.22 (extensive investigation by Class Counsel establishes this, as does the circumstance of the Spearmint Rhino Settlement where Entertainers, who were required under the terms of a national class action settlement to convert into employees, left those establishments in such large numbers in order to be able to perform elsewhere as independent entertainers, that those clubs

65

were required to reverse course and to once again permit the dancers to be able to perform as non-employees).

For such Class Members, the settlement is not about money. Rather, they desire to obtain legally binding redress (provided for by way of the structural relief afforded in the Settlement Agreement) to *preserve and protect* their independent status. They assert claims <u>*not because they want to be employees*</u>, but because they nevertheless believe that the Clubs have in some regards invaded and/or violated their IPE status. And there are certainly valid and indeed compelling reasons for women who earn a living in a lawful yet sexually charged environment to want to be free from control by others over the details of their actions.

The Settlement provides a variety of structural relief over the Defendants to ensure that they are in fact treated as IPE's as opposed to employees, as well as providing rights for the IPE's to have input into those Club operational matters that can have a direct impact upon the income that they are able to generate.

These provisions include, but are not limited to, limitations on the control that the Clubs can exercise over the Entertainers; freedom of scheduling; *a prohibition on any mandatory tip outs to any Club employees*;[27] freedom of costumes; the ability to create an Entertainer committee in order to communicate to club management on

---

[27] *Cf.* Ex. I, Liss-Riordan's declaration in support of her proposed Uber settlement, ¶ 97 ("I believe the portion of the settlement regarding Uber's tipping policy will have *a substantial and real effect on driver's livelihoods*") (emphasis added.)

behalf of all IPE's; and, probably most importantly, the ability to vote on a variety of matters concerning club operations, such as the prices to be charged for personal entertainment performances, the way stage performances are structured and allocated among the entertainers, and Club advertising. SA, § 8.23.

Defendants have not attempted to place a specific monetary value on these aspects of the Settlement, but they are certainly significant. And, the significance of these provisions is demonstrated by the fact that these provisions affording protections to IPE's involve issues that are usually raised by Entertainers who sue clubs for wages by contending that the lack of dancer control or input over such matters are factors that render them to be employees.

The structural relief set forth in the Settlement provides broad legal protections for Entertainers who desire to perform, or desire to continue to perform, as bona fide IPE's. *Yet, none of the Objectors place <u>any</u> value on these critical aspects of the Settlement.*

### VIII. <u>AN "APPLES-TO-APPLES" COMPARISON BETWEEN THE PREVIOUS CIN-LAN SETTLEMENT APPROVED BY THIS COURT AND THIS PROPOSED SETTLEMENT DEMONSTRATES ITS FAIRNESS.</u>

Over numerous objections, this Court granted final approval to the settlement reached in the Cin-Lan Action. Ex. MM (Order); and Ex. NN (Release and Settlement Agreement). That settlement, which did *not* include any of the detailed and elaborate changes to the Clubs' business practices discussed above, had a gross

67

settlement amount of $11,300,000.00 (*id.*, at § 5.1); a cash pool of up to a maximum of $2,000,000 (*id.*, at § 5.2.1), which was reduced by "Direct Attorney Fees" in the amount of $666,666.00 (*id.*, at § 6.2), for a maximum cash pool distribution to the Entertainers then of $1,333,334.00; a Rent Credit Pool of $9,000,000.00 (*id.*, at §5.2.2); and "Indirect Attorney Fees" in the amount of $2,834,000.00 from the Rent Credit Pool (*id.*, § 5.6.5).

In order to make a direct comparison between this Settlement and the settlement in the Cin-Lan Action, however, it is, of course, necessary to add in the consideration being paid by way the SFBSC Management Settlement. That is because the clubs involved in the SFBSC Management Settlement are all members of the Deja Vu Group, and were, in fact, clubs that were included in the settlement of the Cin-Lan Action. S.Decl. ¶ 28.

