ATTACHMENT 8(c)

Hon. Michael D. Marcus (Ret.)
ADR SERVICES, INC.
1900 Avenue of the Stars, Suite 250
Los Angeles, California 90067
Phone: (310) 201-0010
Fax: (310) 201-0016

## IN THE MATTER OF THE ARBITRATION BETWEEN

| | |
|---|---|
| Y.E.          , an individual, ) | ADRS Case No. 15-6878-MDM |
|                            ) | |
|            Claimant,     ) | |
|                v.        ) | **BINDING ARBITRATION AWARD** |
| UBER TECHNOLOGIES, INC., a Delaware ) | |
| Corporation; RASIER, LLC, a Delaware ) | |
| Limited Liability Company, and RAISIER- ) | |
| CA, LLC, a Delaware Limited Liability ) | |
| Company,                       ) | |
|           Respondents.   ) | |
|                        ) | |

## I.   INTRODUCTION

Claimant ▮▮▮▮▮▮▮▮▮▮ claims that he was an employee of Uber

Technologies, Inc. (Uber) and Rasier, LLC (Rasier) and, as such, is entitled to the protections

and benefits afforded employees in California. In turn, Uber contends that ▮▮▮▮ was an

independent contractor and not an employee. Rasier contends that it never had a relationship of

any kind with ▮▮▮. It is found that ▮▮▮▮, as a driver for Uber, was an independent

contractor. Also, the claim against Raisier is dismissed with prejudice for an absence of proof.

1

EXHIBIT L
Page 1

## II. THE ARBITRATION PROCEEDING APPEARANCES

This binding arbitration took place on July 6, 7 and 8, 2016 at ADR Services, Inc., 1900 Avenue of the Stars, Suite 250, Los Angeles, California 90067. Additional briefing and written argument by the parties followed that hearing. Appearing for ▮▮▮▮▮ were Brian Gudmundson, Esq. of Zimmerman Reed in Minneapolis, Minnesota and Caleb L. Marker, Esq. and Hannah Belknap, Esq. of Zimmerman Reed in Manhattan Beach, California. Uber and Rasier were represented by Keith A. Jacoby, Esq. and Andrew M. Spurchise, Esq. of Littler Mendelson, P.C. and Sophia Behnia, Esq. and Dalene Bramer, Esq. of Uber.

## III. THE FACTS

Ordinarily, the facts in an arbitration award are established before the applicable law is discussed and then applied to those facts. That order is not followed here because it is clear that the applicable law as to the issues at hand is conclusively set forth in *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341, which established a series of factors to be followed in deciding whether an individual is or is not an employee of a business. Accordingly, it is preferable to first discuss *Borello* (and *Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522 to the extent it supplements *Borello*) and then apply the admitted facts to the *Borello* standards in arriving at a decision in this matter. (Claimant's counsel submitted additional authority on November 2, 2016, consisting of an October 7, 2016 court's memorandum concerning a judgment on the pleadings in a Pennsylvania federal district court matter and an October 28, 2016 United Kingdom decision. Both cases involved Uber. Uber has objected to this submission. Neither matter is considered because the parties herein rested on July 8, 2016, subject to written argument which was limited to an analysis of the facts as they applied to the *Borello* standards. The last date for submission of that argument was August 31, 2016. Besides, the Pennsylvania and United Kingdom actions are clearly distinguishable: The Pennsylvania action involves the defendants' motion for judgment on the pleadings, which was

2

EXHIBIT L
Page 2

1  both granted and denied. A judgment on the pleadings does not involve live testimony; rather,
2  according to the legal principles summarized in the memorandum, the court in that type of
3  proceeding considers only the allegations in the complaint, attached exhibits, matters of public
4  record and undisputable authentic documents. Thus, it is very much like a demurrer to a
5  complaint. The United Kingdom matter involved an employment tribunal, which heard live
6  testimony and argument. This Arbitrator did not review those submitted facts. The applicable
7  law in that forum were English statutes or regulations apparently governing what are or are not
8  "workers." The legal principles or law relied upon by the tribunal in interpreting those statutes or
9  regulations was British. Thus, while what a British jurist decides regarding the legal relationship
10 between Uber and its drivers may be of interest, it has no precedential value on this arbitration.)

**IV.  *S. G. BORELLO & SONS, INC. v. DEPARTMENT OF INDUSTRIAL RELATIONS*
(1989) 48 CAL.3d 341 and *AYALA v. ANTELOPE VALLEY NEWSPAPERS,
INC.* (2014) 59 CAL.4TH 522**

*Borello* recognizes the continued vitality of the control test in looking at the employer-employee relationship but acknowledges that other indicia are needed to evaluate that relationship.

Following common law tradition, California decisions applying such statutes uniformly declare that '[t]he principal test of an employment relationship is whether the person to whom service is rendered has the right to control the manner and means of accomplishing the result desired. . . .' ¶ However, the courts have long recognized that the 'control' test, applied rigidly and in isolation, is often of little use in evaluating the infinite variety of service arrangements. While conceding that the right to control work details is the 'most important' or 'most significant' consideration, the authorities also endorse several 'secondary' indicia of the nature of a service relationship.

3

EXHIBIT L
Page 3

(*Id.* at p. 350.)

Along with "the right to discharge at will, without cause" which is "[strong] evidence in support of an employment relationship," *Borello* provides eight additional factors from the Second and Third Restatements of Agency for determining whether an individual is or is not an employee. They are:

(a) whether the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee.

(*Id.* at pp. 350-351.) These factors "cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." (*Id.* at p. 351.)

*Borello* notes that other jurisdictions have developed their own standards to determine the independent relationship.

We also note the six-factor test developed by other jurisdictions which determine independent contractorship in light of the remedial purposes of the legislation. Besides the 'right to control the work,' the factors include (1) the alleged employee's opportunity for profit or loss depending on his managerial skill; (2) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (3) whether the service rendered requires a special skill; (4) the degree of permanence of the working

4

EXHIBIT L
Page 4

1  relationship; and (5) whether the service rendered is an integral part of the alleged

2  employer's business.

3  (*Id.* at pp. 354-355.) Despite the obvious similarity of "the other jurisdiction" standards to many

4  of its own, *Borello* finds that all of the guidelines "are logically pertinent to the inherently

5  difficult determination whether a provider of service is an employee or an excluded independent

6  contractor for purposes of workers' compensation law." (*Id.* at p. 355.)

7      Although *Ayala* is significant principally for reversing a trial court's rejection of class

8  certification in a wage and hour case concerning newspaper deliverers and not because of

9  differences in the paper's right to exercise control, but on variations in how that right was exercised,

10  its discussion of the tests for determining the employment relationship are still useful. Like *Borello*,

11  it first recognized that "'[t]he principal test of an employment relationship is whether the person to

12  whom service is rendered has the right to (necessarily) control the manner and means of

13  accomplishing the result desired … .'" (*Id.* at p. 531.) To that standard, *Ayala* added, "'[T]he fact

14  that a certain amount of freedom of action is inherent in the nature of the work does not change the

15  character of the employment where the employer has general supervision and control over it.'"

16  (Authorities.) Perhaps the strongest evidence of the right to control is whether the hirer

17  can discharge the worker without cause, because "[t]he power of the principal to terminate the

18  services of the agent gives him the means of controlling the agent's activities.'" (Authorities.)."

19  (*Ibid.*) *Ayala* then acknowledges *Borello*'s eight other "secondary indicia." (*Id.* at p. 532.)

20
21      Unlike *Borello's* observation that the several factors "cannot be applied mechanically as

22  separate tests; they are intertwined and their weight depends often on particular combinations,"

23  *Ayala* provides greater guidance in how to apply the various standards to the case at hand.

24      When the issue of common law employment is involved, that weighing must be

25  conducted with an eye to the reality that the considerations in the multifactor test are not of

26  uniform significance. Some, such as the hirer's right to fire at will and the basic level of skill

27  called for by the job, are often of inordinate importance. (Authority.) Others, such as the

28  "ownership of the instrumentalities and tools" of the job, may be of "only evidential value,"

29

EXHIBIT L
Page 5

relevant to support an inference that the hiree is, or is not, subject to the hirer's direction and control. (Authorities.)

(*Id.* at p. 539.)

## V.  APPLYING *BORELLO* AND *AYALA* TO THE INSTANT FACTS

### A.  The Control Test

#### 1.  ███████'s "contractual relationship" with Uber

Some of the facts concerning the right to control, or the lack thereof, may be reflected in a written agreement between ███████ and Uber. Other facts, that are part of or related to the "driving experience," are discussed after that agreement.

The first agreement relating to ███████ that could be found was for April 3, 2015. (Exhibit 203; "Agreement".) ███████ is uncertain that the April 3, 2015 Agreement is the first one that may apply to him. (For example, see exhibit 201, a June 21, 2014 Uber software license and online services agreement, and exhibit 202, a June 21, 2014 Uber driver addendum related to Uber services.) Regardless, for the purposes of this hearing, the operative agreement is the April 3, 2015 writing. (In the absence of documented evidence, Uber accepts July 30, 2013 as the date on which ███████ began his relationship with Uber. [See exhibit 209].)

The Agreement states, as to the "relationship of the parties," that "Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contractors. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber and any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any

6

EXHIBIT L
Page 6

1 Driver." (Par. 13.1.) Another part of the Agreement also discusses the absence of control
2 between Uber and its drivers:

> 4 Customer acknowledges and agrees that Uber's provision to Customer of the Driver
> 5 App and the Uber Services creates a direct business relationship between Uber and
> 6 Customer. Uber does not, and shall not be deemed to, direct or control Customer or its
> 7 Drivers generally or in their performance under this Agreement specifically, including in
> 8 connection with the operation of Customers business, the provision of Transportation
> 9 Services, the acts or omissions of Drivers, or the operation and maintenance of any
> 10 Vehicles. Customer and its Drivers retain the sole right to determine when and for how
> 11 long each of them will utilize the Driver App or the Uber Services. ("Driver app" is
> 12 defined as "Uber's mobile application that enables transportation providers to access the
> 13 Uber Services for the purpose of seeking, receiving and fulfilling on-demand requests for
> 14 transportation services by Users …"; "User" is defined as "an end user authorized by
> 15 Uber to use Uber's mobile application for the purpose of obtaining Transportation
> 16 Services offered by Uber's transportation provider customers.")

