CALIFORNIA UNEMPLOYMENT INSURANCE APPEALS BOARD
DECISION OF THE ADMINISTRATIVE LAW JUDGE SAN JOSE OFFICE OF APPEALS
-------------------------------------------------   (408) 277-1561

DATE MAILED: AUG 0 2 1996

CASE NO: C-T-74857
         C-T-72946
         C-T-72945

DATE APPEAL FILED:
NOVEMBER 21, 1994

PETITIONER:  KIT KAT CLUB
             AND CANDID CLUB
             c/o G J MAC DONNELL
             650 CALIFORNIA ST. 20TH FLOOR
             SAN FRANCISCO, CA  94108-2693

ACCOUNT NO.:  209-2090

DATE AND PLACE OF HEARING:
DECEMBER 5, 6, 7, 1995
JANUARY 9, 1996
SAN JOSE, CA

EMPLOYMENT DEVELOPMENT DEPARTMENT
RESPONDENT

PARTIES PRESENT:
PETITIONER
RESPONDENT

Petitions for reassessment were filed by the above-named petitioners to assessments levied by the Department for unpaid contributions, state personal income tax, penalty, plus interest based upon unreported earnings of entertainers who performed services in business establishments owned and operated by petitioners.

STATEMENT OF FACTS

Vilik/Orten Entertainment, Incorporated, and Mariah Inn Incorporated are interrelated business entities that own and operate the Candid Club and the Kit Kat Club. Petitioners purchased the Candid Club in December 1991. The Department levied an assessment against petitioners' Candid Club for the period from October 1, 1991, through September 30, 1993, in the amount of $52,423.28 in contributions, $66,293.60 for California Personal Income Tax, $11,881.70 in penalty, plus interest. The Department agreed at the hearing that the assessment should only be for the period beginning December 1, 1991, rather than October 1, 1991.

The Department levied an assessment against petitioners' Kit Kat Club for the period from October 1, 1993, through June 30, 1994, in the amount of $13,832 in contributions, $24,897.60 in California Personal Income Tax, $3,872.96 in penalty, plus interest.

EXHIBIT V
Page 1

The Department also levied an assessment against petitioners' Kit Kat Club for the period July 1, 1993, through June 30, 1994, in the amount of $35,641.94 in contributions, $64,800 in California Personal Income Tax, $10,044.20 in penalty, plus interest. Petitioners began operation of the Kit Kat Club in December 1993.

Both the Candid Club, and the Kit Kat Club provide female dancers as entertainment to patrons. The Candid Club serves alcoholic beverages. Female dancers performing at that establishment must conform to state laws governing the dress of individuals working or performing in an establishment serving alcoholic beverages. The performers are referred to by the business as "exotic dancers." They perform a number of different dance routines but must wear at least a bikini. Various kinds of other entertainment is available such as card tables, pool tables and television.

The Kit Kat Club serves no alcoholic beverage and is not limited by the same restrictions as the Candid Club. Consequently, female performers are allowed to completely undress and are referred to as "nude dancers." Food is provided at the Kit Kat Club and during the work week, patrons are given a free lunch. A door charge is made of $10 to $12 per person.

At both establishments, the dancers' income primarily consists of monies paid them by patrons of the establishments during and at the end of their dance routines. No set amount is given to dancers by the patrons. The amount received varies considerably, depending upon the number of customers during a particular performance, how well a particular performance is received by a patron, and in some cases, whether a patron is a regular follower of a particular performer.

Petitioners set aside one evening each week for potential performers to audition. Those who show promise are allowed to take part in providing entertainment to patrons of the establishment. Some of those who audition have had experience in dance, in gymnastics, and in providing adult entertainment. Some have not had experience but have a facility for quickly learning what is required. The basic criteria is whether the individual can perform in a manner that the patrons would find entertaining and willing to pay money to support the entertainment. The petitioners feature live entertainment during the day and evening. Performers are asked what shifts they are available and a schedule is prepared weekly. The petitioners try to schedule enough dancers to ensure coverage. Dancers who must miss a scheduled shift for illness or any other reason are expected to notify the petitioner in advance so that a replacement can be obtained.

CT-74857/72946/72945               2

EXHIBIT V
Page 2

The dancers provide their own costumes, select their own music, and make up their own routines based upon their costumes and music selected.

Equipment is provided at the establishments for the playing of music. If music selected proves offensive to customers, the dancer can be asked to refrain from such offensive music at least while the customer is frequenting the establishment.