The Gross Monetary Settlement Value of this Settlement is $6,550,000.00. SA, § 5.1. There is a Net Cash Payment Settlement Fund of $1,000,000.00, which is also used to pay the Enhancement Payments ($30,000.00) and Defendants' portion of the Administrative Costs ($50,000.00). *Id.* The Secondary Pool Remuneration, comprising of Dance Fee Payments and Rent Credits, is $4,500,000.00. *Id.*, § 5.2.2. Defendants are also to pay $100,000.00 for California PAGA Claims. *Id.*, § 5.2.4. And, they are to pay $900,000.00 in Direct Attorneys' Fees, and Class Counsel may

also obtain an additional $300,000.00 in Indirect Attorneys' Fees out of the Secondary Pool Remuneration. *Id.*, § 5.2.5.

The SFBSC Management Settlement agreement (Ex. OO) provides for a First Tier Cash Pool of $2,000,000.00, which is to be used for cash compensation to the Settlement Class Members who elect to receive a cash payment, then for attorney's fees and expenses and the enhancement payments, and for the PAGA Payments, and for administrative costs. If the sum of those claims and payments exceeds $2,000,000.00, the Defendants are to fund a Second Tier Cash Pool of up to $1,000,000.00 to cover the sum of the valid claims for cash payment, the attorney's fees and expenses, the enhancement payments, the PAGA Payment, and administrative costs. *See* SFBSC Management Preliminary Approval Order, Ex. E, at p. 4. Gross Settlement Value of the SFBSC Management Settlement is $5,000,000.00 (*id.*), and there is a Dance Fee Pool of $1,000,000.00. *Id.*, at p. 6.

Consequently, the Defendants present the chart below for comparison between the Cin-Lan Action settlement and this Settlement in combination with SFBSC Management Settlement:

| Descriptions | Original Cin-Lan Action settlement | Totals of this Settlement and the SFBSC Management Settlement |
|---|---|---|
| **Gross Monetary** | $11,300,000 | $10,500,000[28] |

---

[28] This is allocating no value whatsoever to the changes of business practices set forth either in this Settlement or the SFBSC Management Settlement.

| Settlement Value | | |
|---|---|---|
| Net Cash Available for Entertainers (not including PAGA payments) | $1,333,333.00[29] | $2,449,000.00 |
| PAGA Payments | $0 | $200,000.00 |
| Rent Credits/Dance Fee Payments | $9,000,000.00 | $5,500,000.00 |
| Value to Changes of Business Practices | $0 | $4,415,808.00[30] |
| Total Monetary Value Plus Value of Business Practice Changes | $10,333,334.00 | $12,564,808.00.00 |

The fact that the total value of the current "Deja Vu Settlements" (this Settlement together with that of the SFBSC Management Settlement) is significantly greater than the amount previously approved by this Court, over objections, for the Cin-Lan Action settlement further demonstrates the fairness of this Settlement. And, of course, Entertainers who performed in the Clubs here and in the establishments that are subject to the SFBSC Management Settlement *CAN OBTAIN MONETARY*

---

[29] This is determined by taking the maximum cash pool of $2,000,000, and subtracting the Direct Attorneys' Fees of $666,666.00.

[30] As stated above, the District Court in the Northern District of California noted that value of the business practice changes there were estimated to be at least $1,000,000.00. This is added to the direct financial costs to the Defendants as a result of Entertainers reclassifying, or being required to be reclassified, to be employees pursuant to the terms of this Settlement, which Shindel estimates to be approximately $3,415,808.00. *See* Ex. 6 to S.Decl., at p. 2 and Tables 1,2,3,4, and 5. These costs are *per year*, but are only counted here *once* to ensure that the estimate of the total value of these settlements are *extremely conservative*.

***REMUNERATION FROM <u>BOTH</u> SETTLEMENTS***.

Finally, the proposed Release and Settlement Agreement in the Cin-Lan Action (Ex. NN) was mailed, pursuant to the Class Action Fairness Act, to various federal and state officials (*see* Notice of Proposed Settlement Pursuant to 28 U.S.C. § 1715(b) attached at Ex. X), and no one objected.  The same applies to the CAFA notices that were sent here. (*See* Ex. PP)).