17 (Par. 2.4.) The above language, by itself, is not sufficient to identify ▮▮▮▮▮'s status with Uber
18 because "The label placed by the parties on their relationship is not dispositive." (*Borello*, *supra*,
19 at p. 349.) It may however, with respect to all of the other factors, have value in determining
20 the nature of that relationship.

22     The Agreement describes Uber's drivers as "customers" or "transportation service providers."
23 "Driver" is defined, in part, as a "principal, employee or contractor of Customer." (While the
24 Agreement does not include the term "livery partner," it would appear that that term, as used by
25 Brad Rosenthal, the Risk Manager for Uber Tech, Inc., who helps manage Uber's operations and
26 logistics, and was Uber's only witness, is one and the same as a "customer." Thus, a customer, or
27 livery partner, may employ individuals who drive for Uber. Individuals, who do not have an
28 association with a livery partner, may also drive for Uber. (See par. 2.4 of the Agreement.)

29

EXHIBIT L
Page 7

The Agreement also refers to the relationship of livery partners or customers and users. "Customer acknowledges and agrees that Customer's provision of Transportation Services to Users creates a direct business relationship between Customer and the User. Uber is not responsible or liable for the actions or inactions of a User in relation to the activities of a Customer, a Driver or any Vehicle." (Par. 2.3.)

At the end of the Agreement, the following language appears: "By clicking 'I accept,' Customer expressly acknowledges that Customer has read, understood and taken steps to thoughtfully consider the consequences of this Agreement, that Customer agrees to be bound by the terms and conditions of the Agreement and that Customer is legally competent to enter into this Agreement wit Uber."

The Agreement was sent electronically to ▮▮▮▮ who clicked on the "I accept" button without reading the agreement. He explained that he accepted the terms because he wanted to work and did not read the agreement because, "they were long and they gave it to us on an IPhone 4 and I'm not going to read a contract within a few minutes of needing to go to work. So, if they would have sent it to me in the mail and I would have had it in my hand, I would have taken it to somebody to go over it, and then I would decide if I want to sign it or not. … I just wasn't going to read legal contracts on this small phone."

▮▮▮▮'s explanations for not reading the Agreement are insufficient for its invalidation. The fact that he could not work for Uber without agreeing to its terms does not make the Agreement unconscionable or unenforceable in the absence of evidence that it was "overreaching". (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1816 ["generally . . . one who assents to a contract cannot avoid its terms on the ground he failed to read it before signing it."]; *Bruni v. Didion* (2008) 160 Cal.App.4th 1272, 1291 ["The general rule ' " 'that one who signs an instrument may not avoid the impact of its terms on the ground that he failed to read the instrument before signing it' 'applies only in the absence of ' " 'overreaching' " (citation) or " ' "imposition." ' "]; *Rosencrans v. Dover Images, Ltd.* (2011)

8

EXHIBIT L
Page 8

192 Cal.App.4th 1072, 1080 ["Generally, it is not reasonable to fail to read a contract; this is true even if the plaintiff relied on the defendant's assertion that it was not necessary to read the contract. [Citation.] Reasonable diligence requires a party to read a contract before signing it. [Citation.]".)

### 2.  The Uber Application Process

Rosenthal said that prospective drivers can apply online at Uber's web site or in person. That process includes providing their names, telephone or cell phone numbers, email information, banking information, the make and model of their cars, proof of insurance, a driver's license for each driver, the TCP permit if the car is in the livery class, proof of commercial insurance, certificate of liability insurance and an insurance card for each vehicle.

In applying to Uber, ████████ provided a background check and then had an interview with an Uber employee.

### 3.  ████████' initial relationship with Uber

████████ said when he started with Uber, he was not in a direct relationship with the Company. Instead, he drove with or for ZA Limo Transportation, the Arrue Company and Boyds Limousine Service, three different companies that "partnered" with Uber. It is assumed that these entities were livery partners. (Before driving for these companies, ████████ had asked Uber in May 2013 for the names of companies that did business with Uber because his current "limo" company did not wish to work for Uber. [ex. 225].)

### 4.  Livery partners

Although the term "livery partner" is not used in the above Agreement, it is assumed that it is interchangeable with the term "customer," which is, as discussed above, an entity that may employ individuals who drive for Uber. Individuals, who do not have an association with a livery partner, may also drive for Uber. And, individuals may drive both for a livery partner that has an

EXHIBIT L
Page 9

association with Uber and as an individual. Rosenthal said that, because of regulatory requirements and public safety, a California entity with over fifty vehicles cannot drive on the Uber platform. He said that drivers with a livery partner are not screened and that over fifty percent of Uber's drivers are in the livery category. Uber does not require the inspection of vehicles on the livery side. It may, however, confirm that the make and model of the livery vehicles conform to the UberBlack platform. Rosenthal added that Uber does not direct its livery partners how to use its drivers

Rosenthal testified that ▮▮▮▮ was a livery partner with Uber in September 2014. He said that the State of California, and not Uber, required that ▮▮▮ have a livery license and that livery partners do not need a driver's license because "the company doesn't take trips," but that all drivers for that company, including the owner, must have a valid license. As such, ▮▮▮ was required to register with the state of California (on September 30, 2015, ▮▮▮ advised Uber that he had an LLC [see exhibit 229]; see also exhibit 134), obtain a car; obtain a TCP permit (see exhibit 205); have commercial automobile insurance (see exhibit 206, an April 23, 2015 certificate of liability insurance issued to ▮▮▮▮▮); consent to a motor vehicle record check and be subject to a background check. ▮▮▮ agreed that he was subject to these requirements and understood, as a livery partner with Uber, that he could either drive himself or have another person drive his car or cars.

▮▮▮ testified he applied for a TCP permit because Uber told him he had to. ▮▮▮ claimed he attempted to hire two additional drivers but that Uber rejected them. He could not recall the reasons for the rejection. Rosenthal said that Uber never rejected ▮▮▮'s drivers; instead, the drivers never completed Uber's "onboarding" process. (See exhibit 102.) Rosenthal explained that onboarding occurs when a driver goes through the sign-up criteria, which is "going through a motor vehicle record and background check process or more of a screening …" If a driver is involved in "incidents" after having onboarded, Uber "rerun(s) motor vehicle record checks as well as background checks, and if a driver does not meet the screening criteria, they will be deactivated …"

10

EXHIBIT L
Page 10

Rosenthal said that a livery partner determines how its drivers, who are subcontractors, shall be paid. He said that Uber does not direct its livery partners how to use its drivers. Soren Jafari, the CEO of Tesluxe, a Los Angeles car rental company, testified that his company owns thirteen mostly "high end" vehicles, each with its own TCP numbers. Tesluxe employs up to 100 drivers and pays them $20 an hour. Jafari said he gives the drivers drug tests and then submits their names to Uber. Tesluxe, according to Jafari, has its own clients which Uber does not discourage, and that 50% of his business is from private clients. He said Uber is aware that his drivers hand out Tesluxe cards to passengers. His cars are on the Uber Luxe, SUV and Black platforms.

### 5.  Manuals or handbooks

Rosenthal testified that Uber does not provide its partners or drivers with a manual or handbook and, specifically, there was no manual or guidelines in Los Angeles for drivers or partners.

### 6.  Training

███████ said that Uber had a PowerPoint at its Santa Monica office which showed drivers how the app worked and what was expected of them. After he was deactivated in July 2015, he took a course, on his own, to learn more about himself. (Exhibit 223.) Witness 1 , a former Uber driver, said that online training was mandatory when he started with Uber around Thanksgiving 2013. He also said that about fifty new drivers went to Uber's offices in Santa Monica to learn how to use the Uber app.

Rosenthal testified that no training is required to gain access to the Uber app. Drivers only have to watch a fifteen-minute video shown at a "green-light hub" or presented by an Uber operations manager on how to use the app. The video also provides customer service tips. (At his deposition, Rosenthal said Uber "outline(s) the onboarding process, which is what a driver needs to do to become active on our platform.") Additionally, before using the app for the first time, he

11

EXHIBIT L
Page 11

said the driver must consent to a software licensing agreement and, if applicable, a City addendum.

### 7.     Vehicles

The Agreement in par. 3.2 describes the drivers' responsibilities for the vehicles they are to use:

> (E)ach Vehicle shall at all times be: (a) properly registered and licensed to operate as a passenger transportation vehicle in the Territory; (b) owned or leased by Customer, or otherwise in Customer's lawful possession; (c) suitable for performing the passenger transportation services contemplated by this Agreement; and (d) maintained in good operating condition, consistent with industry safety and maintenance standards ...; and in a clean and sanitary condition." (Par. 3.2.)

Both Rosenthal and ███████ agree that drivers for Uber must use their own cars. They differ in that ███████ said Uber "directed" him to Best Limos for a car and that he could only rent from Uber. (See exhibit 225, a May 2013 email stream where ███████ communicated with an Uber employee about companies that "work with Uber so I can apply with them.") Gary Witness 1  who also drove for Uber in Los Angeles, said he was required to buy a Prius to drive for the Company.

Rosenthal denied that Uber "partners" with any car dealer or rental companies. Instead, it "connected" drivers with lenders that would lease vehicles to the drivers. (The use of the term "connected" was not further explained.) He said that Uber, itself, has a subsidiary called "Exchange Leasing" that purchases vehicles and leases them to driver partners. (This subject, too, was not further developed; for example, it was not shown whether ███████ ever leased a vehicle from Exchange Leasing.)

12

EXHIBIT L
Page 12

Rosenthal testified that Uber has several platforms for its riders, from luxury cars to ordinary four-door sedans: the highest one is Luxe, then SUV, Black (which is also "high end"), Select (or "mid-tier sedans"), X for more economical sedans, XL consisting of cars for 6 passengers and Pool, which is the least costly and for people who pool together to reduce the cost of the ride.

Rosenthal explained that Uber does not require that a partner have a certain type of car but, to drive on a particular platform, the driver must conform to the Uber standard for that platform. The eligibility requirements for each category are set by Uber's general managers and operation managers and, as well, in some instances, by the CUPC. A car which comes under the UberLuxe classification is eligible for all levels. The car must also not be too old. Rosenthal said the minimum eligibility for the UberX, XL and pool vehicle is a 2001 model year car, with four doors and does not have a salvage title. ( Witness 2   testified that Uber requires that a car be no more than three or four years of age.) After research, Uber changed its eligibility requirement in mid-2014 to create a greater demand for its product. (See exhibit 74 providing that 2000 model year cars were now "off the platform" for UberX and XL; 2007 model year cars were eligible for UberX; 2010 year SUVS were in the UberXL platform; 2010 vehicles had been "transitioned" from UberBlack to UberSelect and former 2010 cars in UberLuxe were now in UberBlack.