Both establishments have strict rules about contact between dancers and patrons. These rules are intended to prevent any violation of state or local laws. Treatment of dancers or patrons who violate the rules is similar. Rules are posted about prohibited conduct. A violation of the rule can lead to a warning of the patron or dancer or both. If the patron or dancer was unaware of the rule and exhibits a satisfactory attitude upon being warned, the patron or dancer is allowed to remain in the establishment. Repeated violations of rules prohibiting certain kinds of conduct could result in removal of a patron from the establishment, removing a dancer from one or more shifts, or taking the dancer off schedule and not allowing her to continue performing at the establishment.

Performers are not allowed to ask, nor are patrons allowed to offer, monies directly to performers prior to or as a condition of performing specific acts except for dances on the center stage. Such non center stage related activities include a dancer sitting or standing on a table in front of a customer and wiggling or otherwise performing movements for the customer's entertainment, sitting on the lap of a customer which could include wiggling, and otherwise engaging in individualized personal entertainment as compared to being on a center stage for view by all patrons. At the Kit Kat Club, patrons could purchase a ticket for $10 to $12 for table or lap dancing and ask if a particular dancer were willing to engage in such activity. If so, the dancer would take the purchased ticket from the patron, perform the activity and turn in the ticket for one half of the proceeds for the activity. In addition, the performer could receive and the patron could give tips or extra money in appreciation for the activity.

For several months, in response to some dancers who had experienced similar activities in San Francisco, a portion of the establishment at the Kit Kat Club was designated as an X-rated room. In such a room, dancers would perform simulated sex acts with props or other female dancers. The petitioners charged an additional fee for entrance into the X-rated room. However, the dancers received compensation only from patrons who paid such extra monies as appreciation for the performance. Announcements were made on a regular basis that the dancers' pay was primarily and mostly "tips" from customers, who were encouraged to show

their appreciation of the performers by being generous in their "tips."

Performers were expected to leave 10 percent of tips received from customers for the benefit of workers who were considered employees by the petitioner. These workers included the manager, the bartender, the disc jockey, bouncers, and a door man. The petitioner kept a staff at the establishment to perform necessary services, maintain control, and ensure the safety of the dancers as well as other employees. Patrons who attempted to violate rules of the establishment were either not admitted or rejected after admission when the violation was discovered. Patrons were not allowed to bring illegal drugs or alcohol to the establishment, weapons were not allowed, and strict adherence to rules relating to touching or giving money to dancers were enforced.

To ensure safety of dancers, they were required to remain in the establishment's premises during their shifts. If any needed to go outside to their car, an escort was provided to ensure their safety. The dancers were encouraged to send out for food rather than go to a restaurant so that their safety could be maintained.

No reporting of tips received was given to the petitioners by the dancers. On occasion, at the Kit Kat Club, a writing was used to list the names of the dancers and what portion of their tips they left for employees of the petitioner. Some dancers left more ten percent of tips received and some less, depending upon their success on a particular night in obtaining money from patrons. No such "tip out sheet" was used at the Candid Club.

A dressing room and locker were provided by the petitioners to the dancers. The dancers were responsible for providing their own lock as well as all costumes, make up, props, and other materials including music used in the individual dancer's performance.

Many of the dancers worked elsewhere as well as for the petitioner. Some would perform elsewhere from time to time and then return. Some performed other kinds of services such as modeling while continuing to provide dancing services at the petitioners' establishments.

The petitioners from time to time engaged the services of well-known entertainers which were referred to as "head liners." These entertainers had received publicity in various magazines, in movies, or in other media. The head liners usually had an agent and were paid by the petitioners to perform for a specified period of time. A separate dressing room was provided for the head liners by petitioners. The head liners in addition to monies paid by the petitioner for a performance received tips from patrons in appreciation of their performance. The head

CT-74857/72946/72945                    4

EXHIBIT V
Page 4

liner dancers also left 10 percent of their tips for employees of the petitioners.

The dancers found that the bouncers, the bartenders, and disc jockey who played music and announced their names at the beginning of their routine would show much enthusiasm and help excite the patrons to appreciate a particular performance when the performer was generous in sharing her tips usually about ten percent of what she received. The performer also found that employees were more willing to provide escort service to her car when she left and carry baggage when she would share a portion of her tips.

After a dancer was deemed eligible by petitioners following an audition, an agreement was entered into between the petitioner and the performer which designated that the performer would be an independent contractor whose income would be based primarily if not entirely upon tips from customers in appreciation of the performance. The performers were told that they could indicate what shifts and what days they were available to perform and would be responsible for their own taxes, costumes, music, and other props necessary to perform their routine. No other requirement was made of the performer other than she show up as scheduled or let the employer know well in advance so that an adequate substitute could be obtained. The performer was also informed that she must obey rules of the establishment relating to adhering to various state and local laws and safety in the establishment.