## IX.    THERE IS NO REASON CALIFORNIA CLAIMS SHOULD BE DISTRIBUTED A HIGHER CASH PAYMENT.

Objectors Cabrera and Halverson contend the settlement could be disapproved for not adjusting the Cash Payments due to differences in state law, especially California.  Essentially, The Objectors contend that the Global Settlement is unfair by attempting to compare it to the settlement in the matter of the *San Francisco Deja Vu Case*.  The objectors complain that the 4,500 class members in the *San Francisco Deja Vu Case* have access to a $2 Million Dollar cash pool compared to the 28,000 class members in this Global Settlement who "only" have access to a $1 Million Dollar cash pool.  The short answer is that technically, yes, the San Francisco Déjà vu Case settlement provides twice as much money in the cash pool for far fewer class members.  However, there are innumerable legitimate reasons for this "disparity".

First, the Complaint in the San Francisco Déjà vu Case included claims under the San Francisco Administrative Code, which contains substantially increased wage

and hour protections for San Francisco employees, including the highest minimum wage in the Country, along with paid sick and maternity leave and commuting stipends. *See* Exhibits UU and VV. Consider this telling example: San Francisco's minimum wage at the time of its settlement was $13.00/hour, compared, for example, to Michigan's minimum wage for tipped employees, which was $2.13 at the time of its settlement. Noting that San Francisco's minimum wage is more than QUADRUPLE that applicable to the vast majority of the Global Settlement Participating Nightclubs makes it clear why the San Francisco Déjà vu case provided for DOUBLE the cash available in the Global Settlement.

And, there are other reasons the San Francisco Déjà vu Case was settled at higher numbers than the Global Settlement. The San Francisco Ordinance not only made the San Francisco class members' potential wage claims exponential higher than the Global Settlement class, it created litigation risks far in excess of those faced by the Global Settlement participants. For example, the Ordinance contained substantial penalties if wage and hour violations were proven, penalties no club participating in the Global Settlement faced. Exhibit UU at § 12R.16-17. But even more importantly, the San Francisco Ordinance provided for non-monetary penalties, including the loss of the San Francisco's clubs "registration certificates, permits and licenses". *Id*. at § 12R2(c)(2). The risk of the loss of their adult entertainment permits was simply a risk the San Francisco clubs found to require a higher settlement payout,

given that it had the potential to smash them straight out of business.

There are even more reasons the San Francisco Déjà vu case was settled for higher numbers than that of the Global Settlement. The San Francisco clubs had their Arbitration and Class Action Waiver Agreements ruled unenforceable. This ruling, standing alone, was a major driver of their settlement talks. In fact, the ruling was on appeal to the 9th Circuit, and it was the 9th Circuit's own mediator who oversaw the settlement negotiations for the San Francisco Déjà vu Case Settlement. NONE of the Global Settlement Participating Nightclubs have had their Arbitration Agreements found unenforceable, and on information and belief, its viability was a key incentive for the Plaintiffs to enter in to the subject Global Settlement.

In sum, the disparity between what the San Francisco Settlement provides and what the Global Settlement provides was caused by economic realities, not "unfairness."

Dated: June 2nd, 2017                          Respectfully submitted,

                                               __/s/  Bradley J. Shafer_____
                                               **Bradley J. Shafer (P36604)**
                                               **Matthew J. Hoffer (P70495)**
                                               **Shafer & Associates, P.C.**
                                               3800 Capital City Blvd., Suite 2
                                               Lansing, Michigan, 48906
                                               517-886-6560 – Telephone
                                               517-886-6560 – Facsimile
                                               Brad@BradShaferLaw.com
                                               Matt@BradShaferLaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 2nd day of June, 2017, I filed the foregoing document with the Clerk of the Court for the Eastern District of Michigan via the Court's CM/ECF system, thereby causing service by operation of the CM/ECF system upon all counsel of record.

*s/ Matthew J. Hoffer*

**SHAFER & ASSOCIATES, P.C.**