Rosenthal also said that livery drivers are not limited to driving on the Luxe or SUV platforms but can drive on the platforms for Select, XL or X. It is ▮▮▮▮▮'s perception that a driver needed to have a Town Car or Cadillac to drive on the UberBlack platform. In June 2013, he wanted to drive for UberBlack but was told Uber was not hiring for that platform and to "please check back next month." (Ex. 23.) In July 2014, ▮▮▮▮▮ was advised that "Your car was never onboarded as UberSUV or Black, you were onboarded as UberXL. We are not onboarding vehicles to UberBlack or SUV at this time." (Ex. 218, p. 278.)

Before dealing directly with Uber, ▮▮▮▮▮ drove for ZA Limo Transportation, the Arrue Company and Boyds Limousine Service, three different Uber livery partners. He rented vehicles

EXHIBIT L
Page 13

1  from each, paying at least $650 a week, and was paid directly by ZA, Arrue and Boyds. (See
2  exhibit 240, a 2013 W-2 statement from Boyds; exhibit 241, a 1099 statement from Arrue and
3  exhibit 242, a 1099 statement from ZA. Despite the 1099s, ▬▬▬▬ testified he thought he was
4  an employee of both ZA and Arrue.) While driving for ZA and Arrue, ▬▬▬▬ paid for his
5  own gas. Boyd paid for ▬▬▬▬'s gas and insurance. After leaving Arrue for Uber, ▬▬▬▬
6  first bought a Toyota Camry for $17,000 and drove on the UberX platform and later bought a
7  Chevrolet Suburban for $35,000.

8

9
## 8.   Vehicle inspections

10  ▬▬▬▬ said Uber required that cars had to pass an inspection at Penske. (Exhibit 110 are
11  documents he gave Uber to show his Chevrolet Suburban had passed an inspection at Powertech
12  in Culver City on October 10, 2014; Manhattan Auto Center on January 2, 2015 and at Pep Boys
13  in Redondo Beach on January 6, 2015.) Rosenthal denied that inspections are required for livery
14  drivers except to occasionally verify, because of driver complaints, that vehicles on the
15  UberBlack and SUV platforms conformed to the criteria for those platforms. In his deposition,
16  Rosenthal was uncertain that a particular inspection application was in use when ▬▬▬▬ was a
17  driver. (The application mentioned that "All Uber partners need to have their vehicles inspected
18  before they can hit the road.") At the deposition, Rosenthal testified that vehicle inspections are
19  required for non-livery vehicles under the Transportation Network Company business model as
20  mandated by the CPUC. (Page 81, ll. 21-25; p. 82, ll. 1-10.)

21

22
## 9.   Driver schedules

23

24  ▬▬▬▬ conceded that Uber drivers establish their own schedules; there was no minimum
25  number of hours to work; there was no required start time; he rarely worked before 11 a.m.; took
26  as long as he liked for lunch; was off of the app for the entire summer of 2014 when he was in
27  New York City; did not tell Uber he was going to be off and did not need permission to be off.

28
    The Agreement discusses the drivers' freedom to work when they want to:
29

14

EXHIBIT L
Page 14

Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber services.

(Par. 2.4.)

### 10.  Driver expenses

According to the Agreement, except for the Uber devices, such as the driver app, that Uber provides, "Customer shall provide all necessary equipment, tools, and other materials, at Customer's own expense, necessary to perform the Transportation Services." (Par. 2.2.) Rosenthal said that Uber does not reimburse driver expenses. In fact, at Uber's discretion, its "customers," if they "elect to use any Uber device," may be required to reimburse Uber for the wireless plan of such device and to provide a deposit for the device. (Agreement, par. 2.7.1.)

████████ testified that he paid for his own liability insurance in the amount of $750,000. (Exhibit 206.) He added that Uber did not require that he use any particular carrier. Rosenthal said that drivers must have commercial vehicle insurance of at least $750,000. (See the Agreement, par. 8.1, which requires each customer to maintain on all vehicles commercial liability insurance that includes protection against bodily injury and property damage to third parties at levels that satisfy all applicable laws in the Territory, and par. 8.2, providing that the Customer shall also maintain commercial general liability insurance that provides protection against personal injury, advertising injury and property damage to third parties at levels that satisfy all applicable laws in the Territory.)

//

EXHIBIT L
Page 15

## 11.   Driver performance

According to an April 3, 2015 Uber USA, LLC "software license and online services agreement," (April 2015 Agreement), "Uber does not, and shall not be deemed to, direct or control Customer or its drivers generally or in their performance under this Agreement specifically, including in connection with the operation of Customer's business, the provision of Transportation Services, the acts or commissions of Drivers or the operation and maintenance of any Vehicles." (Joint ex. 3, p. 0004.)

███████ testified that he did not have a supervisor while driving for Uber.

## 12.   Driver conduct

Rosenthal testified that Uber has a Code of Conduct on its website with respect to its drivers. (That code was not further described at the arbitration.) He said that Uber provides suggestions, rather than instructions, to the drivers, which do not have to be followed, and not instructions as to how to engage with customers (identified in the Agreement as "Users) concerning such matters as tips and asking about a preferred route. For example, in a weekly report card, it reminded █████ that "top positives" were to return lost items; offer complimentary refreshments, such as water and gum; be professional and open doors whereas the "top negatives" were use of inefficient routes, dirty cars, use of a cell phone and poor driving. (Ex. 62.)

█████ said that Uber told its drivers to have water, gum and cell phone chargers in their cars to keep the customers happy.

## 13.   The Uber App

Rosenthal testified that the Uber app is at the center of the rider-driver experience. (The Agreement, at par. 2.4, defines the app as "Uber's mobile application that enables transportation providers to access the Uber Services for the purpose of seeking, receiving and fulfilling on-demand

16

EXHIBIT L
Page 16

requests for transportation services by Users ..."  Rosenthal opined that Uber has invested above "seven figures" in its development. (████ had no knowledge of the app's capitalization.) According to Rosenthal, Uber drivers must agree to the terms of a software license and online services agreement before they can have access to the "driver app" and, therefore, drive for Uber.

Rosenthal explained that partners can use their own phones or rent an Uber telephone to access the app, which takes up a significant amount of data. Riders who want a transportation service use a function on their cell phone or smart phone to advise Uber where they want to be picked up.  The rider is randomly matched with the closest driver whose app is turned on. (After the app is turned on, Uber gets a GPS of that driver every three seconds. Additionally, the app records every time the driver turns the app on and off.) The app beeps in the car of the closest driver and provides the  rider's first name and the pickup address. (Agreement, par. 2.2.) If the app is turned off, the driver does not know of an incoming call except if he or she looks at the screen or the phone is on vibrate. The driver has fifteen seconds to accept the trip by clicking the screen. (However, drivers cannot accept a trip if they have not previously consented to the addendum regarding fees.) If the driver does not respond or accept, the rider is matched with the next closest driver. Although drivers are not required to accept any trip, Rosenthal testified they are "encouraged" to do so because a rejection is "poor business experience" since the rider must then wait longer for a response to the ride request. (On that point, the Agreement provides, "Customer and its Drivers retain the option, via the Driver App, to attempt to accept or to decline or ignore a User's request for Transportation Services via the Driver App, subject to Uber's then-current cancellation policies." [Par. 2.4.].)

████ testified that drivers first learn of the rider's destination after they arrive at the pickup location and that they are not allowed to reject a short ride for a longer one. In actuality, the rider has the option to provide the destination on his or her mobile application or upon the Uber driver's arrival. (Agreement, par. 2.2.) ████ also said that drivers ask the riders for their preferred route and, if they have none, the driver uses the GPS provided by Uber.

EXHIBIT L
Page 17

## 14.  Fares

Uber sets base or default fares, including the per-minute, per-mile and minimum-fare rates, for each of its platforms.

Customer is entitled to charge a fare for each instance of completed Transportation Services provided to a User that are obtained via the Uber Services ("Fare") where such Fare is calculated based upon a base fare amount plus mileage and/or time amount as detailed for the applicable Territory. ... (A)s between Customer and Uber, the fare is a recommended amount, and the primary purpose of the pre-arranged Fare is to act as the default amount in the event Customer does not negotiate a different amount. Customer shall always have the right to: (i) charge a fare that is less than the pre-arranged Fare; or (ii) negotiate, at Customer's request, a fare that is lower than the pre-arranged Fare ... Uber agrees to remit to Customer on at least a weekly basis: (a) the Fare less the applicable Service Fee ...

(Agreement, par. 4.1.) For example, the fare for an UberBlack ride is $8 to start; $0.45 every minute; $3.55 a mile with a $15 minimum and a $10 cancellation fee. (Ex. 65.) Uber also might increase the rates during periods of high demand. Uber takes a "software licensing fee" from the driver of 25% from each UberBlack trip. ▇▇▇▇ said the fee was 28% for UberSUV rides. (See par. 4.4 of the Agreement which provides that "Customer agrees to pay Uber a service fee on a per transportation Services transaction basis calculated as a percentage of the Fare (regardless of the Negotiated Fare), as provided or otherwise made available by Uber from time to time in the applicable Territory.") As for taxes, "Customer acknowledges and agrees that it is responsible for collecting and remitting all applicable gross receipts, sales and use, excise or any other transaction tax on the provision of Transportation Services." (Par. 4.8.)

Rosenthal testified that while Uber sets the "baseline fare" for the product, it is aware that some drivers may negotiate both a lower fare and the charges for a return trip. He added that some drivers may end a trip early and not charge for the whole ride. Other conditions regarding

18

EXHIBIT L
Page 18

the fares to be charged are that "Uber retains the right to change the Fare Calculation at any time in its discretion based upon local market factors ..." (Agreement, par. 4.2.)

The rider pays the fare at the end of the trip by a credit card. Rosenthal explained that credit cards are used because the payment of cash presents a safety issue for the driver. Uber "facilitates" the payment to the driver for each ride. Livery partners, on the other hand, determine how their drivers shall be paid.

████ and Witness 1 testified that drivers had no input on the rates Uber charged riders. However, Uber might adjust the fare upon a driver's complaint that the drop off address was incorrect (ex. 28) or provide the driver an additional credit to clean the car because the passenger threw up in it. (Ex. 17.) ████ said he unsuccessfully asked Uber to change its fares, for example, where he had to wait an hour for a passenger since, according to Uber's rules, the trip did not start until the passenger entered the car. (Ex. 6.) On one occasion, he unsuccessfully asked Uber to raise its rates for UberBlack rides because he believed they were too low. (Ex. 6.)