The Department contended that the dancers were employees of the petitioners, that the monies received from patrons constituted wages from the petitioner, and that the petitioners intentionally disregarded their obligation of withholding and paying over contributions and taxes to the state as required.

The petitioners contended that the dancers were independent contractors and monies received from patrons were tips not earnings from the petitioner. The petitioners further contended that no writing was given to the petitioners by the performers showing the tips received so that the petitioners were under no obligation to make deductions or report earnings, particularly when no monies were paid to the performers by the petitioners except for splitting amounts received from tickets to table dances, lap dances, or other kinds of specialty dances.

REASONS FOR DECISION

Section 1127 of the Unemployment Insurance Code provides that if the Department is not satisfied with any return made by any employing unit of the amount of employer or wage earner contributions, it may compute the amount required to be paid upon the basis of facts contained in the return or returns or may make an estimate upon the basis of any information in its possession and make an assessment of the amount of the deficiency. If any part of the deficiency is due to negligence or intentional disregard of the law, a penalty of 10 percent of the amount of the deficiency shall be added to the assessment.

Contributions are due the Department from employers with respect to wages paid in employment for unemployment insurance (section 976 of the Unemployment Insurance Code), disability insurance (section 984 of the code), employment training (section 976.6 of the code), and personal income taxes (section 13020 of the code).

Section 601 of the Unemployment Insurance Code provides as follows:

"601. 'Employment' means service, including service in interstate commerce, performed by an employee for wages or under any contract of hire, written or oral, express or implied."

Section 621(b) of the Unemployment Insurance Code defines "employee" to include "Any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee."

Unemployment insurance taxes accrue only on amounts paid as remuneration for services rendered by _employees_. The relationships of employer and employee and of principal and independent contractor have long been recognized to be mutually exclusive. They cannot exist simultaneously with respect to the same transaction. The proof of the one status automatically precludes the existence of the other. Accordingly, the services of an independent contractor are not "employment" within the meaning of Unemployment Insurance Code Section 601, and the remuneration paid for such services is not taxable (Precedent Decision P-T-2).

In <u>Empire Star Mines Co., Ltd.</u> v. <u>California Employment Commission</u> (1946) 28 Cal. 2d 33, the Supreme Court of California stated:

". . . In determining whether one who performs services for another is an employee or an independent contractor, the most important factor is the right to control the manner and means of accomplishing the result desired. If the employer has the authority to exercise complete control, whether or not that right is exercised with respect to all details, an employer-employee relationship exists. . . ."

In the instant case, the relationship between the petitioners and the individual performers were structured in such a manner that the petitioner did not have complete control with respect to the details in which the dancer did her performance. The dancer decided upon her routine, she selected her music, and she determined the appropriate costumes to use for her performance in interpreting the music selected. The dancer decided when she was or was not available and performed elsewhere as desired leaving when she wanted and returning later when she wanted to resume performances at the petitioners' establishments. The petitioners imposed various rules of conduct which were applicable not only to dancers but to patrons and designated employees. Such rules were to ensure conformance with safety and security as well as state and local law. Because the petitioners did not have the authority to exercise complete control with respect to of the dancers' performance, other factors must be considered to determine the status of the dancers.

The following factors are considered in determining whether or not an employment relationship exists (<u>Tieberg</u> v. <u>California Unemployment Insurance Appeals</u> Board (1970) 2 Cal. 3d 943, 950):

1. Which party has the right to control the manner and means of accomplishing the result desired;

2. Whether there is a right to discharge at will, without cause;

3. Whether or not the one performing services is engaged in a distinct occupation or business;

4. Whether the work is usually done under the direction of an employer, or by a specialist without supervision;

5. The skill required;

6. Who supplies the instrumentalities, tools, and place of work of the one performing services.

CT-74857/72946/72945                    7

EXHIBIT V
Page 7

7. The length of time for which the services are to be performed;

8. The method of payment, whether by time or by the job;

9. Whether or not the work is part of a regular business of the beneficiary of the services.

10. Whether or not the parties believe they are creating a relationship of master and servant.

In the instant case, the performers had control over the kind of performance they would give including selection of music, selection of costumes, and selection of routine to coincide with the costumes and music. The performers selected which days and shifts they wished to perform and during a particular shift could change with other performers the sequence of the performances. The performers assumed the risk of receiving any compensation for their performance as it was almost solely based upon monies given them by patrons. The amount of money was not fixed but varied between patrons and between performers. Patrons could give as little or no money or as much as they wished during and following a performance by a dancer. The dancers received one half or more of monies paid by a patron for a specialty dance but the performers could elect whether or not to perform the specialty dance. The performers therefore made many of the decisions that affected their income including when they would perform, how they would perform, and how much they would "tip out" to the employer's staff for services rendered to them by the staff. Both the performers and the employer understood at the outset that the performers would be independent contractors rather than employees, that the performers would be responsible for their own taxes, and most of their income would be from patrons as rewards for appreciation of their performance. A new schedule was made up each week based upon which performers stated wished they to work a particular week. New performers were auditioned regularly and were available to replace any performers who elected not to perform a particular week for whatever reason. Performers who stopped for one or more weeks were free to return and again get on the schedule.