### 15. Tips

Rosenthal said it is not required that passengers tip the driver; the rider may do so if he or she wants to. He further testified that drivers are not deactivated in Los Angeles for accepting tips. On the other hand, Rosenthal said that drivers have been warned for soliciting tips because that can create a "negative experience in the market place"; it can cause "reputational damage" for Uber.

████ testified he had accepted tips, if offered, while driving on the Uber app, even though he knew Uber had a rule against accepting them.

### 15. Drivers' pay and licensing fees

Rosenthal said that drivers pay a licensing fee established by Uber to Uber out of each fare collected. At the time of Rosenthal's deposition, the licensing fee for UuberSUV was 28% and

EXHIBIT L
Page 19

25% for UberBlack. Rosenthal added that drivers cannot accept trips if they do not consent on the app to the addendum regarding fees. ▮▮▮▮ said that Uber's licensing fees were not based on the rider's evaluations.

Witness 2 a former Uber driver, said that his drivers, whom he treats as independent contractors, pay him a small percentage of their fares. In the beginning, he said Uber took 20% from the total charged; it now takes 28% of charges for SUVs. Witness 2 once had two drivers, besides himself, but now can only afford one car.

### 16.  Signage and driver clothing

Rosenthal testified that livery cars do not have Uber decals. According to the April 2015 Agreement, "With the exception of any signage required by local law or permit/license requirements, Uber shall have no right to require Customer or ay Driver to: (a) display Uber's or any of its Affiliates' names, logos or colors on any Vehicle(s)." (Ex. 3, sec. 2.4.)

### 17.  Number of rides

Rosenthal said that the drivers are not guaranteed any number of rides, there is no minimum amount of time a driver must be online and there are no minimum number of trips a driver must be online before going offline. In other words, he said all of this is up to the driver.

### 19.  Driver unavailability

Witness 2 said that drivers must tell Uber if they are going to be unavailable for two or three months but there is no obligation to inform Uber if that time is under a month.

Rosenthal testified that Uber does not deactivate drivers who are off for two months or more. That testimony may be inconsistent with the Agreement which states that "Customer acknowledges and agrees that each Driver is required to fulfill a request for Transportation Services using the Driver App at least once a month to maintain an active Driver profile, and

EXHIBIT L
Page 20

Uber reserves the right to deactivate the Driver ID of those Drivers who have not fulfilled a request for Transportation Services using the Driver App at least once a month." (Par. 2.1.) In the absence of clarifying evidence, of which there was none, it is uncertain whether this condition was enforced or if a driver's notice that he or she was going "out of town for a while" was an observed exception.

Rosenthal also testified that there is no requirement that drivers be on line when they are in their cars.

### 20. Where to drive

For the purposes of this discussion, "where to drive," as distinguished from the acceptance of rides, refers to where a driver may drive when he or she is "on the app."

██████ said he could drive anywhere for Uber when he started but, in 2014, was restricted, when he lived in Hermosa Beach, to driving in Orange County on UberBlack. His email exchange with Uber clarifies that situation. On July 26, 2014, ██████ requested that his SUV with new leather seats be added to the UberBlack platform. Uber responded on July 27, 2014 that it could not put the car on the Los Angeles system at that time but could place it on the Orange County Black or SUV platforms. ██████, in response, asked "what hours and what city is the busiest in Orange County?" Before being activated in Orange County, ██████ was told on July 28 that he would have to "Take the background check (for Orange County)," which would take "5-7 days to process." On August 2, 2014, ██████ wrote that he had completed more than five background checks in the past few months. Uber replied on August 4, 2014 that he was active and to start driving on UberXL. (Ex. 218.) Thus, it appears that it was ██████'s choice to drive with UberBlack in Orange County rather than on the Uber platform as an XL in Los Angeles.

When ██████ was driving in Los Angeles, he chose not to obtain a permit to pick up passengers at the airport because it was too much of a hassle. Rosenthal said that local

EXHIBIT L
Page 21

government, and not Uber, regulates who can pick up passengers at LAX, that obtaining a permit to do so can take up to six months and that Uber lets the livery partner decide whether it wants to obtain a permit.

According to Rosenthal, drivers are not obligated to go where Uber may suggest or the Uber GPS might indicate that they drive to. He said that drivers can unsubscribe from this list or related text messages. "Promotions" suggested by Uber, which might attract large numbers of people, such as Coachella, are relatively frequent (ten percent of the trips in Los Angeles are of the surge type) but drivers do not have to participate; in fact, Rosenthal said that most drivers decline to participate. Rosenthal also said that Uber can determine, from its app records, the percentage of drivers who participate in a "promotion." (The Agreement requires its Customers to agree to having their location available to Uber through a device when the Driver is logged into the Driver App or providing Transportation Services. (Par. 2.8.).) Uber also gave its drivers advice on the best times to drive. (See exhibit 62 that the best times for weekends, which are the busiest times, are rush hours, 10 p.m. to 12 midnight and 12:30 a.m. to 2:00 a.m.)

████████ confirmed that Uber might tell him about particular events where drivers could "expect a high volume of calls." Witness 1 testified there was no guarantee that a driver would get a surge passenger but was encouraged to participate at certain events at his discretion.

### 21. Driving for a competitor

████████ said he could have a Lyft app at the same time as an Uber app and drove for Lyft for an undetermined period. Similarly, Witness 1 another individual who drove for Uber from Thanksgiving 2013 to October 2015, had Uber and Lyft apps and drove for both at the same time. He said he received a 1099 from Lyft, with which he had an independent contractor relationship.

Rosenthal confirmed that Uber drivers can have both Uber and Lyft apps and that both apps can be open at the same time. He explained that Lyft is Uber's biggest competitor in the United

EXHIBIT L
Page 22

1   States. Rosenthal also said that drivers are free to have their own clients outside of those that are
2   arranged by using the Uber app.

3
4   ## 22.  Expert evidence regarding Uber's policies and the control issue

5         ████████  offered the opinions of Alex Rosenblatt on the issue of Uber's control of its
6   drivers.  Rosenblatt, whose credentials are not known (other than, according to exhibit 11, he is a
7   researcher and technical writer for the Intelligence & Autonomy Initiative at Data & Society, a
8   project supported by the John D. and Catherine T. MacArthur Foundation), analyzed Uber's
9   Rideshare service in a draft paper (draft) for the Centre for European Studies in Brussels,
10  Belgium. (Exhibit 10.) (This award considers Rosenblatt's analysis, opinions and conclusions in
11  the draft rather than his article in exhibit 11, "The Truth About How Uber's App Manages
12  Drivers" in the April 2016 Harvard Business Review, because the draft is more comprehensive
13  and the article appears to be a shorter summary of the draft.)

14
15        Rosenblatt concludes that "indirect management gives Uber power over its workers for which
16  it is often not held accountable. Uber's claims regarding its labor model – which center on
17  freedom, flexibility and entrepreneurship – are not borne out in the experience of Uber drivers, in
18  large part due to the information asymmetries and controls that Uber exerts over the driver
19  behaviors through performance metrics, behavioral nudges, unreliable, dynamic rates, and
20  scheduling prompts and design." He contends that "Movers digitally and algorithmically
21  mediated system of flexible employment builds new forms of surveillance and control into the
22  experience of using the system, which results in asymmetries around information and power for
23  workers. In Uber's system, algorithms, CSRs (Community Support Representatives), passengers,
24  semi-automated performance evaluations, and the rating system all act as a combined substitute
25  for direct managerial control over drivers, but distributed responsibility for remote worker
26  management also exacerbates power asymmetries between Uber and its drivers." One conclusion
27  from the paper is that "the information asymmetries produced by Uber's system are fundamental
28  to its ability to structure indirect control over its workers."

29

EXHIBIT L
Page 23

In arriving at the above conclusion, Rosenblatt examined Uber's electronic monitoring, surge pricing and labor scheduling; and the conflation of real-time and predictive analysis and driver ratings. Rosenblatt relied essentially on the comments made by Uber drivers on five dedicated online forums, supplemented by seven individual driver interviews. (One of the problems in analyzing Rosenblatt's findings is that he footnotes some of them, such as that "the data was observed and collected from five dedicated forums," but does not publish the footnotes at the end of the draft. Instead, he only sets forth the "works cited," without numbers, in alphabetical order.)

While recognizing that Uber's promise of "flexible employment" has great appeal, Rosenblatt notes that it "belies the fact that these jobs lack benefits or worker protections." He also notes that in the Uber system, its use of "surveillant practices" effects "soft control over otherwise flexible independent contractors." Rosenthal goes on to assume that the information gathered can be compared by Uber's full-time employees to "drivers in aggregate and ranked accordingly."

Rosenblatt was critical of Uber's use of surge pricing in which fares are temporarily raised for a particular geographic location because of a need for more drivers. (There was some testimony in the arbitration about surge pricing but Rosenthal provided little of substance about it and ▇▇▇▇▇ and his witnesses were generally uncritical about it as a policy.) In any event, Rosenblatt thought that it "generate(s) and co-ordinates(s) clusters of labor in response to dynamic market conditions without explaining the reliability of its cluster incentives or guaranteeing the validity, accuracy, or error rates of its labor deployments." The fallacy behind Rosenthal's finding in this particular area is that the term "deployment" connotes the involuntary movement of a person or persons from one location or job to another whereas, at the same time, he recognizes that Uber's drivers, at least on the surface, have the freedom to choose where and when they want to work. Rosenblatt then adds, without any support, that surge pricing, in effect, undercuts the "free will" of Uber's drivers: "The regular occurrence of surge pricing along with heat maps of passenger activity and affective messaging all work as behavioral engagement tools that impact how drivers schedule their work, and their effect is amplified when low base rates

EXHIBIT L
Page 24

result in unreliable income, undercutting the 'freedom that drivers have to login and log-out at will."

At another point in the draft, Rosenblatt repeats the theme that the drivers are often unawares of the effect of Uber's analytics on their actions: "The opaque combination of algorithmic data analytics and their rhetorical invocation act as a substitute for direct managerial power and control. The ambiguities between real time analytics and predictive analytics shape the drivers' own assessments of when they plan to drive." (Query whether California's right to control test contemplates a 21st Century model where indirect actions by a business are used to control the thoughts and movements of its employee and contractors?)