The ability and skill needed to perform exotic and nude dances in public in an entertaining manner has been well recognized as well as the fact that such dances are artistic expressions of exotic emotion.

As Judge Posner explains in his concurring opinion in *Miller v. Civil City of South Bend* (7th Cir. 1990) 904 F.2d 1081, rev'd on other grounds, sub nom, *Barnes v. Glen Theater, Inc.* (1991) 111 S. Ct. 2456

> Public performance of exotic dances debuted in Western culture in the satyr plays of the ancient Greeks, were suppressed by Christianity, and with Christianity's grip loosening, reappeared in the late nineteenth and early twentieth centuries. They reappeared in a variety of forms: as the can-can and the music-hall chorus line, from which the Folies Bergere and its tame American counterparts--the Ziegfeld Follies, and more recently the Radio City Music Hall Rockettes and the chorus lines in Broadway and Hollywood musicals-- descend. . . . Examples of exotic dance in non-Western cultures include not only belly dancing but also the overtly exotic nude dancing of Les Ballets Africains de Keita Fobeda, which, but for its exoticism, would be considered shockingly explicit. For a remarkable description of fertility dance, Sachs, World History of the Dance, 85-104 (1937); on exotic and nude dancing generally, see Cheshire, *Exoticism in the Performing Arts*, in Webb, the Exotic Arts 297-306 (rev. ed. 1983); Sorell, Dance in Its Time 425-28 (1986). . . . Exotic dances express exotic emotions, such as sexual excitement and longing . . . The striptease was not invented in order to place a cultural patina on displays of naked women. Of course, there will be no female striptease without a prurient interest in the female body; but that is just to say that there would be no exotic art without Eros. . . . The striptease is the ensemble of the music, the dance, the disrobing, and the nude end state; it is more exotic that any of its components; and what makes it more exotic than the body itself, or the disrobing itself, is precisely, that it is *expressive of exotic emotion*. . . .

The evidence is overwhelming that the nude and exotic dancers who performed at petitioners' Kit Kat Club and Candid Club did so as independent contractors and not employees. Both the performers and the petitioners agreed at the outset of services that they would perform as independent contractors. The performers took the risk of loss or profit as no money was guaranteed but was solely dependent upon patrons watching the performance. The performers decided the dates and times they would perform, the manner in which they would perform, the kind of music to which they would perform, the costumes they would wear during the performance, and were only responsible to the petitioners for letting them know when they were available so that schedules could be coordinated. Rules of conduct were imposed by the petitioner but such rules were applicable to patrons, to the

CT-74857/72946/72945    9

EXHIBIT V
Page 9

performers, and to designated employees to ensure safety at the establishments as well as complying with any state or local laws governing such establishments. The petitioners did not have complete control and only asked the performers to "perform" leaving it up to them to decide how they would do it.

Even if the evidence would indicate that the performers provided services as employees rather than independent contractors, most of the monies received by the performers was in the nature of tips or gratuities.

Section 927 of the California Unemployment Insurance Code provides that "wages" means all tips which are received while performing services which constitute employment and included in a written statement furnished to the employer pursuant to section 6053(a) of the Internal Revenue Code. Section 927 applies with respect to wages earned on or after January 1, 1986.

Petitioners' contention is persuasive that because the performers furnished no written statement to the employer setting out tips received, such tips cannot constitute "wages" within the meaning of Code section 927. Therefore, even if one were to conclude that the performers were employees, the petitioners are not liable for any contributions, deductions, state income tax, interest, or penalties based upon any amounts received by the performers as tips. Petitioners therefore would only be liable for contributions, deductions and state income tax on monies given to performers as one half of fees charged for the specialty dances. The evidence indicates that such amounts were a minor part of what was received by the dancers for their services, primarily from patrons.

## DECISION

The petitions for reassessment are granted. The petitioners are not liable for the assessments levied by the Department.

C. L. BOTSFORD
Administrative Law Judge

THIS DECISION IS FINAL UNLESS
APPEALED WITHIN 30 CALENDAR DAYS.
FOR APPEAL OR REOPENING RIGHTS,
SEE ATTACHED NOTICE.

CLB:el

CT-74857/72946/72945                    10

EXHIBIT V
Page 10