Rosenblatt is very critical of Uber's ratings of individual drivers. He opines that the rating by a passenger on a 1 to 5 scale of the drivers "acts as a remote threat and a tangible nudge to drivers to be in compliance with workplace expectations" and that "In a service economy supported by the practices and characteristics of digital labor, the data that workers produce and are monitored by creates affordances for managerial control." He also writes that passengers are empowered to act as middle managers over drivers, whose ratings directly impact their employment eligibility." (None of these "findings" are supported by a footnote or another source.) Through ratings, Rosenblatt concludes that Uber can achieve an organization where the workforce behaves relatively homogenously without giving explicit directives – as with traditional employers." Homogeneity might possibly be produced if Uber were to give its riders factors to consider in rating the drivers on a scale from 1 to 5 (for example, "pleasant," "courteous" or "on time" are a 5, whereas "rude," "vulgar" or "got lost" are a 1) but, without any factors as guidelines or standards, as is the case here, riders use their own subjective criteria to rate each driver, which produces the antithesis of group thinking, a theme which appears to motivate Rosenblatt. In this context, it is difficult to see how one rider's rating of 4.0, for example, has any correlation to another rider's 4.0 rating.

EXHIBIT L
Page 25

Rosenblatt also finds that "the rating system provides a channel for direct feedback, such that a negative passenger experience can directly affect the employability or income-earning potential of platform-based workers." Rosenblatt misunderstands the impact of one low rating. Rosenthal testified that a passenger's negative comment might be brought to the attention of the driver, and can affect his or her employability (for example, where the passenger complained that ▮▮▮▮▮ "hugged her") but, otherwise, one low rating, such as a 1.0, has a negligible effect when considered with four hundred ninety-nine other ratings, especially if the other ratings were mostly 5s.

Regarding the practice of "logging out" of the Uber App to avoid being given an unacceptable ride, such as the prospect of a low minimum fare or a ride in a high-crime area, Rosenblatt states that such practice is a resistance to Uber's policies rather than indicative of an entrepreneurial strategy – "they log out precisely because they would not be 'free' to refuse an unprofitable ride otherwise." Rosenblatt does not, however, explain the loss of freedom in this context.

Thus, Rosenblatt's draft is not considered in deciding whether Uber, for the purposes of this arbitration, had the right to control ▮▮▮▮▮. In addition to the above comments, his draft is based on data observed and collected by others from five "dedicated forums" and eight "in-depth" interviews with seven individual drivers." The accuracy of the information from these forums and interviews has not been established. The methodology used by sources, other than Rosenblatt, for analyzing the content of the forums was not discussed. There is no showing whether these five forums attract a broad spectrum of Uber drivers or are a source for only the disaffected. On a broader scale, the accuracy of forums of all types in which people anonymously post their thoughts is not shown. Also, no one, including Rosenblatt, interviewed anyone associated with Uber; instead, he relied apparently on comments by former and present drivers. Accordingly, the premises he arrives at are interesting but have little weight in this arbitration.

EXHIBIT L
Page 26

### B.  "The Right to Discharge at Will, without Cause"

Uber passengers and drivers may rate each other at the end of a trip. The ratings for the drivers, according to par. 2.6.1 of the Agreement, may have certain negative consequences:

> Uber desires that Users have access to high-quality services via Uber's mobile application … In order to continue to receive access to the Driver App and the Uber Services, each Driver must maintain an average rating by Users that exceeds the minimum average acceptable rating established by Uber for the Territory, as may be updated from time to time by Uber in its sole discretion. … In the event a Driver's average rating falls below the Minimum Average Rating, Uber will notify Customer and may provide the Driver in Uber's discretion, a limited period of time to raise his or her average rating above the Minimum Average rating. If such Driver does nor not increase his or her average rating above the Minimum Average Rating within the time period allowed (if any), Uber reserves the right to deactivate such Driver's access to the Driver App and the Uber Services. Additionally, Customer acknowledges and agrees that repeated failure by a Driver to accept User requests for Transportation Services while such Driver is logged in to the Driver App creates a negative experience for Users of Uber's mobile application. Accordingly, Customer agrees and shall ensure that if a Driver does not wish to accept User requests for Transportation Services for a period of time, such Driver will log off of the Driver App." (Par. 2.6.2.)

Rosenthal explained that the rating system helps to determine whether drivers are meeting Uber's minimum business standards. He testified that drivers and passengers rate each other on a 1 to 5 scale at the end of a trip and that a driver's rating is an average of the driver's last 500 trips. In Los Angeles, Rosenthal stated that the minimum rating, both for livery partners and individual drivers, is approximately 4.65 to 4.70 and that a driver can be deactivated if his or her rating falls below that number. (██████ said the minimum rating was 4.65 and then became 4.70.) The minimum  rating was created in Los Angeles by looking at a distribution curve and at

EXHIBIT L
Page 27

various standard deviations below the curve. The average driver rating is 4.85. Rosenthal said that drivers cannot see the ratings by individual customers because of privacy concerns (Uber considers its customer lists to be proprietary) but have access to their own, individual ratings. Rosenthal also testified that Uber drivers in Los Angeles are notified of their ratings by email and receive weekly "report cards." (Ex. 62.). ███████ acknowledged the existence of this system.

According to Rosenthal, Uber prefers that drivers accept trips when offered "for the general health of the platform," because the refusal to pick up a rider causes the rider to wait longer for a car and becomes a "poor rider experience." In other words, although "driver(s) cannot select which riders they want to pick up. ... (On the other hand), a driver can accept or decline or not accept any particular trip." ████████ said that drivers can be deactivated if they do not accept at least 85 percent of the rides assigned to and accepted by the drivers. (See exhibit 24, a July 22, 2013 email message in which Uber advised ██████ he was in danger of being deactivated because his acceptance rate had dropped below 85 percent.) Witness 1, who drove for Uber from Thanksgiving 2013 to October 2015, testified drivers were deactivated if their acceptance rate fell below 80 percent. Rosenthal said that drivers are deactivated when their cancellation rate is "abnormally high," which is usually greater than 50 percent of the trips.

Rosenthal testified that fewer than three percent of Uber's drivers are deactivated in California for "material" breaches of the software licensing agreement. He said that Uber investigates rider complaints about reckless driving and egregious conduct and that the driver has the opportunity to tell his or her side of the story. He added that "hugging" a passenger could come under "inappropriate behavior" as a basis for deactivation. Altercations with a rider is another reason for deactivating a driver. At his deposition, Rosenthal said that Uber also deactivates drivers for "breaches of a contract that we would have with the driver partner."

The Agreement, at par. 12.2, provides for its termination by either Uber or its customers and/or drivers:

EXHIBIT L
Page 28

Either party may terminate this Agreement: (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate Customer or a particular Driver immediately, without notice, with respect to Customer and/or any Driver in the event Customer and/or any Driver, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or is otherwise set forth in this Agreement.

████████ said he was deactivated by Uber "more times than I could remember." Some of the deactivations were for having low ratings. (See exhibit 9 where ████████ was deactivated on February 9, 2015 for having a 4.75 rating.) On one occasion, he was deactivated for giving a passenger a ride and then later driving the person home; afterward, the rider's secretary complained because the total ████████ had charged was greater than the amount Uber had charged. Another time he was deactivated when Uber learned he had asked riders for their telephone numbers. ████████ explained that Uber did not want its drivers to contact riders for any reason after a trip, except if a personal item had been left in the car. (See ex. 32 and par. 2.2 of the Agreement which provides that "Customer shall not, and shall ensure that all Drivers do not, contact any Users for any reason except for the purpose of fulfilling Transportation Services..") Witness 1 testified it was his "understanding" that he could be deactivated for handing out his own business cards to riders and then giving rides to such customers separately from the Uber app.

Before his last and permanent deactivation, ████████ said that he did not take any courses provided by Uber, which he described as discretionary and not mandatory, before being reactivated. (See ex. 123, a sign up by an Uber partner for drivers who have low ratings or had

EXHIBIT L
Page 29

been deactivated.) On the other hand, Witness 2, said that he had to take a class offered by Uber before he could be reactivated. Rosenthal said that a third party, and not Uber, offers a "quality improvement" course for drivers who have been deactivated; it is one of the methods that drivers could use to regain access to the Uber platform.

█████████ was deactivated permanently on July 6, 2015 for what he described as giving a hug to a female passenger and what Uber described as "sex harassment." (Ex. 21.) █████████ explained he had given a "drunk" female passenger a ride and rather than sit in the rear of his car, she sat in the front next to him. He said the passenger wanted to "hang out" with him and that he gave her a hug after she asked him for one "to diffuse the situation." Uber advised █████████ on August 9, 2015 that it could not reactivate him because "Sexual harassment is a serious offense.") Paragraph 2.4 of the Agreement appears to cover that situation:

> Uber retains the right to, at any time in Uber's sole discretion, deactivate or otherwise restrict Customer or any Driver from accessing or using the Driver App or the Uber Services in the event of a violation of this Agreement, a violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its affiliates, Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliate's brand, reputation or business as determined by Uber in its sole discretion, or for any other reason at the reasonable discretion of Uber.

### B. *Borello*'s Secondary Indicia of Control

#### 1.   Whether the one performing services is engaged in a distinct occupation or business

The response to this factor depends on whether "the one performing services" is Uber or its drivers. Rosenthal sees Uber as more than a transportation company. He explained that Uber is in the business of facilitating and providing information to determine where rider demand is – it is a software company that provides mobile apps that connect riders with providers. It can provide

EXHIBIT L
Page 30

for the transportation of people, goods and food. He said that Uber's technology is being used to determine the demand for food and goods; it has designed a market plan for determining what the public desires and wants to connect people with transactions by car or even helicopter.

Rosenthal said that Uber Tech globally has approximately 8,000 employees, roughly 2,000 of them are engineers. Rosenthal testified at his deposition that Uber's application, at one point, used to say that it was, "Everyone's Private Driver."

███████ apparently had no other means of support than his income from driving for Uber, Lyft and private taxi services. On a larger scale, Uber's "customers" include its livery "partners" and individual drivers who, like ███████, derive some or all of their support from driving for themselves or others, or work at other jobs and supplement that income by driving.

    **2.  The kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision**

While ███████ did not have a supervisor at Uber and Uber did not provide its drivers with a manual, this factor is somewhat of an oxymoron because Uber has apparently brought a new dimension to the workplace in which an app has replaced human intervention. Regardless, this factor cannot be considered because, assuming Uber is a transportation company, there was no evidence how or by what means other transportation companies in Southern California, such as Lyft or taxi companies, supervise their drivers.

    **3.  The skill required in the particular occupation**

To drive for Uber, a person needs a driver's license, a vehicle and insurance. See par. 3.1 of the Agreement, which states that:

Driver shall at all times (a) hold and maintain (i) a valid driver's license with the appropriate level of certification to operate the Vehicle assigned to such, and (ii) all

EXHIBIT L
Page 31

licenses, permits, approvals and authority applicable to Customer and /or Driver that are necessary to provide passenger transportation services to third parties in the Territory; (b) possess the appropriate and current level of training, expertise and experience to provide Transportation Services in a professional manner with due skill, care and diligence; and (c) maintain high standards of professionalism, service and courtesy.

████████ said that one needs only to be able to drive and open a door to work for Uber. Witness 1 testified no specialized skill was required. Jafari testified that the livery business requires customer service skills, attention to detail and a genuine interest in the client, especially with high-end clients.

**4.   Whether the principal or the worker supplies the instrumentalities, tools, and the place of work for the person doing the work**

As noted in the Agreement, except for the driver app, that Uber provides, "Customer shall provide all necessary equipment, tools, and other materials, at Customer's own expense, necessary to perform the Transportation Services." (Par. 2.2.) An essential piece of equipment, besides a cell phone, is the vehicle which, ████████ agreed, the driver provides. As noted earlier, there was evidence that Uber was involved in the rental or sale of these vehicles. (████████ said he rented a car from a company that Uber recommended and Witness 2 said he bought a Chevrolet Suburban through Uber at Penske Chevrolet in Cerritos Auto Square.)

**5.   The length of time for which the services are to be performed**

The driving services are of an undetermined basis; depending on the needs of the passenger, the ride can be short or long. According to Rosenthal, the average participation by a driver on the Uber platform is for six months. It does not appear that this factor is relevant to the control issue herein.

**6.   The method of payment, whether by the time or by the job**

32

EXHIBIT L
Page 32

Uber drivers are paid for the individual ride, giving Uber a percentage of that fare, based on a predetermined rate for the vehicle used and the distance and time of the ride.

### 7.   Whether or not the work is a part of the regular business of the principal

The answer to this factor depends on the meaning of the term "principal." As a principal, Rosenthal said that Uber is a software service that provides transportation services through an app available to consumers. Its primary competitors are rail, buses, taxi companies, taxi dispatch services, black car companies and Lyft. If the individual driver is the "principal," the answer to that issue is idiosyncratic and depends upon the individual needs or characteristics of each driver; some, like ▇▇▇▇▇ may depend entirely on the transportation business for their incomes; others may use it to supplement their incomes.

### 8.   Whether or not the parties believe they are creating the relationship of employer-employee

The Agreement states, as to the "relationship of the parties," that "Except as otherwise expressly provided herein with respect to Uber acting as the limited payment collection agent solely for the purpose of collecting payment from users on behalf of Customer, the relationship between the parties under this Agreement is solely that of independent contractors. The parties expressly agree that: (a) this Agreement is not an employment agreement, nor does it create an employment relationship, between Uber and Customer or Uber any Driver; and (b) no joint venture, partnership, or agency relationship exists between Uber and Customer or Uber and any Driver." (Par. 13.1.)

Rosenthal testified that ▇▇▇▇▇'s relationship with Uber was as a livery partner, which, according to the Agreement, made him an independent contractor. Uber issued ▇▇▇▇▇ a 1099K for 2014 (ex. 244) and sent him information about filing his 2014 returns "as a partner." (Ex. 246.) ▇▇▇▇▇'s Linkedin page (exhibit 247), in which he described himself as an

33

EXHIBIT L
Page 33

"entrepreneur," is not given any weight because that self-description was most probably first used before ██████ began driving for Uber.

The fact that ██████ had private clients when driving for Uber is not necessarily determinative herein because one can be employed and under the control of an entity and have a private business "on the side."

██████ said he believed he was an employee because, "I was W-2 ... and I figured – I went to Uber thinking – I didn't even know I could be a partner, actually. So I thought I was just working for somebody. ... I did not even think to differentiate between Arrue and Uber. I was working whoever gave me the car, follow – follow the payment structure, and that's it." (Boyd's Limousine Service issued ██████ a W-2 for 2013 [ex. 240]; Arrue LLC issued him a 1099 for 2013 [ex. 241]; S. A. Limo issued him a 1099-Misc for 2013 [ex. 242] and Centurion Car Service issued him a 1099-Misc for 2014 [ex. 245].) Like ██████, Witness 1 thought he was an employee of Uber although  he knew he had signed a contract providing he was an independent contractor.

### C.   The Six-Factor Test of Other Jurisdictions

#### 1.   The alleged employee's opportunity for profit or loss depending on his managerial skill

Rosenthal testified there was a skill in how to use the Uber market place in order to maximize earnings. He explained that drivers decide when to drive, can have their own clients (as confirmed by Witness 2 who said that two percent of his rides are from his own clients); can market their own businesses and establish their own rates with their own passengers.

██████ noted that there was a higher return for having a nice car, which therefore impacts compensation.

34

EXHIBIT L
Page 34

**2. The alleged employee's investment in equipment or materials required for his task, or his employment of helpers**

This factor is the same as *Borello*'s "instrumentalities" secondary factor and is not discussed further.

**3. Whether the service rendered requires a special skill**

This factor is the same as *Borello*'s "skills" secondary factor and is not discussed further.

**4. The degree of permanence of the working relationship**

This factor is the same as *Borello*'s "length of time" secondary factor and is not discussed further.

**5. Whether the service rendered is an integral part of the alleged employer's business.**

This factor is the same as *Borello*'s "regular business" secondary factor and is not discussed further.

## VI.  NO EVIDENCE WAS INTRODUCED REGARDING RAISIER, LLC AND RAISIER-CA, LLC

Raisier, LLC, a Delaware Limited Liability Company, and Raisier-CA, LLC, a Delaware Limited Liability Company, are respondents, along with Uber, in this arbitration. Since ████████ does not know the relationship between either Raiser and Uber, never had an agreement with either Raiser entity, never drove for them, never received any monies from them and never got a tax form from either, he has failed to prove by a preponderance of evidence that he had an employment relationship with either of them. Accordingly, his claim against both Raisier, LLC, a Delaware Limited Liability Company, and Raisier-CA, LLC, a Delaware Limited Liability Company, is dismissed with prejudice.

EXHIBIT L
Page 35

## VII.   UBER DOES NOT HAVE THE RIGHT TO CONTROL ITS DRIVERS

### A.   The "Right to Control" Test as Interpreted by the Courts

A review of the "right to control" test as applied in *Alexander v. FedEx Ground Package Sys.* (9th Cir. 2014) 765 F.3d 981 (*Alexander*); *Arnold v. Mutual of Omaha Ins. Co.* (2011) 202 Cal.App.4th 580 (*Arnold*), *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425 (*Millsap*) and *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1 (Estrada) is helpful in applying that test to the facts herein.

*Alexander* is an action in which a class of FedEx drivers alleged that they were employees in California rather than independent contractors.  The Court of Appeals, finding that the *Borello* right to control test applied (at p. 988), held that the drivers were employees and remanded the matter to the district court with instructions to enter summary judgment for plaintiffs on the question of employment status.

The relationship in *Alexander* between the drivers and FedEx is governed by an Operating Agreement (OA) which requires the drivers to pick up and deliver packages within assigned service areas. Drivers must deliver packages every day that FedEx is open for business, and must deliver every package they are assigned each day. They must deliver each package within a specific window of time negotiated between FedEx and its customers. FedEx does not require drivers to follow specific delivery routes. However, FedEx tells its managers to design and recommend to its drivers routes that will "reduce travel time" and "minimize expenses and maximize earnings and service."

FedEx does not expressly dictate working hours, but it structures drivers' workloads to ensure that they work between 9.5 and 11 hours every working day. Drivers are compensated according to a somewhat complex formula that includes per-day and per-stop components. Drivers are expected to arrive at their delivery terminals each morning, and they are not to leave the terminal until all of their packages are available for pick-up. The OA gives FedEx the authority to

36

EXHIBIT L
Page 36

"reconfigure" a driver's service area upon five days' written notice. Drivers have the right to propose a plan to avoid reconfiguration, "using means satisfactory to FedEx."

FedEx trains its drivers on how best to perform their job and to interact with customers. The OA provides that, during the first 30 days of the contract term, FedEx "shall ... familiarize [drivers] with various quality service procedures developed by FedEx." The OA requires drivers to conduct themselves "with integrity and honesty, in a professional manner, and with proper decorum at all times."

A driver's managers may conduct up to four ride-along performance evaluations of the sriver each year, "to verify that [the driver] is meeting the standards of customer service" required by the OA. After finishing a ride-along evaluation, managers are to give immediate feedback to drivers about the quality of their work. Drivers must follow FedEx's "Safe Driving Standards." These standards prohibit many illegal acts, such as "[d]riving while under the influence of alcohol or drugs" and "[u]sing a motor vehicle in the commission of a felony." They also forbid some legal conduct, including "[d]riving a motor vehicle in a speed exhibition, contest or drag race" and "[c]arrying passengers not authorized by FedEx."

FedEx requires its drivers to provide their own vehicles. Vehicles must not only meet "all applicable federal, state and municipal laws and regulations," but also must be specifically approved by FedEx. All vehicles must be painted "FedEx white." They must be marked with the FedEx logo. FedEx requires vehicles to have specific dimensions, and all vehicles must also contain shelves with specific dimensions. Drivers must provide maintenance at their own expense and must "bear all costs and expenses incidental to operation" of the vehicle.

The OA requires that while vehicles are "in the service of FedEx," they must be used "exclusively for the carriage of the goods of FedEx ... and for no other purpose." Drivers may use their vehicles "for other commercial or personal purposes when [they are] not in the service of FedEx," but only if all "identifying numbers, marks, logos and insignia" are removed or covered up.

The OA allows drivers to operate more than one vehicle and route, but only "with the consent of FedEx" and only if "consistent with the capacity of the [driver's] terminal." Drivers may also

EXHIBIT L
Page 37

hire third parties to help perform their work. Third-party helpers must be "qualified_pursuant to applicable federal, state and municipal safety standards and [FedEx's] Safe Driving Standards." Drivers enter into the OA for an initial term of one, two, or three years. At the end of the initial term, the OA provides for automatic renewal for successive one-year terms if neither party provides notice of their intent not to renew. The OA may be terminated by the parties' mutual agreement; for cause, including a breach of any provision of the OA; if FedEx stops doing business or reduces operations in all or part of the driver's service area or upon thirty days' written notice.

The OA requires drivers to comply with personal-appearance _standards and wear a FedEx uniform "maintained in good condition." Drivers must keep their "personal appearance consistent with reasonable standards of good order as ... promulgated from time to time by FedEx."

*Alexander* found several factors of importance in holding that FedEx had the right to control its drivers: FedEx can and does control the appearance of its drivers and their vehicles. "FedEx dictates the vehicles' dimensions, including the dimensions of their 'package shelves' and the materials from which the shelves are made. Managers may prevent drivers from working if they are improperly dressed or groomed, or if their vehicles do not meet specifications." "Second, FedEx can and does control the times its drivers can work." "Third, FedEx can and does control aspects of how and when drivers deliver their packages. It assigns each driver a specific service area, which it 'may, in its sole discretion, reconfigure.' It tells drivers what packages they must deliver and when. It negotiates the delivery window for packages directly with its customers." (*Id.* at p. 990.) In so holding, *Alexander* discussed *Millsap* and *Arnold*, both of which applied the right to control standard.

*Millsap* also involved FedEx but from a personal injury rather than an employment perspective. The plaintiff was injured when her car was struck by a vehicle driven by an individual who was delivering parcels for FedEx and North Country Express (NCE), another delivery company. The appellate court, in affirming the trial court's summary judgment motion

EXHIBIT L
Page 38

and dismissals for FedEx and NCE, found that the individual driver was an independent contractor because he used his own car to deliver the packages, furnished his own gas and oil, furnished his own liability insurance, paid for whatever car repairs were necessary and was paid on a "per route" basis; i.e., he was paid a lump sum based on the distance traveled to deliver the packages he delivered. Also, "he would be called if there were packages available for delivery, or he would stop by to see if there was anything available. He received no employee benefits and no taxes were withheld by NCE from his paychecks. Other than to say 'be careful' or to give him directions to a particular location, or possibly to tell him to deliver the packages in the order received, NCE did not instruct (the driver) how to make the deliveries or how to drive his car. (He) was required to obtain a signed confirmation of delivery which he then returned to NCE. NCE gave him a Federal Express Guide and a list of prices, apparently so that he could answer questions posed by the persons to whom the packages were delivered." (*Id.* at p. 431.)

*Arnold* was a suit by a former insurance agent for Mutual of Omaha who sued it for unpaid employee benefits after leaving the company. She appealed from a summary judgment in favor of defendant Mutual, in which the trial court determined that she was an independent contractor rather than an employee. The critical facts in affirming the trial court's dismissal were that Arnold had the responsibility to maintain the proper licenses to solicit and procure applications for Mutual's products; she was paid by commissions for products she sold; either party could terminate the contract with or without cause through written notice to the other (*id.* at p. 584); she did not receive performance evaluations; her work was not monitored or supervised; attendance at training sessions was not required; she was required to pay for her own business expenses; Mutual did not provide business cards, vehicles, or computers free of charge and agents, such as Arnold, if they chose to work out of the Concord, California office, were required to pay monthly fees to cover "workspace and telephone service." (*Id.* at p. 585.)

The facts of *Estrada*, in which the court, in part, affirmed a trial court order granting class certification for FedEx drivers and the finding that the drivers were employees, are substantially similar to those in *Alexander*. The drivers were subject to an Operating Agreement, the terms of which required the drivers to provide their own trucks, mark the trucks with the FedEx logo, pay all

EXHIBIT L
Page 39

costs of operating and maintaining the trucks and use them exclusively in the service of FedEx (or mask the logo if the truck is used for any other purpose). A driver leases a scanner from FedEx and purchases or leases a truck (usually obtained from FedEx preferred vendors) that meets FedEx's size, model and condition specifications, paints the truck "FedEx White," and applies the FedEx logo to the truck.

Drivers work full time and exclusively for FedEx, and must work every day FedEx provides service unless they have preapproved replacements. FedEx sets the drivers' work hours (9.5 to 11 hours a day). Trucks must be parked in assigned spots and loaded by FedEx employees with the packages assigned to the driver by management (the drivers may not refuse an assignment). FedEx adjusts the number of assigned packages (thereby controlling the driver's hours and pay) by "flexing" from an adjacent route to balance the workload between drivers and in furtherance of its goal—deliver "every package, every day." Almost all drivers participate in the flex program.

The driver must provide "fully competitive" service to a "primary service area" assigned by FedEx, and the Operating Agreement acknowledges the driver's "proprietary interest" in his primary service area's customer accounts—but gives FedEx the right to reconfigure primary service areas (and to reassign packages to another driver) if the volume of packages in the driver's primary service area exceeds the amount the driver could reasonably be expected to handle on any given day. Drivers may not leave the terminal at the beginning of the workday until sorting is completed, and terminal managers may contact drivers during the day about additional assignments. Drivers may "sequence" the order of deliveries and pickups but must meet all pickup and delivery times or "windows" arranged by FedEx's sales representatives and certain customers. These windows affect a driver's ability to sequence his or her own route. Drivers must comply with FedEx's rules for obtaining signatures on scanners, releasing packages without signatures, special handling of overnight and C.O.D. packages, and tracing undelivered or improperly delivered packages. Drivers must place their scanners in their computers after each delivery and, at the end of each day, must return to their assigned terminal

EXHIBIT L
Page 40

1  parking spaces, deliver all paperwork and cash from C.O.D. payments, download their scanners,
2  and provide details about any unsuccessful deliveries.

3      When on any given day a driver makes no attempt to deliver a package, misses a pickup time
4  or window, or is the subject of a complaint, the matter must be discussed with the terminal
5  manager who, in addition, meets with each driver twice each year to communicate and document
6  shortcomings. Several times each year, terminal managers evaluate each driver's performance by
7  means of a "customer service ride" and there are covert checks and security audits conducted in
8  the field. Each driver receives an annual progress review. Terminal managers decide which
9  "failures to service" or alleged breaches of the Operating Agreement to document, and they have
10  discretion (subject to the regional managers' and upper management's approval) to recommend
11  termination or nonrenewal.

12      Drivers must also "cooperate" with FedEx's employees, customers, and other drivers for the
13  common goal of efficient pickup delivery; wear a FedEx-approved uniform and maintain his or her
14  appearance "consistent with reasonable standards of good order." Drivers are paid weekly at rates
15  set by FedEx without negotiation (the drivers' rate is based on a daily rate, a piece rate for packages
16  handled, and bonuses for length and quality of service).
17

18  *Estrada* found that FedEx had the right to control "every exquisite detail of the drivers'
19  performance, including the color of their socks and the style of their hair … The drivers must
20  wear uniforms and use specific scanners and forms, all obtained from FedEx and marked with
21  FedEx's logo. The larger items—trucks and scanners—are obtained from FedEx-approved
22  providers, usually financed through FedEx, and repaid through deductions from the drivers'
23  weekly checks. Many standard employee benefits are provided, and the drivers work full time,
24  with regular schedules and regular routes. The terminal managers are the drivers' immediate
25  supervisors and can unilaterally reconfigure the drivers' routes without regard to the drivers'
26  resulting loss of income." ¶ Drivers "must be at the terminal at regular times for sorting and
27  packing as well as mandatory meetings, and they may not leave until the process is
28  completed. The drivers are not engaged in a separate profession or business, and they are paid
29

41

EXHIBIT L
Page 41

weekly, not by the job. They must work exclusively for FedEx. Although they have a nominal opportunity to profit, that opportunity may be lost at the discretion of the terminal managers by "flexing" and withheld approvals, and for very slight violations of the rules." (*Id.* at pp. 11-12.)

### B.    ██████ was an Independent Contractor Rather than an Employee of Uber's

#### 1.    ██████ as a livery driver

Other than the Agreement, itself, which has already been discussed as not being determinative as to whether ██████ is an employee, ██████'s status must be analyzed in two parts: his position as a livery partner and as a driver for Uber. From the description in the Agreement and from Rosenthal's testimony, it is undisputed that livery partners are treated differently by Uber. A livery partner may employ individuals who drive for Uber. It pays the drivers according to a scale or rate determined by the livery company. Livery companies are regulated by the State of California, which requires that the company have a permit. Drivers with a livery partner are not screened by Uber. Uber does not direct its livery partners how to use its drivers. Uber does not require the inspection of vehicles on the livery side.

The fact that ██████ was unsuccessful in being unable to hire drivers for his ██████ ██████ company does not make it any less a livery business. (Rosenthal said that Uber did not reject ██████'s drivers; instead, the drivers never completed Uber's "onboarding" process.) Thus, any person who is a livery company or has been "hired" by a livery company licensed with the State of California to drive on an Uber platform is not within the control of Uber and Uber has no right to control that person. The analysis does not end here because it is unclear when, or if, ██████ stopped being a livery partner and became a driver for Uber. Thus, it is also necessary to examine ██████'s relationship as a driver with Uber. The facts that demonstrate that Uber did not have the right to control ██████ will be discussed first.

//

42

EXHIBIT L
Page 42

## 2.   Factors that do not constitute the right to control

Uber does not provide drivers with a manual or handbook. Drivers are instructed (in this instance, at a Santa Monica location) how the app works and what was expected of them. Witness 1, the former Uber driver, said the training was mandatory. Rosenthal testified otherwise. He said that drivers need only watch a fifteen-minute video shown at a "green-light hub" or presented by an Uber operations manager on how to use the app. The video also provides customer service tips. The conflict between Witness 1 and Rosenthal is not material because, even if Witness 1 's version is accepted, the training is modest and brief, at best.

Uber requires that drivers provide their own vehicles, whether they are owned or leased, pay for any repairs on the vehicles, the gas used and the liability insurance coverage. The type of car (luxury to a basic four-door sedan) will determine which platform the driver is eligible for. The vehicle must also be in good operating condition and be clean and sanitary.

████████ and Witness 1 testified, in effect, that drivers were required to either rent or buy from companies affiliated with Uber. Rosenthal denied that Uber "partners" with any car dealer or rental companies. Instead, it "connected" drivers with lenders that would lease vehicles to the drivers. (The use of the term "connected" was not further explained.) He said that Uber, itself, has a subsidiary called "Exchange Leasing" that purchases vehicles and leases them to driver partners. (This subject, too, was not further developed; for example, it was not shown whether ████████ ever leased a vehicle from Exchange Leasing.) In the absence of evidence confirming ████████ 's and Witness 1 's conclusions, it is found that Uber does not require that drivers must buy or lease with Uber-affiliated companies.

Uber provides suggestions to drivers, which do not have to be followed, such as return lost items; offer complimentary refreshments, such as water and gum; be professional and avoid using inefficient routes, dirty cars, use of a cell phone and poor driving. It was also suggested that drivers have cell phone chargers in their cars to keep the customers happy.

EXHIBIT L
Page 43

According to Rosenthal, the State of California requires that the cars of non-livery drivers must be inspected.

Uber does not guarantee its drivers the number of rides they shall be given, does not require a minimum amount of time a driver must be online, allows its drivers to drive for competitors and to be available to both Uber and the competitor at the same time and does not tell drivers where to drive while they are on the app. (Uber might "encourage" drivers to participate in certain "surge" events by offering a higher volume of calls for their participation in the "surge.") Uber drivers establish their own schedules; have no required start time; take as long as they want for lunch; do not tell Uber when they are going to be off the app and do not need permission to be off the app. These conditions are consistent with par. 2.4 of the Agreement which states:

Customer acknowledges and agrees that it has complete discretion to operate its independent business and direct its Drivers at its own discretion, including the ability to provide services at any time to any third party separate and apart from Transportation Services. For the sake of clarity, Customer understands that Customer retains the complete right to provide transportation services to its existing customers and to use other software application services in addition to the Uber services.

Uber does not require either a livery customer or driver to wear a uniform or any other clothing displaying Uber's or any of its Affiliates' names, logos or colors.

These factors, individually, or in the aggregate, establish that Uber did and does not have the right to control ███████ or any comparable driver.

### 3.  Factors that arguably may constitute the right to control drivers

Facts from which it may be inferred that Uber has the right to control drivers include the following: Every person who drives for Uber, whether it be with a livery company or as an

44

EXHIBIT L
Page 44

individual, must agree to the terms of a software license and online services agreement before they can have access to the app and, therefore, drive for Uber.

Uber sets base or default fares, including the per-minute, per-mile and minimum-fare rates, for each of its platforms. Uber also retains the right to change the fare calculation at any time in its discretion based upon local market factors. Drivers have no input on the fares passengers are to be charged. Drivers pay a licensing fee established by Uber to Uber from each fare collected. The fee varies, depending on the platform used in the particular instance.

Uber discourages its drivers from soliciting tips from passengers and ▮▮▮▮▮ accepted tips, while driving on the app, even though he knew the practice was discouraged. Uber did not deactivate drivers in Los Angeles who accepted tips.

Uber uses ratings by passengers in evaluating drivers which may lead to its deactivating (i.e., terminating) drivers whose average rating falls below the acceptable standard for the area in which the driver operates, in this instance Los Angeles County. Passengers are not given criteria or standards for rating drivers between a 1 to 5 scale. In Los Angeles, a driver could be deactivated if his or her rating fell below 4.65 or 4.70. The minimum rating was created by looking at a distribution curve and at various standard deviations below the curve. Uber drivers in Los Angeles are notified of their ratings by email and receive weekly "report cards." Rosenthal explained that the rating average of 500 trips helps to determine whether drivers are meeting Uber's minimum business standards.

Drivers may also be deactivated for refusing to accept trips when offered on the app. There was no uniformity on the percentage of refusals which may lead to deactivation: ▮▮▮▮▮ thought that drivers must accept at least 85 percent of the trips offered; Witness 1 said it was 80 percent and Rosenthal said that drivers are deactivated when their cancellation rate is "abnormally high," which is usually greater than 50 percent of the trips. Regardless, Uber does terminate drivers "for the general health of the platform" who refuse to accept too many trips

45

EXHIBIT L
Page 45

because the refusal to pick up a rider causes that rider to wait longer for a car and becomes a "poor rider experience."

Uber also deactivates drivers in California for "material" breaches of the software licensing agreement, which can include reckless driving, inappropriate behavior (such as hugging a passenger) and asking riders for their telephone numbers. More specifically, the Agreement, at par. 12.2, provides for termination by Uber its customers or drivers in the following circumstances:

Either party may terminate this Agreement: (a) without cause at any time upon seven (7) days prior written notice to the other party; (b) immediately, without notice, for the other party's material breach of this Agreement; or (c) immediately, without notice, in the event of the insolvency or bankruptcy of the other party, or upon the other party's filing or submission of request for suspension of payment (or similar action or event) against the terminating party. In addition, Uber may terminate this Agreement or deactivate Customer or a particular Driver immediately, without notice, with respect to Customer and/or any Driver in the event Customer and/or any Driver, as applicable, no longer qualifies, under applicable law or the standards and policies of Uber, to provide Transportation Services or to operate the Vehicle, or is otherwise set forth in this Agreement.

Par. 2.4 of the Agreement provides a more general basis for termination:

Uber retains the right to, at any time in Uber's sole discretion, deactivate or otherwise restrict Customer or any Driver from accessing or using the Driver App or the Uber Services in the event of a violation of this Agreement, a violation of a Driver Addendum, Customer's or any Driver's disparagement of Uber or any of its affiliates, Customer's or any Driver's act or omission that causes harm to Uber's or its Affiliate's brand, reputation or business as determined by Uber in its sole discretion, or for any other reason at the reasonable discretion of Uber.

EXHIBIT L
Page 46

Drivers who have been deactivated may take a course to regain access to the Uber app. The course is not a requirement for reactivation.

*Ayala* noted, in instructing how the various *Borello* factors shall be applied, that the right to fire at will and the basic level of skill called for by the job are of inordinate value and that other factors, such as the owner of the instrumentalities and tools are of "only "evidential value." (*Supra*, 59 Cal.4th at p. 539.)

Although the Agreement herein contained a provision that either Uber or the driver could terminate the relationship without cause upon seven day's notice (which is comparable to an at-will termination, which may not include a notice clause), that language does not have the importance *Ayala* placed upon it because the Agreement also provides several other bases for termination: a material breach of the Agreement; a violation of a driver addendum; disparagement of Uber; an act that causes harm to Uber's brand or reputation; insolvency or bankruptcy of a party and a driver no longer qualifies under existing law or Uber's policies to operate a vehicle. Further, there was no evidence introduced at the hearing that ███████ or his peers were ever terminated without cause.

The circumstances in this case are much closer to those in *Millsap* and *Arnold* than those in *Alexander* and *Estrada*. Uber drivers are not supervised; supply the cars they drive; do not wear Uber uniforms or signage; can drive simultaneously for any competitor, including Lyft, Uber's biggest competitor; are paid for each ride and have the unfettered option to work as little or as much as they want and wherever they want in the geographical location assigned to their platform. The fact, alone, that Uber has an active interest in deactivating certain drivers does not establish an employer-employment situation because an employer "is permitted to exercise a certain measure of control for a definite and restricted purpose without incurring the responsibilities or acquiring the immunities of a master, with respect to the person controlled." (*Bohanon v. James McClatchy Publishing Co.* (1936) 16 Cal.2d 188, 199; see also *Milsapp, supra*, 227 Cal.App.3d 425, 432.) Uber's right to require drivers to use an app to obtain rides and

EXHIBIT L
Page 47

to set passenger fares and the percentages that drivers shall receive from those fares and to terminate drivers who do not meet passengers' and Uber's standards fall under the same rubric and do not constitute the right to control drivers.

### VIII.   CONCLUSION

Because ▮▮▮▮▮▮▮▮▮▮ has not proven by a preponderance of evidence that he was an employee of Uber Technologies, Inc., his claim(s) against that company are dismissed with prejudice.

November 23, 2016

Hon. Michael D. Marcus (Ret.), Arbitrator

48

EXHIBIT L
Page 48

# REQUEST FOR CERTIFIED MAIL

| Case Name: | *v. UBER* |
|---|---|
| Addressee: | Caleb L. Marker, Esq.<br>Bradley C. Buhrow, Esq.<br>ZIMMERMAN REED<br>2381 Rosecrans Avenue, Suite 328<br>Manhattan Beach, CA 90245 |
| AFFIX LABEL HERE: | 7015 1520 0001 8077 0554 |
| Case Manager: | Christie Woo |
| Date: | November 23, 2016 |

| Case Name: | *v. UBER* |
|---|---|
| Addressee: | Andrew Spurchise, Esq.<br>LITTLER MENDELSON<br>650 California Street, 20th Floor<br>San Francisco, California 94108 |
| AFFIX LABEL HERE: | 7015 1520 0001 8077 0530 |
| Case Manager: | Christie Woo |
| Date: | November 23, 2016 |

| Case Name: | *v. UBER* |
|---|---|
| Addressee: | Sophia Behnia, Esq.<br>UBER TECHNOLOGIES, INC.<br>1455 Market Street Floor 4<br>San Francisco, California |
| AFFIX LABEL HERE: | 7015 1520 0001 8077 0547 |
| Case Manager: | Christie Woo |
| Date: | November 23, 2016 |

EXHIBIT L<br>Page 49

# PROOF OF SERVICE

**State of California**
**County of Los Angeles**

I certify that I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1900 Avenue of the Stars, Suite 250, Los Angeles, California 90067.

On November 23, 2016, I served the foregoing document described as the **BINDING ARBITRATION AWARD** on the interested parties in this action as follows:

Caleb L. Marker, Esq.
Bradley C. Buhrow, Esq.
ZIMMERMAN REED
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
caleb.marker@zimmreed.com
brad.buhrow@zimmreed.com

Andrew Spurchise, Esq.
LITTLER MENDELSON
650 California Street, 20th Floor
San Francisco, California 94108
aspurchise@littler.com

Sophia Behnia, Esq.
UBER TECHNOLOGIES, INC.
1455 Market Street Floor 4
San Francisco, California
sbehnia@uber.com

  X   **BY U.S. CERTIFIED MAIL,** I placed a true copy of the document described above in a sealed envelope and caused such envelope with postage thereon to be placed in the United States mail at Los Angeles, California.

      **BY FACSIMILE,** I caused such to be faxed to the attorneys on November 23, 2016

  X   **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address *patricia@adrservices.org* to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

      **BY PERSONAL SERVICE,** I caused such envelope to be delivered by hand to the attorneys on November 23, 2016.

  X   **STATE** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

      **FEDERAL** I declare under penalty of perjury under the laws of the United States that the above is true and correct.

Executed on November 23, 2016 at Los Angeles, California

Patricia Taylor